**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

DARRICK AND YOLANDA GRIMES,

                  Plaintiffs,

vs.

FREMONT GENERAL CORPORATION,
FREMONT INVESTMENT AND LOAN,
JONATHAN TANENBAUM, AMERICA'S
SERVICING COMPANY, U.S. BANCORP, AND
U.S. BANK, NATIONAL ASSOCIATION, AS
TRUSTEE FOR MASTER ASSET BACKED
SECURITIES TRUST 2006-FRE-1,

                  Defendants.

Civil Action No. 08-cv-01024 (JGK)

**DECLARATION OF**
**STEVEN M. HECHT IN SUPPORT**
**OF MOTION TO DISMISS**
**COMPLAINT PURSUANT TO RULE**
**12(b)(6) FOR FAILURE TO STATE A**
**CLAIM**

I, **STEVEN M. HECHT**, hereby declare pursuant to 28 U.S.C. § 1746 as follows:

1.    I am a member of the law firm Lowenstein Sandler PC, attorneys for Defendants America's Servicing Company ("ASC"), U.S. Bancorp ("US Bancorp") and U.S. Bank N.A. as Trustee for Master Asset Backed Securities Trust 2006-FRE-1 ("US Bank/Trustee" and, collectively with ASC and US Bancorp, the "Moving Defendants") in the above-captioned matter.  As such, I am familiar with the facts set forth herein.  I submit this Declaration in support of the Moving Defendants' Motion to Dismiss the Complaint Pursuant to Rule 12(b)(6) for Failure to State a Claim.

2.    Attached hereto are true and correct copies of the following documents:

| EXHIBIT | DOCUMENT |
|---|---|
| **Exhibit A** | Complaint dated January 29, 2008 filed by Plaintiffs in this matter |
| **Exhibit B** | Exhibit 3 to the Complaint filed by Plaintiffs in this matter |

| **Exhibit C** | Exhibit 12 to the Complaint filed by Plaintiffs in this matter |
|---|---|
| **Exhibit D** | Exhibit 5 to the Complaint filed by Plaintiffs in this matter |
| **Exhibit E** | Amended Answer dated July 9, 2007 filed by Plaintiffs in the foreclosure action pending against them in New York State Court, Index No. 06-10714 |
| **Exhibit F** | Verified Complaint dated December 21, 2006 filed by U.S. Bank, National Association, as Trustee for Master Asset Backed Securities Trust 2006-FRE-1 in the foreclosure action pending against Plaintiffs in New York State Court, Index No. 06-10714 |
| **Exhibit G** | Exhibit 4 to the Complaint filed by Plaintiffs in this matter |
| **Exhibit H** | Exhibit 8 to the Complaint filed by Plaintiffs in this matter |
| **Exhibit I** | Exhibit 9 to the Complaint filed by Plaintiffs in this matter |

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated June 16, 2008

/s/ Steven M. Hecht, Esq.
Steven M. Hecht (SH-0414)

**LOWENSTEIN SANDLER PC**
1251 Avenue of the Americas
New York, New York 10020
Tel.: 212.262.6700
Fax: 212.262.7402
*Attorneys for Defendants America's Servicing Company, U.S. Bancorp, and U.S. Bank, N.A. as Trustee for Master Asset Backed Securities Trust 2006-FRE-1*

**Exhibit A**

JUDGE KOELTL

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

——————————————————————x

Darrick Grimes and Yolanda Grimes,

**08 CV 01024**

Plaintiffs,

v.

Fremont General Corporation, Fremont Investment
and Loan, WCS Lending LLC, Jonathan Tanenbaum,
America's Servicing Company, U.S. Bancorp and
U.S. Bank, National Association, as Trustee for
Master Asset Backed Securities Trust 2006-FRE-1

Defendants.

——————————————————————x

Civil Action No.:
Jury Trial Demanded

**COMPLAINT**

## PRELIMINARY STATEMENT

1.      The ownership of a home is a fundamental bridge to financial security that has become an indispensable part of the "American Dream". It is the bedrock of economic security, as well as the primary vehicle by which families build wealth. Each year, predatory lending extracts billions of dollars of wealth from African-American homeowners and low-income and minority communities, depriving homeowners of their hard-earned equity and vitiating the promise of financial security that is the cornerstone of homeownership. Home equity accounts for more than one-third of the average net wealth of United States households. The lending industry has a long history of engaging in racial discrimination in connections with mortgage loans made to African-Americans, with products and terms that are drastically worse than those given their Caucasian counterparts.

2.      Predatory lenders target the equity, and ultimately the homes, of vulnerable homeowners by extending unaffordable loans packed with excessive fees and interest rates. In recent years, predatory lenders have aggressively marketed an array of "exotic" or "non-traditional" loans to vulnerable homeowners. Many of these loans carry deceptively low initial "teaser" rates and other abusive terms, which obscure the true cost of the loan. By qualifying the

1

borrower for these loans at the initial rate, despite the borrower's inability to make future payments, lenders almost guarantee that the borrower will default on the loan.

3.     Predatory lenders aggressively fuel this process by rewarding mortgage brokers with an incentive structure that pays the broker more compensation through the yield spread premium ("YSP") for steering consumers into loans with higher interest rates than they qualify for with less favorable terms such as prepayment penalties. Subprime loans are high-cost mortgage products that are theoretically given to borrowers who have impaired credit. During the past 10 years, an entire "subprime" industry has been spawned by larger "profits generated by the higher rates and exorbitant fees charged to "high risk" borrowers.

4.     Predatory lenders are also rewarded through higher interest rates for making so-called stated income loans or low documentation loans where the borrower's income is not verified through traditional documentation of income— even where documentation is, in fact, available. Thus, it is not surprising that the proliferation of predatory loans in the subprime mortgage market is one of the primary causes of the nationwide foreclosure epidemic.

5.     In 2006, the Center for Responsible Lending, a non-profit research organization, found that even when income and credit risk were accounted for, African-American were still 31% to 34% more likely to receive higher rate subprime loans, and that the disparities between them and Caucasians with the same risk factors were "large and statistically significant". The lending industry has a long history of engaging in racial discrimination in connection with mortgage loans made to African-Americans, with products and terms that are drastically worse than those given to their Caucasian counterparts. Recently, the Federal Reserve Board concluded that African-Americans were more likely to pay higher prices for mortgages than their Caucasian counterparts.

6.     The United States Inspector General cited that report as showing "significant" differences, making it "clear" that African-Americans were "much more likely to get higher-priced loans" than Caucasians. In addition to carrying higher interest rates, subprime loans to African-American are typically laden with improperly disclosed fees, including excessive

2

prepayment penalties which effectively prohibit borrowers from refinancing at a fairer rate.

7.    The Center for Responsible Lending estimates that families lose $23 billion each year from their home equity wealth because of prepayment penalties in subprime mortgage loans. African-Americans are more than three times as likely as Caucasians to be put into one of these equity-draining subprime loans. These predatory tactics have been disproportionately applied and targeted toward members of the African-American community.

8.    In addition or in the alternative, under the guise of these purportedly facially-neutral subprime loan policies and practices, Defendants, Fremont General Corporation, Fremont Investment and Loan and WCS Lending LLC had a discriminatory effect and created statistical disparities so great between African-American and Caucasian mortgagees as to be functionally equivalent to intentional discrimination. The use of Adjustable Rate Mortgages (**ARM**) consisting of a lower fixed rate for a short-term periods, followed by an increase to a higher, adjustable rate which would then increase every six month for the remaining years of the loan. These loans were known as 2/28 loans (2 year fixed/ 28 year adjustable rate).

9.    Borrowers were qualified for ARM loans based on only the initial "teaser rate" without regard to their ability to pay beyond that teaser rate. Fremont mortgage brokers often promised borrowers they could simply refinance before the ARM adjustment, without disclosing that such refinancing was entirely dependent on continued price appreciation on their home.

10.    In 2004, African-Americans homeowners who received subprime mortgage loans from Fremont Investment and Loan were 30% more likely to be issued high rate risky loans than Caucasian borrowers with the same qualifications. In another study, the National Community Reinvestment Coalition determined that lending institutions in six major metropolitan areas engaged in "pervasive discriminatory and predatory practices", including making high cost subprime loans to higher-qualified African-Americans 54% of the time, compared to 23% of the time for Caucasians, even when Caucasian applicants were similarly, and often less, qualified.

11.    These statistical disparities are not mere happenstance, but instead result from a

3

systematic and predatory targeting of African- Americans. African-American and Caucasian borrowers with the same qualifications should be treated equally. Instead, Fremont and WCS Lending have intentionally discriminated against African-American borrowers through deceptive, unfair acts and fraudulent practices to obtain a financial benefit for their own accounts. During the last decade, African-Americans have joined Hispanic borrowers in helping to fuel a multiyear housing boom, accounting for 49% of the increase in home ownership from 1995 to 2005, according to Harvard Joint Center for Housing Studies. Nonetheless, African-Americans are far more likely to have their "American Dream" unduly burdened with subprime loans than their Caucasian counterparts. While some borrowers in the subprime market are genuine credit risks, African-American borrowers have been targeted and illegally steered into subprime loans.

12.    The unsoundness and unduly lending practices by Fremont by way of 100% financing, typically through an arrangement that provided one loan for 80% and a second, piggyback loan" for 20% of the purchase price. The disproportionate impact of foreclosures on minority communities, in particular African-American communities may be a predictable, but no less disturbing, reflection of the fact that African-American borrowers are more likely to receive high-rate risky APR loans than their white counterparts, regardless of their income levels or credit scores, which again has been confirmed by the Federal Reserve Board, recently released mortgage lending data under the federal Home Mortgage Disclosure Act ("HMDA"). The Defendants have engaged in a predatory subprime lending scheme, knowingly making loans with high loan-to-value ratios, in this case to borrowers who qualify for lower-cost or prime loans, in what amounts to a kind of "reverse redlining".

13.    In September 2007, the 2006 Home Mortgage Disclosure Act data was released. The Federal Reserve Board's analysis of the data showed that high –APR lending is "notably greater" for African-Americans and Latinos than for non-white Latinos. This analysis of the 2006 HMDA data "revealed substantial differences across racial and ethnic lines in the incidence of higher-priced lending and in denial rates." The complexity of the issue should not be underestimated; we cannot ignore economic factors, but neither can we ignore a history of housing discrimination and resulting segregated housing patterns, imbalanced and unequal

access to financial services, and discriminatory lending practices.

14.    The Plaintiffs bring this lawsuit to enjoin Defendants from continuing their discriminatory practices, to compel them to adhere to compliance of applicable federal and state laws, and to ensure Defendants' continuing compliance with applicable federal and state laws.

## THE PARTIES

15.    Darrick Grimes and Yolanda Grimes are African-Americans homeowners who face the possibility of losing their home because, they fell prey to a scheme to defraud. They were defrauded through forgery of signatures on documents as well as other deceptive and fraudulent acts of misrepresentation relative to obtaining a mortgage.

16.    Darrick Grimes is an African-American male who currently lives in Newburgh, New York. Yolanda Grimes is an African-American female who currently lives in Newburgh, New York for the past two years. They currently reside in their home located at 23 Stacy Lee Drive, Newburgh, NY 12550 (the "subject property") which is the home they have resided in since October 29, 2005.

17.    Upon information and belief, Fremont General Corporation is a publicly traded corporation organized under the laws of the State of Nevada and maintains its principal place of business at 2425 Olympic Boulevard, 3rd Floor, Santa Monica, California 90404 ("**Fremont General**").

18.    Upon information and belief, Fremont Investment and Loan is a wholly owned subsidiary of Fremont General Corporation and is organized under the laws of the State of California and maintains its principal place of business at 2727 East Imperial Highway, Brea, California 92821 ("**Fremont Investment and Loan**").

19.    Upon information and belief, Fremont Investment and Loan is a licensed mortgage banker in the State of New York and is and has been at all relevant times a wholly owned subsidiary of Fremont General.

20.    Upon information and belief, at all relevant times prior to the commencement of

5

this lawsuit, Fremont Investment and Loan was owned, dominated and controlled by Fremont General.

21.    Upon information and belief, Fremont Investment and Loan is a wholesale lender, obtaining all of its loans through a network of independent mortgage brokers to sell unduly risky loans that were designed to fail, including loan products with 100% financing and adjustable rate mortgages (2/28 and 3/27 ARMs) with dramatic increases in monthly payments after two or three years.

22.    Upon information and belief, Fremont Investment and Loan requires all brokers that it contracts with to become affiliated with Fremont Investment and Loan as well as its loan approval process.

23.    Upon information and belief, Fremont Investment and Loan offers and sells its mortgage product, including the Adjustable Rate Mortgage products to consumers in the State of New York.

24.    Upon information and belief, Fremont Investment and Loan structured loan products where borrowers were qualified for adjustable rate mortgages based upon the initial "teaser" lower interest rate, without regard to their ability to repay the debt back at a higher adjustable interest rate where monthly payments would increase with the adjustment rate.

25.    Upon information and belief, WCS Lending LLC is a licensed mortgage broker under the laws of the State of Florida and maintains its principal place of business at 6501 Congress Avenue, Boca Raton, Florida 33487 ("**WCS Lending**").

26.    Upon information and belief, WCS Lending is organized under the laws of the State of Florida and is a licensed mortgage broker in the State of New York.

27.    Upon information and belief, Jonathan Tanenbaum is a licensed mortgage broker in the State of Florida and an employee of WCS Lending.

28.    Upon information and belief, Jonathan Tanenbaum and WCS Lending acted as agents of Fremont Investment and Loan in carrying out the acts described in this complaint.

NYC/366658.1

29.    Upon information and belief, American Servicing Company is the loan servicing company of Wells Fargo & Company, NA, and is a wholly owned subsidiary of Wells Fargo & Company, NA. Upon information and belief, American Servicing Company is organized under the laws of Iowa and maintains its principal place of business at One Home Campus, X2302-02J, Des Moines, Iowa 50328. ("**America's Servicing Company**").

30.    American Servicing Company is named as a necessary party to this action pursuant to Rule 19 of the Federal Rules of Civil Procedure.

31.    Upon information and belief, U.S. Bank, National Association is a national banking association and, acts as Trustee for Master Asset Backed Securities Trust 2006 FRE-1 and/or any assignee and is organized under the laws of the State of South Carolina. ("**U.S. Bank**").

32.    Upon information and belief, U.S. Bancorp is a bank holding company and maintains its principal place of business at 800 Nicollett Mall, Minneapolis, Minnesota 55402-4302.

33.    U.S. Bancorp is named as a necessary party to this action pursuant to Rule 19 of the Federal Rules of Civil Procedure.

34.    Upon information and belief, U.S. Bank, National Association, is the trustee for the securitization pool that contains the Grimes loan pursuant to a Pooling and Servicing Agreement dated August 1, 2006 between American Home Mortgage Assets, LLC, Wells Fargo Bank, N.A. and U.S. Bank, National Association as Trustee for the Master Asset Backed Securities Trust 2006-FRE-1 holds the pool and issues mortgage-backed pass through certificates.

35.    Upon information and belief, U.S Bank, National Association's principal corporate office for administration of this trust is located at 800 Nicollett Mall, Minneapolis, Minnesota 55402-4302.

36.    U.S. Bank, National Association is named as a necessary party to this action pursuant to Rule 19 of the Federal Rules of Civil Procedure.

7

37.    Upon information and belief, US Bancorp is the custodian that holds the Grimes' mortgage loan. U.S. Bancorp is a bank holding company with offices at 800 Nicollett Mall, Minneapolis, Minnesota 55402-4302.

## STATEMENT OF FACTS

38.    In 2005, Darrick and Yolanda Grimes were looking to sell their home in St. Albans, New York, to purchase their second home, a one-family property located at 23 Stacy Lee Drive in Newburgh, New York. They presently reside in this home with their two children.

39.    The Grimes' submitted an application to Washington Mutual sometime in July, 2005 for a mortgage. On or about September 5, 2005, the Grimes were informed of Washington Mutual's denial for mortgage financing. They immediately began searching for other mortgage financing, as they had put a down payment on the property located at 23 Stacy Lee Drive, Newburgh, New York and did not want to risk losing their deposit.

40.    On September 6, 2005, Yolanda Grimes' did an internet search through Nextag.com to locate a lending source. Her search revealed three different banks that would be willing to finance the transaction. Out of the three banks, Ms. Grimes chose one, Jonathan Tanenbaum of WCS Lending. The following day, Mr. Tanenbaum sent an e-mail introducing himself and his firm WCS Lending LLC as a reputable mortgage brokerage firm.

41.    Mr. Tanenbaum told the Grimes he could help them obtain their mortgage financing at a reasonable 7% interest rate, enabling them to finance the purchase of their house. Mr. Tanenbaum also told the Grimes' that because he was dealing directly with lenders and investors, he would  be able to find financing that would meet the lending guidelines and therefore incur the lowest costs possible in connection with the loan.

8

42.    Mr. Tanenbaum collected personal and income information from the Grimes' in order to process a loan application, including the Grimes social security number, driver's licenses and bank statements and arranged an appraisal of the home.

43.    On or about September 12, 2005, Mr. Tanenbaum advised the Grimes that Mrs. Grimes had pre-qualified for mortgage financing up to the amount of $418,000 based upon in his words: "specifically, your credit history and assets are excellent and your income conforms to our investor guideline. From the time of the application, I would expect to obtain a mortgage commitment in approximately two (2) weeks." The Grimes received the mortgage application and related disclosure documents for a loan with a **fixed 7% annual interest rate** on September 13, 2005. A copy of said fraudulent mortgage application and disclosure documents is attached hereto as *Exhibit 1*.

44.    Upon information and belief, on September 13, 2005 Mr. Tanenbaum and another WCS Lending employee submitted the Grimes' mortgage application (without the Grimes knowledge) and related pre-disclosure documents to Fremont Investment and Loan on behalf of the Grimes. The mortgage application and pre-disclosure documents contained forged signatures as well as falsified information relating to inflated income ("Phantom Rental Income). A copy of said fraudulent mortgage application and disclosure documents is attached hereto as *Exhibit 2*.

45.    Upon information and belief, on September 13, 2005, WCS Lending sent the Grimes' a packet of documents which included the mortgage application and related pre-disclosure documents with instructions for them to sign and return certain forms. A copy of said disclosure documents is attached hereto as *Exhibit 3*.

46.    Upon information and belief, on or about September 13, 2005, Mr. Tanenbaum advised the Grimes's via e-mail communication that the signed mortgage application was not required for submission to Fremont Investment and Loan's underwriting department and that the appraisal of the house came in at $460,000.

47.    On or about September 14, 2005, the Grimes' told Mr. Tanenbaum that they

9

thought the approval process was being delayed. Mr. Tanenbaum assured the Grimes' that everything was moving smoothly. A copy of said disclosure documents is attached hereto as ***Exhibit 15***.

48.    Mr. Tanenbaum then informed the Grimes that he needed a Residential House Lease to support their mortgage application in the event their house in St. Albans, New York was not sold prior to closing date. His explanation for this was that the underwriters would have a level of comfort if the Grimes' were renting out their house in St. Albans, New York and receiving additional rental income, as opposed to carrying two mortgages.

49.    The Grimes strongly opposed any suggestion that the house had rental income and did not supply Mr. Tanenbaum with a Residential House Lease because they were uncomfortable with lying in order to procure a mortgage. A copy of said documents is attached hereto as ***Exhibit 16***.

50.    They felt their combined incomes were more than enough to qualify for a decent mortgage and if not, they had nothing to lose because they already owned a home with substantial equity built-in over the course of seven years.

51.    Mr. Tanenbaum responded that it was routine and that he would speak directly with the underwriters. For the next few weeks the Grimes were in touch with Mr. Tanenbaum via e-mail communications and telephone on a weekly basis.

52.    Upon information and belief, on September 16, 2005, Fremont Investment and Loan notified WCS Lending and Jonathan Tanenbaum that the two mortgages were approved for the Grimes with certain terms and conditions. At no point in time, were Darrick and Yolanda Grimes aware that the mortgage had been approved on September 16, 2005. Mr. Tanenbaum and Fremont General, Fremont Investment and Loan and WCS Lending intentionally concealed the terms and conditions of the loan approval on September 16, 2005. A copy of documents is attached hereto as ***Exhibit 5***.

10

53.    Upon information and belief, on or about September 16, 2005, the conditional loan approval and issuance of the mortgage commitment letter was delivered by Fremont Investment and Loan to WCS Lending. A copy of said documents is attached hereto as ***Exhibit 5***.

54.    At no time between September 16, 2005 and October 12, 2005, did Defendants, Fremont General, Fremont Investment and Loan, WCS Lending and Jonathan Tanenbaum provide written correspondence or confirmation, e-mail communications or a final underwriting loan approval letter to the Grimes. A copy of Fremont Loan Tracking documents are attached hereto as ***Exhibit 7***.

55.    Under the terms of the loan, the conditional loan approval by Fremont Investment and Loan was on September 16, 2005 and October 11, 2005, respectively and the Grimes did not receive any mortgage commitment letters on the initial or final loan approval.

56.    Upon information and belief on September 16, 2005, Fremont Investment and Loan approved two mortgages in the amount that is described in the HUD-1 Settlement Statement and Good Faith Estimate.   Even still, the Grimes never received a mortgage commitment letter from Fremont or WCS Lending. A copy of said documents is attached hereto as ***Exhibit 5 and Exhibit 6***.

57.    Upon information and belief on September 26, 2005, Fremont Investment and Loan issued a Conditional Countered Offer on two approved mortgages in the amount of $405,000 and $22,500 respectively, to WCS Lending as noted in the HUD-1 Settlement Statement and Good Faith Estimate. A copy of said fraudulent mortgage application and disclosure documents is attached hereto as ***Exhibit 5***.

58.    On or about September 20, 2005, the Grimes' completed, signed and dated the mortgage application and related pre-disclosure documents with a fixed interest rate of 7.0% and submitted said documents to WCS Lending for mortgage financing. The Grimes combined income statements showed that they were earning roughly $5,443.65 in net income and

11

$8,007.14 in gross income per month for their respective employment. Copies of said document are attached hereto as *Exhibit 3*.

59.    During the time period between September 22, 2005 and October 11, 2005, Mr. Tanenbaum and WCS Lending were intentionally concealing and stalling the Grimes' advising them that the loan was still pending with the lender when in fact the loan had been approved on September 16, 2005.

60.    Mrs. Grimes kept asking and requesting from Mr. Tanenbaum to provide a copy of the mortgage commitment letter and the final numbers and terms and conditions of the mortgage loan **prior to closing.** Each time Mr. Tanenbaum came up with an excuse, which the Grimes' have now learned was a stalling tactic.

61.    On or about October 4, 2005, Mrs. Grimes sent an e-mail to Mr. Tanenbaum again asking for the final numbers prior to closing. Again, Mr. Tanenbaum stalled them. The Grimes began to become very concerned as well as the Sellers since a mortgage commitment letter had not been issued. The Grimes even considered consulting another mortgage broker or bank. They advised Mr. Tanenbaum that they were considering consulting someone else to do the transaction and Mr. Tanenbaum continued to delay and stall but reassured the Grimes that he was working with a lender to obtain a reasonable fixed rate 30 year mortgage at 7% or thereabout.

62.    The Grimes subsequently called Mr. Tanenbaum again to inform him that they were very concerned about the delay in obtaining a mortgage approval or commitment letter at a reasonable interest rate and they did not want to risk losing or forfeiting their earnest money deposit.

63.    The Grimes advised Mr. Tanenbaum that the Sellers were extremely concerned about the long delay in obtaining mortgage financing and that transaction would need to proceed in a timely manner.

64.    In response, Mr. Tanenbaum told the Grimes not to worry and explained that as long as the valuation and appraisal on the house was above market, the approval of the loan would come in shortly. Mr. Tanenbaum added that after one or two years he would help the Grimes to refinance the mortgage into an even better loan without having to pay any additional closing fees and costs, and that this would be possible because WCS Lending would assist them with dramatically improving their credit scores.

65.    These statements convinced the Grimes to wait a couple of more days for the approval of the mortgage with the lender. The Grimes were again relying on Mr. Tanenbaum's statements.

66.    At no time during the time period between September 16, 2005 **(the date the mortgage was approved)** through October 12, 2005 did Fremont General, Fremont Investment and Loan, WCS Lending or Mr. Tanenbaum reveal, disclose, inform or provide a copy of any mortgage commitment letter issued by Fremont Investment and Loan or approval letter regarding the terms and conditions of the loans that were approved. A copy of said fraudulent mortgage application and disclosure documents is attached hereto as *__Exhibit 6__*.

67.    The loan that the Grimes received, from Fremont Investment and Loan was not a fixed-rate 30 year mortgage, but an adjustable rate mortgage (2/28) that contained a higher interest rate of 8.45% with a payment of $3,807 that would call for an adjustable-rate increase in two years (after December 1, 2007) at an even higher interest rate.

68.    At the time the loans were originated, the Grimes had a joint net income of $5,489.26 per month. Their fully amortizing payment on the first monthly mortgage was $3,807 per month, including school and property taxes and the second monthly mortgage was $227 per month. A copy of said documents is attached hereto as *__Exhibit 14__*.

69.    Thus when Fremont Investment and Loan was in the process of originating and approving the loans, the loans were virtually designed to fail. Borrowers were placed in a position where the event of default was certain when the reset rate took place and their failure to make future payments would lead to a default, which in turn would lead to a foreclosure action, as it was predictably unsustainable for the borrowers to repay the debt.

13

70.    Through repeated misrepresentations, concealment of terms and conditions and inaccurate disclosures, WCS Lending, Fremont General, Fremont Investment and Loan and Jonathan Tanenbaum prevented the Grimes from comprehending the truly destructive nature of the loan.

71.    Defendants, Fremont General, Fremont Investment and Loan and Jonathan Tanenbaum engaged in unfair and deceptive conduct on a broad scale in connection with selling mortgage loans to New York State consumers, by selling exceedingly risky mortgage loan products that Fremont Investment and Loan knew or should have known were designed to fail, and including loan products that combined 100% financing, no income documentation ("stated income" loans), and adjustable rate mortgages that caused large increases in monthly mortgage payments after two (2) or three (3) years.

72.    Moreover, Fremont General and Fremont Investment and Loan recklessly and aggressively pursued a business model of compensating mortgage brokers who referred business to them on a regular basis. Fremont Investment and Loan wholesale lending business grew by selling those loans through third-party mortgage brokers and providing financial incentives to those mortgage brokers to sell even higher costing loan products.    Fremont failed to meaningfully monitor or control the unfair and deceptive conduct used by mortgage brokers of WCS Lending to sell Fremont Investment and Loan's loan products.

73.    Such conduct by WCS Lending in this case included the submission of forged and falsified documents; steering and inducing borrowers into unsuitable loan products; and misleading borrowers about reasonable loan term offers and their ability to refinance to lower costing loan products.

74.    Defendants, Fremont General, Fremont Investment and Loan and WCS Lending knew or should have known that certain loan products were unsuitable for the Grimes and that the Grimes' lacked the ability to repay the loans.

75.    Fremont General Corporation and Fremont Investment and Loan also failed to exercise oversight over its mortgage brokers' network and failed to properly disclose broker

14

compensation in a timely manner prior to closing.

76.    The Defendants' fraudulent and deceptive actions violated numerous federal and state consumer-protection laws, including the Truth in Lending Act; the Home Ownership and Equity Protection Act; the Real Estate Settlement Procedures Act; the New York State Deceptive Practices Act; the New York State Usury Law; and the common law doctrines of fraud and conspiracy to commit fraud.

77.    The Grimes did not receive the Fremont "Mortgage Commitment Letter" or any written communications from WCS Lending or Fremont Investment and Loan regarding the terms and conditions of the loan or the formal approval of the loan until the day of closing of the loan (October 12, 2005). At this point, they had already put an earnest money deposit down on the home they were trying to purchase and did not want to risk losing their deposit. They were shocked at the closing to find out what the real numbers were.

78.    The interest rate had changed from the interest rate on the application that they had signed, the mortgage was an ARM and not a traditional fixed 30 year mortgage, and there were fees being charged that were never discussed between the Grimes and Mr. Tanenbaum.

79.    The Grimes' closed under extreme duress.    They were bamboozled and sandbagged at the closing in front of the Sellers, their attorney and the real estate brokers. There was no way to get clarity regarding the numbers in this transaction from Mr. Tanenbaum, because unfortunately, he was out of the office on vacation on the day of the closing. The Grimes also tried to reach Mr. Tanenbaum on his mobile phone, but to no avail.

80.    When the Grimes returned home they began to feel uneasy about the transaction. They worried that they had been pressured into a bad deal without being allowed to properly review the terms and conditions of the loans or the loan documents as well as properly consult with their attorney.

81.    The Grimes called Mr. Tanenbaum several times per day for approximately one week after the closing, both at work and on Mr. Tanenbaum's mobile phone, intent on

15

refinancing or modifying the terms of the mortgage they had been pressured into signing – to no avail.

82.    Documents relating to the Grimes mortgage reveal that the terms they ultimately received were considerably different than both the terms described by Mr. Tanenbaum and the terms reflected in the initial disclosure documents that WCS Lending or Fremont Investment and Loan had mailed to the Grimes several weeks earlier.

83.    Defendants, Mr. Tanenbaum, WCS Lending and Fremont Investment and Loan misrepresented, misled and intentionally concealed the true terms and conditions of the loan to the Grimes regarding several material facts of the loan, enticing them to sign a loan that stripped tens of thousands of dollars in equity from their home; that would cost them, over the life of the loan, almost two-and-a-half times as previously represented; and whose monthly payments would quickly rise above their ability to repay, exposing them to significant risk of foreclosure.

84.    Unbeknownst to the Grimes the 7% interest rate that they were promised lasted for only one day.

85.    Upon information and belief, on the September 16, 2005, the conditional loan approval delivered to WCS Lending indicated that the initial interest rate for the first mortgage was structured at 8.00% Adjustable Rate fixed for 2 years with a 1.5% Yield Spread Premium and the second mortgage at 11.59% for 15 years fixed. A copy of said document is attached hereto as *Exhibit 5*.

86.    Upon information and belief, the conditional loan approval rate of 8.00% on September 16, 2005 increased to a final loan approval on October 11, 2005 to 8.45% by Fremont Investment and Loan. A copy of said document is attached hereto as *Exhibit 5*.

87.    The actual loan the Grimes were qualified and approved for by Fremont Investment and Loan was a first mortgage at 8.45% adjustable rate fixed for 2 years and second mortgage at 12.49% for 15 years fixed with a 1.5% Yield Spread Premium to the mortgage broker paid by Fremont.

88.    On October 12, 2005, the day of the closing, the Grimes' received a first

16

NYC/366658.1

mortgage of $405,000 with an interest rate of 8.45% and a second mortgage of $22,500 with an interest rate of 12.75% from Fremont Investment and Loan. The monthly payment for the first mortgage was approximately $3,807.87 for the first twenty-four months which covered both interest and principal per month (including escrow for school and property taxes); the monthly payment for the second mortgage was $277.18. The first mortgage was structured as an ARM, originating as a 2/28 residential mortgage loan product.

89.    Defendants, Fremont Investment and Loan, Jonathan Tanenbaum and WCS Lending knew or should have known that the Grimes did not have sufficient income to repay the loan as structured by the lender. The Grimes combined income statements showed that they were earning roughly $5,443.65 in net income and $8,007.14 in gross income per month from their respective employment. A copy of said income statements is attached hereto as *Exhibit 14*.

90.    Moreover, because the second mortgage contained a significant prepayment penalty for the first year (six months' interest) refinancing within the first year in order to avoid the payment shock of the reset would only further add to the growing principal balance, making refinancing the monthly payments unaffordable for the Grimes. This prepayment penalty effectively trapped the Grimes into a loan that they could not afford.

91.    The HUD-1 Settlement Statement dated October 12, 2005, indicates that $11,365 in broker fees and miscellaneous fees were paid to WCS Lending for "steering" the Grimes to the subject lender, and that the Grimes' incurred $22,649.38 in settlement charges. A copy of the HUD-1 Settlement Statement dated October 12, 2005 is attached hereto as *Exhibit 13*.

92.    The HUD-1 Settlement Statement indicates that the settlement charges were $22,649.38. The charges on this statement do not add up correctly and include "addendum charges" of $19,690.

93.    The HUD-1 Settlement Statement also indicates that Fremont Investment and Loan paid WCS Lending $6,074.75 as an "YSP", or service release premium, commonly known as a yield spread premium ("YSP"). By its definition a yield spread premium is a rebate retained by the broker. Lenders pay these rebates on high-rate loans.

94.    Upon information and belief, WCS Lending provided no service to the Grimes nor did they add any additional value to the transaction except to induce and steer the borrowers

17

NYC/366658.1

into a loan with unfavorable terms and high risk.

95.    The HUD-1 settlement statement also shows that WCS Lending was paid a $945 "Processing Fee" out of the proceeds of the loan.

96.    Upon information and belief, WCS Lending received this compensation from Fremont Investment and Loan solely for the purpose of steering and inducing the Grimes' to take out a loan on terms less favorable than were otherwise available to them.

97.    The initial mortgage disclosure documents that the Grimes received from Fremont Investment and Loan and WCS Lending obscured the true terms of the loan and even reinforced Mr. Tanenbaum's misleading description of the loan. A copy of said fraudulent mortgage application and disclosure documents is attached hereto as *Exhibit 3*.

98.    The "monthly mortgage payment" far exceeded the Grimes net monthly income by any reasonable income to debt expense ratio of 74.5% per month which would result in their inability to repay each month.

99.    The first and second monthly mortgage payments of $4.084.00 per month was 74.5% the Grimes' combined net monthly income of $5,443.65. This clearly shows that the Grimes could not afford said mortgage going forward. How were they expected to pay other expenses and additional debts?

100.    The Defendants sole purpose of concealing and misleading the true cost of the adjustable rate mortgage and actual terms and conditions of the mortgage was to defraud and induce the Grimes into entering into an unsuitable mortgage loan.

101.    Fremont Investment and Loan has a duty to disclose and provide every borrower with a mortgage commitment letter outlining in simple basic terms the amount of money being loaned and the terms and conditions of the loan.

102.    These material misrepresentations were instrumental in inducing the Grimes to sign the loan documents at closing.

103.    The Defendants concealed material facts about the loan that surely had the Grimes

18

knew about these facts, they would not have accepted the loan. In addition to the concealment and failure to properly disclose the material terms of the true cost of the loan, Mr. Tanenbaum concealed many fees that were charged to Grimes.

104.    Mr. Tanenbaum told the Grimes that they would be reimbursed for the appraisal report which they had paid $400. The Grimes were never reimbursed for the appraisal, and now wonder if the appraisal were inflated to complete this transaction.

105.    Mr. Tanenbaum also promised and assured the Grimes that he could help them refinance after one year. Yet Mr. Tanenbaum failed to inform the Grimes that the second mortgage contained a one-year prepayment penalty that would likely cost the Grimes more money if they were to refinance within one year.

106.    Only after signing the loan documents at closing did the Grimes realize that Fremont Investment and Loan, Jonathan Tanenbaum and WCS Lending had intentionally blindsided them at closing in front of the Sellers. This pervasive predatory lending scheme was purposefully structured and designed to lure the Grimes into possible foreclosure as well as years of damaging credit rating. A copy of said documents is attached hereto as *Exhibit 13*.

107.    Upon information and belief, on or about February 1, 2006 after the Grimes' loan originated, the first mortgage was transferred, assigned and/or sold to Wells Fargo & Co.-America's Servicing Company through a series of transactions. The loan was securitized and placed into a trust, U.S. Bank, National Association, as Trustee for Master Asset Backed Securities Trust 2006-FRE-1. Defendant U.S. Bank, N.A. is the trustee for Master Asset Backed Securities Trust 2006-FRE-1 and defendant U.S. Bank, N.A. is the custodian who now holds Grimes' mortgage loan. A copy of said letter from Fremont to the Grimes explaining that their mortgage had been transferred is attached hereto as *Exhibit 9*.

## JURISDICTION AND VENUE

108.    This Court has federal jurisdiction over plaintiffs federal claims pursuant to 28 U.S.C. § 1331 and 1343.

109.    This Court has supplemental jurisdiction over plaintiffs pendent state law claims

19

pursuant to 28 U.S.C. § 1367.

110.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 139 1(b) because a substantial portion of the events giving rise to this complaint occurred within the Southern District of New York.

## FIRST CAUSE OF ACTION
## TRUTH IN LENDING ACT

(Against Fremont General Corporation, Fremont Investment and Loan, WCS Lending, America's Servicing Company, US Bancorp., and U.S. Bank, National Association as Trustee for Master Asset Backed Securities Trust 2006-FRE-1)

111.    Plaintiffs repeat, reiterate and reallege each and every paragraph numbered 1 through 110 as though the same were fully set forth herein.

112.    At the time of the subject transaction, defendant, Fremont Investment and Loan acted as a creditor who regularly engaged in the making of mortgage loans for which the payment of a finance charge is or may be required. This is the case whether in connection with loans, sales of property or services, or otherwise. Accordingly, defendant is subject to the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq., and its implementing regulations, Federal Reserve Board Regulation Z, 12 C.F.R. § 226.

113.    As a result of the subject transaction, defendants acquired an interest in plaintiff's primary dwelling that secures payment or performance of an obligation.

114.    Upon information and belief, in the course of this consumer credit transaction, defendants violated the disclosure and rescission requirements of TILA and Regulation Z by failing to provide two copies of the notice of the right to rescind and an accurate date for the expiration of the rescission period, in violation of 15 U.S.C. § 1635 and 12 C.F.R. § 226.23(b).

115.    In the course of this consumer credit transaction, because of fraud, forgery and conflicting representations, defendants failed to make required material disclosures clearly and conspicuously in writing in violation of 15 U.S.C. § 1632(a) and Regulation Z § 226.17(a) and therefore failed to deliver all "material" disclosures as required by the Act and Regulation Z,

20

including the following:

    a) failing to properly and accurately disclose the "amount financed," in violation of 15 U.S.C. § 1638(a)(2) and 12 C.F.R. § 226.18;

    b) failing to properly and accurately disclose the "finance charge," in violation of 15 U.S.C. § 1638(a)(3) and 12 C.F.R. § 226.18;

    c) failing to properly and accurately disclose the "annual percentage rate," in violation of 15 U.S.C. § 1638(a)(4) and 12 C.F.R. § 226.18;

    d) failing to properly and accurately disclose the "total of payments," in violation of 15 U.S.C. § 1638(a)(5) and 12 C.F.R. § 226.18(h); and

    e) failing to properly and accurately disclose the numbers, amounts, and due dates or period of payments scheduled to repay the obligation, in violation of 15 U.S.C. §1638(a)(6) and 12 C.F.R. § 226.18(g).

116.    The 'TILA violations described at paragraphs 112, 114 and 115 above give plaintiffs an extended right to rescind the loan held by defendants pursuant to 15 U.S.C. § 1635 and 12 C.F.R. § 22623. Plaintiffs is also entitled to an extended right of rescission against any assignees of the loan pursuant to 15 U.S.C. § 1641(c).

117.    On December 28, 2006, September 28, 2007 and October 15, 2007, the Grimes' rescinded the transaction by mailing a notice of rescission to America's Servicing Company, an agent of U.S. Bank, National Association, as Trustee for Master Asset Backed Securities Trust 2006-FRE-1, whom the Grimes' had been made to believe was their new lender. The notice of rescission was mailed to America's Servicing Company's Legal Department. Copies of said letters are attached hereto as *Exhibit 8*.

118.    The Grimes' sent several letters to America's Servicing Company and U.S. Bank, National Association, as Trustee for Master Backed Securities Trust 2006 FRE-1 and had numerous telephone calls with their Loss Mitigation and legal departments regarding the

21

fraudulent acts surrounding their loan. The Grimes also made several attempts to rescind the transaction after discovering the forged documents. The Grimes received the forged documents sometime in March, 2007, after filing a complaint with various federal and state regulatory agencies, including, but not limited to the Federal Trade Commission, U.S. Department of Housing and Urban Development, Fair Housing Division, Office of Attorney General State of New York, New York State Department of Banking and New York State Executive Division of Human Rights. The documents were submitted to the New York State Banking Department, Mortgage Division by Fremont Loan and Investment in response to the Grimes' complaints. Copies of said documents are attached hereto as *Exhibit 10*.

119.    Any assignees of the loan are liable for all of the above claims that the Grimes' assert against Fremont Investment and Loan pursuant to 15 U.S.C. § 1641(d).

120.    Upon information and belief, defendants also violated the disclosure requirements of TILA and Regulation Z by failing to provide either an itemization of the amount financed, a qualified substitution for the itemization of the amount financed, or a statement that the Grimes' had a right to request such an itemization, in violation of 15 U.S.C. § 1638(a)(2)(B) and 12 C.F.R. § 226.18(c).

121.    As a result of the aforesaid violations of TILA and Regulation Z, Fremont Investment and Loan and any assignees are liable to plaintiffs for:

        a)  the return of any money or property that has been given to anyone in connection with the transaction and the termination of defendant's security interest in the property;

        b)  actual damages in an amount to be determined at trial;

        c)  statutory damages as provided by 15 U.S.C. § 1640;

        d)  costs and disbursements; and

22

e) attorneys' fees to the plaintiffs' counsel.

## SECOND CAUSE OF ACTION
## HOME OWNERSHIP AND EQUITY PROTECTION ACT

(Against WCS Lending LLC, Jonathan Tanenbaum, Fremont General Corporation, Fremont Investment and Loan, US Bancorp. and America's Servicing Company and US Bank, NA, as Trustee for the Master Asset Backed Trust 2006-FRE-1)

122.    Plaintiffs repeat, reiterate and reallege each and every paragraph numbered 1 through 121 as though the same were fully set forth herein.

123.    The Home Ownership and Equity Protection Act ("HOEPA"), 15 U.S.C. § 1639, is an amendment to TILA and offers further protections for high rate mortgages, as defined by 15 U.S.C. § 1602(aa)(l)(B)(i), Federal Reserve Board Regulation Z, 12 C.FR. § 226.32.

124.    A mortgage that is a credit transaction secured by the consumer's principal dwelling and whose "total points and fees" exceed eight percent of the total loan amount is a high rate mortgage within the meaning of the HOEPA. 15 U.S.C. § 1602(aa)(l)(B)(i).

125.    The subject consumer credit transaction between the Grimes' and Fremont Investment and Loan was secured by the Grimes' principal dwelling.

126.    Upon information and belief, the subject loan transaction between the Grimes' and Fremont Investment and Loan is subject to HOEPA because, among other things, the total points and fees payable by the Grimes' exceeded eight percent of the total loan amount.

127.    Fremont Investment and Loan and WCS Lending violated HOEPA and Regulation Z by:

> a) failing to provide the Grimes' with a required timely and accurate material disclosures required under HOEPA at least three business days prior to the consummation of the transaction, in violation of 15 U.S.C. § 1639(a) and (b) and 12 C.F.R. § 226.32(c);
>
> b) providing the Grimes' with a loan that contains a prepayment penalty, in

23

NYC/366658.1

violation of 15 U.S.C. § 1639(c) and 12 C.F.R. § 226.32(d)(6);

c) providing the Grimes' with a loan that contains negative amortization terms, in violation of 15 U.S.C. § 1639W and 12 C.R.F. § 226.32(d)(2); and

d) extending credit without regard to the Grimes' ability to pay the debt, in violation of 15 U.S.C. § 1639(h) and 12 C.R.F. § 226.34(a)(4).

128.   Fremont Investment and Loan's violations of HOEPA and Regulation Z give the Grimes' a statutory right to rescind the Fremont Investment and Loan mortgage loan pursuant to 15 U.S.C. § 1635 and 1639(j) and 12 C.F.R. § 226.23.

129.   Any assignees of the loan are liable for all claims that the Grimes' asserts against America's Servicing Company and U.S. Bank, National Association, as Trustee for the Master Asset Backed Securities Trust 2006-FRE-1 pursuant to 15 U.S.C. § 1641(d).

130.   As a result of the aforesaid violations of HOEPA and Regulation Z, America's Servicing Company and U.S. Bank, National Association, as Trustee for the Master Asset Backed Securities Trust 2006-FRE-1 and any assignees are liable to plaintiffs for:

a) rescission of the mortgage loan transaction, termination of any interest created under the transaction, and return of any money or property given by Fremont Investment and Loan to anyone in connection with this transaction;

b) actual damages in an amount to be determined at trial;

c) statutory damages as provided by 15 U.S.C. § 1640;

d) costs and disbursements; and

e) attorneys' fees to plaintiffs' counsel.

### THIRD CAUSE OF ACTION
### NEW YORK STATE GENERAL BUSINESS LAW § 349
### ("DECEPTIVE PRACTICES ACT")

24

(Against WCS Lending LLC, Fremont General Corporation, Fremont Investment and Loan , America's Serving Company, US Bancorp, and U.S. Bank National Association, as Trustees For the Master Asset Backed Securities Trust 2005-FRE-1)

131.    Plaintiffs repeat, reiterate and reallege each and every paragraph numbered 1 through 130 as though the same were fully set forth herein.

132.    Defendants "conducted a business" and/or "furnished a service" within the meaning of New York State General Business Law § 349.

133.    As a holding company, Fremont General owed a variety of duties under the Holding Company Act and other provisions of the federal and states laws, including the California and New York States banking laws and regulations.

134.    Among those was the duty to ensure that its wholly-owned subsidiary, Fremont Investment and Loan made regular, accurate and complete material disclosures to consumers regarding the true cost and accurate terms and conditions and risk associated with its mortgage loan products.

135.    Fremont General also had a duty, apart from the Holding Company Act, to be truthful when it communicated with the Commissioner of the Federal Deposit Insurance Corporation, and various State Attorney General Offices located throughout the United States of America, including the State of New York Attorney General Office.  Fremont had a duty not to conceal information regarding its lack of supervision or oversight over its wholly-owned subsidiary Fremont Investment and Loan.

136.    Because of Fremont General's lack of oversight and management supervision over its wholly-owned subsidiary, Fremont Investment and Loan; Fremont Investment and Loan's was able to provide a series of misrepresentations and concealment of material information directly to consumers throughout country.

137.    Furthermore because of Fremont Investment and Loan' misrepresentations and

25

concealment of the true terms and conditions of the loan, the Grimes did not know when the mortgage commitment letter was issued to WCS Lending or what the true terms and conditions of the mortgage were at the time of issuance.

138.    Despite these duties, Fremont General's omissions, misrepresentation and concealment regarding the lack of management oversight and supervision of its wholly-owned subsidiary, Fremont Investment and Loan created hundreds or thousands of adverse events for many consumers, in particular African-American consumers whose mortgage loan products were structured with a high risk of default resulting in foreclosure.

139.    A lender owes a contractual and common law duty to its customers to underwrite loans or mortgages for the mutual benefit of the borrower and the lender. Fremont Investment and Loan and WCS Lending made representations to justify payment of the Yield Spread Premium to WCS Lending for steering the Grimes to them. They never expected the Grimes to discover the forged documents or the false information they provided on the fraudulently submitted loan application – (phantom rental and inflated income). These acts and the presentation of these fraudulent documents is what were utilized to get the loan approved through the Fremont's underwriters. Copies of said fraudulent disclosure documents are attached hereto as ***Exhibit 2, Exhibit 4 and Exhibit 12***.

140.    Defendants, Fremont General, Fremont Investment and Loan and WCS Lending and Jonathan Tanenbaum are all in violation the Deceptive Practices Act, New York General Business Law § 349, ("§ 349"). Defendants willful violations of the New York State General Business Law § 349 – Deceptive Practices Act clearly demonstrates the intentional and willful intent to defraud and discriminate against African-Americans and other minority groups within the state from as far as the State of Florida and California to make a profit. The deceptive acts and practices include, but were not limited to, those set forth below.

141.    Defendants, Fremont Investment and Loan, WCS Lending and Jonathan Tanenbaum intentionally misled plaintiffs into thinking that the financing for the purchase of their house would be a stated and reasonable interest rate of 7% per annum for a fixed 30 year mortgage. Copies of said documents is attached hereto as ***Exhibit 3***.

142.    Defendants, Fremont Investment and Loan, WCS Lending and Jonathan

26

Tanenbaum misled plaintiffs to enter into a mortgage that was unaffordable and that far exceeded the debt to income ratio of **50%**, when in fact the actual debt to income ratio expense was **74.5%** of the plaintiffs' net income.

143.    Defendants, Fremont Investment and Loan, WCS Lending and Jonathan Tanenbaum intentionally misled plaintiffs into thinking that the mortgages they entered were affordable based upon their combined net incomes, but concealed the fact that their reliance of the loans was based upon fraudulent Phantom Rental Income to support the unaffordable mortgage payments. The defendants intentionally targeted people of color including plaintiffs, and primarily non-white neighborhoods in submitting mortgage applications to Fremont Investment and Loan to obtain quick loan approval based upon fraud, misrepresentation and omissions of material facts concerning rental income on property in Queens, New York, that was on the market for sale at the time.

144.    Defendant, Fremont Investment and Loan originated two loans to plaintiffs that required documented income statements and verification of the phantom rental income that was fraudulently submitted with the mortgage application by WCS Lending and Jonathan Tanenbaum. A copy of said documents is attached hereto as ***Exhibit 2, Exhibit 4, and Exhibit 12***.

145.    Defendants, Fremont Investment and Loan, WCS Lending and Jonathan Tanenbaum misled plaintiffs to enter into a high interest-rate balloon second mortgage that they could not afford and that would inevitably lead to the loss of their home, and that when combined with the first mortgage, entirely exceeded the value of the property.

146.    Defendants, Fremont Investment and Loan, WCS Lending and Jonathan Tanenbaum charged plaintiffs' excessive loan origination and mortgage broker fees based upon fraudulent acts and services being provided. A copy of said disclosure documents is attached hereto as ***Exhibit 13***.

147.    Defendants, WCS Lending and Jonathan Tanenbaum charged plaintiffs' $4,050 worth of brokers' fees, in the transaction, well beyond any reasonable industry standard, and then failed to disclosed these unreasonable fees as financed charges, as required by federal law. (12

27

C.F.R. Sec. 226.4(c)(7)). A copy of said disclosure documents is attached hereto as *Exhibit 4*.

148.    Defendants, Fremont Investment and Loan, WCS Lending and Jonathan Tanenbaum intentionally misled plaintiffs by failing to provide them with a Good Faith Estimate of settlement cost prior to closing their mortgage loans, in violation of federal Real Estate Settlement Procedures Act and regulations (24 C.F.R. Section 3500.7). A copy of said disclosure documents is attached hereto as *Exhibit 4*.

149.    Defendant, Fremont Investment and Loan, as a national mortgage lender that was actively involved in the subprime lending market, targeted people of color including plaintiff and primarily non-white neighborhoods, when seeking to consummate real estate transaction on terms that were grossly unfair and abusive; a mortgage lender has a duty to consider if a breach of their lender's underwriting process (which determines the amount of interest rate that a borrower will be charged) focused solely on obtaining an approval on a loan to cover the lender's retained risk, without regard to whether a borrower's ability to repay.

150.    Because the prepayment penalty is computed as six months interest on the principal balance of the second mortgage, and because-unlike a traditional loan, the principal balance of the first mortgage is subject to an adjustable rate increases after 2 years with the next schedule monthly payment to be higher than the first twenty-four months payments, the penalty for Grimes is to refinance this loan within two years of origination.

151.    In other words, if the Grimes had refinanced on January 1, 2006, they would have had to incur a penalty of approximately $1,345.00. This prepayment penalty further demonstrates the unfair and deceptive nature of the loan and its unsuitability for the Grimes.

152.    Defendants' willful and malicious inclusion of a one year prepayment penalty violates New York State General Obligations Law § 5-501(3)(b) and constitutes an unfair, misleading and deceptive trade practice under § 349.

153.    Upon information and belief, the YSP paid by Fremont Investment and Loan to WCS Lending was excessive and was unrelated to any service or benefit provided to the Grimes.

154.    Defendants knew or should have known that the Grimes' could not afford to make

28

their payments on the loan necessary to pay the interest or interest and principal on the loan or sustain the monthly mortgage payments after December 2007.

155.    Defendants making of a mortgage loans to the Grimes' that defendants knew they could not repay willfully and maliciously deceived and misled consumers, specifically the Grimes', violating § 349.

156.    Defendants lending to the Grimes' without consideration of their ability to repay the mortgage constitutes an unfair, misleading, and deceptive trade practice under § 349.

157.    Defendants willful and malicious steering of the Grimes' into a loan to with grossly unfavorable terms based on YSP incentives constitutes an unfair, misleading and deceptive trade practice under § 349.

158.    Defendants willful and malicious steering of the Grimes' into a fraudulent loan with a higher interest rate, despite the fact that they provided documentation of income, constitutes an unfair, misleading and deceptive trade practice under § 349.

159.    Defendants repeatedly concealed and misrepresented the essential terms and therefore the cost of the loan to Grimes', deceiving them into believing that the interest rate was much lower than it was, that their monthly payments would be fixed for 30 years and that they would be able to refinance the loan without incurring any cost within one year.

160.    Many of the misrepresentations and omissions of material facts constituted violations of the requirement that timely and adequate disclosures were made pursuant to TILA be "clear and conspicuous," rendering those and any other disclosures inoperative and depriving Grimes' of the crucial information that TILA is meant to secure for borrowers. Accordingly, defendants' willful and malicious misrepresentations and lack of clear and conspicuous disclosure constitute an unfair and deceptive trade practice under § 349.

161.    Upon information and belief, these unfair business practices directed at plaintiffs were part of, and representative of, a pattern of misleading activities targeted at numerous other home buyers, including, but not limited to, African-American home buyers.

29

162.    Plaintiffs suffered serious injury, including but not limited to credit reputation damage, economic detriment, incurring significant attorney fees, continued costs of litigation and other special and consequential damages in an amount not yet determined, as a direct and proximate result of such deceptive acts and unfair practices of the defendants.  These damages were entirely foreseeable, predictable, and the intended results of defendants' conduct

163.    As authorized by § 349(h), plaintiffs seeks an order from this Court enjoining WCS Lending, Fremont General, Fremont Investment and Jonathan Tanenbaum from the unlawful actions and practices under the Deceptive Practices Act described above.

164.    As a result of their violations of the Deceptive Practices Act, WCS Lending, Fremont General, Fremont Investment and Loan and Jonathan Tanenbaum are liable to Grimes' for:

        a)  actual damages;

        b)  statutory damages as provided by § 349(h);

        c)  treble damages as provided by § 349(h);

        d)  costs and disbursements; and

        e)  attorneys' fees to the plaintiffs' counsel.

## FOURTH CAUSE OF ACTION – FRAUD

(Against WCS Lending LLC, Fremont General Corporation, Fremont Investment and Loan, America's Serving Company, US Bancorp and U.S. Bank National Association, as Trustees For the Master Asset Backed Securities Trust 2006-FRE-1)

165.    Plaintiffs repeat, reiterate and reallege each and every paragraph numbered 1 through 164 as though the same were fully set forth herein.

NYC/366658.1

166.   Defendants fraudulently, intentionally, and knowingly induced the Grimes' to enter into the subject mortgage transactions by concealing, misrepresenting and failing to provide material disclosures and information of the true terms and conditions of the mortgage, including the following:

a)   misrepresenting, concealing and failing to disclose to the Grimes' that the annual interest rate on the subject mortgage was a fixed rate 7% per annum for thirty (30) years;

b)   misrepresenting, concealing and failing to disclose to the Grimes' that monthly mortgage payments of $3,807 for the first mortgage would be affordable to cover the interest  and principal on the loan for the duration of the loan of 30 years;

c)   misrepresenting, concealing and failing to properly inform the Grimes' that they could easily refinance after one year, when in fact doing so would cause them to incur a prepayment penalty;

d)   misrepresenting, concealing and failing to disclose to the Grimes' that Fremont Investment and Loan approved the mortgage loans at a higher interest rate and that the mortgage would be an Adjustable Rate Mortgage consisting of a lower fixed interest rate for a short-term time period, followed by an increase to a higher, adjustable rate which would than increase thereafter for the remaining years of the loan;

e)   misrepresenting, concealing and failing to disclose to the Grimes' that the fees payable to WCS Lending from the proceeds of the mortgage were bona fide and reasonable and necessary for the extension of credit;

f)   misrepresenting, concealing and failing to disclose to the Grimes' that the financing that they arranged typically disguised as 2/28 and 3/27 ARMs or

31

100% financing or commonly called a "piggyback loan" that provided one loan for 80% and a second for 20% of the purchase price which would result in a high risk loan resulting in foreclosure for borrowers;

g) misrepresenting, concealing and failing to disclose to the Grimes' that the subject loans would provide them with a benefit; and

h) misrepresenting, concealing and failing to disclose to the Grimes' that they could afford the subject loan.

167.    The Grimes' suffered serious injury as the proximate result of their reliance on the Defendants' intentional misrepresentations, concealment and failure to disclose material facts and terms of the loan.  Plaintiffs are informed and believes and herein alleges that the Defendants acted with intentional oppression, fraud and/or malice in taking actions complained of herein, and in conscious disregard of Plaintiffs' rights, so as to justify an award of exemplary and punitive damages.

168.    Defendants, Fremont General, Fremont Investment and Loan, WCS Lending and Jonathan Tanenbaum knowingly and intentionally caused the subject property to be substantially financed and appraised through misrepresentation and/or omission of material facts through a scheme of "bait and switch".

169.    Defendants, Fremont General, Fremont Investment and Loan, WCS Lending and Jonathan Tanenbaum misrepresented to plaintiffs that the mortgages were affordable when they were not, and/or omitted material facts including that the monthly mortgage payments would be wholly unaffordable based upon plaintiffs current or expected income, that the first mortgage included drastic and unaffordable rate increases and that the second mortgage included an unaffordable balloon payments.

170.    Defendants, Fremont General, Fremont Investment and Loan, WCS Lending and Jonathan Tanenbaum misrepresented the true terms and conditions of the mortgage loans and omitted from their representations the material facts that the terms of the loans were approved on different terms and interest rates.

32

171.    Defendants, Fremont General, Fremont Investment and Loan, WCS Lending and Jonathan Tanenbaum intentionally concealed and omitted material facts to the plaintiffs that the loans were approved and based upon the reliance of phantom rental income to support the unaffordable mortgage payments.

172.    Defendants' misrepresentations and omissions of material facts were false and misleading at the time they were made.

173.    Plaintiffs had a reasonable right to rely, and in fact relied, on defendants' representations and omissions of material facts in agreeing to purchase and finance the subject property. Had plaintiffs known the truth about the issues enumerated above, they would have not have purchased and financed the property based upon the terms and conditions of the defendants.

174.    As a direct and proximate result of defendants' misrepresentations and omissions of materials facts plaintiffs suffered damages.

175.    Defendants' actions were intentional, wanton, malicious and in violation of the public interest and entitle plaintiffs to punitive damages.

176.    As a result of the aforesaid fraud, the mortgage loan transactions should be declared void, and the security interest created under the transaction should be terminated. In addition, defendants are liable to the Grimes' for:

        a)  actual damages;

        b)  punitive damages;

        c)  costs and disbursements; and

        d)  attorney's fees to plaintiffs' counsel.

33

## FIFTH CAUSE OF ACTION
## CIVIL CONSPIRACY TO COMMIT FRAUD

(Against WCS Lending LLC, Fremont General Corporation, Fremont Investment and Loan,
America's Serving Company, US Bancorp, and U.S. Bank National Association, as Trustees For the
Master Asset Backed Securities Trust 2006-FRE-1)

177.    Plaintiffs repeat, reiterate and reallege each and every paragraph numbered 1
through 176 as though the same were fully set forth herein.

178.    Defendants knowingly entered into an agreement to fraudulently induce the
Grimes' to enter into the subject mortgages.

179.    Defendants, Fremont General, Fremont Investment and Loan, WCS Lending and
Jonathan Tanenbaum knowingly entered into an agreement to fraudulently induce plaintiffs to
purchase and finance the subject property on a "bait and switch" scheme by intentionally making
material misrepresentations and/or omissions of material facts as described above.

180.    Defendants intentionally, knowingly and willfully participated in this "bait and
switch" scheme by committing overt acts and making misrepresentations and/or failing to
provide material information, in furtherance of the agreement, including but not limited to those
representations set forth above.

181.    Defendants, through their unlawful conduct constituting a civil conspiracy to
defraud vulnerable, African-American homeowners, defendants acted in a malicious, willful,
wanton, and oppressive fashion, in reckless disregard of the plaintiffs' rights.

182.    Plaintiffs' suffered serious injury as the proximate result of their reliance on
Defendants' omissions, misrepresentations, concealment and failure to disclosure of material
facts to cause the pending adverse developments in their personal credit records and the severity
of their financial hardships and conditions.

34

NYC/366658.1

183.    Defendants' actions were intentional, wanton and malicious and in violation of public interest and entitle plaintiffs' to punitive damages.

184.    As a result of the aforesaid conspiracy to commit fraud, the mortgage transaction should be declared void, and the security interest created under the transaction should be terminated. In addition, defendants are liable to the plaintiffs' for:

    a) actual damages;

    b) punitive damages;

    c) costs and disbursements of suit; and

    d) attorney's fees to the plaintiffs' counsel.

## SIXTH CAUSE OF ACTION
## REAL ESTATE SETTLEMENT PROCEDURES ACT

(Against WCS Lending LLC, Fremont General Corporation, Fremont Investment and Loan, America's Serving Company, US Bancorp and U.S. Bank National Association, as Trustees For the Master Asset Backed Securities Trust 2006-FRE-1)

185.    Plaintiffs repeat, reiterate and reallege each and every paragraph numbered 1 through 184 as though the same were fully set forth herein.

186.    The Fremont Investment and Loan mortgage is a "federally related mortgage loan" as defined in 12 U.S.C. § 2602(1), and therefore is subject to the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 et seq.

187.    Defendants WCS Lending, Jonathan Tanenbaum, Fremont General and Fremont Investment and Loan violated RESPA with respect to plaintiffs' loan transaction by: (a) giving or accepting kickbacks or other things of value in violation of 12 U.S.C. § 2607(a) and 24 C.F.R. § 3500.14(b); and (b) giving a portion, split, or percentage of charges made or received for the

35

rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed, in violation of 12 U.S.C. § 2607(b) and 24 C.F.R. § 3500.14(c).

188.    Among other things, no goods or facilities were furnished, nor were any services performed in exchange for the $894 "Commitment Fee", $495 "Application Fee", $945 "Processing Fee to WCS Lending", $4,050 "Mortgage Broker Fee", S60 "Tax Service Fee", $2,331.16 "Escrow for Taxes and Insurance", $2,029.20 "Short-Term Interest", $9.50 "Flood Certification Fee", $1,450 "Bank Attorney Fee" and the $6,074.00 "YSF" listed on the October 12, 2005 HUD-1 Settlement Statement. Furthermore, even if goods, facilities or services were provided, their value was not reasonably related to the payments. Therefore, WCS Lending, Fremont General and Fremont Investment and Loan are liable to the Grimes' for:

        a)  actual damages, trebled under 12 U.S.C. § 2607(d)(2);

        b)  costs and disbursements; and

        c)  attorneys' fees to the plaintiffs' counsel.

### SEVENTH CAUSE OF ACTION
### (NEW YORK STATE GENERAL OBLIGATIONS LAW § 5-501)

(Against WCS Lending LLC, Fremont General Corporation, Fremont Investment and Loan, America's Serving Company, US Bancorp and U.S. Bank National Association, as Trustees For the Master Asset Backed Securities Trust 2006-FRE-1)

189.    Plaintiffs repeat, reiterate and reallege each and every paragraph numbered 1 through 188 as though the same were fully set forth herein.

190.    The subject loan is secured by an interest in real property improved by a one-family residence occupied by the owner, and the interest rate charged on that loan exceeds six per centum per annum.

36

191.    The prepayment penalty imposed on the subject loan had a term of one year, in violation of § 5-501(3Xb).

192.    As a result of the aforesaid violation, the mortgage transaction should be declared void, and the security interest created under the transaction should be terminated, pursuant to § 5-511.

## EIGHTH CAUSE OF ACTION
## (FAIR HOUSING ACT-42 U.S.C. § 3601 et seq.)

(Against WCS Lending LLC, Fremont General Corporation, Fremont Investment and Loan, America's Serving Company, US Bancorp, and U.S. Bank National Association, as Trustees For the Master Asset Backed Securities Trust 2006-FRE-1)

193.    Plaintiffs repeat, reiterate and reallege each and every paragraph numbered 1 through 192, as though the same were fully set forth herein.

194.    The Fair Housing Act, 42 U.S.C. Section 3601 et seq., was first enacted in 1968 to prohibit discrimination in connection with real estate transactions, including home purchases and refinancing.  The Act has been broadly constructed by the courts to make its provisions effective to protect consumers.

195.    The Act prohibits mortgage lenders from imposing different terms or conditions on a loan, such as different interest rates, points or fees, on the basis of race.  Defendants, Fremont Investment and Loan, WCS Lending and Jonathan Tanenbaum targeted African-Americans for higher cost subprime mortgage loans, while directing Caucasian applicants, with the same qualifications after accounting for risk, into lower cost loans. Such discriminatory actions include, but are not limited to: targeting plaintiffs for this scheme to defraud on the basis of their race and color in obtaining mortgage home loans.

196.    These defendants, and their principals and employees, discriminated against plaintiffs on the basis of race and color in a residential real estate transaction in violation of the federal Fair Housing Act, 42 U.S.C. Section 3605. Such discriminatory actions include are but limited to: targeting plaintiffs for this scheme of "bait and switch" on the basis of their race and

37

color; making loans unaffordable based upon current personal and expected incomes; providing financial assistance for the purchase of real estate with grossly unfavorable terms based upon plaintiffs' race and color.

197.    In addition or in the alternative, under the guise of these purportedly facially-neutral subprime loan policies and practices, Defendants, Fremont General, Fremont Investment and Loan and Jonathan Tanenbaum, WCS Lending had a discriminatory effect and created statistical disparities so great between African-American and Caucasian mortgagees as to be functionally equivalent to intentional discrimination. Defendants induce, misled and steered African-American borrowers into high cost home loans without due regard of the borrowers ability to repay the loan.

198.    A borrower is presumed to be able to make a scheduled payment if (a) the scheduled monthly payment plus payments for all other debts does not in the aggregate exceed 50% of the borrower's documented and verified monthly gross income and (b) the borrower has residual sufficient income to pay essential monthly expenses after paying the schedule monthly mortgage payment and any additional debt. If the schedule monthly payment exceeds either of the threshold mentioned above, the lender must determine and document prior to closing of the loan that the making of the loan is justified based upon compensation factors, such as the borrowers long credit history, the borrower's demonstrated ability to make payment under comparable or greater debt to income ratios, the conservative use of credit standards, the borrower's significant liquid assets or other reasonable factors.

199.    By the actions described above, Defendants, Fremont General, Fremont Investment and Loan, WCS Lending and Jonathan Tanenbaum have violated 42 U.S.C. Sections 3601, 3604 and 3605. Section 3605 states:

that "[i]t shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such transaction, because of race ......" The plaintiffs were subjected to these

38

discriminatory practices as alleged, and given loans on grossly unfavorable terms.

200.    Upon information and belief, Defendant, Fremont Investment and Loan continue to provide mortgage loans to Caucasian applicants with similar qualifications on significantly more favorable terms, and their policies and practices will continue to have a discriminatory impact in violation of the Act against other African-American in applications for a mortgage, as they have on the plaintiffs in the past. Therefore, as a proximate result of Defendants, Fremont Investment and Loan, WCS Lending and Jonathan Tanenbaum's systematic violation of this statute, plaintiffs are entitled to the requested relief provided under the Act. If not enjoined from such violations by the Court, Defendants will continue to engage in conduct that disregards the rights of the plaintiffs and cause irreparable injury.

201.    Defendants, Fremont General, Fremont Investment and Loan, WCS Lending and Jonathan Tanenbaum discriminated against plaintiffs, by targeting plaintiffs for a predatory home purchase and mortgage loan transaction that, by reason of its grossly unaffordable loan terms and based on an intentionally concealment and omission of material facts and intentionally submitting false information and forged signatures to the mortgage application, provided plaintiffs with grossly inferior terms, conditions, and/or privileges of services in connection with the financing transaction on the basis of race and color. These actions were taken deliberately and with racial intent and with reckless disregard of plaintiffs' rights.

202.    As a proximate result of such discriminatory housing practices, plaintiffs have suffered economic loss, mental anguish, deprivation of civil rights, and the prospective loss of their home.

203.    Defendants' actions were intentional, wanton and malicious and in violation of the public interest and entitle plaintiffs to punitive damages.

204.    Treating the plaintiffs differently in mortgage lending based on their race and color violates the Fair Housing Act. As a proximate result of Defendants, Fremont Investment and Loan, WCS Lending and Jonathan Tanenbaum systematic violation of this Act, plaintiffs are

39

entitled to the requested relief requested herein.

## NINTH CAUSE OF ACTION
### (EQUAL CREDIT OPPORTUNITY ACT-15 U.S.C. §§ 1691 et seq.)

(Against WCS Lending LLC, Fremont General Corporation, Fremont Investment and Loan, America's Serving Company, US Bancorp, and U.S. Bank National Association, as Trustees For the Master Asset Backed Securities Trust 2006-FRE-1)

205.    Plaintiffs repeat, reiterate and reallege each and every paragraph numbered 1 through 204 as though the same were fully set forth herein.

206.    The Equal Credit Opportunity Act was enacted in 1974 as a consumer protection statute prohibiting discrimination in the issuing of credit. The Act has been broadly construed by the courts in order to make effective its provisions to protect consumers.

207.    Defendants, Fremont General and Fremont Investment and Loan is a creditor within the meaning of 15 U.S.C. §§ 1691(e). The mortgage loans offered to the Plaintiffs are credit transactions. The Act provides that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction… on the basis of race". 15 U.S.C. Section 1691(a)(1). The Plaintiffs were systematically and continuously extend mortgage credit by Defendants on a discriminatory basis. (Please refer to FDIC's Order to Cease and Desist, dated March 7, 2007, regarding Fremont Investment and Loan unsafe and unsound banking practices and violations of laws and regulations with regard to mortgage lending on the A copy said FDIC Order to Cease and Desist, dated March 7, 2007 is attached hereto as *Exhibit 11.*

208.    Defendants, Fremont General, Fremont Investment and Loan, Jonathan Tanenbaum and WCS Lending discriminated against the Plaintiffs on the basis of race and color on the terms and conditions of the loan contract, including charging higher interest rates to African-American than similarly-qualified Caucasians, falsifying information on the mortgage application and forging their signatures to the same application for the sole purpose of making a profit. In addition, said defendants named above will continue to engage in conduct that disregards the rights of African-Americans and causes irreparable injury if not enjoined from such violations by the Court.

209.    Treating Plaintiffs differently in mortgage lending based on their race and color

NYC/366658.1

violates this Act.    As a proximate result of Defendants, Fremont General and Fremont Investment and Loan's systematic violation of this Act, plaintiffs are entitled to the requested relief requested herein.

## TENTH CAUSE OF ACTION
### (CIVIL RIGHTS ACT: RACIAL DISCRIMINATION 42 U.S.C. §§ 1981, 1982, 1985 et seq.)

(Against WCS Lending LLC, Jonathan Tanenbaum, Fremont General Corporation, Fremont Investment and Loan, America's Serving Company, U.S. Bancorp and U.S. Bank N.A., as Trustees For the Master Asset Backed Securities Trust 2006-FRE-1)

210.    Plaintiffs repeat, reiterate and reallege each and every paragraph numbered 1 through 209 as though the same were fully set forth herein.

211.    The Civil Rights Act of 1866 and 1870, and later expanded upon through 1991, prohibits racial discrimination in the formation and issuance of contracts, and intentional interference to purchase and hold real property ("Civil Rights Act").

212.    Defendants, Fremont General, Fremont Investment and Loan and WCS Lending intentionally concealed certain material facts that Fremont Investment and Loan had a duty to disclose and by concealing these material facts, Fremont Investment and Loan and WCS Lending intended to deceive the Grimes with misleading terms and conditions.  The Grimes relied upon Fremont Investment and WCS Lending not to conceal, and that such reliance was reasonable under the circumstances.  Said concealment was a substantial factor in causing damages to the Grimes. Defendants, Fremont Investment and Loan, Jonathan Tanenbaum and WCS Lending intentionally misled and induced the Grimes into entering into a grossly unfair and abusive high cost loan disguised as an 2/28 ARM loan transaction for the sole purpose of defrauding and steering the plaintiffs into an unsuitable abusive mortgage loan product that carried excessive risk layers without regard to the borrower's ability to repay.

213.    Defendants intentionally discriminated against Plaintiffs by steering, concealing and structuring short-term high cost loans that they could disguise as ARM loans, thereby charging them higher interest rates than those charges to similarly-situated Caucasian mortgagees.  These de facto short-term high cost loans disguised as ARM loans were structured

41

as short-term high-cost loans by separating them into a short-term introductory period with a teaser rate and a longer term adjustable rate period that were aggressively marketed through Fremont's network of brokers to the African-American homeowners. This racially discriminatory pattern of acts and conducts constitutes "reverse redlining" and denied plaintiffs the same rights to make and enforce contracts, and to enjoy the full and equal benefits of the laws, as enjoyed by white citizens of the United States, in violation of 42 U.S.C. § 1981.

214.    Defendants, by intentionally concealing and misrepresenting the true terms and conditions of the loan, and by charging higher rates to the Plaintiffs, Defendants unlawfully discriminated against Plaintiffs in (i) formation of contracts, (ii) making, performance, modification, and termination of contracts, and/or (ii) the enjoyment of all benefits, privilege, terms and conditions of the contractual relationship, and in their right to purchase, finance, inherit, lease, sell, hold and convey real property, as enjoyed by white citizens of the United States, in violation of 42 U.S.C. § 1982a. Defendants, America' Servicing Company and U.S. Bancorp and U.S. Bank National Association, as Trustees for the Master Asset Backed Securities Trust 2006-FRE-1 intentionally failed to acknowledge, investigate or resolve disputes brought to their attention in a timely manner by African-American consumers, in violation of 42 U.S.C. § 1982.

215.    Defendants' actions violated 42 U.S.C. § 1981 and 1982. Defendants' action were intentional, wanton, malicious and in violation of public interest and entitle plaintiff to punitive damages under the Civil Rights Act. Finally, such pattern of actions constitute a conspiracy for the purpose of depriving plaintiffs of the equal protection of the laws, or of equal privileges and immunities of the laws of the United States in violation of 42 U.S.C. § 1985(3). As a proximate result of Defendants' racially discriminatory actions and systematic violation of this statue, plaintiffs have suffered economic loss, mental anguish, deprivation of civil rights, and the prospective loss of their home, they are entitled to the request relief provide under the Civil Rights Act.

42

## ELEVENTH CAUSE OF ACTION
### (NEW YORK STATE HUMAN RIGHTS LAW, EXECUTIVE LAW § 296(5)

(Against WCS Lending LLC, Jonathan Tanenbaum, Fremont General Corporation, Fremont Investment
and Loan, America's Serving Company, U.S. Bancorp and U.S. Bank N.A., as Trustees For the Master
Asset Backed Securities Trust 2006-FRE-1)

216.    Plaintiffs repeat, reiterate and reallege each and every paragraph numbered 1
through 215 as though the same were fully set forth herein.

217.    Defendants, Fremont General, Fremont Investment and Loan, WCS Lending,
Jonathan Tanenbaum and their employees and principals, through their actions described above,
have engaged in a pattern of unlawful discriminatory practices in violation of the New York
State Human Rights Law, Executive Law § 296.  Such actions include targeting victims on the
basis of race and color, steering and inducing people of color and non-white persons into
unaffordable mortgage products and denying affordable mortgage financing on the basis of race
and color; discriminating in the terms and conditions of mortgage financing, and in the
furnishing of facilities and services in connection with financing transactions.  Such actions were
taken deliberately and with racially discriminatory intent, with reckless disregard for plaintiffs'
right.

218.    In addition, said defendants engaged in a pattern of practices related to financing
transactions that resulted in a disparate impact of non-white prospective homebuyers and
borrowers in, and residents and would be residents in, communities of color through New York
City and State of New York.

219.    As a proximate result of these racially discriminatory actions, plaintiffs have
suffered economic loss, mental anguish, deprivation of civil rights, and the prospective loss of
their home.

220.    Defendants actions were intentional, wanton, malicious and in violation of the
public interest and entitle plaintiff to punitive damages.

43

## PRAYER FOR RELIEF

**WHEREFORE**, in light of the foregoing, plaintiffs respectfully request that this Court:

a) Enjoin enforcement of the mortgage and note and declare the mortgage and note unenforceable;

b) Award actual damages pursuant to all causes of action in an amount to be determined at trial;

c) Award statutory damages pursuant to all causes of action;

d) Award punitive damages in an amount to be determined at trial;

e) Award liquidated damages pursuant to all causes of action;

f) Award plaintiffs' attorney fees, pursuant to all causes of action;

g) Award plaintiffs' reasonable costs and expenses pursuant to all causes of action;

h) Enjoin defendants from engaging in deceptive acts and practices that affect consumers in New York State under New York State General Business Law § 349(h);

i) Rescind the underlying mortgage loan transaction and terminate any security interest in plaintiffs property created under the transaction;

j) Prohibit the defendants from taking any action toward foreclosures unless they have reviewed and investigated consumer complaints and confirmed that the consumer has not been the subject of any illegal practices;

k) Investigate and resolve any consumer disputes arising out of real estate transactions;

l) Declare the subject note and mortgage unenforceable, and enjoin and terminate the security interest pursuant to the first, third, fourth, fifth, seven,

44

eighth, ninth, tenth, eleventh and § 5-511; and

m) Award such other and further general relief as this Court deems just and

proper.

Dated: January 29, 2008
      Newburgh, New York

_____

Darrick Grimes
23 Stacy Lee Dive
Newburgh, New York 12550
Telephone: 845-562-0450

_____

Yolanda Grimes
23 Stacy Lee Dive
Newburgh, New York 12550
Telephone: 845-562-0450

45

# EXHIBIT ADDENDUM TO COMPLAINT

| **Exhibit** | **Contents of Exhibit** |
|---|---|
| 1. | Pre-Qualification Letter, dated September 12, 2005 from WCS Lending LLC |
| 2. | Forged Mortgage Application and Pre-Disclosure documents, dated and signed on September 13, 2005 and submitted on behalf of the Grimes by WCS Lending LLC and Jonathan Tanenbaum |
| 3. | Actual Mortgage Application and Pre-Disclosure documents, dated and signed on September 20, 2005 by the Grimes and submitted to WCS Lending and Jonathan Tanenbaum same day. |
| 4. | Fraudulently signed Good Faith Estimate and Truth in Lending Statement (forged signatures of the Grimes, dated September 13, 2005 and the Actual Good Faith Estimate and Truth in Lending Statement (signed by the Grimes on September 20, 2005 and October 12, 2005 (Fremont Closing Document) |
| 5. | Fremont Investment and Loan – Conditional Counter-Offer Approval Notices showing the terms and loan amounts of first and second mortgages |
| 6. | Fremont Mortgage Commitment Letter, dated September 16, 2005 |
| 7. | Fremont Loan Tracking Documents – Underwriter's Summary |
| 8. | Recession letters mailed to America's Servicing Company |
| 9. | Notices of Assignment, Sale or Transfer of Servicing Rights to the Grimes re assignment of the first mortgage to America's Servicing Company, dated February 9, 2006 and second mortgage assigned to Ocwen Loan Servicing, LLC |
| 10. | Copies of the Complaint Letters to various state and federal regulatory agencies regarding fraud and predatory lending practices |

11. FDIC Order of Cease and Desist, dated March 7, 2007

12. Fraudulently signed Residential Contract of Sale and Amendment to the Contract of Sale, dated September 14, 2005 submitted by WCS Lending LLC and Jonathan Tanenbaum with forged signatures of the Grimes (Purchasers) as well as the Sellers, the Cohen and a copy of Original "Draft of Contract of Sale"

13. Copies of the Closing Documents signed by the Grimes on October 15, 2005 as provided by Fremont Investment and Loan

14. Documented income statements (Paycheck stubs and W-2s) of the Grimes submitted to WCS Lending as of September 2005

15. Fremont Investment & Loan - Loan Submission Form from WCS Lending

16. Fremont Investment & Loan Final Underwriter Summary-Underwriter's Recommendation -Note Rental Income

# Exhibit B - Part 1

# GOOD FAITH ESTIMATE

Applicants:    Darrick Grimes, Yolanda Grimes
Property Address: 23 Kelly Ann Drive Newburgh, NY 12550          Borrowers: Darrick Grimes, Yolanda Grimes
Prepared By:    WCS Financial Services  Ph. 866-927-5363          Date Prepared:  09/13/2005
                6501 Congress Avenue, 3rd Floor, Boca Raton, FL 33487          Loan Program:   2/28 ARM

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates-actual charges may be more or less. Your transaction may not involve a fee for every item listed. The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 settlement statement which you will be receiving at settlement. The HUD-1 settlement statement will show you the actual cost for items paid at settlement.

Total Loan Amount $    405,000    Interest Rate:   7.000  %    Term:   360 / 360  mths

## 800 ITEMS PAYABLE IN CONNECTION WITH LOAN

| | | | | |
|---|---|---|---|---|
| 801 | Loan Origination Fee | | | |
| 802 | Loan Discount | | $ | |
| 803 | Appraisal Fee | | | |
| 804 | Credit Report | | (PAID) | 300.00 |
| 805 | Lender's Inspection Fee | | | |
| 808 | Mortgage Broker Fee | 1.000% | | |
| 809 | Tax Related Service Fee | | | 4,050.00 |
| 810 | Processing Fee | | | 60.00 |
| 811 | Underwriting Fee | | | 575.00 |
| 812 | Wire Transfer Fee | | | 405.00 |
| | Application Fee | | | |
| | Flood Certification | | | 225.00 |
| | | | | 9.50 |

## 1100 TITLE CHARGES

| | | | | |
|---|---|---|---|---|
| 1101 | Closing or Escrow Fee | | | |
| 1105 | Document Preparation Fee | | $ | |
| 1106 | Notary Fees | | | 195.00 |
| 1107 | Attorney Fees | | | |
| 1108 | Title Insurance: | NY (Orange) Purchase Owners | | 500.00 |
| | Title Search | | | 2,104.00 |
| | Title Exam | | | 195.00 |
| | Miscellaneous Title | | | 150.00 |
| | | | | 300.00 |

## 1200 GOVERNMENT RECORDING & TRANSFER CHARGES

| | | | | |
|---|---|---|---|---|
| 1201 | Recording Fees: | | | |
| 1202 | City/County Tax/Stamps: | | $ | 150.00 |
| 1203 | State Tax/Stamps: | | | |

## 1300 ADDITIONAL SETTLEMENT CHARGES

| | | | | |
|---|---|---|---|---|
| 1302 | Pest Inspection | | $ | |

Estimated Closing Costs    9,218.50

## 900 ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE

| | | | | |
|---|---|---|---|---|
| 901 | Interest for | 15 | days @ $ | 78.7500 | per day | $ | 1,181.25 |
| 902 | Mortgage Insurance Premium | | | |
| 903 | Hazard Insurance Premium | | | 900.00 |
| 904 | | | | |
| 905 | VA Funding Fee | | | |

## 1000 RESERVES DEPOSITED WITH LENDER

| | | | | |
|---|---|---|---|---|
| 1001 | Hazard Insurance Premiums | | months @ $ | | $ | |
| 1002 | Mortgage Ins. Premium Reserves | 5 | months @ $ | 75.00 | per month | 375.00 |
| 1003 | School Tax | | months @ $ | | per month | |
| 1004 | Taxes and Assessment Reserves | 2 | months @ $ | 585.00 | per month | 1,170.00 |
| 1005 | Flood Insurance Reserves | | months @ $ | | per month | |
| | | | months @ $ | | per month | |
| | | | months @ $ | | per month | |

Settlement 19,268 Charges

| | | |
|---|---|---|
| TOTAL ESTIMATED SETTLEMENT CHARGES | Estimated Prepaid Items/Reserves | 3,626.25 |
| | | 12,844.75 |

## COMPENSATION TO BROKER (Not Paid Out of Loan Proceeds)

| | | |
|---|---|---|
| Lender Paid Comp 0-4% | $ | |

## TOTAL ESTIMATED FUNDS NEEDED TO CLOSE

| | | | |
|---|---|---|---|
| Purchase Price/Payoff (+) | 450,000.00 | New First Mortgage(-) | |
| Loan Amount (-) | 405,000.00 | Sub Financing(-) | |
| Est. Closing Costs (+) | 9,218.50 | New 2nd Mtg Closing Costs(+) | |
| Est. Prepaid Items/Reserves (+) | 3,626.25 | | |
| Amount Paid by Seller (-) | 3,626.25 | | |

## TOTAL ESTIMATED MONTHLY PAYMENT

| | |
|---|---|
| Principal & Interest | 2,694.48 |
| Other Financing (P & I) | 270.00 |
| Hazard Insurance | |
| Real Estate Taxes | 75.00 |
| Mortgage Insurance | 585.00 |
| Homeowner Assn. Dues | |
| Other | |

Total Est. Funds needed to close    57,844.75    Total Monthly Payment    3,624.48

☐ This Good Faith Estimate is being provided by _____, a mortgage broker, and no lender has been obtained. Those estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the lender will take a first lien on the property. The undersigned acknowledges receipt of the booklet "Settlement Costs," and if applicable the Consumer Handbook on ARM Mortgages.

_Darrick Grimes_  9/20/05        _Yolanda Grimes_  9/20/05
Applicant    Darrick Grimes    Date        Applicant    Yolanda Grimes    Date

Calyx Form gfe.frm 11/01

| | |
|---|---|
| Applicants: Darrick Grimes<br>Yolanda Grimes<br>Property Address: 23 Stacy Lee Drive<br>Newburgh, NY 1250<br>Application No: GrimesYolandaNT80659 | Prepared By: WCS Financial Services<br>6501 Congress Avenue, 3rd Floor<br>Boca Raton, FL 33487<br>866-927-5363<br>Date Prepared: 09/13/2005 |

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate | FINANCE CHARGE<br>The dollar amount the credit will cost you | AMOUNT FINANCED<br>The amount of credit provided to you or on your behalf | TOTAL OF PAYMENTS<br>The amount you will have paid after making all payments as scheduled |
|---|---|---|---|
| * 5.167 % | $ * 380,698.21 | $ * 405,000.00 | $ * 785,698.21 |

REQUIRED DEPOSIT: The annual percentage rate does not take into account y our required deposit
PAYMENTS: Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| | | Monthly Beginning: | | | Monthly Beginning: | | | Monthly Beginning: |
| 24 | 2,694.48 | | | | | | | |
| 12 | 2,194.78 | | | | | | | |
| 323 | 2,144.11 | | | | | | | |
| 1 | 2,145.80 | | | | | | | |

☐ DEMAND FEATURE: This obligation has a demand featu re.
☑ VARIABLE RATE FEATURE: This loan contai ns a variable rate feature. A variable rate disclosure has b een provided earlier.

CREDIT LIFE/CREDIT DISABILITY: Credit life insurance and credit disability insurance are not req uired to obtain credit, and will not be provided unless you sign and agree to pay the additional cost.

| Type | Premium | Signature |
|---|---|---|
| Credit Life | | I want credit life insurance. |
| Credit D isability | | I want credit disability insurance. Signature: |
| Credit Life and D isability | | I want credit life and disability insurance. Signature: |

INSURANCE: The following insurance is required to obtain credit:
☐ Credit life insurance ☐ Credit disability ☐ Property insurance ☐ Flood insurance
You may obtain the insurance from anyone you want th at is acceptable to creditor
☐ If you purchase ☐ property ☐ flood insurance fr om creditor you will pay $ _____ for a one year term.
SECURITY: You are giving a security interest i n: 23 Stacy Lee Drive, Newburgh NY 1250
☑ The goods or property being purchased ☐ Real property you already own.
FILING FEES: $
LATE CHARGE: If a payment is more than 15 days late, you will be charged 5.000 % of the payment
PREPAYMENT: If you pay off early, you
☐ may ☑ will not have to pay a penalty.
☐ may ☑ will not be entitled to a refund of part of the finance charge.
ASSUMPTION: Someone bu ying your property
☐ may ☐ may, subject to conditions ☑ may not assume th e remainder of your loan on the original terms.
See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds an d penalties
☑ * means an estimate ☐ all dates and numerical disclosures except the late payment disclosures are estimates.

* NOTE: The Payments shown above include reserve d eposits for Mortgage Insurance (if applicable), but exclude Property T axes and Insurance.

THE UNDERSIGNED ACKNOWLEDGES RECEIVING A COMPLETED COPY OF THIS DISCLOSURE.

| | | | | | |
|---|---|---|---|---|---|
| _Darrick Grimes_ | 9/20/05 | | _Yolanda Grimes_ | 9/20/05 | |
| Darrick Grimes (Applicant) | (Date) | | Yolanda Grimes (Applicant) | (Date) | |
| _____ (Applicant) | (Date) | | _____ (Applicant) | (Date) | |
| _____ (Lender) | (Date) | | | | |

Calyx Form - tilhp (02/95)

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable, Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA    ☑ Conventional    ☐ Other (explain): | Agency Case Number | Lender Case Number |
|---|---|---|---|
| | ☐ FHA    ☐ USDA/Rural Housing Service | | |

| Amount $ 405,000 | Interest Rate 7.000 % | No. of Months 360/360 | Amortization Type: | ☐ Fixed Rate    ☐ Other (explain): ☐ GPM    ☑ ARM (type): 2/28 |
|---|---|---|---|---|

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, ZIP)  23 Stacy Lee Drive,  Newburgh, NY 1250    County: Orange | No. of Units 1 |
|---|---|
| Legal Description of Subject Property (attach description if necessary)  See title | Year Built 1987 |

| Purpose of Loan | ☑ Purchase    ☐ Construction | ☐ Other (explain): | Property will be: |
|---|---|---|---|
| | ☐ Refinance    ☐ Construction-Permanent | | ☑ Primary Residence  ☐ Secondary Residence  ☐ Investment |

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a+b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

Complete this line if this is a refinance loan.

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements | ☐ made    ☐ to be made |
|---|---|---|---|---|---|
| | $ | $ | | Cost: $ | |

| Title will be held in what Name(s)    Darrick Grimes  Yolanda Grimes | Manner in which Title will be held  Joint tenants | Estate will be held in: ☑ Fee Simple ☐ Leasehold (show expiration date) |
|---|---|---|

| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain)  Deposit on Sales Contract |
|---|

## III. BORROWER INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|
| Name (include Jr. or Sr. if applicable) | Darrick Grimes | Yolanda Grimes |

| Social Security Number 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 | Home Phone (incl. area code) 718-464-3331 | DOB (MM/DD/YYYY) 01/09/1982 | Yrs. School 14 | Social Security Number 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 | Home Phone (incl. area code) | DOB (MM/DD/YYYY) 10/29/1968 | Yrs. School 14 |
|---|---|---|---|---|---|---|---|

| ☑ Married  ☐ Unmarried (include single, divorced, widowed) ☐ Separated | Dependents (not listed by Co-Borrower) no. 2    ages 2,14 | ☑ Married  ☐ Unmarried (include single, divorced, widowed) ☐ Separated | Dependents (not lis ted by Borrower) no. 2    ages 2,14 |
|---|---|---|---|

| Present Address (street, city, state, ZIP)  ☑ Own  ☐ Rent  7  No. Yrs.  188-19 104th Avenue  St. Albans, NY 11412 | Present Address (street, city, state, ZIP)  ☑ Own  ☐ Rent  7  No. Yrs.  188-19 104th Avenue  St. Albans, NY 11412 |
|---|---|

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|

If residing at present address for less than two years, complete the following:

| Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  No. Yrs. | Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  No. Yrs. |
|---|---|

## IV. EMPLOYMENT INFORMATION

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| Name & Address of Employer  EDO Corporation  60 East 42nd Street  New york, NY 10166 | ☑ Self Employed | Yrs. on this job 0 yr(s) 10 mth(s)  Yrs. employed in this line of work/profession 0.8 | Name & Address of Employer  Debevoise And Plimpton  919 Third Ave  New York, NY 10022 | ☐ Self Employed | Yrs. on this job 3 yr(s) 0 mth(s)  Yrs. employed in this line of work/profession 3 |

| Position/Title/Type of Business  Legal Assistant | Business Phone (incl. area code) 212-716-2069 | Position/Title/Type of Business  Legal Assistant | Business Phone (incl. area code) 212-909-6401 |
|---|---|---|---|

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Name & Address of Employer  CitiGroup  388 Grenwich Street  New York, NY 10001 | ☐ Self Employed | Dates (from-to) 3/99 - 10/04  Monthly Income $ 6,000.00 | Name & Address of Employer | ☐ Self Employed | Dates (from-to)  Monthly Income |
|---|---|---|---|---|---|

| Position/Title/Type of Business  Legal Assistant | Business Phone (incl. area code) 212-382-7000 | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|

| Name & Address of Employer | ☐ Self Employed | Dates (from-to)  Monthly Income $ | Name & Address of Employer | ☐ Self Employed | Dates (from-to)  Monthly Income $ |
|---|---|---|---|---|---|

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 6,493.00 | $ 3,061.00 | 9,554.00 | Rent | $ | |
| Overtime | | | | First Mortgage (P&I) | | $ 2,694.48 |
| Bonuses | | | | Other Financing (P&I) | | 270.00 |
| Commissions | | | | Hazard Insurance | | 75.00 |
| Dividends/Interest | | | | Real Estate Taxes | | 585.00 |
| Net Rental Income | 1,076.00 | | 1,076.00 | Mortgage Insurance | | |
| Other (before completing, see the notice in "describe other income," below) | | | | Homeowner Assn. Dues | | |
| | | | | Other: | | |
| Total | $ 7,569.00 | $ 3,061.00 | 10,630.00 | Total | $ | $ 3,624.48 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

Describe Other Income   Notice:  Alimony, child support, or separate maintenance income need not be revealed if the
Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| B/C | | Monthly Amount |
|---|---|---|
| | | $ |
| | | |
| | | |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

Completed   ☐ Jointly   ☐ Not Jointly

| ASSETS  Description | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
|---|---|---|---|---|
| Cash deposit toward purchase held by: | $ | | | |
| | | **LIABILITIES** | Monthly Payment & Months Left to Pay | Unpaid Balance |
| *List checking and savings accounts below* | | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union  Commerce Bank | | HFC - USA  P.O. BOX 1547  CHESAPEAKE, VA 23320 | | |
| Acct. no. | $ 10,000 | Acct. no. 64721500318863 | (2,046) | 292,142 |
| Name and address of Bank, S&L, or Credit Union  Commerce Bank | | Name and address of Company  SALLIE MAE 3RD PTY L  1002 ARTHUR DR  LYNN HAVEN, FL 32444 | $ Payment/Months | $ |
| Acct. no. | $ 2,000 | Acct. no. 1115664461076 | 249 | 37,420 |
| Name and address of Bank, S&L, or Credit Union  ING DIRECT | | Name and address of Company  SM SERVICING  PO BOX 9500  WILKES BARRE, PA 18773 | $ Payment/Months | $ |
| Acct. no. | $ 1,500 | Acct. no. 111566446107F | 249 | 37,420 |
| Name and address of Bank, S&L, or Credit Union  401k | | Name and address of Company  HFC - USA  P.O. BOX 1547  CHESAPEAKE, VA 23320 | $ Payment/Months | $ |
| Acct. no. | $ 11,000 | Acct. no. 64721516125790 | 503 | 35,209 |
| Stocks & Bonds (Company name/ number & description) | $ | Name and address of Company  CHRYSLER FINANCIAL  1 BLUE HILL PLZ STE 15  PEARL RIVER, NY 10965 | $ Payment/Months | $ |
| | | Acct. no. 7000579255 | 397 | 9,379 |
| Life insurance net cash value | $ | Name and address of Company  CAPITAL 1 BK  PO BOX 85015  RICHMOND, VA 23285 | $ Payment/Months | $ |
| Face amount: $ | | | | |
| Subtotal Liquid Assets | 26,500 | Acct. no. 517805246356 | 218 | 7,281 |
| Real estate owned (enter market value from schedule of real estate owned) | $ 440,000 | Name and address of Company  HSBC/LEVTZ  90 CHRISTIANA RD  NEW CASTLE, DE 19720 | $ Payment/Months | $ |
| Vested interest in retirement fund | $ | | | |
| Net worth of business(es) owned (attach financial statement) | $ | Acct. no. 72062410245 | (94) | 1,882 |
| Automobiles owned (make and year) | | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| Other Assets (itemize) | $ | | | |
| | | Job Related Expense (child care, union dues, etc.) | $ | |
| | | Total Monthly Payments | $ 1,910 | |
| **Total Assets a.** | $ 466,500 | Net Worth (a minus b) | $ 37,532 | **Total Liabilities b.** | $ 428,968 |

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower: Darrick Grimes | Agency Case Number: |
| | Co-Borrower: Yolanda Grimes | Lender Case Number: |

## VII. ASSETS AND LIABILITIES

| ASSETS | Cash or Market Value | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Name and address of Bank, S&L, or Credit Union  401k | $ | Name and address of Company HSBC/LEVITZ 90 CHRISTINANA ROAD NEW CASTLE, DE 19720 | $ Payt./Mos. | $ |
| Acct. no. | $  2,000 | Acct. no.  720624-4102456197 | 94 | 1,882 |
| Name and address of Bank, S&L, or Credit Union | $ | Name and address of Company PROVIDIAN FINANCIAL 4940 JOHNSON DR PLEASANTON, CA 94566 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. no.  0300645735 | 51 | 1,687 |
| Name and address of Bank, S&L, or Credit Union | $ | Name and address of Company PROVIDIAN FINANCIAL 4940 JOHNSON DR PLEASANTON, CA 94566 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  0800611925 | 32 | 1,039 |
| Name and address of Bank, S&L, or Credit Union | $ | Name and address of Company HSBC NV POB 98706 LAS VEGAS, NV 89193 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  544045005310 | 26 | 893 |
| Name and address of Bank, S&L, or Credit Union | $ | Name and address of Company DRS SHERMAN STR 322 WALL STREET PRINCETON, NJ 08540 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  684026 | | 725 |
| Name and address of Bank, S&L, or Credit Union | $ | Name and address of Company HSBC NV 1441 SCHILLING PLACE SALINAS, CA 93901 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  275000393589 | 18 | 662 |
| Name and address of Bank, S&L, or Credit Union | $ | Name and address of Company HSBC NV 1441 SCHILLING PLACE SALINAS, CA 93901 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  912055364537 | 18 | 507 |
| Name and address of Bank, S&L, or Credit Union | $ | Name and address of Company CAPITAL 1 BK PO BOX 85015 RICHMOND, VA 23285 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  517805248879 | 15 | 348 |
| Name and address of Bank, S&L, or Credit Union | $ | Name and address of Company CAPITAL 1 BK PO BOX 85015 RICHMOND, VA 23285 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  517805256683 | 15 | 255 |
| Name and address of Bank, S&L, or Credit Union | $ | Name and address of Company ACTION CARD/BANK FIR POB 2394 OMAHA, NE 68103 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  5256181011029103 | 15 | 157 |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: X ~~Darrick Grimes~~ | Date 9/20/05 | Co-Borrower's Signature: X ~~Yolanda Grimes~~ | Date 9-20-05 |

Freddie Mac Form 65    01/04
CALYX Form 1003 Lnap4ast.frm 01/04

Fannie Mae Form 1003    01/04

**Schedule of Real Estate Owned** (if additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 188-19 104th Ave<br>St Albens NY,11412 | R | RENTAL<br>MULTI | $ 440,000 | $ 312,000 | $ 4,400 | $ 2,024 | $ 200 | 1,076 |
| | | | | | | | |
| | | | | | | | |
| | Totals | $ 440,000 | $ 312,000 | $ 4,400 | $ 2,024 | $ 200 | 1,076 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

| VII. DETAILS OF TRANSACTION | | VIII. DECLARATIONS | | | | |
|---|---|---|---|---|---|---|
| a. Purchase price | $ 450,000.00 | If you answer "yes" to any questions a through i, please use continuation sheet for explanation. | Borrower | | Co-Borrower | |
| b. Alterations, improvements, repairs | | | Yes | No | Yes | No |
| c. Land (if acquired separately) | | a. Are there any outstanding judgments against you? | ☐ | ☑ | ☐ | ☑ |
| d. Refinance (incl. debts to be paid off) | | b. Have you been declared bankrupt within the past 7 years? | ☐ | ☑ | ☐ | ☑ |
| e. Estimated prepaid items | 3,626.25 | c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | ☐ | ☑ | ☐ | ☑ |
| f. Estimated closing costs | 9,218.50 | | | | | |
| g. PMI, MIP, Funding Fee | | d. Are you a party to a lawsuit? | ☐ | ☑ | ☐ | ☑ |
| h. Discount (if Borrower will pay) | | e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? | ☐ | ☑ | ☐ | ☑ |
| i. Total costs (add items a through h) | 462,844.75 | (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | | | |
| j. Subordinate financing | | | | | | |
| k. Borrower's closing costs paid by Seller | | | | | | |
| l. Other Credits(explain) | | f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | ☐ | ☑ | ☐ | ☑ |
|    Cash Deposit | 10,000.00 | | | | | |
| | | g. Are you obligated to pay alimony, child support, or separate maintenance? | ☐ | ☑ | ☐ | ☑ |
| | | h. Is any part of the down payment borrowed? | ☐ | ☑ | ☐ | ☑ |
| | | i. Are you a co-maker or endorser on a note? | ☐ | ☑ | ☐ | ☑ |
| m. Loan amount<br>(exclude PMI, MIP, Funding Fee financed) | 405,000.00 | j. Are you a U. S. citizen? | ☑ | ☐ | ☑ | ☐ |
| | | k. Are you a permanent resident alien? | ☐ | ☑ | ☐ | ☑ |
| n. PMI, MIP, Funding Fee financed | | l. Do you intend to occupy the property as your primary residence? If "Yes," complete question below. | ☑ | ☐ | ☑ | ☐ |
| o. Loan amount (add m & n) | 405,000.00 | m. Have you had an ownership interest in a property in the last three years? | ☑ | ☐ | ☑ | ☐ |
| | | (1) What type of property did you own-principal residence (PR), second home (SH), or investment property (IP)? | PR/IP | | PR/IP | |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | 47,844.75 | (2) How did you hold title to the home-solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | SP | | SP | |

**IX. ACKNOWLEDGEMENT AND AGREEMENT**

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described herein; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated herein; (6) any owner or servicer of the Loan may verify or reverify any information contained in the application from any source named in this application, and Lender, its successors or assigns may retain the original and/or an electronic record of this application, even if the Loan is not approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the owner or servicer of the Loan may, in addition to any other rights and remedies that it m ay have relating to such delinquency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X _Daniel Jones_ | 9/20/05 | X _Yolanda Jones_ | 9-20-05 |

**X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES**

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a Lender may discriminate neither on the basis of this information, nor on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation or surname. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | ☐ I do not wish to furnish this information | CO-BORROWER | ☐ I do not wish to furnish this information |
|---|---|---|---|
| Ethnicity: | ☐ Hispanic or Latino    ☑ Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino    ☑ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaska Native    ☐ Asian    ☑ Black or African American | Race: | ☐ American Indian or Alaska Native    ☐ Asian    ☑ Black or African American |
| | ☐ Native Hawaiian or Other Pacific Islander    ☐ White | | ☐ Native Hawaiian or Other Pacific Islander    ☐ White |
| Sex: | ☐ Female    ☑ Male | Sex: | ☑ Female    ☐ Male |

| To be Completed by Interviewer | Interviewer's Name (print or type) | Name and Address of Interviewer's Employer |
|---|---|---|
| This application was taken by: | JTanenbaum | WCS Financial Services |
| ☐ Face-to-face interview | | 6501 Congress Avenue, 3rd Floor |
| ☐ Mail | Interviewer's Signature      Date | Boca Raton, FL 33487 |
| ☑ Telephone | | (P) 866-927-5363 |
| ☐ Internet | Interviewer's Phone Number (incl. area code) | (F) 561-864-2801 |
| | 866-927-5363 | |

## Continuation Sheet/Residential Loan Application

| | |
|---|---|
| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower: **Darrick Grimes** |
| | Co-Borrower: **Yolanda Grimes** |

| | |
|---|---|
| Agency Case Number: | |
| Lender Case Number: | |

### VI. ASSETS AND LIABILITIES

| ASSETS | Cash or Market Value | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company AMEX P O BOX 297871 FORT LAUDERDAL, FL 33329 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. 144999036017301261 | | 40 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company AMEX PO BOX 297871 FORT LAUDERDALE, FL 33329 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. -144999036017301261 | 10 | 40 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: X | Date 9/20/05 | Co-Borrower's Signature: | Date 9-20-05 |
|---|---|---|---|

Freddie Mac Form 65    01/04
CALYX Form 1003 Lnap4ast.frm 01/04

Page 4 of 4

Fannie Mae Form 1003    01/04

Continuation Sheet Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower: Darrick Grimes | Agency Case Number: |
| | Co-Borrower: Yolanda Grimes | Lender Case Number: |

| Borrower | VII. BORROWER INFORMATION | Co-Borrower |
|---|---|---|
| Former Address (street, city, state, ZIP) ☐ Own ☐ Rent _____ No. Yrs. | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent _____ No. Yrs. | |

We/I fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: X _Darrick Grimes_ | Date 9/20/05 | Co-Borrower's Signature: X _Yolanda Grimes_ | Date 9-20-05 |

Continuation Sheet/Residential Loan Application

| | | |
|---|---|---|
| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower:<br>Darrick Grimes | Agency Case Number: |
| | Co-Borrower:<br>Yolanda Grimes | Lender Case Number: |

| Borrower | | IV. EMPLOYMENT INFORMATION | Co-Borrower | |
|---|---|---|---|---|
| Name and Address of Employer | ☐ Self Employed | Dates(from-to) | Name and Address of Employer ☐ Self Employed | Dates(from-to) |
| | | Monthly Income $ | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
| Name and Address of Employer | ☐ Self Employed | Dates(from-to) | Name and Address of Employer ☐ Self Employed | Dates(from-to) |
| | | Monthly Income $ | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
| Name and Address of Employer | ☐ Self Employed | Dates(from-to) | Name and Address of Employer ☐ Self Employed | Dates(from-to) |
| | | Monthly Income $ | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
| Name and Address of Employer | ☐ Self Employed | Dates(from-to) | Name and Address of Employer ☐ Self Employed | Dates(from-to) |
| | | Monthly Income $ | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
| Name and Address of Employer | ☐ Self Employed | Dates(from-to) | Name and Address of Employer ☐ Self Employed | Dates(from-to) |
| | | Monthly Income $ | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
| Name and Address of Employer | ☐ Self Employed | Dates(from-to) | Name and Address of Employer ☐ Self Employed | Dates(from-to) |
| | | Monthly Income $ | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature:<br>X _Darrick Grimes_ | Date<br>9/20/05 | Co-Borrower's Signature:<br>X _Yolanda Grimes_ | Date<br>9-20-05 |
|---|---|---|---|

Freddie Mac Form 65    01/04
Calyx Form 1003 Lnap4emp.frm 0.1/04

Page 4 of 4

Fannie Mae Form 1003    01/04

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower:<br>Darrick Grimes | Agency Case Number: |
|---|---|---|
| | Co-Borrower:<br>Yolanda Grimes | Lender Case Number: |

## VI. ASSETS AND LIABILITIES

### Schedule of Real Estate Owned

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature:<br>X | Date<br>9/20/05 | Co-Borrower's Signature:<br>X | Date<br>9-20-05 |
|---|---|---|---|

Freddie Mac Form 65   01/04
Calyx Form 1003 Lnap4reo.frm 01/04

Page 4 of 4

Fannie Mae Form 1003   01/04

# WCS FINANCIAL SERVICES

### MORTGAGES MADE EASIER

## RATE LOCK / FLOAT ADDENDUM

Applicant acknowledges that the interest rate on this loan is floating unless Applicant receives an Interest Rate Lock-In Agreement confirmation from WCS Lending by mail, e-mail or fax. Applicant must sign an Interest Rate Lock-In Agreement in order to have the lock-in guaranteed by WCS Lending. If Applicant has not signed an Interest Rate Lock-In Agreement, the rate is <u>not</u> locked and therefore <u>not</u> guaranteed.

If Applicant has locked in a rate, and WCS Lending has not received an application package back within Seven (7) days, the Interest Rate Lock-In Agreement will be cancelled.

Please check the appropriate selection and sign below:

_____    I have received an Interest Rate Lock-In Agreement from WCS Lending and my rate is in accordance to what was agreed.

__✓__    I acknowledge that my interest rate is currently floating and is subject to daily changes based upon market fluctuations.

_____     9/20/05
Applicant                                               Date

_____     9/20/05
Co-Applicant                                          Date

6501 Congress Avenue, 3rd Floor • Boca Raton, Florida 33487
(866) WCS-LEND • www.WCSLending.com

# WCS FINANCIAL SERVICES

MORTGAGES MADE EASIER

## NEW YORK: PRE-APPLICATION DISCLOSURE AND BROKER FEE AGREEMENT

1. The Registrant, WCS Financial Services (since Registrant is "acting as a mortgage broker"), may not make mortgage loans or commitments. The Registrant ("WCS") may furnish a lock-in or commitment to Applicant on behalf of Applicant when WCS has obtained a written and executed commitment or lock-in from a lender on behalf of Applicant.

2. WCS has advised me/us ("Applicant/s") that WCS is authorized and prepared to assist and advise Applicant/s in securing financing. Applicant/s understands that WCS's services may include, but are not limited to:
   - Counseling on available mortgage products and general qualification procedures;
   - Counseling on Applicant/s financial capabilities;
   - Assistance in completing, processing, and in meeting conditions of the loan.

3. Applicant/s hereby engages WCS as Applicant's agent for the purpose of advising Applicant/s about financing and to provide the services described herein. This agreement will continue until the earlier of the declination of Applicant/s loan request, the closing of the loan, or Applicant/s termination of WCS's services.

4. Prior to paying any fees or submitting an application, the Applicant/s understands that:
   WCS's services are advisory and administrative in nature. WCS is acting as a broker and will not make the mortgage loan or commitment. WCS cannot guarantee acceptance into any particular loan program, specific loan terms or conditions. WCS may be eligible to receive a Lender paid bonus based upon the quality of loans placed with the Lender.

5. **BROKER FEE:**

   Applicant/s understand that, as compensation for WCS's services, WCS will be paid as indicated below:

   A. The maximum fee the *Lender* will pay WCS is not known at this time and will be in the range of 0.00% to 4.00% of the loan amount. The exact amount, if any, can be disclosed when the Lender confirms a rate lock request. The compensation WCS will receive from the lender for WCS's services is included in the rate, points, fees and terms of the loan as quoted by the Lender in its commitment; and/or,

   B. The Applicant/s will pay WCS directly a total mortgage broker fee (inclusive of Application Fee and Processing Fee noted in Item 7) of  $4,945.00 .

6. WCS's mortgage broker fee, whether paid by Applicant/s directly, or from the loan proceeds, will be considered a cost of the credit and will be disclosed to Applicant/s by the Lender as part of the financing charges. Applicant/s understand the fee will be paid to WCS, and there is no other fee agreement between the parties.

7. Applicant/s understands that s/he is required to pay the following fees, made payable to (**WCS Lending, LLC**), at Application or at Closing:

   | | | | |
   |---|---|---|---|
   | A. | Application Fee | $295.00 | At Application |
   | B. | Processing Fee | $650.00 | At Closing |
   | C. | Mortgage Broker Fee | $4,000.00 | At Closing |

   ### THE APPLICATION FEE IS NON-REFUNDABLE

8. WCS's mortgage broker fee, whether paid by Applicant/s directly, or from the loan proceeds, or by the lender, will be considered a cost of the credit and will be disclosed to Applicant/s by the Lender as part of the financing charges. Applicant/s understand the fee will be paid to WCS, and there is no other fee agreement between the parties.

9. Applicant understands that s/he is required to pay a property appraisal fee directly to the appraisal company, either at the time the appraisal is performed, or at the closing of the loan. The estimate for this cost is $300.00. Applicant/s understands that s/he has the right to a *copy* of the appraisal report, provided that Applicant has paid the Appraisal Fee in full. Applicant understands that he/she will not be charged for a credit report that WCS will obtain on Applicant's behalf at a cost of approximately $18.

10. Applicant/s understand that certain mortgage products impose a prepayment penalty on the borrower. WCS will disclose the amount of, or the formula for calculating, the prepayment penalty, if any, as soon as WCS is informed.

11. TO EXPEDITE THE APPROVAL OF THE LOAN, APPLICANT/S HEREBY PRE-AUTHORIZATIONS WCS TO INCUR THIRD-PARTY FEES (ie., FLOOD CERTIFICATION OF $22.00) ON APPLICANT/S BEHALF. APPLICANT/S AGREES TO REIMBURSE WCS FOR THE FEES ADVANCED.

12. Applicant/s may call William Schneider, Toll Free, at (866) WCS-LEND to address any complaints regarding the application. Any changes to this Agreement must be in writing and signed by an authorized officer of WCS.

Applicant/s acknowledges receipt of a copy of this Broker Fee Agreement.

Applicant _____    Date  9-20-05

Co-Applicant _____    Date  9-20-05

WCS Lending _____    Date _____

6501 Congress Avenue, 3rd Floor • Boca Raton, Florida 33487
(866) WCS-LEND • www.WCSLending.com

# WCS FINANCIAL SERVICES

### MORTGAGES MADE EASIER

Do not do anything that negatively impacts your ability to qualify for your mortgage loan, or initiates a new round of paperwork. If you have any doubts about doing something that may affect your ability to qualify for your mortgage loan, please do not hesitate to contact me.

These suggestions are all offered as cautions. Your mortgage application is not a static snap-shot of a client's financial life, but rather an on-going process that takes into account everything done right up until the day of closing.

By signing this Statement of understanding, you acknowledge that the information above has been fully explained to you.

_____     9/20/05
Applicant                                              Date

_____     9-20-05
Co-Applicant                                         Date

# WCS FINANCIAL SERVICES

### MORTGAGES MADE EASIER

## CONTACT INFORMATION FORM

This form is designed to gives us all the appropriate contact information to allow your processing to move as freely as possible. The information gathered here will also help us provide periodic updates on loan status, market conditions and any special promotions WCS Lending may be running.

**Borrower:**

Name: Darrick & Yolanda Grimes
Address: 188-19 104th Avenue
St. Albans, New York 11412
E-mail: Ypgrimes@aol.com

Phone (H): 718 464-3331
Phone (W): 212 909-6401
Mobile: 917 776-8580 / 347 224-8141
Pager:
Fax:

**Your Realtor:**

Agency: Lyra's Easy Lifestyle
Name: Lyra Blumenthal
Address: 655 Fostertown Road
Newburgh, NY 12550

Phone (W): (845) 565-1900
E-mail: lyrarealte aol.com
Mobile: (845) 728-9940
Pager:
Fax:

**Your Attorney:**

Firm Name: Keith Schutzman
Address: 774 White Plains Road
Suite 220
Scarsdale, NY 10583

Phone (W): (914) 713-0001
E-mail:
Mobile:
Pager:
Fax: (914) 713-0004

**Seller:**

Name:
Phone:

**Listing Agent:**

Name:
Phone:

**Managing Agent:**

Name:
Phone:

# WCS FINANCIAL SERVICES

### MORTGAGES MADE EASIER

## Damages and Costs

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that section.

## Servicing Transfer Estimated

1. The following is the best estimate of what will happen to the servicing of your mortgage loan:

   A. ☐ We may assign, sell or transfer the servicing of your loan sometime while the loan is outstanding. We are able to service your loan, and we
      ☐ will service your loan.
      ☐ will not service your loan.
      ☐ haven't decided whether to service your loan.
   B. ☒ We do not service mortgage loans, and we have not serviced mortgage loans in the past Three (3) years.

      We presently intend to assign, sell or transfer the servicing of your mortgage loan. You will be informed about your servicer.

2. For all the first lien mortgage loans that we make in the 12 month period after your mortgage loan is funded, we estimate that the percentage of such loans for which we will transfer servicing is between:

   ☐ 0 to 25%    ☐ 26 to 50%    ☐ 51 to 75%    ☒ 76 to 100%

   This estimate ☒ does ☐ does not include assignments, sales or transfers to affiliates or subsidiaries. This is only our best estimate and it is not binding. Business conditions or other circumstances may affect our future transferring decisions.

3. A. ☒ We have previously assigned, sold or transferred the services of the first lien mortgage loans.
   B. ☒ This is our record of transferring the servicing of the first lien mortgage loans we have made in:

   | Year | Percentage of Loans Transferred |
   | --- | --- |
   | 2002 | 100% |
   | 2003 | 100% |
   | 2004 | 100% |

   This information ☒ does ☐ does not include assignments, sales or transfers to affiliates or subsidiaries.

## ACKNOWLEDGMENT OF MORTGAGE LOAN APPLICANT

I/We have read this disclosure form, understand its contents, and understand that this acknowledgement is a required part of the mortgage loan application as evidenced by my/our signatures below.

_____        9-20-05
Applicant                              Date

_____        9-20-05
Co-Applicant                           Date

# WCS FINANCIAL SERVICES

MORTGAGES MADE EASIER

## DISCLOSURE NOTICES

Applicant(s): Yolanda Grimes          Property Address:

_____ , NY

☐

### OCCUPANCY STATEMENT

This is to certify that I/We ☐ do ☐ do not intend to occupy the subject property as principal residence. I/We hereby certify under penalty of U.S. Criminal Code Section 1010 Title 18 U.S.C., that the above statement submitted for the purpose of obtaining mortgage insurance under the National Housing Act is true and correct. Initials _____

### FAIR CREDIT REPORTING ACT

An investigation will be made as to the credit standing of all individuals seeking credit in this application. The nature and scope of any investigation will be furnished to you upon written request made within a reasonable period of time. In the event of denied credit due to an unfavorable consumer report, you will be advised of the identity of the Consumer Reporting Agency making such report and of right to request within Sixty (60) days the reason for the adverse action, pursuant to provisions of section of the Fair Credit Reporting Act. Initials _____

### EQUAL CREDIT OPPORTUNITY ACT

The Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. Income which you choose to rely on such sources to qualify for the loan. Income from these and other sources, including part-time or temporary employment, will not be discounted by this lender because of your sex or marital status. However, we will consider very carefully the stability and probable continuity of any income you disclose to us. The Federal Agency that administers compliance with this law concerning this creditor is the Office of Thrift Supervision , 1700 G. Street NW, Washington, DC 20552 (202) 906-6000 Initials _____

☐

### RIGHT TO FINANCIAL PRIVACY ACT

I/We acknowledge that this is notice to me/us as required by The Right to Financial Privacy Act of 1978 that the Veterans Administration (in the case of a VA Loan) or Department of Housing and Urban Development (in the case of an FHA Loan) has a right of access to financial records held by financial institutions in connection with the consideration or administration of assistance to Financial records involving transactions will be available to the VA (in the case of a VA Loan) or to HUD (in the case of an FHA Loan) without further notice or authorization but will not be disclosed or released to another government agency or department without consent, except as required or permitted by law. Initials _____

☐

### INFORMATION DISCLOSURE AUTHORIZATION

I/We hereby authorize you to release to WCS Lending, LLC for verification purposes, information concerning:
☒Employment History, dates, title(s), income, hours worked, etc.☒ Banking (checking & savings) account of record. ☒Mortgage loan, rating, opening date, high credit, payment amount, loan balance and payment. ☒Any information deemed necessary in connection with consumer credit report for real estate transaction. This information is for the confidential use of this lender in compiling a mortgage loan credit report. A copy of this authorization may be deemed to be the equivalent of the original and may be used as a duplicate original. Initials _____

☐

### ANTI-COERCION STATEMENT

The insurance laws of this state provide that the lender may not require the applicant to take insurance through any particular insurance agent or company to protect the mortgaged property. The applicant, subject to the rules adopted by the Insurance Commissioner, has the right to have the insurance placed with an insurance agent or company of his choice, provided the company meets the requirements of the lender. The lender has the right to designate reasonable financial requirements as to the company and the adequacy of the coverage. I have read the foregoing statement, or the rules of the Insurance Commissioner relative thereto, and understand my rights and privileges and those of the lender relative to the placing of such insurance. I have selected the following agencies to write the insurance covering the property described above: Insurance Co. Name: _____ Agent: _____ Initials _____

☐

### FLOOD INSURANCE NOTIFICATION

Federal regulations require us to inform you that the property used as security for this loan is located in an area identified by the U.S. Secretary of Housing Urban Development as having special flood hazards and that in the event of damage to the property caused by flooding in a Federally-declared disaster, Federal disaster relief assistance, if authorized, will be available for the property. At closing you will be asked to acknowledge your receipt of this information. If you have any questions concerning this notice, kindly contact your loan officer.
**IMPORTANT:** Please notify your insurance agent that the "loss payee" clause for the mortgagee on both the hazard and flood insurance must read as follows, unless otherwise advised: Initials _____

☐

### CONSUMER HANDBOOK ON ADJUSTABLE RATE MORTGAGES

I/W hereby acknowledge receipt from WCS Lending, LLC of a copy of the book titled "CONSUMER HANDBOOK ON ADJUSTABLE RATE MORTGAGES published by the Federal Reserve Board and the Federal Home Bank Board which is provided in addition to other required adjustable rate mortgage disclosures. Initials _____

I/We hereby certify that I/We have read the Notices set forth and fully understand all of the above.

| | | | |
|---|---|---|---|
| _Samuel Dee_ | 9/20/05 | _Yolanda Grimes_ | 9-20-05 |
| Applicant | Date | Co-Applicant | Date |

6501 Congress Avenue, 3rd Floor • Boca Raton, Florida 33487
(866) WCS-LEND • www.WCSLending.com

# WCS FINANCIAL SERVICES

MORTGAGES MADE EASIER

## NOTICE TO APPLICANT OF RIGHT
## TO RECEIVE COPY OF APPRAISAL REPORT

**Property Address :**

, NY

**File # :**  NT80659

**Date :**  September 13,

You have the right to receive a copy of the appraisal report to be obtained in connection with the loan for which you are applying, provided that you have paid for the appraisal. We must receive your written request no later than Ninety (90) days after we notify you about the action on your application or you withdraw your application. If you would like a copy of the appraisal report, please contact:

Jonathan Tanenbaum
WCS Lending, LLC
6501 Congress Avenue, 3rd Floor
Boca Raton, FL 33487

_____
Applicant

9/20/05
Date

_____
Co-Applicant

9-20-05
Date

# WCS FINANCIAL SERVICES

### MORTGAGES MADE EASIER

## GOOD FAITH ESTIMATE PROVIDER RELATIONSHIP

| | |
|---|---|
| Applicants: | Yolanda Grimes |
| Property Address: | , NY |
| Application No: | NT80659 |

Prepared By:  WCS Lending, LLC

6501 Congress Avenue, 3rd
Boca Raton, FL 33487

Date Prepared:  September 13, 2005

Lender requires use of the following provider(s) of settlement services  (if none are listed, Lender does not require the use of specified providers):

Provider  Equiifax
Address  6 E Clementon Road, Suite A-2
         Gibbsboro, NJ 08026
Phone    1-800-333-0037

Provider_____
Address_____
_____
Phone_____

Services to be rendered by this provider are items number

_____

Services to be rendered by this provider are items number

_____

above and the amounts listed are based upon the charges of this provider. If checked, Lender has the following type of business relationship  with this provider:

[ ] The provider is an associate of Lender.

[ ] The provider is an affiliate of Lender.

[ ] The provider is a relative of Lender.

[ ] The provider has an employment, franchise or other business relationship with Lender.

[ ] Within the last 12 months, the provider has maintained an account with Lender or had an outstanding loan or credit arrangement with Lender.

[x] Within the last 12 months, Lender has repeatedly used or required borrowers to use the services of this provider.

above and the amounts listed are based upon the charges of this provider. If checked, Lender has the following type of business relationship with this provider:

[ ] The provider is an associate of Lender.

[ ] The provider is an affiliate of Lender.

[ ] The provider is a relative of Lender.

[ ] The provider has an employment, franchise or other business relationship with Lender.

[ ] Within the last 12 months, the provider has maintained an account with Lender or had an outstanding loan or credit arrangement with Lender.

[ ] Within the last 12 months, Lender has repeatedly used or required borrowers to use the services of this provider.

| | | | |
|---|---|---|---|
| _Applicant_ | _Date_ 9/20/05 | _Applicant_ | _Date_ 9-20-05 |
| _Applicant_ | _Date_ | _Applicant_ | _Date_ |

# WCS FINANCIAL SERVICES

### MORTGAGES MADE EASIER

## OPT-OUT REQUEST FORM

Please Print:

1) Borrower and Co Name: *Darrick & Yolanda Grimes*

2) Address: *188-19 104th Avenue*

3) City, State and Zip: *St. Albans, NY 11412*

4) Borrower and Co SS #: *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 / 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*
   (Required to Process Your Request)

5) Loan #:

6) Borrower and Co Signature: *Darrick Grimes / Yolanda Grimes*

7) Please provide a telephone number that we may use to contact you if we have questions:
   *917 776-8580*

8) Please complete all information in this form, and mail it back to the following address:

   **Attn: Operations Manager**
   WCS Lending, LLC
   6501 Congress Avenue, 3rd Floor
   Boca Raton, FL 33487

_____ Please exclude me from non-public personal information sharing with non-affiliated third parties (other than those disclosures permitted by law). I understand that I may be contacted by affiliated third parties, only for services directly related to this loan application.

_____      *9-20-05*
Applicant                            Date

_____      *9-20-05*
Co-Applicant                         Date

Please allow a reasonable period of time (up to 90 days) for us to process your request.

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when □ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or □ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a comm unity property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | □ VA □ FHA | ☑ Conventional □ USDA/Rural Housing Service | □ Other (explain): | Agency Case Number | Lender Case Number |
|---|---|---|---|---|---|

| Amount $ 405,000 | Interest Rate 7.000 % | No. of Months 360/360 | Amortization Type: | □ Fixed Rate □ GPM | ☑ Other (explain): ☑ ARM (type): 2/28 |
|---|---|---|---|---|---|

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, ZIP) 23 Stacy Lee Drive,   Newburgh, NY 1250   County: Orange | No. of Units 1 |
|---|---|

| Legal Description of Subject Property (attach description if necessary) See title | Year Built 1987 |
|---|---|

| Purpose of Loan | ☑ Purchase □ Construction □ Refinance □ Construction-Permanent | □ Other (explain): | Property will be: ☑ Primary Residence □ Secondary Residence □ Investment |
|---|---|---|---|

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost $ | Amount Existing Liens $ | (a) Present Value of Lot $ | (b) Cost of Improvements $ | Total (a+b) $ |
|---|---|---|---|---|---|

Complete this line if this is a refinance loan.

| Year Acquired | Original Cost $ | Amount Existing Liens $ | Purpose of Refinance | Describe Improvements □ made □ to be made Cost: $ |
|---|---|---|---|---|

| Title will be held in what Name(s) Darrick Grimes   Yolanda Grimes | Manner in which Title will be held Joint tenants | Estate will be held in: ☑ Fee Simple □ Leasehold (show expiration date) |
|---|---|---|

| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain) Deposit on Sales Contract |
|---|

## III. BORROWER INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|
| Name (include Jr. or Sr. if applicable) | Darrick Grimes | Yolanda Grimes |
| Social Security Number | 133-84-305T | 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 |
| Home Phone (incl. area code) | 718-464-3331 | |
| DOB (MM/DD/YYYY) | 01/09/1962 | 10/29/1968 |
| Yrs. School | 14 | 14 |

| | Borrower | Co-Borrower |
|---|---|---|
| | ☑ Married □ Unmarried (include single, divorced, widowed) □ Separated | ☑ Married □ Unmarried (include single, divorced, widowed) □ Separated |
| Dependents (not listed by Co-Borrower) | no. 2  ages 2,14 | no. 2  ages 2,14 |

| | Borrower | Co-Borrower |
|---|---|---|
| Present Address (street, city, state, ZIP) | ☑ Own □ Rent  7  No. Yrs. 188-19 104th Avenue St. Albans, NY 11412 | ☑ Own □ Rent  7  No. Yrs. 188-19 104th Avenue St. Albans, NY 11412 |
| Mailing Address, if different from Present Address | | |

If residing at present address for less than two years, complete the following:

| Former Address (street, city, state, ZIP) | □ Own □ Rent  No. Yrs. | Former Address (street, city, state, ZIP) | □ Own □ Rent  No. Yrs. |
|---|---|---|---|

## IV. EMPLOYMENT INFORMATION

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| Name & Address of Employer | EDO Corporation 60 East 42nd Street New york, NY 10166 | ☑ Self Employed Yrs. on this job 0 yr(s) 10 mth(s) Yrs. employed in this line of work/profession 0.8 | Debevoise And Plimpton 919 Third Ave New York, NY 10022 | □ Self Employed Yrs. on this job 3 yr(s) 9 mth(s) Yrs. employed in this line of work/profession 3 |
| Position/Title/Type of Business | Legal Assistant | Business Phone (incl. area code) 212-716-2069 | Legal Assistant | Business Phone (incl. area code) 212-909-6401 |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Name & Address of Employer | CitiGroup 388 Grenwich Street New York, NY 10001 | □ Self Employed Dates (from-to) 3/99 - 10/04 Monthly Income $ 6,000.00 | Name & Address of Employer | □ Self Employed Dates (from-to) Monthly Income $ |
|---|---|---|---|---|
| Position/Title/Type of Business | Legal Assistant | Business Phone (incl. area code) 212-382-7000 | Position/Title/Type of Business | Business Phone (incl. area code) |

| Name & Address of Employer | □ Self Employed Dates (from-to) Monthly Income $ | Name & Address of Employer | □ Self Employed Dates (from-to) Monthly Income $ |
|---|---|---|---|
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 6,493.00 | 3,061.00 | $ 9,554.00 | Rent | $ | |
| Overtime | | | | First Mortgage (P&I) | | $ 2,694.48 |
| Bonuses | | | | Other Financing (P&I) | | 270.00 |
| Commissions | | | | Hazard Insurance | | 75.00 |
| Dividends/Interest | | | | Real Estate Taxes | | 585.00 |
| Net Rental Income | 1,076.00 | | 1,076.00 | Mortgage Insurance | | |
| Other (before completing, see the notice in "describe other income," below) | | | | Homeowner Assn. Dues | | |
| | | | | Other: | | |
| Total | $ 7,569.00 | $ 3,061.00 | $ 10,630.00 | Total | $ | $ 3,624.48 |

\* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

**Describe Other Income**   *Notice:* Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| B/C | | Monthly Amount |
|---|---|---|
| | | $ |
| | | |
| | | |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

Completed ☐ Jointly ☐ Not Jointly

| ASSETS | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
|---|---|---|---|---|
| Description | | | | |
| Cash deposit toward purchase held by: | $ | | | |
| | | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
| List checking and savings accounts below | | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | HFC - USA | | |
| Commerce Bank | | P.O. BOX 1547 | | |
| | | CHESAPEAKE, VA 23320 | | |
| | | Acct. no. 64721500318863 | (2,046) | 292,142 |
| Acct. no. | $ 10,000 | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | SALLIE MAE 3RD PTY L | | |
| Commerce Bank | | 1002 ARTHUR DR | | |
| | | LYNN HAVEN, FL 32444 | | |
| | | Acct. no. 1115664461076 | 249 | 37,420 |
| Acct. no. | $ 2,000 | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | SM SERVICING | | |
| ING DIRECT | | PO BOX 9500 | | |
| | | WILKES BARRE, PA 18773 | | |
| | | Acct. no. 111566446107F | 249 | 37,420 |
| Acct. no. | $ 1,500 | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | HFC - USA | | |
| 401k | | P.O. BOX 1547 | | |
| | | CHESAPEAKE, VA 23320 | | |
| | | Acct. no. 64721516125790 | 503 | 35,209 |
| Acct. no. | $ 11,000 | Name and address of Company | $ Payment/Months | $ |
| Stocks & Bonds (Company name/ number & description) | $ | CHRYSLER FINANCIAL | | |
| | | 1 BLUE HILL PLZ STE 15 | | |
| | | PEARL RIVER, NY 10965 | | |
| | | Acct. no. 7000579255 | 397 | 9,379 |
| | | Name and address of Company | $ Payment/Months | $ |
| Life insurance net cash value | $ | CAPITAL 1 BK | | |
| Face amount $ | | PO BOX 85015 | | |
| | | RICHMOND, VA 23285 | | |
| Subtotal Liquid Assets | $ 26,500 | Acct. no. 517805246356 | 218 | 7,281 |
| Real estate owned (enter market value from schedule of real estate owned) | $ 440,000 | Name and address of Company | $ Payment/Months | $ |
| Vested interest in retirement fund | $ | HSBC/LEVTZ | | |
| Net worth of business(es) owned (attach financial statement) | $ | 90 CHRISTIANA RD | | |
| | | NEW CASTLE, DE 19720 | | |
| Automobiles owned (make and year) | | Acct. no. 72062410245 | (94) | 1,882 |
| | | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| Other Assets (itemize) | $ | | | |
| | | Job Related Expense (child care, union dues, etc.) | $ | |
| | | Total Monthly Payments | $ 1,910 | |
| Total Assets a. | $ 466,500 | Net Worth (a minus b) | $ 37,532 | Total Liabilities b. $ 428,968 |

Freddie Mac Form 65   01/04
Calyx Form: Loanapp2.frm  01/04

Page 2 of 4

Fannie Mae Form 1003   01/04

## VII. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 188-19 104th Ave St Albens NY, 11412 | R  MULTI | RENTAL $ 440,000 | $ 312,000 | $ 4,400 | $ 2,024 | $ 200 | $ 1,076 |
| | | | | | | | |
| | | | | | | | |
| Totals | | $ 440,000 | $ 312,000 | $ 4,400 | $ 2,024 | $ 200 | $ 1,076 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

## VIII. DETAILS OF TRANSACTION

| | | IX. DECLARATIONS |
|---|---|---|
| a. Purchase price | $ 450,000.00 | If you answer "yes" to any questions a through i, please use continuation sheet for explanation. |

| | | Borrower | | Co-Borrower | |
|---|---|---|---|---|---|
| | | Yes | No | Yes | No |
| a. Are there any outstanding judgments against you? | | ☐ | ☑ | ☐ | ☑ |
| b. Have you been declared bankrupt within the past 7 years? | | ☐ | ☑ | ☐ | ☑ |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | ☐ | ☑ | ☐ | ☑ |
| d. Are you a party to a lawsuit? | | ☐ | ☑ | ☐ | ☑ |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | ☐ | ☑ | ☐ | ☑ |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | ☐ | ☑ | ☐ | ☑ |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | | ☐ | ☑ | ☐ | ☑ |
| h. Is any part of the down payment borrowed? | | ☐ | ☑ | ☐ | ☑ |
| i. Are you a co-maker or endorser on a note? | | ☐ | ☑ | ☐ | ☑ |
| j. Are you a U. S. citizen? | | ☑ | ☐ | ☑ | ☐ |
| k. Are you a permanent resident alien? | | ☐ | ☑ | ☐ | ☑ |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | | ☑ | ☐ | ☑ | ☐ |
| m. Have you had an ownership interest in a property in the last three years? | | ☑ | ☐ | ☑ | ☐ |
| (1) What type of property did you own-principal residence (PR), second home (SH), or investment property (IP)? | | prip | | prip | |
| (2) How did you hold title to the home-solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | | SP | | SP | |

| | |
|---|---|
| b. Alterations, improvements, repairs | |
| c. Land (if acquired separately) | |
| d. Refinance (incl. debts to be paid off) | |
| e. Estimated prepaid items | 3,626.25 |
| f. Estimated closing costs | 9,218.50 |
| g. PMI, MIP, Funding Fee | |
| h. Discount (if Borrower will pay) | |
| i. Total costs (add items a through h) | 462,844.75 |
| j. Subordinate financing | |
| k. Borrower's closing costs paid by Seller | |
| l. Other Credits (explain) | |
| Cash Deposit | 10,000.00 |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 405,000.00 |
| n. PMI, MIP, Funding Fee financed | |
| o. Loan amount (add m & n) | 405,000.00 |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | 47,844.75 |

## X. ACKNOWLEDGMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described herein; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated herein; (6) any owner or servicer of the Loan may verify or reverify any information contained in this application from any source named in this application, and Lender, its successors or assigns may retain the original and/or an electronic record of this application, even if the Loan is not approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the owner or servicer of the Loan may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X [signature] | 9/20/05 | X [signature] | 9-20-05 |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a Lender may neither discriminate on the basis of this information, nor on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation or surname. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | ☐ I do not wish to furnish this information | CO-BORROWER | ☐ I do not wish to furnish this information |
|---|---|---|---|
| Ethnicity: | ☐ Hispanic or Latino   ☑ Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino   ☑ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaska Native   ☐ Asian   ☑ Black or African American   ☐ Native Hawaiian or Other Pacific Islander   ☐ White | Race: | ☐ American Indian or Alaska Native   ☐ Asian   ☑ Black or African American   ☐ Native Hawaiian or Other Pacific Islander   ☐ White |
| Sex: | ☐ Female   ☑ Male | Sex: | ☑ Female   ☐ Male |

| To be Completed by Interviewer | Interviewer's Name (print or type) JTanenbaum | |
|---|---|---|
| This application was taken by: ☐ Face-to-face interview ☐ Mail ☑ Telephone ☐ Internet | Interviewer's Signature | Date |
| | Interviewer's Phone Number (incl. area code) 866-927-5363 | Name and Address of Interviewer's Employer WCS Financial Services 6501 Congress Avenue, 3rd Floor Boca Raton, FL 33487 (P) 866-927-5363 (F) 561-864-2801 |

| | | |
|---|---|---|
| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower: Darrick Grimes | Agency Case Number: |
| | Co-Borrower: Yolanda Grimes | Lender Case Number: |

### VI. ASSETS AND LIABILITIES

| ASSETS | Cash or Market Value | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Name and address of Bank, S&L, or Credit Union  401k | | Name and address of Company  HSBC/LEVITZ  90 CHRISTINANA ROAD  NEW CASTLE, DE 19720 | $ Payt./Mos. | $ |
| Acct. no. | $ 2,000 | Acct. No.  720624-4192456197 | 94 | 1,882 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company  PROVIDIAN FINANCIAL  4940 JOHNSON DR  PLEASANTON, CA 94566 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  0300545735 | 51 | 1,687 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company  PROVIDIAN FINANCIAL  4940 JOHNSON DR  PLEASANTON, CA 94566 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  0800611925 | 32 | 1,039 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company  HSBC NV  POB 98706  LAS VEGAS, NV 89193 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  5440445005310 | 26 | 893 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company  DRS SHERMAN STR  322 WALL STREET  PRINCETON, NJ 06540 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  684026 | | 725 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company  HSBC NV  1441 SCHILLING PLACE  SALINAS, CA 93901 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  275000393589 | 18 | 662 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company  HSBC NV  1441 SCHILLING PLACE  SALINAS, CA 93901 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  912055364537 | 18 | 507 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company  CAPITAL 1 BK  PO BOX 85015  RICHMOND, VA 23285 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  517805248879 | 15 | 348 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company  CAPITAL 1 BK  PO BOX 85015  RICHMOND, VA 23285 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  517805256683 | 15 | 255 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company  ACTION CARD/BANK FIR  POB 2394  OMAHA, NE 68103 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  5256181011029103 | 15 | 157 |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: X [signature] | Date 9/20/05 | Co-Borrower's Signature: X [signature] | Date 9-20-05 |
|---|---|---|---|

Freddie Mac Form 65   01/04
CALYX Form 1003 Lnap4ast.frm 01/04

Fannie Mae Form 1003   01/04

Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower.

| Borrower: Darrick Grimes | Agency Case Number: |
| Co-Borrower: Yolanda Grimes | Lender Case Number: |

## VI. ASSETS AND LIABILITIES

| ASSETS<br>Name and address of Bank, S&L, or Credit Union | Cash or Market Value | LIABILITIES<br>Name and address of Company | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| | | AMEX<br>P O BOX 297871<br>FORT LAUDERDAL, FL 33329 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. 144999036017301261 | | 40 |
| Name and address of Bank, S&L, or Credit Union | | AMEX<br>PO BOX 297871<br>FORT LAUDERDALE, FL 33329 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. 144999036017301261 | 10 | 40 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: X _Darrick Grimes_ | Date 9/20/05 | Co-Borrower's Signature: X _Yolanda Grimes_ | Date 9-20-05 |

Freddie Mac Form 65    01/04
CALYX Form 1003 Lnap4ast.frm 01/04

Page 4 of 4

Fannie Mae Form 1003    01/04

Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower.

Borrower:

Darrick Grimes

Co-Borrower:

Yolanda Grimes

Agency Case Number:

Lender Case Number:

## BORROWER INFORMATION

| Borrower | Co-Borrower |
|---|---|
| Former Address (street, city, state, ZIP) ☐ Own ☐ Rent _____ No. Yrs. | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent _____ No. Yrs. |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: X _Darrick Grimes_ | Date: 9/20/05 | Co-Borrower's Signature: X _Yolanda Grimes_ | Date 9-20-05 |
|---|---|---|---|

Freddie Mac Form 65    01/04
Calyx Form  1003 Lnap4add.frm  0 1/04

Page 4 of 4

Fannie Mae Form 1003    01/04

Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower.

| Borrower: | Agency Case Number: |
|---|---|
| Darrick Grimes | |
| Co-Borrower: | Lender Case Number: |
| Yolanda Grimes | |

| Borrower | IV. EMPLOYMENT INFORMATION | Co-Borrower |
|---|---|---|

| Name and Address of Employer | ☐ Self Employed | Dates(from-to) | Name and Address of Employer | ☐ Self Employed | Dates(from-to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | | Position/Title/Type of Business | Business Phone (incl. area code) | |

| Name and Address of Employer | ☐ Self Employed | Dates(from-to) | Name and Address of Employer | ☐ Self Employed | Dates(from-to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | | Position/Title/Type of Business | Business Phone (incl. area code) | |

| Name and Address of Employer | ☐ Self Employed | Dates(from-to) | Name and Address of Employer | ☐ Self Employed | Dates(from-to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | | Position/Title/Type of Business | Business Phone (incl. area code) | |

| Name and Address of Employer | ☐ Self Employed | Dates(from-to) | Name and Address of Employer | ☐ Self Employed | Dates(from-to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | | Position/Title/Type of Business | Business Phone (incl. area code) | |

| Name and Address of Employer | ☐ Self Employed | Dates(from-to) | Name and Address of Employer | ☐ Self Employed | Dates(from-to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | | Position/Title/Type of Business | Business Phone (incl. area code) | |

| Name and Address of Employer | ☐ Self Employed | Dates(from-to) | Name and Address of Employer | ☐ Self Employed | Dates(from-to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | | Position/Title/Type of Business | Business Phone (incl. area code) | |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date | Co-Borrower's Signature: | Date |
|---|---|---|---|
| X _Darrick Grimes_ | 9/20/05 | X _Yolinda Grimes_ | 9-20-05 |

Freddie Mac Form 65 01/04
Calyx Form 1003 Lnap4emp.frm 01/04

Page 4 of 4

Fannie Mae Form 1003 01/04

Continuation Sheet/Residential Loan Application

| | |
|---|---|
| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower: Darrick Grimes |
| | Co-Borrower: Yolanda Grimes |

Agency Case Number:

Lender Case Number:

## VI. ASSETS AND LIABILITIES

### Schedule of Real Estate Owned

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: X | Date 9/20/05 | Co-Borrower's Signature: X | Date 9-20-05 |
|---|---|---|---|

Freddie Mac Form 65    01/04
Calyx Form 1003 Lnap4reo.frm 01/04

Page 4 of 4

Fannie Mae Form 1003    01/04

(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Applicant: Darrick Grimes
Yolanda Grimes

Property Address:  23 Stacy Lee Drive
Newburgh, NY 1250

Application No:  GrimesYolandaNT80659

Prepared By:  WCS Financial Services
6501 Congress Avenue, 3rd Floor
Boca Raton , FL  33487
866-927-5363

Date Prepared:  09/13/2005

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | AMOUNT FINANCED | TOTAL OF PAYMENTS |
|---|---|---|---|
| The cost of your credit as a yearly rate | The dollar amount the credit will cost you | The amount of credit provided to you or on your behalf | The amount you will have paid after making all payments as scheduled |
| * 5.167  % | $    * 380,698.21 | $    * 405,000.00 | $    * 785,698.21 |

☐ REQUIRED DEPOSIT:  The annual percentage rate does not take into account y our required deposit
PAYMENTS:  Your payment schedule wil l be:

| Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| | | Monthly Beginning: | | | Monthly Beginning: | | | Monthly Beginning: |
| 24 | 2,694.48 | | | | | | | |
| 12 | 2,194.78 | | | | | | | |
| 323 | 2,144.11 | | | | | | | |
| 1 | 2,145.80 | | | | | | | |

☐ DEMAND FEATU RE:  This obligation has a demand featu re.
☑ VARIABLE RATE FEATURE:  This loan contai ns a variable rate feature.  A variable rate disclosure has b een provided earlier.

CREDIT LIFE/CREDIT DISABILITY:  Credit life insurance and credit disability  insurance are not requ ired to obtain credit,
and will not be provided unless  you sign and agree to pay the additional cost.

| Type | Premium | Signature | |
|---|---|---|---|
| Credit Life | | I want credit life insurance. | Signature: |
| Credit Disability | | I want credit disability insurance. | Signature: |
| Credit Life and D isability | | I want credit life and disability insurance. | Signature: |

INSURANCE:  The following insurance is required to obtain credit:
☐ Credit life insurance   ☐ Credit disability   ☐ Property insurance   ☐ Flood insurance
You may obtain the insurance from anyone you want th at is acceptable to creditor
☐ If you purchase ☐ property   ☐ flood insurance from creditor you will pay $            for a one year term.
SECURITY:  You are giving a security interest in: 23 Stacy Lee Drive, Newburgh NY 1250.
☑ The goods or property being purchased         ☐ Real property you already own.
FILING FEES: $
LATE CHARGE:  If a payment is more than    15  days late, you will be charged    5.000  % of the payment.
PREPAYMENT:  If you pay off early, you
☐ may   ☑ will not   have to pay a penalty.
☐ may   ☑ will not   be entitled to a refund of part of the finance charge.
ASSUMPTION:  Someone bu ying your property
☐ may   ☐ may, subject to conditions   ☑ may not   assume th e remainder of your loan on the original  terms.
See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds an d penalties.
☑ * means an estimate   ☐ all dates and numerical disclosures except the late payment disclosures are estimates.
* NOTE: The Payments shown above include reserve d eposits for Mortgage Insurance (if applicable), but exclude Property T axes and Insurance.

THE UNDERSIGNED ACKNOWLEDGES RECEIVING A COMPLETED COPY OF THIS DISCLOSURE.

_Darrick Grimes_  9/20/05              _Yolanda Grimes_  9/20/05
Darrick Grimes          (Applicant)    (Date)    Yolanda Grimes        (Applicant)    (Date)

_____          _____
(Applicant)    (Date)                  (Applicant)    (Date)

_____
(Lender)    (Date)

Calyx Form - til.hp (02/95)

# WCS FINANCIAL SERVICES

MORTGAGES MADE EASIER

## NEW YORK: PRE-APPLICATION DISCLOSURE AND BROKER FEE AGREEMENT

1. The Registrant, WCS Financial Services (since Registrant is "acting as a mortgage broker"), may not make mortgage loans or commitments. The Registrant ("WCS") may furnish a lock-in or commitment to Applicant on behalf of Applicant when WCS has obtained a written and executed commitment or lock-in from a lender on behalf of Applicant.

2. WCS has advised me/us ("Applicant/s") that WCS is authorized and prepared to assist and advise Applicant/s in securing financing. Applicant/s understands that WCS's services may include, but are not limited to:
   - Counseling on available mortgage products and general qualification procedures;
   - Counseling on Applicant/s financial capabilities;
   - Assistance in completing, processing, and in meeting conditions of the loan.

3. Applicant/s hereby engages WCS as Applicant's agent for the purpose of advising Applicant/s about financing and to provide the services described herein. This agreement will continue until the earlier of the declination of Applicant/s loan request, the closing of the loan, or Applicant/s termination of WCS's services.

4. Prior to paying any fees or submitting an application, the Applicant/s understands that:
   WCS's services are advisory and administrative in nature. WCS is acting as a broker and will not make the mortgage loan or commitment. WCS cannot guarantee acceptance into any particular loan program, specific loan terms or conditions. WCS may be eligible to receive a Lender paid bonus based upon the quality of loans placed with the Lender.

5. **BROKER FEE:**

   Applicant/s understand that, as compensation for WCS's services, WCS will be paid as indicated below:

   A. The maximum fee the *Lender* will pay WCS is not known at this time and will be in the range of 0.00% to 4.00% of the loan amount. The exact amount, if any, can be disclosed when the Lender confirms a rate lock request. The compensation WCS will receive from the lender for WCS's services is included in the rate, points, fees and terms of the loan as quoted by the Lender in its commitment; and/or,

   B. The Applicant/s will pay WCS directly a total mortgage broker fee (inclusive of Application Fee and Processing Fee noted in Item 7) of $4,945.00 .

6. WCS's mortgage broker fee, whether paid by Applicant/s directly, or from the loan proceeds, will be considered a cost of the credit and will be disclosed to Applicant/s by the Lender as part of the financing charges. Applicant/s understand the fee will be paid to WCS, and there is no other fee agreement between the parties.

7. Applicant/s understands that s/he is required to pay the following fees, made payable to (**WCS Lending, LLC**), at Application or at Closing:

   | | | | |
   |---|---|---|---|
   | A. | Application Fee | $295.00 | At Application |
   | B. | Processing Fee | $650.00 | At Closing |
   | C. | Mortgage Broker Fee | $4,000.00 | At Closing |

   ### THE APPLICATION FEE IS NON-REFUNDABLE

8. WCS's mortgage broker fee, whether paid by Applicant/s directly, or from the loan proceeds, or by the lender, will be considered a cost of the credit and will be disclosed to Applicant/s by the Lender as part of the financing charges. Applicant/s understand the fee will be paid to WCS, and there is no other fee agreement between the parties.

9. Applicant understands that s/he is required to pay a property appraisal fee directly to the appraisal company, either at the time the appraisal is performed, or at the closing of the loan. The estimate for this cost is $300.00. Applicant/s understands that s/he has the right to a *copy* of the appraisal report, provided that Applicant has paid the Appraisal Fee in full. Applicant understands that he/she will not be charged for a credit report that WCS will obtain on Applicant's behalf at a cost of approximately $18.

10. Applicant/s understand that certain mortgage products impose a prepayment penalty on the borrower. WCS will disclose the amount of, or the formula for calculating, the prepayment penalty, if any, as soon as WCS is informed.

11. TO EXPEDITE THE APPROVAL OF THE LOAN, APPLICANT/S HEREBY PRE-AUTHORIZATIONS WCS TO INCUR THIRD-PARTY FEES (ie., FLOOD CERTIFICATION OF $22.00) ON APPLICANT/S BEHALF. APPLICANT/S AGREES TO REIMBURSE WCS FOR THE FEES ADVANCED:

12. Applicant/s may call William Schneider, Toll Free, at (866) WCS-LEND to address any complaints regarding the application. Any changes to this Agreement must be in writing and signed by an authorized officer of WCS.

   Applicant/s acknowledges receipt of a copy of this Broker Fee Agreement.

   Applicant _____ Date 9-20-05

   Co-Applicant _____ Date 9-20-05

   WCS Lending _____ Date _____

6501 Congress Avenue, 3rd Floor • Boca Raton, Florida 33487
(866) WCS-LEND • www.WCSLending.com

**WCS FINANCIAL SERVICES**

MORTGAGES MADE EASIER

## RATE LOCK / FLOAT ADDENDUM

Applicant acknowledges that the interest rate on this loan is floating unless Applicant receives an Interest Rate Lock-In Agreement confirmation from WCS Lending by mail, e-mail or fax. Applicant must sign an Interest Rate Lock-In Agreement in order to have the lock-in guaranteed by WCS Lending. If Applicant has not signed an Interest Rate Lock-In Agreement, the rate is <u>not</u> locked and therefore <u>not</u> guaranteed.

If Applicant has locked in a rate, and WCS Lending has not received an application package back within Seven (7) days, the Interest Rate Lock-In Agreement will be cancelled.

Please check the appropriate selection and sign below:

_____   I have received an Interest Rate Lock-In Agreement from WCS Lending and my rate is in accordance to what was agreed.

___✓___   I acknowledge that my interest rate is currently floating and is subject to daily changes based upon market fluctuations.


_____        9/20/05
Applicant                                Date

_____        9/20/05
Co-Applicant                             Date

6501 Congress Avenue, 3rd Floor • Boca Raton, Florida 33487
(866) WCS-LEND • www.WCSLending.com

# Exhibit B - Part 2

# WCS FINANCIAL SERVICES

MORTGAGES MADE EASIER

## OPT-OUT REQUEST FORM

Please Print:

1) Borrower and Co Name: *Darrick & Yolanda Grimes*

2) Address: *188-19 104th Avenue*

3) City, State and Zip: *St. Albans, NY 11412*

4) Borrower and Co SS #: *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 / 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*
   (Required to Process Your Request)

5) Loan #:

6) Borrower and Co Signature: *Darrick Grimes & Yolanda Grimes*

7) Please provide a telephone number that we may use to contact you if we have questions:
   *917 716-8580*

8) Please complete all information in this form, and mail it back to the following address:

   **Attn: Operations Manager**
   WCS Lending, LLC
   6501 Congress Avenue, 3rd Floor
   Boca Raton, FL 33487

_____ Please exclude me from non-public personal information sharing with non-affiliated third parties (other than those disclosures permitted by law). I understand that I may be contacted by affiliated third parties, only for services directly related to this loan application.

*Darrick Grimes*
Applicant

*9-20-05*
Date

*Yolanda Grimes*
Co-Applicant

*9-20-05*
Date

Please allow a reasonable period of time (up to 90 days) for us to process your request.

6501 Congress Avenue, 3rd Floor • Boca Raton, Florida 33487.
(866) WCS-LEND • www.WCSLending.com

# WCS FINANCIAL SERVICES
## MORTGAGES MADE EASIER

## Damages and Costs

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that section.

### Servicing Transfer Estimated

1. The following is the best estimate of what will happen to the servicing of your mortgage loan:

    A. ☐ We may assign, sell or transfer the servicing of your loan sometime while the loan is outstanding. We are able to service your loan, and we
    
        ☐ will service your loan.
        ☐ will not service your loan.
        ☐ haven't decided whether to service your loan.

    B. ☒ We do not service mortgage loans, and we have not serviced mortgage loans in the past Three (3) years.

        We presently intend to assign, sell or transfer the servicing of your mortgage loan. You will be informed about your servicer.

2. For all the first lien mortgage loans that we make in the 12 month period after your mortgage loan is funded, we estimate that the percentage of such loans for which we will transfer servicing is between:

    ☐ 0 to 25%    ☐ 26 to 50%    ☐ 51 to 75%    ☒ 76 to 100%

    This estimate ☒ does ☐ does not include assignments, sales or transfers to affiliates or subsidiaries. This is only our best estimate and it is not binding. Business conditions or other circumstances may affect our future transferring decisions.

3. A. ☒ We have previously assigned, sold or transferred the services of the first lien mortgage loans.
    B. ☒ This is our record of transferring the servicing of the first lien mortgage loans we have made in:

    | Year | Percentage of Loans Transferred |
    |------|-------------------------------|
    | 2002 | 100% |
    | 2003 | 100% |
    | 2004 | 100% |

    This information ☒ does ☐ does not include assignments, sales or transfers to affiliates or subsidiaries.

## ACKNOWLEDGMENT OF MORTGAGE LOAN APPLICANT

I/We have read this disclosure form, understand its contents, and understand that this acknowledgement is a required part of the mortgage loan application as evidenced by my/our signatures below.

_____    9-20-05
Applicant                                   Date

_____    9-20-05
Co-Applicant                                Date

6501 Congress Avenue, 3rd Floor • Boca Raton, Florida 33487
(866) WCS-LEND • www.WCSLending.com

**WCS FINANCIAL SERVICES**

MORTGAGES MADE EASIER

## DISCLOSURE NOTICES

Applicant(s): Yolanda Grimes          Property Address:

_____ , NY

☐ **OCCUPANCY STATEMENT**

This is to certify that I/We ☐ do ☐ do not intend to occupy the subject property as principal residence. I/We hereby certify under penalty of U.S. Criminal Code Section 1010 Title 18 U.S.C., that the above statement submitted for the purpose of obtaining mortgage insurance under the National Housing Act is true and correct.  Initials _____

☐ **FAIR CREDIT REPORTING ACT**

An investigation will be made as to the credit standing of all individuals seeking credit in this application. The nature and scope of any investigation will be furnished to you upon written request made within a reasonable period of time. In the event of denied credit due to an unfavorable consumer report, you will be advised of the identity of the Consumer Reporting Agency making such report and of right to request within Sixty (60) days the reason for the adverse action, pursuant to provisions of section of the Fair Credit Reporting Act.  Initials _____

☐ **EQUAL CREDIT OPPORTUNITY ACT**

The Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. Income which you receive as alimony, child support or separate maintenance need not be disclosed to this creditor unless you choose to rely on such sources to qualify for the loan. Income from these and other sources, including part-time or temporary employment, will not be discounted by this lender because of your sex or marital status. However, we will consider very carefully the stability and probable continuity of any income you disclose to us. The Federal Agency that administers compliance with this law concerning this creditor is the Office of Thrift Supervision , 1700 G. Street NW, Washington, DC 20552 (202) 906-6000  Initials _____

☐ **RIGHT TO FINANCIAL PRIVACY ACT**

I/We acknowledge that this is notice to me/us as required by The Right to Financial Privacy Act of 1978 that the Veterans Administration (in the case of a VA Loan) or Department of Housing and Urban Development (in the case of an FHA Loan) has a right of access to financial records held by financial institutions in connection with the consideration or administration of assistance to Financial records involving transactions will be available to the VA (in the case of a VA Loan) or to HUD (in the case of an FHA Loan) without further notice or authorization but will not be disclosed or released to another government agency or department without consent, except as required or permitted by law.  Initials _____

☐ **INFORMATION DISCLOSURE AUTHORIZATION**

I/We hereby authorize you to release to WCS Lending, LLC for verification purposes, information concerning: ☒Employment History, dates, title(s); income, hours worked, etc.☒ Banking (checking & savings) account of record. ☒Mortgage loan rating, opening date, high credit, payment amount; loan balance and payment. ☒Any information deemed necessary in connection with consumer credit report for real estate transaction. This information is for the confidential use of this lender in compiling a mortgage loan credit report. A copy of this authorization may be deemed to be the equivalent of the original and may be used as a duplicate original.  Initials _YG_/_DC_

☐ **ANTI-COERCION STATEMENT**

The insurance laws of this state provide that the lender may not require the applicant to take insurance through any particular insurance agent or company to protect the mortgaged property. The applicant, subject to the rules adopted by the Insurance Commissioner, has the right to have the insurance placed with an insurance agent or company of his choice, provided the company meets the requirements of the lender. The lender has the right to designate reasonable financial requirements as to the company and the adequacy of the coverage. I have read the foregoing statement, or the rules of the Insurance Commissioner relative thereto, and understand my rights and privileges and those of the lender relative to the placing of such insurance. I have selected the following agencies to write the insurance covering the property described above: Insurance Co. Name: _____ Agent: _____  Initials _____

☐ **FLOOD INSURANCE NOTIFICATION**

Federal regulations require us to inform you that the property used as security for this loan is located in an area identified by the U.S. Secretary of Housing Urban Development as having special flood hazards and that in the event of damage to the property caused by flooding in a Federally-declared disaster, Federal disaster relief assistance, if authorized, will be available for the property. At closing you will be asked to acknowledge your receipt of this information. If you have any questions concerning this notice, kindly contact your loan officer.
**IMPORTANT:** Please notify your insurance agent that the "loss payee" clause for the mortgagee on both the hazard and flood insurance must read as follows, unless otherwise advised:  Initials _____

☐ **CONSUMER HANDBOOK ON ADJUSTABLE RATE MORTGAGES**

I/W hereby acknowledge receipt from WCS Lending, LLC of a copy of the book titled "CONSUMER HANDBOOK ON ADJUSTABLE RATE MORTGAGES published by the Federal Reserve Board and the Federal Home Bank Board which is provided in addition to other required adjustable rate mortgage disclosures.  Initials _____

I/We hereby certify that I/We have read the Notices set forth and fully understand all of the above.

_Samuel Doe_  9/20/05          _Yolanda Grimes_  9-20-05
Applicant          Date                    Co-Applicant          Date

6501 Congress Avenue, 3rd Floor • Boca Raton, Florida 33487
(866) WCS-LEND • www.WCSLending.com

# WCS FINANCIAL SERVICES

## MORTGAGES MADE EASIER

## NOTICE TO APPLICANT OF RIGHT
## TO RECEIVE COPY OF APPRAISAL REPORT

**Property Address :**

, NY

**File # :**     NT80659
**Date :**      September 13,

You have the right to receive a copy of the appraisal report to be obtained in connection with the loan for which you are applying, provided that you have paid for the appraisal. We must receive your written request no later than Ninety (90) days after we notify you about the action on your application or you withdraw your application. If you would like a copy of the appraisal report, please contact:

Jonathan Tanenbaum
WCS Lending, LLC
6501 Congress Avenue, 3rd Floor
Boca Raton, FL 33487

_____     9/20/05
Applicant                                                    Date

_____     9-20-05
Co-Applicant                                                Date

# WCS FINANCIAL SERVICES

### MORTGAGES MADE EASIER

## GOOD FAITH ESTIMATE PROVIDER RELATIONSHIP

| | |
|---|---|
| Applicants: | Yolanda Grimes |
| Property Address: | |
| Application No: | , NY NT80659 |

Prepared By:   WCS Lending, LLC
6501 Congress Avenue, 3rd.
Boca Raton, FL 33487

Date Prepared:   September 13, 2005

Lender requires use of the following provider(s) of settlement services  (if none are listed, Lender does not require the use of specified providers):

Provider  Equiifax
Address   6 E Clementon Road, Suite A-2
              Gibbsboro, NJ 08026
Phone:    1-800-333-0037

Provider _____
Address _____
_____
Phone _____

Services to be rendered by this provider are items number

_____

above and the amounts listed are based upon the charges of this provider. If checked, Lender has the following type of business relationship with this provider:

[ ] The provider is an associate of Lender.

[ ] The provider is an affiliate of Lender.

[ ] The provider is a relative of Lender.

[ ] The provider has an employment, franchise or other business relationship with Lender.

[ ] Within the last 12 months, the provider has maintained an account with Lender or had an outstanding loan or credit arrangement with Lender.

[x] Within the last 12 months, Lender has repeatedly used or required borrowers to use the services of this provider.

Services to be rendered by this provider are items number

_____

above and the amounts listed are based upon the charges of this provider. If checked, Lender has the following type of business relationship with this provider:

[ ] The provider is an associate of Lender.

[ ] The provider is an affiliate of Lender.

[ ] The provider is a relative of Lender.

[ ] The provider has an employment, franchise or other business relationship with Lender.

[ ] Within the last 12 months, the provider has maintained an account with Lender or had an outstanding loan or credit arrangement with Lender.

[ ] Within the last 12 months, Lender has repeatedly used or required borrowers to use the services of this provider.

| | | | |
|---|---|---|---|
| _signature_ | 9/20/05 | _Yolanda Grimes_ | 9-20-05 |
| Applicant | Date | Applicant | Date |
| _____ | _____ | _____ | _____ |
| Applicant | Date | Applicant | Date |

# WCS FINANCIAL SERVICES

### MORTGAGES MADE EASIER

Do not do anything that negatively impacts your ability to qualify for your mortgage loan, or initiates a new round of paperwork. If you have any doubts about doing something that may affect your ability to qualify for your mortgage loan, please do not hesitate to contact me.

These suggestions are all offered as cautions. Your mortgage application is not a static snap-shot of a client's financial life, but rather an on-going process that takes into account everything done right up until the day of closing.

By signing this Statement of understanding, you acknowledge that the information above has been fully explained to you.

_____
Applicant

9/20/05
Date

_____
Co-Applicant

9-20-05
Date

# WCS FINANCIAL SERVICES

### MORTGAGES MADE EASIER

## CONTACT INFORMATION FORM

This form is designed to gives us all the appropriate contact information to allow your processing to move as freely as possible. The information gathered here will also help us provide periodic updates on loan status, market conditions and any special promotions WCS Lending may be running.

**Borrower:**

Name: Darrick & Yolanda Grimes
Address: 188-19 104th Avenue
St. Albans, New York 11412
E-mail: Ypgrimes@aol.com

Phone (H): 718 464-3331
Phone (W): 212 909-6401
Mobile: 917 776-8580 / 347 224-8141
Pager: _____
Fax: _____

**Your Realtor:**

Agency: Living an Easy Lifestyle
Name: Lyra Blumenthal
Address: 655 Fostertown Road
Newburgh, NY 12550

Phone (W): (845) 565-1900
E-mail: lyrarealte@aol.com
Mobile: (845) 728-9940
Pager: _____
Fax: _____

**Your Attorney:**

Firm:
Name: Keith Schutzman
Address: 714 White Plains Road
Suite 220
Scarsdale, NY 10583

Phone (W): (914) 713-0001
E-mail: _____
Mobile: _____
Pager: _____
Fax: (914) 713-0004

**Seller:**

Name: _____
Phone: _____

**Listing Agent:**

Name: _____
Phone: _____

**Managing Agent:**

Name: _____
Phone: _____

6501 Congress Avenue, 3rd Floor • Boca Raton, Florida 33487
(866) WCS-LEND • www.WCSLending.com

# RESIDENTIAL CONTRACT OF SALE

*Jointly Prepared by the Real Property Section of the New York State Bar Association, the New York State Land Title Association, the Committee on Real Property Law of the Association of the Bar of the City of New York and the Committee on Real Property Law of the New York County Lawyers' Association (11/00)*

## CONSULT YOUR LAWYER BEFORE SIGNING THIS CONTRACT.

NOTE: FIRE AND CASUALTY LOSSES AND CONDEMNATION. This contract form does not provide for what happens in the event of fire, or other casualty loss or condemnation before the title closing. Unless different provision is made in this contract, Section 5-1311 of the General Obligations Law will apply. One part of that law makes a Purchaser responsible for fire and casualty loss upon taking possession of the Premises before the title closing.

WARNING: PLAIN LANGUAGE. No representation is made that this form of contract for the sale and purchase of real estate complies with Section 5-702 of the General Obligations Law ("Plain Language").

CONTRACT OF SALE made as of *Aug 12, 2005*                                                                between

    Ronald J. Cohen and Ann Eve Cohen, husband and wife
Address: 23 Stacy Lee Drive, Newburgh, New York 12550

Social Security Number/Fed. I. D. No(s):
                                                      hereinafter called "Seller" and

    Darrick Grimes and Yolanda Grimes, husband and wife
Address: 188-19 104th Avenue, St. Albans, New York 11412

Social Security Number/Fed. I. D. No(s):
                                                     hereinafter called "Purchaser."

The parties hereby agree as follows:

1.   **Premises.** Seller shall sell and convey and Purchaser shall purchase the property, together with all buildings and improvements thereon (collectively the "Premises"), more fully described on a separate page marked "Schedule A," annexed hereto and made a part hereof and also known as:
Street Address: 23 Stacy Lee Drive, Newburgh, New York 12550
Tax Map Designation: Section 106, Block 2, Lot(s) 4.2, Town of Newburgh, Orange County
Together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway,\* ~~opened or proposed, adjoining the Premises to the center line thereof,~~ including any right of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway. Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), or thereafter, on demand, any documents that Purchaser may reasonably require for the conveyance of such title and the assignment and collection of such award or damages.

2.   **Personal Property.** This sale also includes all <u>attached</u> fixtures and articles of personal property now attached or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at Closing they will be paid for and owned by Seller, free and clear of all liens and encumbrances, except any existing mortgage to which this sale may be subject. They include, but are not limited to, plumbing, heating, lighting and cooking fixtures, ~~chandeliers~~, bathroom and kitchen cabinets and counters, mantels, ~~door mirrors~~, switch plates and door hardware, venetian blinds, window treatments, shades, screens, ~~awnings, storm windows, storm doors, window boxes,~~ mail box, ~~TV aerials, weather vane, flagpole, pumps, shrubbery,~~ fencing, ~~outdoor statuary,~~ tool shed, dishwasher, washing machine, clothes dryer, ~~garbage disposal unit,~~ range, oven, ~~built-in microwave oven,~~ refrigerator, freezer, ~~air~~ ~~FREEZER~~ conditioning equipment and installations, wall to wall carpeting and built-ins not excluded below. ~~(strike out inapplicable items).~~
central vacum, ceiling fan, cook top, compactor, garage door opener, microwave wall oven, 2 sheds, pool heating, pool filter, pool cover,

~~Excluded from this sale are furniture and household furnishings and~~

\* and Stacy Lee Drive private road and interest therein

3.  Purchase Price. The purchase price is
payable as follows:                                                                                                $    435,000.00

(a)   on the signing of this contract, by Purchaser's good check payable to the Escrowee (as hereinafter defined), subject to
collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 6 of this contract (the
"Downpayment");

(b)   by allowance for the principal amount unpaid on the existing mortgage on the date hereof, payment of which Purchaser
shall assume by joinder in the deed.                                                                                $    20,000.00

(c)   by a purchase money note and mortgage from Purchaser to Seller.                                               $

(d)   balance at Closing in accordance with paragraph 7:                                                            $    415,000.00

4.   Existing Mortgage. (Delete if inapplicable) If this sale is subject to an existing mortgage as indicated in paragraph 3(b) above:
(a)  The Premises shall be conveyed subject to the continuing lien of the existing mortgage, which is presently payable, with
interest at the rate of _____ percent per annum, in monthly installments of $ _____ which include principal,
interest and escrow amounts, if any, and with any balance of principal being due and payable on _____.
(b)  To the extent that any required payments are made on the existing mortgage between the date hereof and Closing which
reduce the unpaid principal amount thereof below the amount shown in paragraph 3(b), then the balance of the price payable at
Closing under paragraph 3(d) shall be increased by the amount of the payments of principal. Seller represents and warrants that the
amount shown in paragraph 3(b) is substantially correct and agrees that only payments required by the existing mortgage will be
made between the date hereof and Closing.
(c)  If there is a mortgagee escrow account, Seller shall assign it to Purchaser, if it can be assigned, and in that case Purchaser
shall pay the amount in the escrow account to Seller at Closing.
(d)  Seller shall deliver to Purchaser at Closing a certificate dated not more than 30 days before Closing signed by the holder
of the existing mortgage, in form for recording, certifying the amount of the unpaid principal, the date to which interest has been
paid and the amounts, if any, claimed to be unpaid for principal and interest, itemizing the same. Seller shall pay the fees for
recording such certificate. If the holder of the existing mortgage is a bank or other institution as defined in Section 274-a of the Real
Property Law it may, instead of the certificate, furnish a letter signed by a duly authorized officer, employee or agent, dated not more
than 30 days before Closing, containing the same information.
(e)  Seller represents and warrants that (i) Seller has delivered to Purchaser true and complete copies of the existing mortgage,
the note secured thereby and any extensions and modifications thereof, (ii) the existing mortgage is not now, and at the time of
Closing will not be, in default, and (iii) the existing mortgage does not contain any provision that permits the holder of the mortgage
to require its immediate payment in full or to change any other term thereof by reason of the sale or conveyance of the Premises.

5.   Purchase Money Mortgage. (Delete if inapplicable) If there is to be a purchase money mortgage as indicated in paragraph
3(c) above:
(a)  The purchase money note and mortgage shall be drawn by the attorney for Seller in the form attached or, if not, in the
standard form adopted by the New York State Land Title Association. Purchaser shall pay at Closing the mortgage recording tax,
recording fees and the attorneys fees in the amount of $ _____ for its preparation.
(b)  The purchase money note and mortgage shall also provide that it is subject and subordinate to the lien of the existing
mortgage and any extensions, modifications, replacements or consolidations of the existing mortgage, provided that (i) the interest
rate thereof shall not be greater than _____ percent per annum and the total debt service thereunder shall not be greater than
$ _____ per annum, and (ii) if the principal amount thereof shall exceed the amount of principal owing and unpaid on the
existing mortgage at the time of placing such new mortgage or consolidated mortgage, the excess be paid to the holder of such
purchase money mortgage in reduction of the principal thereof. The purchase money mortgage shall also provide that such payment
to the holder thereof shall not alter or affect the regular installments, if any, of principal payable thereunder and that the holder
thereof will, on demand and without charge therefor, execute, acknowledge and deliver any agreement or agreements further to
effectuate such subordination.

6.   Downpayment in Escrow. (a) Seller's attorney ("Escrowee") shall hold the Downpayment in escrow in a segregated bank
account at The Bank of New York
Address: 225 Main Street, Goshen, New York 10924
until Closing or sooner termination of this contract and shall pay over or apply the Downpayment in accordance with the terms of
this paragraph. Escrowee shall hold the Downpayment in a(n)    non    interest-bearing account for the benefit of the parties. If
interest is held for the benefit of the parties, it shall be paid to the party entitled to the Downpayment and the party receiving the
interest shall pay any income taxes thereon. If interest is not held for the benefit of the parties, the Downpayment shall be placed in
an IOLA account or as otherwise permitted or required by law. The Social Security or Federal Identification numbers of the parties
shall be furnished to Escrowee upon request. At Closing, the Downpayment shall be paid by Escrowee to Seller. If for any reason
Closing does not occur and either party gives Notice (as defined in paragraph 25) to Escrowee demanding payment of the
Downpayment, Escrowee shall give prompt Notice to the other party of such demand. If Escrowee does not receive Notice of

objection from such other party to the proposed payment within 10 business days after the giving of such Notice, Escrowee is hereby authorized and directed to make such payment. If Escrowee does receive such Notice of objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until Escrowee shall have the right at any time to deposit the Downpayment and the interest thereon with the clerk of a court in the county in which the Premises are located and shall give Notice of such deposit to Seller and Purchaser. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

   (b)   The parties acknowledge that, Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.

   (c)   Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from acting upon the advice of such counsel.

   (d)   Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this contract.

   (e)   Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

   (f)   The party whose attorney is Escrowee shall be liable for loss of the Downpayment.

7.   Acceptable Funds. All money payable under this contract, unless otherwise specified, shall be paid by:
   (a)   Cash, but not over $1,000.00;
   (b)   Good certified check of Purchaser drawn on or official check issued by ~~any bank~~, savings bank, trust company or savings and loan association having a banking office in the State of New York, unendorsed and payable to the order of Seller, or as Seller may otherwise direct upon reasonable prior notice (by telephone or otherwise) to Purchaser;
   (c)   As to money other than the purchase price payable to Seller at Closing, uncertified check of Purchaser up to the amount of $ 250.00      ; and
   (d)   As otherwise agreed to in writing by Seller or Seller's attorney.

8. Mortgage Commitment Contingency. ~~(Delete paragraph if inapplicable. For explanation, see Notes on Mortgage Commitment Contingency Clause.)~~

   (a)  The obligation of Purchaser to purchase under this contract is conditioned upon issuance, on or before     30     days after a fully executed copy of this contract is given to Purchaser or Purchaser's attorney in the manner set forth in paragraph 25 or subparagraph 8(j) (the "Commitment Date"), of a written commitment from an Institutional Lender  pursuant to which such Institutional Lender agrees to make a first mortgage loan, other than a VA, FHA or other governmentally insured loan, to Purchaser, at Purchaser's sole cost and expense, of $    391,500.00    for a term of at least      30      years (or such lesser sum or shorter term as Purchaser shall be willing to accept) at the prevailing fixed or adjustable rate of interest and on other customary commitment terms (the "Commitment"). To the extent a Commitment is conditioned on the sale of Purchaser's current home, payment of any outstanding debt, no material adverse change in Purchaser's financial condition or any other customary conditions, Purchaser accepts the risk that such conditions may not be met; however, a commitment conditioned on the Institutional Lender's approval of an appraisal shall not be deemed a "Commitment" hereunder until an appraisal is approved (and if that does not occur before the Commitment Date, Purchaser may cancel under subparagraph 8(e) unless the Commitment Date is extended). Purchaser's obligations hereunder are conditioned only on issuance of a Commitment. Once a Commitment is issued, Purchaser is bound under this contract even if the lender fails or refuses to fund the loan for any reason.

   (b)  Purchaser shall (i) make prompt application to one or, at Purchaser's election, more than one Institutional Lender for such mortgage loan, (ii) furnish accurate and complete information regarding Purchaser and members of Purchaser's family, as required, (iii) pay all fees, points and charges required in connection with such application and loan, (iv) pursue such application with diligence, and (v) cooperate in good faith with such Institutional Lender(s) to obtain a Commitment. Purchaser shall accept a Commitment meeting the terms set forth in subparagraph 8(a) and shall comply with all requirements of such Commitment (or any other commitment accepted by Purchaser). Purchaser shall furnish Seller with a copy of the Commitment promptly after receipt thereof.

   (c)  ~~(Delete this subparagraph if inapplicable)~~ Prompt submission by Purchaser of an application to a mortgage broker registered pursuant to Article 12-D of the New York Banking Law ("Mortgage Broker") shall constitute full compliance with the

terms and conditions set forth in subparagraph 8(b)(i), provided that such Mortgage Broker promptly submits such application to such Institutional Lender(s). Purchaser shall cooperate in good faith with such Mortgage Broker to obtain a Commitment from such Institutional Lender(s).

(d) If all Institutional Lenders to whom applications were made deny such applications in writing prior to the Commitment Date, Purchaser may cancel this contract by giving Notice thereof to Seller, with a copy of such denials, provided that Purchaser has complied with all its obligations under this paragraph 8.

(e) If no Commitment is issued by the Institutional Lender on or before the Commitment Date, then, unless Purchaser has accepted a written commitment from an Institutional Lender that does not conform to the terms set forth in subparagraph 8(a), Purchaser may cancel this contract by giving Notice to Seller within 5 business days after the Commitment Date, provided that such Notice includes the name and address of the Institutional Lender(s) to whom application was made and that Purchaser has complied with all its obligations under this paragraph 8.

(f) If this contract is canceled by Purchaser pursuant to subparagraphs 8(d) or (e), neither party shall thereafter have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser and except as set forth in paragraph 27.

(g) If Purchaser fails to give timely Notice of cancellation or if Purchaser accepts a written commitment from an Institutional Lender that does not conform to the terms set forth in subparagraph 8(a), then Purchaser shall be deemed to have waived Purchaser's right to cancel this contract and to receive a refund of the Downpayment by reason of the contingency contained in this paragraph 8.

(h) If Seller has not received a copy of a commitment from an Institutional Lender accepted by Purchaser by the Commitment Date, Seller may cancel this contract by giving Notice to Purchaser within 5 business days after the Commitment Date, which cancellation shall become effective unless Purchaser delivers a copy of such commitment to Seller within 10 business days after the Commitment Date. After such cancellation neither party shall have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser (provided Purchaser has complied with all its obligations under this paragraph 8) and except as set forth in paragraph 27.

(i) For purposes of this contract, the term "Institutional Lender" shall mean any bank, savings bank, private banker, trust company, savings and loan association, credit union or similar banking institution whether organized under the laws of this state, the United States or any other state; foreign banking corporation licensed by the Superintendent of Banks of New York or regulated by the Comptroller of the Currency to transact business in New York State; insurance company duly organized or licensed to do business in New York State; mortgage banker licensed pursuant to Article 12-D of the Banking Law; and any instrumentality created by the United States or any state with the power to make mortgage loans.

(j) For purposes of subparagraph 8(a), Purchaser shall be deemed to have been given a fully executed copy of this contract on the third business day following the date of ordinary or regular mailing, postage prepaid.

9. **Permitted Exceptions.** The Premises are sold and shall be conveyed subject to:
  (a)  Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the property or their use;
  (b)  Consents for the erection of any structures on, under or above any streets on which the Premises abut;
  (c)  Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;
  (d)  Real estate taxes that are a lien, but are not yet due and payable; and
  (e)  The other matters, if any, including a survey exception, set forth in a Rider attached.

10.  **Governmental Violations and Orders.** (a) Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as of the date hereof by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises. The Premises shall be conveyed free of them at Closing. Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters.

(b)  *(Delete if inapplicable)* All obligations affecting the Premises pursuant to the Administrative Code of the City of New York incurred prior to Closing and payable in money shall be discharged by Seller at or prior to Closing.

11.  **Seller's Representations.** (a) Seller represents and warrants to Purchaser that:
  (i)   The Premises abut or have a right of access to a public road;
  (ii)  Seller is the sole owner of the Premises and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this contract;
  (iii) Seller is not a "foreign person," as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code ("IRC") Section 1445, as amended, and the regulations promulgated thereunder (collectively "FIRPTA");
  (iv)  The Premises are not affected by any exemptions or abatements of taxes; and
  (v)   Seller has been known by no other name for the past ten years, except

(b) Seller covenants and warrants that all of the representations and warranties set forth in this contract shall be true and correct at Closing.

(c) Except as otherwise expressly set forth in this contract, none of Seller's covenants, representations, warranties or other obligations contained in this contract shall survive Closing.

12. Condition of Property. Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical condition, state of repair, use, cost of operation or any other matter related to the Premises or the other property included in the sale, given or made by Seller or its representatives, and shall accept the same "as is" in their present condition and state of repair, subject to reasonable use, wear, tear and natural deterioration between the date hereof and the date of closing (except as otherwise set forth in paragraph 16(c)) without any reduction in the purchase price or claim of any kind for any change in such condition by reason thereof subsequent to the date of this contract. Purchaser and its authorized representatives shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the Premises before Closing.

13. Insurable Title. Seller shall give and Purchaser shall accept such title as any reputable title insurance or abstract company licensed to do business in the state of New York shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for in this contract.

14. Closing, Deed and Title. (a) "Closing" means the settlement of the obligations of Seller and Purchaser to each other under this contract, including the payment of the purchase price to Seller, and the delivery to Purchaser of a bargain and sale with covenant against grantor's acts deed in proper statutory short form for record, duly executed and acknowledged, so as to convey to Purchaser fee simple title to the Premises, free of all encumbrances, except as otherwise herein stated. The deed shall contain a covenant by Seller as required by subd. 5 of Section 13 of the Lien Law.

(b) If Seller is a corporation, it shall deliver to Purchaser at the time of Closing (i) a resolution of its Board of Directors authorizing the sale and delivery of the deed, and (ii) a certificate by the Secretary or Assistant Secretary of the corporation certifying such resolution and setting forth facts showing that the transfer is in conformity with the requirements of Section 909 of the Business Corporation Law. The deed in such case shall contain a recital sufficient to establish compliance with that Section.

15. Closing Date and Place. Closing shall take place at the office of Seller's attorney at    10AM    o'clock on    or about September 15, 2005    or, upon reasonable notice (by telephone or otherwise) by Purchaser, at the office of    lender's attorney

16. Conditions to Closing. This contract and Purchaser's obligation to purchase the Premises are also subject to and conditioned upon the fulfillment of the following conditions precedent:

(a) The accuracy, as of the date of Closing, of the representations and warranties of Seller made in this contract.

(b) The delivery by Seller to Purchaser of a valid and subsisting Certificate of Occupancy or other required certificate of compliance, or evidence that none was required, covering the building(s) and all of the other improvements located on the property authorizing their use as a   single family dwelling at the date of Closing.

(c) The delivery by Seller to Purchaser of a certificate stating that Seller is not a foreign person, which certificate shall be in the form then required by FIRPTA, or a withholding certificate from the I.R.S. If Seller fails to deliver the aforesaid certificate or if Purchaser is not entitled under FIRPTA to rely on such certificate, Purchaser shall deduct and withhold from the purchase price a sum equal to 10% thereof (or any lesser amount permitted by law) and shall at Closing remit the withheld amount with the required forms to the Internal Revenue Service.

(d) The delivery of the Premises and all buildings(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with keys to the Premises.

(e) All plumbing (including water supply and septic systems, if any), heating and air conditioning, if any, electrical and mechanical systems, equipment and machinery in the buildings(s) located on the property and all appliances which are included in this sale being in working order as of the date of Closing.

(f) If the Premises are a one or two family house, delivery by the parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Premises a smoke detecting alarm device or devices.

(g) The delivery by the parties of any other affidavits required as a condition of recording the deed.

17. Deed Transfer and Recording Taxes. At Closing, certified or official bank checks payable to the order of the appropriate

State, City or County officer in the amount of any applicable transfer and/or recording tax payable by reason of the delivery or recording of the deed or mortgage, if any, shall be delivered by the party required by law or by this contract to pay such transfer and/or recording tax, together with any required tax returns duly executed and sworn to, and such party shall cause any such checks and returns to be delivered to the appropriate officer promptly after Closing. The obligation to pay any additional tax or deficiency and any interest or penalties thereon shall survive Closing.

18.  Apportionments and Other Adjustments; Water Meter and Installment Assessments. (a) To the extent applicable, the following shall be apportioned as of midnight of the day before the day of Closing:

(i)  taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed; (ii) fuel; (iii) interest on the existing mortgage; (iv) premiums on existing transferable insurance policies and renewals of those expiring prior to Closing; (v) vault charges; (vi) rents as and when collected.  (iii) Apple Knoll Estates $100 per quarter maintenance fe

(b)  If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to the latest assessed valuation.

(c)  If there is a water meter on the Premises, Seller shall furnish a reading to a date not more than 30 days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

(d)  If at the date of Closing the premises are affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e)  Any errors or omissions in computing apportionments or other adjustments at Closing shall be corrected within a reasonable time following Closing. This subparagraph shall survive Closing.

19.  Allowance for Unpaid Taxes, etc. Seller has the option to credit Purchaser as an adjustment to the purchase price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less than five business days after Closing, provided that official bills therefor computed to said date are produced at Closing.

20.  Use of Purchase Price to Remove Encumbrances. If at Closing there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the cash balance of the purchase price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments. As an alternative Seller may deposit sufficient moneys with the title insurance company employed by Purchaser acceptable to and required by it to assure their discharge, but only if the title insurance company will insure Purchaser's title clear of the matters or insure against their enforcement out of the Premises and will insure Purchaser's Institutional Lender clear of such matters. Upon reasonable prior notice (by telephone or otherwise), Purchaser shall provide separate certified or official bank checks as requested to assist in clearing up these matters.

21.  Title Examination; Seller's Inability to Convey; Limitations of Liability. (a) Purchaser shall order an examination of title in respect of the Premises from a title company licensed or authorized to issue title insurance by the New York State Insurance Department or any agent for such title company promptly after the execution of this contract or, if this contract is subject to the mortgage contingency set forth in paragraph 8, after a mortgage commitment has been accepted by Purchaser. Purchaser shall cause a copy of the title report and of any additions thereto to be delivered to the attorney(s) for Seller promptly after receipt thereof.

(b)(i) If at the date of Closing Seller is unable to transfer title to Purchaser in accordance with this contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called "Defects"), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other than those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the purchase price, then, except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this contract; (ii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate (but not extending beyond the date upon which Purchaser's mortgage commitment, if any, shall expire), and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. If for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with such Defects at the expiration of such adjournment(s), and if Purchaser shall still be unwilling to waive the same and to close title without abatement of the purchase price, then either party may cancel this contract by Notice to the other given within 10 days after such adjourned date; (iii) notwithstanding the foregoing, the existing mortgage (unless this sale is subject to the same) and any matter created by Seller after the date hereof shall be released, discharged or otherwise cured by Seller at or prior to Closing.

(c)  If this contract is cancelled pursuant to its terms, other than as a result of Purchaser's default, this contract shall terminate and come to an end, and neither party shall have any further rights, obligations or liabilities against or to the other hereunder or otherwise, except that: (i) Seller shall promptly refund or cause the Escrowee to refund the Downpayment to Purchaser and, unless

cancelled as a result of Purchaser's default or pursuant to paragraph 8, to reimburse Purchaser ~~for the net cost of examination of title, including any appropriate additional charges related thereto, and the net cost, if actually paid or incurred by Purchaser, for updating the existing survey of the Premises or of a new survey, and (ii) the obligations under paragraph 27 shall survive the termination of this contract.~~

22.  **Affidavit as to Judgments, Bankruptcies, etc.** If a title examination discloses judgments, bankruptcies or other returns against persons having names the same as or similar to that of Seller, Seller shall deliver an affidavit at Closing showing that they are not against Seller.

23.  **Defaults and Remedies.** (a) If Purchaser defaults hereunder, Seller's sole remedy shall be to receive and retain the Downpayment as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be impossible to ascertain and that the Downpayment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

  (b)  If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including, but not limited to, specific performance.

24.  **Purchaser's Lien.** All money paid on account of this contract, and the reasonable expenses of examination of title to the Premises and of any survey and survey inspection charges, are hereby made liens on the Premises, but such liens shall not continue after default by Purchaser under this contract.

25.  **Notices.** Any notice or other communication ("Notice") shall be in writing and either (a) sent by either of the parties hereto or by their respective attorneys who are hereby authorized to do so on their behalf or by the Escrowee, by registered or certified mail, postage prepaid, or

  (b)  delivered in person or by overnight courier, with receipt acknowledged, to the respective addresses given in this contract for the party and the Escrowee, to whom the Notice is to be given, or to such other address as such party or Escrowee shall hereafter designate by Notice given to the other party or parties and the Escrowee pursuant to this paragraph. Each Notice mailed shall be deemed given on the third business day following the date of mailing the same, except that any notice to Escrowee shall be deemed given only upon receipt by Escrowee and each Notice delivered in person or by overnight courier shall be deemed given when delivered, or

  (c)  with respect to ¶7(b) or ¶20, sent by fax to the party's attorney. Each Notice by fax shall be deemed given when transmission is confirmed by the sender's fax machine. A copy of each Notice sent to a party shall also be sent to the party's attorney. The attorneys for the parties are hereby authorized to give and receive on behalf of their clients all Notices and deliveries. This contract may be delivered as provided above or by ordinary mail.

26.  **No Assignment.** This contract may not be assigned by Purchaser without the prior written consent of Seller in each instance and any purported assignment(s) made without such consent shall be void.

27.  **Broker.** Seller and Purchaser each represents and warrants to the other that it has not dealt with any real estate broker in connection with this sale other than  Easy Lifestyle Real Estate (selling broker) and Century 21 Anarumo-ZOAR Realty (listing broker)
("Broker") and Seller shall pay Broker any commission earned pursuant to a separate agreement between Seller and Broker. Seller and Purchaser shall indemnify and defend each other against any costs, claims and expenses, including reasonable attorneys' fees, arising out of the breach on their respective parts of any representation or agreement contained in this paragraph. The provisions of this paragraph shall survive Closing or, if Closing does not occur, the termination of this contract.

28.  **Miscellaneous.** (a) All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract; it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.

  (b)  Neither this contract nor any provision thereof may be waived, changed or cancelled except in writing. This contract shall also apply to and bind the heirs, distributees, legal representatives, successors and permitted assigns of the respective parties. The parties hereby authorize their respective attorneys to agree in writing to any changes in dates and time periods provided for in this contract.

  (c)  Any singular word or term herein shall also be read as in the plural and the neuter shall include the masculine and feminine gender, whenever the sense of this contract may require it.

  (d)  The captions in this contract are for convenience of reference only and in no way define, limit or describe the scope of this contract and shall not be considered in the interpretation of this contract or any provision hereof.

  (e)  This contract shall not be binding or effective until duly executed and delivered by Seller and Purchaser.

(f) Seller and Purchaser shall comply with IRC reporting requirements, if applicable. This subparagraph shall survive Closing.

(g) Each party shall, at any time and from time to time, execute, acknowledge where appropriate and deliver such further instruments and documents and take such other action as may be reasonably requested by the other in order to carry out the intent and purpose of this contract. This subparagraph shall survive Closing.

(h) This contract is intended for the exclusive benefit of the parties hereto and, except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by, any other person or entity.

(i) If applicable, the complete and fully executed disclosure of information on lead-based paint and/or lead-based paint hazards is attached hereto and made a part hereof.

IN WITNESS WHEREOF, this contract has been duly executed by the parties hereto.

_____          _____
Ronald J. Cohen, Seller                  Darrick Grimes, Purchaser

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                              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
Social Security No./Fed. I.D. No.         Social Security No./Fed. I.D. No.

Ann Eve Cohen                            Yolanda Grimes
_____          _____
Ann Eve Cohen, Seller                    Yolanda Grimes, Purchaser

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                              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
Social Security No./Fed. I.D. No.         Social Security No./Fed. I.D. No.

Attorney for Seller:                     Attorney for Purchaser: Mark Marmer, Esq.
         Cohen, Estis & Associates, LLP          Debevoise & Plimpton LLP
Address: 40 Matthews Street              Address: 919 3rd Avenue
         Goshen, New York 10924                   New York, New York 10022
Tel.: (845) 291-1900    Fax: (845) 291-0861    Tel.: (212) 909-7211    Fax: (212) 909-6386

Receipt of the Downpayment is acknowledged and the undersigned agrees to act in accordance with the provisions of paragraph 6.

                    Cohen, Estis & Associates, LLP

Underwriter No. 8711048097
Title Number 0211040653

Schedule A Description

ALL that certain plot, piece or parcel of land situate lying and being in the Town of Newburgh, County of Orange and State of New York, being designated as Lot No. 11 on a map entitled "Subdivision Plan Lands of Parcel Development Corp.", dated May 20, 1986, filed in the Orange County Clerk's Office on June 23, 1986 as Map No. 7681, being more particularly bounded and described as follows:

Beginning at a point in the southwesterly line of the existing Stacy Lee Drive, a 60 foot right-of-way and private road, said point being North 67 deg. 37' West 440.00 feet from the intersection of the said southwesterly line of Stacy Lee Drive with the westerly line of the existing Frozen Ridge Road, said point also being on the division line between Lot No. 12, of the above mentioned filed map, on the east and the lot No. 11 herein described on the west; thence along the last mentioned division line, South 22 deg. 23' West 238.39 feet to a point on the division line between the lands now or formerly of Frozen Ridge Acres on the south and Lot No. 11 herein described on the north; thence along the last mentioned division line, North 72 deg. 40' West 301.17 feet to a point on the division line between Lot No. 10, of the above mentioned filed map, on the west and Lot No. 11 herein described on the east; thence along the last mentioned division line, North 22 deg. 23' East 264.90 feet to a point in the aforementioned southwesterly line of Stacy Lee Drive; thence along the last mentioned line South 67 deg. 37' East 300.00 feet to the point or place of beginning.

Together with an undivided one twelfth interest in and to the private road known as Stacy Lee Drive as shown on the aforementioned Map No. 7681 as well as the right to place utilities under said private road.

Insure

## DISCLOSURE OF INFORMATION ON LEAD-BASED PAINT AND LEAD-BASED PAINT HAZARDS

**Lead Warning Statement**

Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

**Seller's Disclosure (initial)**

_____ (a)    Presence of lead-based paint and/or lead-based paint hazards (check one below):

[ ]    Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

_____

[ ]    Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

_____ (b)    Records and reports available to the seller (check one below):

[ ]    Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

_____

[ ]    Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment (initial)**

_____ (c)    Purchaser has received copies of all information listed above.

_____ (d)    Purchaser has received the pamphlet _Protect Your Family from Lead in Your Home._

_____ (e)    Purchaser has (check one below):

[ ]    Received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

[ ]    Waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment (initial)**

_____ (f)    Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information provided by the signatory is true and accurate.

| | | |
|---|---|---|
| Seller Ronald J. Cohen    8/1/05 | Seller Ann Eve Cohen    8/12/05 | |
| Date | Date | |
| Agent | Agent | |
| Purchaser Darrick Grimes    8/1/05 | Purchaser Yolanda Grimes    8/1/05 | |
| Date | Date | |

© 2004 Matthew Bender & Co., a member of the LexisNexis Group.

EXHIBIT "A"

SELLER'S RIDER TO CONTRACT

RONALD J. COHEN and ANN EVE COHEN
TO
DARRICK GRIMES and YOLANDA GRIMES

### 1.    NOTICE OF OBJECTIONS

Purchaser agrees to notify COHEN, ESTIS & ASSOCIATES, LLP, attorneys for the Seller, in writing, of any objections to title at least twenty (20) days before the date set for closing. In the event that there be any objections to title, the Seller may adjourn the closing of title to afford him reasonable opportunity to dispose of such objections. Seller, however, shall not be required to bring any action or proceeding or incur any expense to render its title marketable, except as hereinafter provided, with respect to disposition or payment of judgment, mechanic liens, mortgages federal and state tax liens and warrants.

### 2.    MERGER OF CONTRACT

It is understood and agreed by the parties that the delivery and acceptance of the deed of conveyance at the time of closing of title shall be deemed to constitute full compliance by the Seller of all of the terms, covenants and conditions of this Contract on its part to be performed. It is agreed that none of the terms hereof except those specifically made to survive title closing, shall survive such title closing.

### 3.    SELLER'S LIABILITY LIMITED

In the event Seller shall be unable to convey a marketable title to the premises hereinabove described or convey title to the premises in accordance with the terms of this Contract, Purchaser shall at Purchaser's election have the right to accept such title as the Seller is able to convey without claim on the part of the Purchaser for abatement for defects or objections, or Purchaser shall have the right to rescind this Contract, and upon such recision pursuant to this paragraph, the rights of the Purchaser shall be limited to the return of the monies paid upon the signing of this Contract shall be under no obligation or liability whatsoever to the Purchaser for any damages that Purchaser may have sustained by reason of Seller's failure to convey title hereunder. In no event shall Seller be required to incur any expenditures of any sums of money to cure or remove defects, liens or encumbrances or institute any action or proceedings to render title marketable.

### 4.    DEPOSIT FOR LIENS

If the premises be subject to any liens, including transfer, inheritance, estate, franchise, license or other similar tax, the amount of which has not been finally fixed, the same shall not be deemed an objection to title, provided that any title company in good standing to which Purchaser has applied for title insurance will, at the time of the closing of title, issue or bind itself to issue its policy which will insure Purchaser against collection of said liens and taxes from said premises, or if Seller leaves a reasonable deposit with Seller's attorney or with Purchaser's title company to

secure the payment thereof.

### 5.    PURCHASER'S RISKS

Purchaser represents that the Purchaser has inspected the premises hereinabove described and is purchasing said premises in "as is" condition as of this date, reasonable wear and tear excepted. This Contract, as written, contains all the terms of the agreement entered into between the parties, and Purchaser acknowledges that Seller has made no representations, is unwilling to make any representations, and held out no inducements to the Purchaser, other than those herein expressed, and the Seller is not liable or bound in any manner by expressed or implied warranties, guarantees, promises, statements, representations, or information pertaining to the said premises as to the physical condition, income, expense, operation, or to what use the premises can be applied, including, but not limited to any matter or thing affecting or relating to the said premises, except as herein specifically set forth. The Seller is not liable or bound in any manner by any verbal or written statements, representations, or information pertaining to the above premises furnished by any real estate broker, agent, employee, servant or other person, unless the same are specifically set forth herein.

### 6.    RIGHT OF ASSIGNMENT

The Purchaser shall not assign this agreement without the written consent of the Seller.

### 7    CONTROLLING PROVISIONS

The provisions of this rider are in addition to the main body of this Contract. In each instance in which a provision of this rider shall contradict or be inconsistent with a provision of the main body of the Contract or any subsequent rider, the provisions contained in this rider shall govern and prevail.

### 8    ACCEPTANCE OF RIDER

The execution of the printed form by the Seller and the Purchaser of the Contract annexed hereto shall constitute acceptance of the terms of this rider.

### 9.    CHANGING OR CANCELING OF CONTRACT

This Contract may not be changed or canceled except in writing. The Contract shall also apply to and bind the distributees, heirs, executors, administrators, successors and assign of the respective parties. Each of the parties hereby authorize their attorneys to agree in writing to any change in dates and time period provided for in this Contract.

The purchaser acknowledges that this agreement was prepared by the attorney for the Seller. To the extent that changes made by the Purchaser or his attorney are not initialed by the Seller, those changes shall not be binding upon the Seller and terms of this agreement as originally prepared in that respect shall be binding upon both parties hereto.

10    CONTRACT TERMINATION

In the event this Contract is terminated by Purchaser, notwithstanding any other provision of this agreement, or law of the State of New York, Purchaser shall deliver to Seller all maps, surveys, site plans, preliminary and final subdivision plans, engineering reports, studies and analyses at no cost to the Seller.

11.    METES AND BOUNDS DESCRIPTION

If Purchaser orders a survey, Purchaser shall use the firm of Vince Doce, 15 New Road, Newburgh, NY 12550.

In the event Purchaser obtains a survey of the premises and the survey is certified to the Seller, the Seller agrees to include in the deed of conveyance a metes and bounds description in accordance with the survey, with the understanding by Purchaser that Seller does not thereby warrant the accuracy of said metes and bounds description.

12.    PURCHASER'S DEFAULT

The parties mutually acknowledge that if the Purchasers should default in closing title or under any other term or condition of this Contract, it may be impossible to determine Seller's actual damages. Accordingly, if the Purchasers shall default, whether such default be willful or otherwise, the Sellers shall have the option to retain any and all funds previously paid by the Purchasers pursuant to this agreement as liquidated damages. In the event Seller elects to retain the down payment, both parties shall be relieved and released of and from any further liabilities hereunder, and Purchaser expressly releases any lien Purchaser may have against the property. Further, in the event of any default by Purchasers in closing title, the Seller is authorized to place the premises back on the market free and clear of any claim which the Purchaser may have against the premises.

13.    WATER SUPPLY

If the water supply serving the premises is derived from a well, Seller represents that the water is potable and of pure quality for domestic purposes, without the need for treatment and Purchaser is given the right to test the water to determine the above. The Purchaser shall have until ten (10) days after receipt of fully executed contracts to obtain the report and notify Seller's attorney of any defects and in the event the Purchaser does not so notify Seller's attorney by that date, performance of the condition shall be deemed waived.

14.    TERMITE INSPECTION

The Purchaser may have the premises inspected for termite and/or carpenter ant infestation. In the event such infestation is found, the Seller, at Seller's option, may have same repaired by a licensed exterminator of their choice, or in the alternative, may cancel this Contract and return the down payment hereunder, unless the Purchaser, at Purchaser's option, elects to accept the premises "as is". Purchaser shall have until ten (10) days after receipt of fully executed contract to obtain the report and notify Seller's attorney for any defects and in the event Purchaser does not so notify

Seller's attorney by that date, performance of the condition shall be deemed waived.

## 15. INSPECTIONS

Within ten (10) days Purchaser(s) at his/her/their own cost and expense may cause the premises to be examined by an engineer for structural items, for mold contamination and if such inspection reveals unacceptable conditions then the Purchaser(s) may, at their option, terminate this agreement and receive the return of the downpayment.

## 16.    LEAD PAINT DISCLOSURE

Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, a reduced intelligence quotient, behavior problem and impaired memory. Lead Poisoning also poses a particular risk to pregnant women. The Seller of any interest in residential property is required to provide the buyer with any information on lead based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead based paint hazards. A risk assessment or inspection for possible lead based paint hazards is recommended prior to purchase. Seller knows of no lead based paint hazards and has no reports or records pertaining to lead based paint or hazards in the house, except as may be attached to this Contract. Purchaser has ten (10) days from the signing of this Contract to conduct a risk assessment or inspection for the presence of lead based paint and/or lead based paint hazards.

## 17. SMOKE ALARM  AFFIDAVIT

The Seller(s) herein shall deliver to the Purchaser(s) at the time of transfer an affidavit, in recordable form, indicating that the dwelling in question is in compliance with the Executive Law Section 378(5), and that such dwelling has installed an operable single station smoke detecting alarm device or devices, which is in compliance with the uniform code, prior to the sale or transfer of the property.

## 18. CARBO MONOXIDE AFFIDAVIT

The Seller(s) herein shall deliver to the Purchaser(s) at the time of transfer an affidavit, in recordable form, indicating that the dwelling in question is in compliance with Executive Law Section 378(5)(a), and that such dwelling has installed an operable single station carbon monoxide detecting alarm device or devices, which is in compliance with the uniform code, prior to the sale or transfer of the property.

## 19.    LENDING INSTITUTION IN ANOTHER COUNTY

If the lending institution selected by the Purchasers requires a closing to be held in a county other than the county where the property is located, the Purchasers agree to pay to the Seller at

closing, an additional sum of $250.00 for travel to adjacent counties. If travel is to New York City or any of the boroughs of New York City, the additional sum is $400.00; if travel to Westchester County, the additional sum is $300.00.

### 20.    SALE OF HOUSE CONTINGENCY

Purchaser represents that they have a house in Queen County that must be sold prior to their ability to close on this contract. Purchaser represents that they have already or will within ten (10) days of execution of this contarct list the house with licensed real estate broker at fair market value. Seller may elect to accept another offer to purchase the premises in the event that Purchaser does not close on their Queens property within ninety(90) days of this contract. Purchaser shall receive ten (10) day written notice from Seller and has the right to close within the 100th day of this contract, otherwise Seller has the right to either (a) terminate Purchasers rights under this contract ; or (b) extend the opportunity of Purchaser to proceed to a closing upon such term and conditions as Seller shall require. The purpose of this provision is to prevent an unlimited "lock-in" of the Sales Price and terms of Seller's obligations to hold the Premises out for the benefit of the Purchaser.

### 21.    POSSESSION OF PROPERTY

The conditions of the premises on closing shall be the same as at the time of the contract, reasonable wear and tear excepted. The Seller shall deliver the premises vacant and broom clean, free of all rubbish, garbage, debris and waste. Seller agrees to maintain the property in its present condition, continuing to mow and otherwise care for the lawn and garden beds and to generally maintain the appearance of the premises in accord with the standard of the neighborhood.

### 22.    "SUBJECT TO" CLAUSES

In addition to any other "subject to" clauses contained in the form contract, said premises are sold subject to the following:

a.    Any state of facts an accurate survey would show provided same do not render title unmarketable;

b.    Zoning ordinances, building regulations, covenants, easements, restrictions of record affecting the same premises, provided existing structure does not violate the same;

c.    Mining and mineral rights of third parties, if any;

d.    Any variance in connection with fence, hedge, and like, surrounding the premises, provided the same does not render title unmarketable;

e.    In the event there exists any additional improvement to the premises, which violate covenants and restrictions, the existence of such violation of the covenants and restrictions shall not be deemed objection to title provided a title company can insure that said additions or improvements may remain in their present location as long as the same shall stand;

f.    Any state of facts a personal inspection of the premises would disclose.

g.    Public utility easements of record, if any.

## 23.    IRS INFORMATION RETURN DESIGNATION

Pursuant to the revised Section 6045 of the Internal Revenue Code, the attorney for the Seller, the attorney for the Purchaser or other closing agent must report the details of the closing of this transaction to the Internal Revenue Service.  To enable such party to so report this transaction, the parties hereby certify that the Federal Identification Number/ Social Security Number is as follows:

Seller: _____          Purchaser:____ _____

Seller:___ _____          Purchaser:____ _____

Seller and Purchaser agree to notify the party required to report this transaction to the Internal Revenue Service at the closing, and to sign and date an informational sheet in that regard. It is further agreed that if the lender's attorney does not agree to perform such filing, said filing shall be the responsibility of the Seller's attorney.

## 24.    EXECUTION OF CONTRACT

It is expressly understood and agreed that this Contract offer made by Seller is not a binding Contract, and is subject to Sellers' acceptance and approval, and that this Contract is not an offer to sell, and shall not in any way bind Sellers until such time as the same has been approved and executed by the Sellers and delivered to the Purchaser or Purchaser's attorney. Until this Contract is executed by the Sellers and good checks are received by the Sellers, the Purchaser has no interest in the property or remedy against the Sellers for failure to execute this Contract.

Executed contracts of sale must be returned to the Seller's attorney's office no later than August 1, 2005, or this Contract shall be deemed null and void and the Sellers shall have the right to place their property back on the market.

## 24.    APPORTIONMENTS

Any errors or omissions in computing closing costs or apportionments at closing shall be corrected as soon as reasonably possible. This provision shall survive closing of title.

## 25.  .  CERTIFIED FUNDS

Notwithstanding the acceptance of any uncertified funds by the Seller in consideration for the delivery of the deed herein, said acceptance shall not constitute a waiver of any right under this Contract or shall be construed as an unconditional delivery of the deed to the Purchaser by the Seller, it being the attention of the parties hereto that the Purchaser shall personally guarantee, as part of Purchaser's consideration hereunder, said uncertified funds and further, it being the intention of the



of the parties, that the failure of said uncertified funds to be honored upon presentation to an appropriate bank shall constitute a failure of consideration under this Contract and shall require the Purchaser to tender the deed back to the Seller on ten (10) days written notice of that event. This provision shall survive closing of title.

### 26.    STACY LEE DRIVE

Seller has disclosed that Stacy Lee Drive is a private road and is governed by a recorded agreement see Exhibit "A" annexed.

The fee(s) assed by the homeowners association Apple Knoll Estates is $100.00 per quarter and this shall be apportioned at closing. There is no notice to Seller of any special Assessment. The maintenance fee covers(i) taxes on the private road - all up to date (ii) insurance and (iii) maintenance.

### 27.    PROPERTY DISCLOSURE FORM

Seller has completed and the form is annexed hereto.

### 28.    TITLE COMPANY

Purchaser shall use Feldman- Jacobson Abstract Corp. at 24 Market Street, Poughkeepsie, NY 12601, phone 845 454-1171, fax 845 454-3720 as the title company. Notwithstanding anything herein to the contrary.

RONALD J. COHEN                        DARRICK GRIMES

ANN EVE COHEN                          YOLANDA GRIMES

# Property Condition Disclosure Statement

Name of Seller or Sellers: <u>Ronald J. Cohen and Ann Eve Cohen</u>
Property Address: <u>23 Stacy Lee Drive, Newburgh, New York 12550</u>

The Property Condition Disclosure Act requires the seller of residential real property to cause this disclosure statement or a copy thereof to be delivered to a buyer or buyer's agent prior to the signing by the buyer of a binding contract of sale.

Purpose of Statement:
This is a statement of certain conditions and information concerning the property known to the seller. This disclosure statement is not a warranty of any kind by the seller or by any agent representing the seller in this transaction. It is not a substitute for any inspections or tests and the buyer is encouraged to obtain his or her own independent professional inspections and environmental tests and also is encouraged to check public records pertaining to the property.

A knowingly false or incomplete statement by the seller on this form may subject the seller to claims by the buyer prior to or after the transfer of title. In the event a seller fails to perform the duty prescribed in this article to deliver a disclosure statement prior to the signing by the buyer of a binding contract of sale, the buyer shall receive upon the transfer of title a credit of five hundred dollars ($500.00) against the agreed upon purchase price of the residential real property.

"Residential Real Property" means real property improved by a one to four family dwelling used or occupied, or intended to be used or occupied, wholly or partly, as the home or residence of one or more persons, but shall not refer to (a) unimproved real property upon which such dwellings are to be constructed or (b) condominium units or cooperative apartments or (c) property on a homeowners' association that is not owned in fee simple by the seller.

Instructions to the Seller:
(a). Answer all questions based upon your actual knowledge.
(b) Attach additional pages with your signature if additional space is required.
(c) Complete this form yourself.
(d) If some items do not apply to your property, check "NA" (Non-Applicable). If you do not know the answer check "Unkn" (Unknown).

Seller's Statement: The seller makes the following representations to the buyer based upon the seller's actual knowledge at the time of signing this document. The seller authorizes his or her agent, if any, to provide a copy of this statement to a prospective buyer of the residential real property. The following are representations made by the seller and are not the representations of the seller's agent.

General Information
1. How long have you owned the property? <u>1987 New at the time</u>
2. How long have you occupied the property? <u>1987</u>
3. What is the age of the structure or structures? <u>1987 House</u>
   Note to Buyer - If the structure was built before 1978 you are encouraged to investigate for the presence of lead based paint.
4. Does anybody other than yourself have a lease, easement or any other right to use or occupy any part of your property other than those stated in documents available in the public record, such as rights to use a road or path or cut trees or crops?
   Yes (No) Unkn NA     (If yes, explain below.)
5. Does anybody else claim to own any part of your property?
   Yes (No) Unkn NA     (If yes, explain below.)

6. Has anyone denied you access to the property or made a formal legal claim challenging your title to the property?    Yes   (No)   Unkn   NA   (If yes, explain below.)

7. Are there any features of the property shared in common with adjoining land owners or a homeowners association, such as walls, fences or driveways?  (Yes)  No   Unkn   NA   (If yes, describe below.)   *Stacy Lee Drive Private Road*

8. Are there any electric or gas utility surcharges for line extensions, special assessments or homeowner or other association fees that apply to the property?  (Yes)  No   Unkn   NA   (If yes, explain below.)   *100 per quarter to Apple Knoll Estates.*

9. Are there certificates of occupancy related to the property?  (Yes)  No   Unkn   NA   (If no, explain below.)

## Environmental

*Note to Seller* - In this section, you will be asked questions regarding petroleum products and hazardous or toxic substances that you know to have been spilled, leaked or otherwise been released on the property or from the property onto any other property. Petroleum products may include, but are not limited to, gasoline, diesel fuel, home heating fuel, and lubricants. Hazardous or toxic substances are products that could pose short- or long-term danger to personal health or the environment if they are not properly disposed of, applied or stored. These include, but are not limited to, fertilizers, pesticides and insecticides, paint including paint thinner, varnish remover and wood preservatives, treated wood, construction materials such as asphalt and roofing materials, antifreeze and other automotive products, batteries, cleaning solvents including septic tank cleaners, household cleaners and pool chemicals and products containing mercury and lead.

*Note to Buyer* - If contamination of this property from petroleum products and/or hazardous or toxic substances is a concern to you, you are urged to consider soil and groundwater testing of this property.

10. Is any or all of the property located in a designated floodplain?
Yes   (No)   Unkn   NA   (If yes, explain below.)

11. Is any or all of the property located in a designated wetland?
Yes   (No)   Unkn   NA   (If yes, explain below.)

12. Is the property located in an agricultural district?
Yes   (No)   Unkn   NA   (If yes, explain below.)

13. Was the property ever the site of a landfill?
Yes   (No)   Unkn   NA   (If yes, explain below.)

14. Are there or have there ever been fuel storage tanks above or below the ground on the property?  (Yes)  No   Unkn   NA   *Oil Tank*
If yes, are they currently in use?
Yes   No   Unkn   NA
Location(s) _____
Are they leaking or have they ever leaked?
Yes   (No)   Unkn   NA   (If yes, explain below.)

15. Is there asbestos in the structure?
Yes   (No)   Unkn   NA   (If yes, explain below.)

16. Is lead plumbing present?
Yes   (No)   Unkn   NA   (If yes, state location or locations below.)

17. Has a radon test been done?
Yes   (No)   Unkn   NA   (If yes, attach a copy of the report.)

18. Has motor fuel, motor oil, home heating fuel, lubricating oil or any other petroleum product, methane gas, or any hazardous or toxic substance spilled, leaked or otherwise been released on the property or from the property onto any other property?
Yes   (No)   Unkn   NA   (If yes, describe below.)

2   © 2004 Matthew Bender & Co., a member of the LexisNexis Group

19. Has the property been tested for the presence of motor fuel, motor oil, home heating fuel, lubricating oil, or any other petroleum product, methane gas, or any hazardous or toxic substance?
           Yes    No    Unkn    NA    (If yes, attach report(s).)

## Structural

20. Is there any rot or water damage to the structure or structures?
           Yes   (No)   Unkn   NA    (If yes, explain below.)

21. Is there any fire or smoke damage to the structure or structures?
           Yes   (No)   Unkn   NA    (If yes, explain below.)

22. Is there any termite, insect, rodent or pest infestation or damage?
           Yes   (No)   Unkn   NA    (If yes, explain below.)

23. Has the property been tested for termite, insect, rodent or pest infestation or damage?
           Yes   (No)   Unkn   NA    (If yes, please attach report(s).)

24. What is the type of roof/roof covering (slate, asphalt, other.)?
Any known material defects?
           Yes   (No)   Unkn   NA    (If yes, explain below.)
How old is the roof? _____ 1988 _____
Is there a transferable warrantee on the roof in effect now?
           Yes   (No)   Unkn   NA    (If yes, explain below.)

25. Are there any known material defects in any of the following structural systems: footings, beams, girders, lintels, columns or partitions?
           Yes   (No)   Unkn   NA    (If yes, explain below.)

## Mechanical Systems & Services

26. What is the water source (Circle all that apply - (well) private, municipal, other)?
If municipal, is it metered?
           Yes    No    Unkn   NA

27. Has the water quality and/or flow rate been tested?
           Yes   (No)   Unkn   NA    (If yes, describe below.)

28. What is the type of sewage system (Circle all that apply - public sewer, private sewer, septic or cesspool)?
If septic or cesspool, age? _Septic 1987_
Date last pumped? _About two (2) years ago_
Frequency of pumping? _2-3 years_
Any known material defects? _No_
           Yes   (No)   Unkn   NA    (If yes, explain below.)

29. Who is your electric service provider? _Central Hudson_
What is the amperage? _____
Does it have circuit breakers or fuses? _Yes_
Private or public poles? _____
Any known material defects? _____
           Yes   (No)   Unkn   NA    (If yes, explain below.)

30. Are there any flooding, drainage or grading problems that resulted in standing water on any portion of the property?   Yes   (No)   Unkn   NA    (If yes, state locations and explain below.)

31. Does the basement have seepage that results in standing water?
           Yes   (No)   Unkn   NA    (If yes, explain below.)

© 2004 Matthew Bender & Co., a member of the LexisNexis Group.

Are there any known material defects in any of the following (If yes, explain below. Use additional sheets if necessary.):

| | | | | |
|---|---|---|---|---|
| 32. Plumbing System? | Yes | No | Unkn | NA |
| 33. Security System? | Yes | No | Unkn | NA |
| 34. Carbon Monoxide Detector? | Yes | No | Unkn | NA |
| 35. Smoke Detector? | Yes | No | Unkn | NA |
| 36. Fire Sprinkler System? | Yes | No | Unkn | NA |
| 37. Sump Pump? | Yes | No | Unkn | NA |
| 38. Foundation/Slab? | Yes | No | Unkn | NA |
| 39. Interior Walls/Ceilings? | Yes | No | Unkn | NA |
| 40. Exterior Walls Or Siding? | Yes | No | Unkn | NA |
| 41. Floors? | Yes | No | Unkn | NA |
| 42. Chimney/Fireplace or Stove? | Yes | No | Unkn | NA |
| 43. Patio/Deck? | Yes | No | Unkn | NA |
| 44. Driveway? | Yes | No | Unkn | NA |
| 45. Air Conditioner? | Yes | No | Unkn | NA |
| 46. Heating System? | Yes | No | Unkn | NA |
| 47. Hot Water Heater? | Yes | No | Unkn | NA |

*(handwritten note at item 41:)* some tiles cracked

48. The Property is located in the following School District: Newburgh   Unkn
*(handwritten:)* Enlarged City School

*Note:* Buyer is encouraged to check public records concerning the property (e.g. tax records and wetland and flood plain maps.)

The seller should use this area to further explain any item above. If necessary, attach additional pages and indicate here the number of additional pages attached.

_____

_____

_____

_____

**Seller's Certification:** Seller certifies that the information in this property condition disclosure statement is true and complete to the seller's actual knowledge as of the date signed by the seller. If a seller of residential real property acquires knowledge which renders materially inaccurate a property condition disclosure statement provided previously, the seller shall deliver a revised property condition disclosure statement to the buyer as soon as practicable. In no event, however, shall a seller be required to provide a revised property condition disclosure statement after the transfer of title from the seller to the buyer or occupancy by the buyer, whichever is earlier.

Seller *Ann E. Cohen*      Date 7/14/05

Seller *(signature)*      Date 7/14/05

**Buyer's Acknowledgment:** Buyer acknowledges receipt of a copy of this statement and buyer understands that this information is a statement of certain conditions and information concerning the property known to the seller. It is not a warranty of any kind by the seller or seller's agent and is not a substitute for any home, pest, radon or other inspections or testing of the property or inspection of the public records.

Buyer *(signature)*      Date 8/1/05

Buyer *Yolanda Grimes*      Date 8/1/05

## ADDITIONAL RIDER TO CONTRACT OF SALE
### 23 Stacy Lee Drive
### Newburgh, NY

1. The terms of this Additional Rider shall prevail over the terms of the printed form and any other Rider to the Contract to which this Additional Rider is attached.

2. Seller makes the following additional representations and covenants:

   (a) The underground oil tank has never leaked or been damaged.
   (b) All work and alterations to the Premises have been performed in accordance with applicable law,
   (c) Seller shall maintain the Premises, including landscaping in its present condition (reasonable wear and tear excepted) until closing,
   (d) Seller is not in violation of any of the Restrictive Covenants set forth in the deed in which the premises were conveyed to Seller, and
   (e) At closing, (i) the roof and basement shall be free of leaks and water seepage, and (ii) all pool equipment shall be working and included in this sale.

3. This Agreement may be executed in counterparts, and the delivery of facsimile copies of the fully executed agreement shall constitute a binding agreement provided that the Downpayment is delivered to Escrow Agent, and that original executed copies are delivered promptly after the delivery of a facsimile copy.

4. If due to Purchaser's inability to close, the closing does not occur by September 15, 2005 then the Seller shall have the pool closed for the season and Purchaser shall reimburse Seller the sum of $500 at closing.

5. Paragraph 20 of the Rider is modified and supplemented to provide that in the event that Purchaser is unable to close title due to the inability to close title on the sale of their present residence within 90 days following the date a fully executed copy of this Contract is delivered to Purchaser attorney, then Seller by notice to Purchaser delivered within 10 days following the expiration of such 90 day period, may elect to either (x) terminate this Contract, in which case Seller shall cause the Downpayment to be refunded to Purchaser and neither party shall have any further obligations to the other party, or (b) extend the contract under the same terms and conditions for an additional thirty (30) days. The Contract shall automatically terminate at the expiration of such additional 30 day period if the closing has not occurred and the Downpayment shall be refunded to Purchaser, If Seller delivers a notice of termination, Purchaser shall have the right by notice to Seller deliveagted within five (5) days following the receipt of the termination to elect to close notwithstanding that Purchaser has not closed on the sale of their present residence, and in which case the parties shall proceed to closing on a date no later than 15 days later then the date of Purchaser's notice to proceed.

6. Modifying Paragraph 2 of the First Rider, (a) delivery of the title report shall constitute notice of objections, and (b) notwithstanding the provisions of this paragraph, Seller shall cause any mortgages executed by Seller to be discharged at the closing.

7. Modifying paragraphs 3 and 5 of the Rider, nothing contained therein shall diminish Seller's obligations under Paragraph 16 of the Printed Form of this Contract.

8. Paragraph 11 of the Rider is deleted. If Seller is in possession of a survey, Seller shall deliver same to Purchaser simultaneously with the delivery of fully executed copies of the Contract of Sale. Otherwise Purchaser may order a survey from any licensed surveyor and Seller agrees to attach a metes and bounds description as an exhibit to the deed unless Seller demonstrates error in such description.

9. Paragraph 28 of the Rider is deleted in its entirety.

10. Modifying Paragraph 15 of the first Rider, Purchaser within 15 days of the date its attorney receives a fully executed copy of the Contract, may cause the underground fuel tank and to be inspected for tightness. If the inspection reveals leakage or contamination, Seller shall remediate same prior to closing.

**IN WITNESS WHEREOF**, the parties have executed the within instrument as of the /_ day of July, 2005

SELLERS:                              PURCHASERS:

# Exhibit C - Part 1

# RESIDENTIAL CONTRACT OF SALE

*Jointly Prepared by the Real Property Section of the New York State Bar Association, the New York State Land Title Association, the Committee on Real Property Law of the Association of the Bar of the City of New York and the Committee on Real Property Law of the New York County Lawyers' Association. (11/00)*

## CONSULT YOUR LAWYER BEFORE SIGNING THIS CONTRACT.

**NOTE: FIRE AND CASUALTY LOSSES AND CONDEMNATION.** This contract form does not provide for what happens in the event of fire, or other casualty loss or condemnation before the title closing. Unless different provision is made in this contract, Section 5-1311 of the General Obligations Law will apply. One part of that law makes a Purchaser responsible for fire and casualty loss upon taking possession of the Premises before the title closing.

**WARNING: PLAIN LANGUAGE.** No representation is made that this form of contract for the sale and purchase of real estate complies with Section 5-702 of the General Obligations Law ("Plain Language").

**CONTRACT OF SALE** made as of
                                                                    between

    Ronald J. Cohen and Ann Eve Cohen, husband and wife
Address: 23 Stacy Lee Drive, Newburgh, New York 12550

Social Security Number/Fed. I. D. No(s):
                                                        hereinafter called "Seller" and

    Darrick Grimes and Yolanda Grimes, husband and wife
Address: 188-19 104th Avenue, St. Albans, New York 11412

Social Security Number/Fed. I. D. No(s):
                                                        hereinafter called "Purchaser."

The parties hereby agree as follows:

1.    **Premises.** Seller shall sell and convey and Purchaser shall purchase the property, together with all buildings and improvements thereon (collectively the "Premises"), more fully described on a separate page marked "Schedule A," annexed hereto and made a part hereof and also known as:
Street Address: 23 Stacy Lee Drive, Newburgh, New York 12550
Tax Map Designation: Section 106, Block 2, Lot(s) 4.2, Town of Newburgh, Orange County
Together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, ~~opened or proposed, adjoining the Premises to the center line thereof,~~ including any right of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway. Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), or thereafter, on demand, any documents that Purchaser may reasonably require for the conveyance of such title and the assignment and collection of such award or damages.
    *attached*

2.    **Personal Property.** This sale also includes all fixtures and articles of personal property now attached or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at Closing they will be paid for and owned by Seller, free and clear of all liens and encumbrances, except any existing mortgage to which this sale may be subject. They include, but are not limited to, plumbing, heating, lighting and cooking fixtures, ~~chandeliers~~, bathroom and kitchen cabinets and counters, ~~mantels, door mirrors~~, switch plates and door hardware, venetian blinds, window treatments, ~~shades, screens, awnings, storm windows, storm doors, window boxes~~, mail box, TV aerials, ~~weather vane~~, flagpole, ~~pumps, shrubbery~~, fencing, ~~outdoor statuary, tool shed~~, dishwasher, washing machine, clothes dryer, ~~garbage disposal unit, range, oven, built-in microwave oven~~, refrigerator, ~~freezer~~, air conditioning equipment and installations, wall to wall carpeting and built-ins not excluded below. ~~(strike out inapplicable items)~~.

central vacum, ceiling fan, cook top, compactor, garage door opener, microwave wall oven, 2 sheds, pool heating, pool filter, pool cover.


~~Excluded from this sale are furniture and household furnishings and~~


    * and Stacy Lee Drive private road and interest therein

3.   **Purchase Price.** The purchase price is              $    435,000.00
payable as follows:

    (a)   on the signing of this contract, by Purchaser's good check payable to the Escrowee (as hereinafter defined), subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 6 of this contract (the "Downpayment"):              $     20,000.00

~~(b) by allowance for the principal amount unpaid on the existing mortgage on the date hereof, payment of which Purchaser shall assume by joinder in the deed:~~           $

~~(c) by a purchase money note and mortgage from Purchaser to Seller:~~           $

    (d)   balance at Closing in accordance with paragraph 7:           $     415,000.00

~~4.   Existing Mortgage. (Delete if inapplicable) If this sale is subject to an existing mortgage as indicated in paragraph 3(b) above:~~

~~(a)   The Premises shall be conveyed subject to the continuing lien of the existing mortgage, which is presently payable, with interest at the rate of     percent per annum, in monthly installments of $     which include principal, interest and escrow amounts, if any, and with any balance of principal being due and payable on~~

~~(b)   To the extent that any required payments are made on the existing mortgage between the date hereof and Closing which reduce the unpaid principal amount thereof below the amount shown in paragraph 3(b), then the balance of the price payable at Closing under paragraph 3(d) shall be increased by the amount of the payments of principal. Seller represents and warrants that the amount shown in paragraph 3(b) is substantially correct and agrees that only payments required by the existing mortgage will be made between the date hereof and Closing.~~

~~(c)   If there is a mortgage escrow account, Seller shall assign it to Purchaser, if it can be assigned, and in that case Purchaser shall pay the amount in the escrow account to Seller at Closing.~~

~~(d)   Seller shall deliver to Purchaser at Closing a certificate dated not more than 30 days before Closing signed by the holder of the existing mortgage, in form for recording, certifying the amount of the unpaid principal, the date to which interest has been paid and the amounts, if any, claimed to be unpaid for principal and interest, itemizing the same. Seller shall pay the fees for recording such certificate. If the holder of the existing mortgage is a bank or other institution as defined in Section 274-a of the Real Property Law it may, instead of the certificate, furnish a letter signed by a duly authorized officer, employee or agent, dated not more than 30 days before Closing, containing the same information.~~

~~(e)   Seller represents and warrants that (i) Seller has delivered to Purchaser true and complete copies of the existing mortgage, the note secured thereby and any extensions and modifications thereof, (ii) the existing mortgage is not now, and at the time of Closing will not be, in default, and (iii) the existing mortgage does not contain any provision that permits the holder of the mortgage to require its immediate payment in full or to change any other term thereof by reason of the sale or conveyance of the Premises.~~

~~5.   Purchase Money Mortgage. (Delete if inapplicable) If there is to be a purchase money mortgage as indicated in paragraph 3(c) above:~~

~~(a)   The purchase money note and mortgage shall be drawn by the attorney for Seller in the form attached or, if not, in the standard form adopted by the New York State Land Title Association. Purchaser shall pay at Closing the mortgage recording tax, recording fees and the attorney's fees in the amount of $     for its preparation.~~

~~(b)   The purchase money note and mortgage shall also provide that it is subject and subordinate to the lien of the existing mortgage and any extensions, modifications, replacements or consolidations of the existing mortgage, provided that (i) the interest rate thereof shall not be greater than     percent per annum and the total debt service thereunder shall not be greater than $     per annum, and (ii) if the principal amount thereof shall exceed the amount of principal owing and unpaid on the existing mortgage at the time of placing such new mortgage or consolidated mortgage, the excess be paid to the holder of such purchase money mortgage in reduction of the principal thereof. The purchase money mortgage shall also provide that such payment to the holder thereof shall not alter or affect the regular installments, if any, of principal payable thereunder and that the holder thereof will, on demand and without charge therefor, execute, acknowledge and deliver any agreement or agreements further to effectuate such subordination.~~

6.   **Downpayment in Escrow.** (a) Seller's attorney ("Escrowee") shall hold the Downpayment in escrow in a segregated bank account at   The Bank of New York
Address:   225 Main Street, Goshen, New York 10924
until Closing or sooner termination of this contract and shall pay over or apply the Downpayment in accordance with the terms of this paragraph. Escrowee shall hold the Downpayment in a(n)    non    interest-bearing account for the benefit of the parties. If interest is held for the benefit of the parties, it shall be paid to the party entitled to the Downpayment and the party receiving the interest shall pay any income taxes thereon. If interest is not held for the benefit of the parties, the Downpayment shall be placed in an IOLA account or as otherwise permitted or required by law. The Social Security or Federal Identification numbers of the parties shall be furnished to Escrowee upon request. At Closing, the Downpayment shall be paid by Escrowee to Seller. If for any reason Closing does not occur and either party gives Notice (as defined in paragraph 25) to Escrowee demanding payment of the Downpayment, Escrowee shall give prompt Notice to the other party of such demand. If Escrowee does not receive Notice of

objection from such other party to the proposed payment within 10 business days after the giving of such Notice, Escrowee is hereby authorized and directed to make such payment. If Escrowee does receive such Notice of objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by Notice from the parties to this contract or a final, nonappealable judgment, order or decree of a court. However, Escrowee shall have the right at any time to deposit the Downpayment and the interest thereon with the clerk of a court in the county in which the Premises are located and shall give Notice of such deposit to Seller and Purchaser. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b)   The parties acknowledge that, Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of the Escrowee.

(c)   Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from acting upon the advice of such counsel.

(d)   Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this contract.

(e)   Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

(f)   The party whose attorney is Escrowee shall be liable for loss of the Downpayment.

7.   Acceptable Funds. All money payable under this contract, unless otherwise specified, shall be paid by:
(a).   Cash, but not over $1,000.00;
(b)   Good certified check of Purchaser drawn on or official check issued by any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York, unendorsed and payable to the order of Seller, or as Seller may otherwise direct upon reasonable prior notice (by telephone or otherwise) to Purchaser;
(c)   As to money other than the purchase price payable to Seller at Closing, uncertified check of Purchaser up to the amount of $ 250.00   ; and
(d)   As otherwise agreed to in writing by Seller or Seller's attorney.

8. Mortgage Commitment Contingency. *(Delete paragraph if inapplicable. For explanation, see Notes on Mortgage Commitment Contingency Clause.)*

(a) The obligation of Purchaser to purchase under this contract is conditioned upon issuance, on or before   30   days after a fully executed copy of this contract is given to Purchaser or Purchaser's attorney in the manner set forth in paragraph 25 or subparagraph 8(j) (the "Commitment Date"), of a written commitment from an Institutional Lender   pursuant to which such Institutional Lender agrees to make a first mortgage loan, other than a VA, FHA or other governmentally insured loan, to Purchaser, at Purchaser's sole cost and expense, of $   391,500.00   for a term of at least   30   years (or such lesser sum or shorter term as Purchaser shall be willing to accept) at the prevailing fixed or adjustable rate of interest and on other customary commitment terms (the "Commitment"). To the extent a Commitment is conditioned on the sale of Purchaser's current home, payment of any outstanding debt, no material adverse change in Purchaser's financial condition or any other customary conditions, Purchaser accepts the risk that such conditions may not be met; however, a commitment conditioned on the Institutional Lender's approval of an appraisal shall not be deemed a "Commitment" hereunder until an appraisal is approved (and if that does not occur before the Commitment Date, Purchaser may cancel under subparagraph 8(e) unless the Commitment Date is extended). Purchaser's obligations hereunder are conditioned only on issuance of a Commitment. Once a Commitment is issued, Purchaser is bound under this contract even if the lender fails or refuses to fund the loan for any reason.

(b) Purchaser shall (i) make prompt application to one or, at Purchaser's election, more than one Institutional Lender for such mortgage loan, (ii) furnish accurate and complete information regarding Purchaser and members of Purchaser's family, as required, (iii) pay all fees, points and charges required in connection with such application and loan, (iv) pursue such application with diligence, and (v) cooperate in good faith with such Institutional Lender(s) to obtain a Commitment. Purchaser shall accept a Commitment meeting the terms set forth in subparagraph 8(a) and shall comply with all requirements of such Commitment (or any other commitment accepted by Purchaser). Purchaser shall furnish Seller with a copy of the Commitment promptly after receipt thereof.

(c) *(Delete this subparagraph if inapplicable.)* Prompt submission by Purchaser of an application to a mortgage broker registered pursuant to Article 12-D of the New York Banking Law ("Mortgage Broker") shall constitute full compliance with the

terms and conditions set forth in subparagraph 8(b)(i), provided that such Mortgage Broker promptly submits such application to such Institutional Lender(s). Purchaser shall cooperate in good faith with such Mortgage Broker to obtain a Commitment from such Institutional Lender(s).

(d) If all Institutional Lenders to whom applications were made deny such applications in writing prior to the Commitment Date, Purchaser may cancel this contract by giving Notice thereof to Seller, with a copy of such denials, provided that Purchaser has complied with all its obligations under this paragraph 8.

(e) If no Commitment is issued by the Institutional Lender on or before the Commitment Date, then, unless Purchaser has accepted a written commitment from an Institutional Lender that does not conform to the terms set forth in subparagraph 8(a), Purchaser may cancel this contract by giving Notice to Seller within 5 business days after the Commitment Date, provided that such Notice includes the name and address of the Institutional Lender(s) to whom application was made and that Purchaser has complied with all its obligations under this paragraph 8.

(f) If this contract is canceled by Purchaser pursuant to subparagraphs 8(d) or (e), neither party shall thereafter have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser and except as set forth in paragraph 27.

(g) If Purchaser fails to give timely Notice of cancellation or if Purchaser accepts a written commitment from an Institutional Lender that does not conform to the terms set forth in subparagraph 8(a), then Purchaser shall be deemed to have waived Purchaser's right to cancel this contract and to receive a refund of the Downpayment by reason of the contingency contained in this paragraph 8.

(h) If Seller has not received a copy of a commitment from an Institutional Lender accepted by Purchaser by the Commitment Date, Seller may cancel this contract by giving Notice to Purchaser within 5 business days after the Commitment Date, which cancellation shall become effective unless Purchaser delivers a copy of such commitment to Seller within 10 business days after the Commitment Date. After such cancellation neither party shall have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser (provided Purchaser has complied with all its obligations under this paragraph 8) and except as set forth in paragraph 27.

(i) For purposes of this contract, the term "Institutional Lender" shall mean any bank, savings bank, private banker, trust company, savings and loan association, credit union or similar banking institution whether organized under the laws of this state, the United States or any other state; foreign banking corporation licensed by the Superintendent of Banks of New York or regulated by the Comptroller of the Currency to transact business in New York State; insurance company duly organized or licensed to do business in New York State; mortgage banker licensed pursuant to Article 12-D of the Banking Law; and any instrumentality created by the United States or any state with the power to make mortgage loans.

(j) For purposes of subparagraph 8(a), Purchaser shall be deemed to have been given a fully executed copy of this contract on the third business day following the date of ordinary or regular mailing, postage prepaid.

9.    Permitted Exceptions. The Premises are sold and shall be conveyed subject to:

(a)    Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the property or their use;

(b)    Consents for the erection of any structures on, under or above any streets on which the Premises abut;

(c)    Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;

(d)    Real estate taxes that are a lien, but are not yet due and payable; and

(e)    The other matters, if any, including a survey exception, set forth in a Rider attached.

10.    Governmental Violations and Orders. (a) Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as of the date hereof by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises. The Premises shall be conveyed free of them at Closing. Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters.

(b)    (Delete if inapplicable) All obligations affecting the Premises pursuant to the Administrative Code of the City of New York incurred prior to Closing and payable in money shall be discharged by Seller at or prior to Closing.

11.    Seller's Representations. (a) Seller represents and warrants to Purchaser that:

(i)    The Premises abut or have a right of access to a public road;

(ii)    Seller is the sole owner of the Premises and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this contract;

(iii)    Seller is not a "foreign person," as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code ("IRC") Section 1445, as amended, and the regulations promulgated thereunder (collectively "FIRPTA");

(iv)    The Premises are not affected by any exemptions or abatements of taxes; and

(v)    Seller has been known by no other name for the past ten years, except

(b)   Seller covenants and warrants that all of the representations and warranties set forth in this contract shall be true and correct at Closing.

(c)   Except as otherwise expressly set forth in this contract, none of Seller's covenants, representations, warranties or other obligations contained in this contract shall survive Closing.

12.   **Condition of Property.** Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical condition, state of repair, use, cost of operation or any other matter related to the Premises or the other property included in the sale, given or made by Seller or its representatives, and shall accept the same "as is" in their present condition and state of repair, subject to reasonable use, wear, tear and natural deterioration between the date hereof and the date of closing ~~(except as otherwise set forth in paragraph 16(e))~~, without any reduction in the purchase price or claim of any kind for any change in such condition by reason thereof subsequent to the date of this contract. Purchaser and its authorized representatives shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the Premises before Closing.

13.   **Insurable Title.** Seller shall give and Purchaser shall accept such title as any reputable title insurance or abstract company licensed to do business in the state of New York shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for in this contract.

14.   **Closing, Deed and Title.** (a) "Closing" means the settlement of the obligations of Seller and Purchaser to each other under this contract, including the payment of the purchase price to Seller, and the delivery to Purchaser of a bargain and sale with covenant against grantor's acts deed in proper statutory short form for record, duly executed and acknowledged, so as to convey to Purchaser fee simple title to the Premises, free of all encumbrances, except as otherwise herein stated. The deed shall contain a covenant by Seller as required by subd. 5 of Section 13 of the Lien Law.

~~(b)   If Seller is a corporation, it shall deliver to Purchaser at the time of Closing (I) a resolution of its Board of Directors authorizing the sale and delivery of the deed, and (II) a certificate by the Secretary or Assistant Secretary of the corporation certifying such resolution and setting forth facts showing that the transfer is in conformity with the requirements of Section 909 of the Business Corporation Law. The deed in such case shall contain a recital sufficient to establish compliance with that Section.~~

15.   **Closing Date and Place.** Closing shall take place at the office of Seller's attorney

at   10AM   o'clock on   or about September 15, 2005   or, upon reasonable notice (by telephone or otherwise) by Purchaser, at the office of lender's attorney

16.   **Conditions to Closing.** This contract and Purchaser's obligation to purchase the Premises are also subject to and conditioned upon the fulfillment of the following conditions precedent:

(a)   The accuracy, as of the date of Closing, of the representations and warranties of Seller made in this contract.

(b)   The delivery by Seller to Purchaser of a valid and subsisting Certificate of Occupancy or other required certificate of compliance, or evidence that none was required, covering the building(s) and all of the other improvements located on the property authorizing their use as a single family dwelling at the date of Closing.

(c)   The delivery by Seller to Purchaser of a certificate stating that Seller is not a foreign person, which certificate shall be in the form then required by FIRPTA, or a withholding certificate from the I.R.S. If Seller fails to deliver the aforesaid certificate or if Purchaser is not entitled under FIRPTA to rely on such certificate, Purchaser shall deduct and withhold from the purchase price a sum equal to 10% thereof (or any lesser amount permitted by law) and shall at Closing remit the withheld amount with the required forms to the Internal Revenue Service.

(d)   The delivery of the Premises and all buildings(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with keys to the Premises.

(e)   All plumbing (including water supply and septic systems, if any), heating and air conditioning, if any, electrical and mechanical systems, equipment and machinery in the buildings(s) located on the property and all appliances which are included in this sale being in working order as of the date of Closing.

(f)   If the Premises are a one or two family house, delivery by the parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Premises a smoke detecting alarm device or devices.

(g)   The delivery by the parties of any other affidavits required as a condition of recording the deed.

17.   **Deed Transfer and Recording Taxes.** At Closing, certified or official bank checks payable to the order of the appropriate

State, City or County officer in the amount of any applicable transfer and/or recording tax payable by reason of the delivery or recording of the deed or mortgage, if any, shall be delivered by the party required by law or by this contract to pay such transfer and/or recording tax, together with any required tax returns duly executed and sworn to, and such party shall cause any such checks and returns to be delivered to the appropriate officer promptly after Closing. The obligation to pay any additional tax or deficiency and any interest or penalties thereon shall survive Closing.

18. **Apportionments and Other Adjustments; Water Meter and Installment Assessments.** (a) To the extent applicable, the following shall be apportioned as of midnight of the day before the day of Closing:

(i) ~~taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed; (ii) fuel; (iii) interest on the existing mortgage; (iv) premiums on existing transferable insurance policies and renewals of those expiring prior to Closing; (v) vault charges; (vi) rents as and when collected~~ **(iii) Apple Knoll Estates $100 per quarter maintenance fee**

(b) If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to the latest assessed valuation.

(c) ~~If there is a water meter on the Premises, Seller shall furnish a reading to a date not more than 30 days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.~~

(d) If at the date of Closing the premises are affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e) Any errors or omissions in computing apportionments or other adjustments at Closing shall be corrected within a reasonable time following Closing. This subparagraph shall survive Closing.

19. **Allowance for Unpaid Taxes, etc.** Seller has the option to credit Purchaser as an adjustment to the purchase price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less than five business days after Closing, provided that official bills therefor computed to said date are produced at Closing.

20. **Use of Purchase Price to Remove Encumbrances.** If at Closing there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the cash balance of the purchase price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments. As an alternative Seller may deposit sufficient moneys with the title insurance company employed by Purchaser acceptable to and required by it to assure their discharge, but only if the title insurance company will insure Purchaser's title clear of the matters or insure against their enforcement out of the Premises and will insure Purchaser's Institutional Lender clear of such matters. Upon reasonable prior notice (by telephone or otherwise), Purchaser shall provide separate certified or official bank checks as requested to assist in clearing up these matters.

21. **Title Examination; Seller's Inability to Convey; Limitations of Liability.** (a) Purchaser shall order an examination of title in respect of the Premises from a title company licensed or authorized to issue title insurance by the New York State Insurance Department or any agent for such title company promptly after the execution of this contract or, if this contract is subject to the mortgage contingency set forth in paragraph 8, after a mortgage commitment has been accepted by Purchaser, Purchaser shall cause a copy of the title report and of any additions thereto to be delivered to the attorney(s) for Seller promptly after receipt thereof.

(b)(i) If at the date of Closing Seller is unable to transfer title to Purchaser in accordance with this contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called "Defects"), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other than those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the purchase price, then, except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this contract; (ii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate (but not extending beyond the date upon which Purchaser's mortgage commitment, if any, shall expire), and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. If for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with such Defects at the expiration of such adjournment(s), and if Purchaser shall still be unwilling to waive the same and to close title without abatement of the purchase price, then either party may cancel this contract by Notice to the other given within 10 days after such adjourned date; (iii) notwithstanding the foregoing, the existing mortgage (unless this sale is subject to the same) and any matter created by Seller after the date hereof shall be released, discharged or otherwise cured by Seller at or prior to Closing.

(c) If this contract is cancelled pursuant to its terms, other than as a result of Purchaser's default, this contract shall terminate and come to an end, and neither party shall have any further rights, obligations or liabilities against or to the other hereunder or otherwise, except that; (i) Seller shall promptly refund or cause the Escrowee to refund the Downpayment to Purchaser and, unless

~~cancelled as a result of Purchaser's default or pursuant to paragraph 8, to reimburse Purchaser for the net cost of examination of title, including any appropriate additional charges related thereto, and the net cost, if actually paid or incurred by Purchaser, for updating the existing survey of the Premises or of a new survey, and (ii) the obligations under paragraph 27 shall survive the termination of this contract.~~

22.  Affidavit as to Judgments, Bankruptcies, etc. If a title examination discloses judgments, bankruptcies or other returns against persons having names the same as or similar to that of Seller, Seller shall deliver an affidavit at Closing showing that they are not against Seller.

23.  Defaults and Remedies. (a) If Purchaser defaults hereunder, Seller's sole remedy shall be to receive and retain the Downpayment as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be impossible to ascertain and that the Downpayment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.
     (b)  If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including, but not limited to, specific performance.

24.  Purchaser's Lien. All money paid on account of this contract, and the reasonable expenses of examination of title to the Premises and of any survey and survey inspection charges, are hereby made liens on the Premises, but such liens shall not continue after default by Purchaser under this contract.

25.  Notices. Any notice or other communication ("Notice") shall be in writing and either (a) sent by either of the parties hereto or by their respective attorneys who are hereby authorized to do so on their behalf or by the Escrowee, by registered or certified mail, postage prepaid, or
     (b)  delivered in person or by overnight courier, with receipt acknowledged, to the respective addresses given in this contract for the party and the Escrowee, to whom the Notice is to be given, or to such other address as such party or Escrowee shall hereafter designate by Notice given to the other party or parties and the Escrowee pursuant to this paragraph. Each Notice mailed shall be deemed given on the third business day following the date of mailing the same, except that any notice to Escrowee shall be deemed given only upon receipt by Escrowee and each Notice delivered in person or by overnight courier shall be deemed given when delivered, or
     (c)  with respect to ¶7(b) or ¶20, sent by fax to the party's attorney. Each Notice by fax shall be deemed given when transmission is confirmed by the sender's fax machine. A copy of each Notice sent to a party shall also be sent to the party's attorney. The attorneys for the parties are hereby authorized to give and receive on behalf of their clients all Notices and deliveries. This contract may be delivered as provided above or by ordinary mail.

26.  No Assignment. This contract may not be assigned by Purchaser without the prior written consent of Seller in each instance and any purported assignment(s) made without such consent shall be void.

27.  Broker. Seller and Purchaser each represents and warrants to the other that it has not dealt with any real estate broker in connection with this sale other than  Easy Lifestyle Real Estate (selling broker) and Century 21 Anarumo-ZOAR Realty (listing broker)
("Broker") and Seller shall pay Broker any commission earned pursuant to a separate agreement between Seller and Broker. Seller and Purchaser shall indemnify and defend each other against any costs, claims and expenses, including reasonable attorneys' fees, arising out of the breach on their respective parts of any representation or agreement contained in this paragraph. The provisions of this paragraph shall survive Closing or, if Closing does not occur, the termination of this contract.

28.  Miscellaneous. (a) All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract; it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.
     (b)  Neither this contract nor any provision thereof may be waived, changed or cancelled except in writing. This contract shall also apply to and bind the heirs, distributees, legal representatives, successors and permitted assigns of the respective parties. The parties hereby authorize their respective attorneys to agree in writing to any changes in dates and time periods provided for in this contract.
     (c)  Any singular word or term herein shall also be read as in the plural and the neuter shall include the masculine and feminine gender, whenever the sense of this contract may require it.
     (d)  The captions in this contract are for convenience of reference only and in no way define, limit or describe the scope of this contract and shall not be considered in the interpretation of this contract or any provision hereof.
     (e)  This contract shall not be binding or effective until duly executed and delivered by Seller and Purchaser.

(f)  Seller and Purchaser shall comply with IRC reporting requirements, if applicable. This subparagraph shall survive Closing.

(g)  Each party shall, at any time and from time to time, execute, acknowledge where appropriate and deliver such further instruments and documents and take such other action as may be reasonably requested by the other in order to carry out the intent and purpose of this contract. This subparagraph shall survive Closing.

(h)  This contract is intended for the exclusive benefit of the parties hereto and, except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by, any other person or entity.

(i)  If applicable, the complete and fully executed disclosure of information on lead-based paint and/or lead-based paint hazards is attached hereto and made a part hereof.

IN WITNESS WHEREOF, this contract has been duly executed by the parties hereto.

_Ronald J. Cohen, Seller_

_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_
_Social Security No./Fed. I.D. No._

_And Eye Cohen, Seller_

_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_
_Social Security No./Fed. I.D. No._

_Darrick Grimes, Purchaser_

_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_
_Social Security No./Fed. I.D. No._

_Yolanda Grimes, Purchaser_

_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_
_Social Security No./Fed. I.D. No._

Attorney for Seller:
    Cohen, Estis & Associates, LLP
Address: 40 Matthews Street
    Goshen, New York 10924
Tel.: (845) 291-1900    Fax: (845) 291-0861

Attorney for Purchaser: Mark Marmer, Esq.
    Debevoise & Plimpton LLC
Address: 919 3rd Avenue
    New York, New York 10022
Tel.: (212) 909-7211    Fax: (212) 909-6386

Receipt of the Downpayment is acknowledged and the undersigned agrees to act in accordance with the provisions of paragraph 6.

Cohen, Estis & Associates, LLP

© 2004 Matthew Bender & Co., a member of the LexisNexis Group.

Schedule A Description

ALL that certain plot, piece or parcel of land situate lying and being in the Town of Newburgh, County of Orange and State of New York, being designated as Lot No. 11 on a map entitled "Subdivision Plan Lands of Parcel Development Corp.", dated May 20, 1986, filed in the Orange County Clerk's Office on June 23, 1986 as Map No. 7681, being more particularly bounded and described as follows:

Beginning at a point in the southwesterly line of the existing Stacy Lee Drive, a 60 foot right-of-way and private road, said point being North 67 deg. 37' West 440.00 feet from the intersection of the said southwesterly line of Stacy Lee Drive with the westerly line of the existing Frozen Ridge Road, said point also being on the division line between Lot No. 12, of the above mentioned filed map, on the east and the lot No. 11 herein described on the west; thence along the last mentioned division line, South 22 deg. 23' West 238.39 feet to a point on the division line between the lands now or formerly of Frozen Ridge Acres on the south and Lot No. 11 herein described on the north; thence along the last mentioned division line, North 72 deg. 40' West 301.17 feet to a point on the division line between Lot No. 10, of the above mentioned filed map, on the west and Lot No. 11 herein described on the east; thence along the last mentioned division line, North 22 deg. 23' East 264.90 feet to a point in the aforementioned southwesterly line of Stacy Lee Drive; thence along the last mentioned line South 67 deg. 37' East 300.00 feet to the point or place of beginning.

Together with an undivided one twelfth interest in and to the private road known as Stacy Lee Drive as shown on the aforementioned Map No. 7681 as well as the right to place utilities under said private road.

Insure

## DISCLOSURE OF INFORMATION ON LEAD-BASED PAINT
## AND LEAD-BASED PAINT HAZARDS

**Lead Warning Statement**

Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

**Seller's Disclosure (initial)**

_____  (a)  Presence of lead-based paint and/or lead-based paint hazards (check one below):
     [ ]  Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

_____

     [ ]  Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.
_____  (b)  Records and reports available to the seller (check one below):
     [ ]  Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

_____

     [ ]  Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment (initial)**

_____  (c)  Purchaser has received copies of all information listed above.
_____  (d)  Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home*.
_____  (e)  Purchaser has (check one below):
     [ ]  Received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or
     [ ]  Waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment (initial)**

_____  (f)  Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information provided by the signatory is true and accurate.

| | | |
|---|---|---|
| *Ronald Cohen* | | *Ann Cohen* |
| Seller  Ronald J. Cohen                    Date | | Seller  Ann Eve Cohen                    Date |
| | | |
| Agent                    Date | | Agent                    Date |
| *Darrell Grimes* | | *Yolanda Grimes* |
| Purchaser  Darrick Grimes                    Date | | Purchaser  Yolanda Grimes                    Date |

NYSBA's Residential Real Estate Forms (9/03)

© 2004 Matthew Bender & Co., a member of the LexisNexis Group.

EXHIBIT "A"

## SELLER'S RIDER TO CONTRACT

RONALD J. COHEN and ANN EVE COHEN
TO
DARRICK GRIMES and YOLANDA GRIMES

### 1.    NOTICE OF OBJECTIONS

Purchaser agrees to notify COHEN, ESTIS & ASSOCIATES, LLP, attorneys for the Seller, in writing, of any objections to title at least twenty (20) days before the date set for closing. In the event that there be any objections to title, the Seller may adjourn the closing of title to afford him reasonable opportunity to dispose of such objections. Seller, however, shall not be required to bring any action or proceeding or incur any expense to render its title marketable, except as hereinafter provided, with respect to disposition or payment of judgment, mechanic liens, mortgages federal and state tax liens and warrants.

### 2.    MERGER OF CONTRACT

It is understood and agreed by the parties that the delivery and acceptance of the deed of conveyance at the time of closing of title shall be deemed to constitute full compliance by the Seller of all of the terms, covenants and conditions of this Contract on its part to be performed. It is agreed that none of the terms hereof except those specifically made to survive title closing, shall survive such title closing.

### 3.    SELLER'S LIABILITY LIMITED

In the event Seller shall be unable to convey a marketable title to the premises hereinabove described or convey title to the premises in accordance with the terms of this Contract, Purchaser shall at Purchaser's election have the right to accept such title as the Seller is able to convey without claim on the part of the Purchaser for abatement for defects or objections, or Purchaser shall have the right to rescind this Contract, and upon such recision pursuant to this paragraph, the rights of the Purchaser shall be limited to the return of the monies paid upon the signing of this Contract shall be under no obligation or liability whatsoever to the Purchaser for any damages that Purchaser may have sustained by reason of Seller's failure to convey title hereunder. In no event shall Seller be required to incur any expenditures of any sums of money to cure or remove defects, liens or encumbrances or institute any action or proceedings to render title marketable.

### 4.    DEPOSIT FOR LIENS

If the premises be subject to any liens, including transfer, inheritance, estate, franchise, license or other similar tax, the amount of which has not been finally fixed, the same shall not be deemed an objection to title, provided that any title company in good standing to which Purchaser has applied for title insurance will, at the time of the closing of title, issue or bind itself to issue its policy which will insure Purchaser against collection of said liens and taxes from said premises, or if Seller leaves a reasonable deposit with Seller's attorney or with Purchaser's title company to

secure the payment thereof.

### 5.    PURCHASER'S RISKS

Purchaser represents that the Purchaser has inspected the premises hereinabove described and is purchasing said premises in "as is" condition as of this date, reasonable wear and tear excepted. This Contract, as written, contains all the terms of the agreement entered into between the parties, and Purchaser acknowledges that Seller has made no representations, is unwilling to make any representations, and held out no inducements to the Purchaser, other than those herein expressed, and the Seller is not liable or bound in any manner by expressed or implied warranties, guarantees, promises, statements, representations, or information pertaining to the said premises as to the physical condition, income, expense, operation, or to what use the premises can be applied, including, but not limited to any matter or thing affecting or relating to the said premises, except as herein specifically set forth. The Seller is not liable or bound in any manner by any verbal or written statements, representations, or information pertaining to the above premises furnished by any real estate broker, agent, employee, servant or other person, unless the same are specifically set forth herein.

### 6.    RIGHT OF ASSIGNMENT

The Purchaser shall not assign this agreement without the written consent of the Seller.

### 7    CONTROLLING PROVISIONS

The provisions of this rider are in addition to the main body of this Contract. In each instance in which a provision of this rider shall contradict or be inconsistent with a provision of the main body of the Contract or any subsequent rider, the provisions contained in this rider shall govern and prevail.

### 8    ACCEPTANCE OF RIDER

The execution of the printed form by the Seller and the Purchaser of the Contract annexed hereto shall constitute acceptance of the terms of this rider.

### 9.    CHANGING OR CANCELING OF CONTRACT

This Contract may not be changed or canceled except in writing. The Contract shall also apply to and bind the distributees, heirs, executors, administrators, successors and assign of the respective parties. Each of the parties hereby authorize their attorneys to agree in writing to any change in dates and time period provided for in this Contract.

The purchaser acknowledges that this agreement was prepared by the attorney for the Seller. To the extent that changes made by the Purchaser or his attorney are not initialed by the Seller, those changes shall not be binding upon the Seller and terms of this agreement as originally prepared in that respect shall be binding upon both parties hereto.

10   CONTRACT TERMINATION

In the event this Contract is terminated by Purchaser, notwithstanding any other provision of this agreement, or law of the State of New York, Purchaser shall deliver to Seller all maps, surveys, site plans, preliminary and final subdivision plans, engineering reports, studies and analyses at no cost to the Seller.

11.   METES AND BOUNDS DESCRIPTION

If Purchaser orders a survey, Purchaser shall use the firm of Vince Doce, 15 New Road, Newburgh, NY 12550.

In the event Purchaser obtains a survey of the premises and the survey is certified to the Seller, the Seller agrees to include in the deed of conveyance a metes and bounds description in accordance with the survey, with the understanding by Purchaser that Seller does not thereby warrant the accuracy of said metes and bounds description.

12.   PURCHASER'S DEFAULT

The parties mutually acknowledge that if the Purchasers should default in closing title or under any other term or condition of this Contract, it may be impossible to determine Seller's actual damages. Accordingly, if the Purchasers shall default, whether such default be willful or otherwise, the Sellers shall have the option to retain any and all funds previously paid by the Purchasers pursuant to this agreement as liquidated damages. In the event Seller elects to retain the down payment, both parties shall be relieved and released of and from any further liabilities hereunder, and Purchaser expressly releases any lien Purchaser may have against the property. Further, in the event of any default by Purchasers in closing title, the Seller is authorized to place the premises back on the market free and clear of any claim which the Purchaser may have against the premises.

13.   WATER SUPPLY

If the water supply serving the premises is derived from a well, Seller represents that the water is potable and of pure quality for domestic purposes, without the need for treatment and Purchaser is given the right to test the water to determine the above. The Purchaser shall have until ten (10) days after receipt of fully executed contracts to obtain the report and notify Seller's attorney of any defects and in the event the Purchaser does not so notify Seller's attorney by that date, performance of the condition shall be deemed waived.

14.   TERMITE INSPECTION

The Purchaser may have the premises inspected for termite and/or carpenter ant infestation. In the event such infestation is found, the Seller, at Seller's option, may have same repaired by a licensed exterminator of their choice, or in the alternative, may cancel this Contract and return the down payment hereunder, unless the Purchaser, at Purchaser's option, elects to accept the premises "as is". Purchaser shall have until ten (10) days after receipt of fully executed contract to obtain the report and notify Seller's attorney for any defects and in the event Purchaser does not so notify

Seller's attorney by that date, performance of the condition shall be deemed waived.

## 15. INSPECTIONS

Within ten (10) days Purchaser(s) at his/her/their own cost and expense may cause the premises to be examined by an engineer for structural items, for mold contamination and if such inspection reveals unacceptable conditions then the Purchaser(s) may, at their option, terminate this agreement and receive the return of the downpayment.

## 16. LEAD PAINT DISCLOSURE

Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, a reduced intelligence quotient, behavior problem and impaired memory. Lead Poisoning also poses a particular risk to pregnant women. The Seller of any interest in residential property is required to provide the buyer with any information on lead based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead based paint hazards. A risk assessment or inspection for possible lead based paint hazards is recommended prior to purchase. Seller knows of no lead based paint hazards and has no reports or records pertaining to lead based paint or hazards in the house, except as may be attached to this Contract. Purchaser has ten (10) days from the signing of this Contract to conduct a risk assessment or inspection for the presence of lead based paint and/or lead based paint hazards.

## 17. SMOKE ALARM AFFIDAVIT

The Seller(s) herein shall deliver to the Purchaser(s) at the time of transfer an affidavit, in recordable form, indicating that the dwelling in question is in compliance with the Executive Law Section 378(5), and that such dwelling has installed an operable single station smoke detecting alarm device or devices, which is in compliance with the uniform code, prior to the sale or transfer of the property.

## 18. CARBO MONOXIDE AFFIDAVIT

The Seller(s) herein shall deliver to the Purchaser(s) at the time of transfer an affidavit, in recordable form, indicating that the dwelling in question is in compliance with Executive Law Section 378(5)(a), and that such dwelling has installed an operable single station carbon monoxide detecting alarm device or devices, which is in compliance with the uniform code, prior to the sale or transfer of the property.

## 19. LENDING INSTITUTION IN ANOTHER COUNTY

If the lending institution selected by the Purchasers requires a closing to be held in a county other than the county where the property is located, the Purchasers agree to pay to the Seller at

closing, an additional sum of $250.00 for travel to adjacent counties. If travel is to New York City or any of the boroughs of New York City, the additional sum is $400.00; if travel to Westchester County, the additional sum is $300.00.

## 20. SALE OF HOUSE CONTINGENCY

Purchaser represents that they have a house in Queen County that must be sold prior to their ability to close on this contract. Purchaser represents that they have already or will within ten (10) days of execution of this contarct list the house with licensed real estate broker at fair market value. Seller may elect to accept another offer to purchase the premises in the event that Purchaser does not close on their Queens property within ninety(90) days of this contract. Purchaser shall receive ten (10) day written notice from Seller and has the right to close within the 100th day of this contract, otherwise Seller has the right to either (a) terminate Purchasers rights under this contract ; or (b) extend the opportunity of Purchaser to proceed to a closing upon such term and conditions as Seller shall require. The purpose of this provision is to prevent an unlimited "lock-in" of the Sales Price and terms of Seller's obligations to hold the Premises out for the benefit of the Purchaser.

## 21. POSSESSION OF PROPERTY

The conditions of the premises on closing shall be the same as at the time of the contract, reasonable wear and tear excepted. The Seller shall deliver the premises vacant and broom clean, free of all rubbish, garbage, debris and waste. Seller agrees to maintain the property in its present condition, continuing to mow and otherwise care for the lawn and garden beds and to generally maintain the appearance of the premises in accord with the standard of the neighborhood.

## 22. "SUBJECT TO" CLAUSES

In addition to any other "subject to" clauses contained in the form contract, said premises are sold subject to the following:

a. Any state of facts an accurate survey would show provided same do not render title unmarketable;

b. Zoning ordinances, building regulations, covenants, easements, restrictions of record affecting the same premises, provided existing structure does not violate the same; .

c. Mining and mineral rights of third parties, if any;

d. Any variance in connection with fence, hedge, and like, surrounding the premises, provided the same does not render title unmarketable;

e. In the event there exists any additional improvement to the premises, which violate covenants and restrictions, the existence of such violation of the covenants and restrictions shall not be deemed objection to title provided a title company can insure that said additions or improvements may remain in their present location as long as the same shall stand;

f.    Any state of facts a personal inspection of the premises would disclose.

g.    Public utility easements of record, if any.

### 23.    IRS INFORMATION RETURN DESIGNATION

Pursuant to the revised Section 6045 of the Internal Revenue Code, the attorney for the Seller, the attorney for the Purchaser or other closing agent must report the details of the closing of this transaction to the Internal Revenue Service. To enable such party to so report this transaction, the parties hereby certify that the Federal Identification Number/ Social Security Number is as follows:

Seller: _____        Purchaser: _____

Seller: _____        Purchaser: _____

Seller and Purchaser agree to notify the party required to report this transaction to the Internal Revenue Service at the closing, and to sign and date an informational sheet in that regard. It is further agreed that if the lender's attorney does not agree to perform such filing, said filing shall be the responsibility of the Seller's attorney.

### 24.    EXECUTION OF CONTRACT

It is expressly understood and agreed that this Contract offer made by Seller is not a binding Contract, and is subject to Sellers' acceptance and approval, and that this Contract is not an offer to sell, and shall not in any way bind Sellers until such time as the same has been approved and executed by the Sellers and delivered to the Purchaser or Purchaser's attorney. Until this Contract is executed by the Sellers and good checks are received by the Sellers, the Purchaser has no interest in the property or remedy against the Sellers for failure to execute this Contract.

Executed contracts of sale must be returned to the Seller's attorney's office no later than August 1, 2005, or this Contract shall be deemed null and void and the Sellers shall have the right to place their property back on the market.

### 24.    APPORTIONMENTS

Any errors or omissions in computing closing costs or apportionments at closing shall be corrected as soon as reasonably possible. This provision shall survive closing of title.

### 25.    CERTIFIED FUNDS

Notwithstanding the acceptance of any uncertified funds by the Seller in consideration for the delivery of the deed herein, said acceptance shall not constitute a waiver of any right under this Contract or shall be construed as an unconditional delivery of the deed to the Purchaser by the Seller, it being the attention of the parties hereto that the Purchaser shall personally guarantee, as part of Purchaser's consideration hereunder, said uncertified funds and further, it being the intention of the

of the parties, that the failure of said uncertified funds to be honored upon presentation to an appropriate bank shall constitute a failure of consideration under this Contract and shall require the Purchaser to tender the deed back to the Seller on ten (10) days written notice of that event. This provision shall survive closing of title.

26.    **STACY LEE DRIVE**

Seller has disclosed that Stacy Lee Drive is a private road and is governed by a recorded agreement see Exhibit "A" annexed.

The fee(s) assed by the homeowners association Apple Knoll Estates is $100.00 per quarter and this shall be apportioned at closing. There is no notice to Seller of any special Assessment. The maintenance fee covers (i) taxes on the private road - all up to date (ii) insurance and (iii) maintenance.

27.    **PROPERTY DISCLOSURE FORM**

Seller has completed and the form is annexed hereto.

28.    **TITLE COMPANY**

Purchaser shall use Feldman-Jacobson Abstract Corp. at 24 Market Street, Poughkeepsie, NY 12601, phone 845 454-1171, fax 845 454-3720 as the title company. Notwithstanding anything herein to the contrary.

RONALD J. COHEN                          DARRICK GRIMES


ANN EVE COHEN                            YOLANDA GRIMES

# Property Condition Disclosure Statement

Name of Seller or Sellers:  Ronald J. Cohen and Ann Eve Cohen
Property Address:       23 Stacy Lee Drive, Newburgh, New York 12550

The Property Condition Disclosure Act requires the seller of residential real property to cause this disclosure statement or a copy thereof to be delivered to a buyer or buyer's agent prior to the signing by the buyer of a binding contract of sale.

**Purpose of Statement:**
This is a statement of certain conditions and information concerning the property known to the seller. This disclosure statement is not a warranty of any kind by the seller or by any agent representing the seller in this transaction. It is not a substitute for any inspections or tests and the buyer is encouraged to obtain his or her own independent professional inspections and environmental tests and also is encouraged to check public records pertaining to the property.

A knowingly false or incomplete statement by the seller on this form may subject the seller to claims by the buyer prior to or after the transfer of title. In the event a seller fails to perform the duty prescribed in this article to deliver a disclosure statement prior to the signing by the buyer of a binding contract of sale, the buyer shall receive upon the transfer of title a credit of five hundred dollars ($500.00) against the agreed upon purchase price of the residential real property.

"Residential Real Property" means real property improved by a one to four family dwelling used or occupied, or intended to be used or occupied, wholly or partly, as the home or residence of one or more persons, but shall not refer to (a) unimproved real property upon which such dwellings are to be constructed or (b) condominium units or cooperative apartments or (c) property on a homeowners' association that is not owned in fee simple by the owner.

**Instructions to the Seller:**
(a) Answer all questions based upon your actual knowledge.
(b) Attach additional pages with your signature if additional space is required.
(c) Complete this form yourself.
(d) If some items do not apply to your property, check "NA" (Non-Applicable). If you do not know the answer check "Unkn" (Unknown).

**Seller's Statement:** The seller makes the following representations to the buyer based upon the seller's actual knowledge at the time of signing this document. The seller authorizes his or her agent, if any, to provide a copy of this statement to a prospective buyer of the residential real property. The following are representations made by the seller and are not the representations of the seller's agent.

**General Information**
1. How long have you owned the property?      1987   New at the time
2. How long have you occupied the property?    1987
3. What is the age of the structure or structures?   1987   House
   *Note to Buyer* – If the structure was built before 1978 you are encouraged to investigate for the presence of lead based paint.
4. Does anybody other than yourself have a lease, easement or any other right to use or occupy any part of your property other than those stated in documents available in the public record, such as rights to use a road or path or cut trees or crops?
   Yes   (No)   Unkn   NA   (If yes, explain below.)
5. Does anybody else claim to own any part of your property?
   Yes   (No)   Unkn   NA   (If yes, explain below.)

6. Has anyone denied you access to the property or made a formal legal claim challenging your title to the property?    Yes    (No)   Unkn   NA    (If yes, explain below.)

7. Are there any features of the property shared in common with adjoining land owners or a homeowners association, such as walls, fences or driveways?   (Yes)   No   Unkn   NA   (If yes, describe below.)   *Stacy Lee Drive Private Road*

8. Are there any electric or gas utility surcharges for line extensions, special assessments or homeowner or other association fees that apply to the property?   (Yes)   No   Unkn   NA   (If yes, explain below.)   *100 per quarter*

9. Are there certificates of occupancy related to the property?   (Yes)   No   Unkn   NA   (If no, explain below.)   *to Apple Knoll Estates.*

## Environmental

*Note to Seller -* In this section, you will be asked questions regarding petroleum products and hazardous or toxic substances that you know to have been spilled, leaked or otherwise been released on the property or from the property onto any other property. Petroleum products may include, but are not limited to, gasoline, diesel fuel, home heating fuel, and lubricants. Hazardous or toxic substances are products that could pose short- or long-term danger to personal health or the environment if they are not properly disposed of, applied or stored. These include, but are not limited to, fertilizers, pesticides and insecticides, paint including paint thinner, varnish remover and wood preservatives, treated wood, construction materials such as asphalt and roofing materials, antifreeze and other automotive products, batteries, cleaning solvents including septic tank cleaners, household cleaners and pool chemicals and products containing mercury and lead.

*Note to Buyer -* If contamination of this property from petroleum products and/or hazardous or toxic substances is a concern to you, you are urged to consider soil and groundwater testing of this property.

10. Is any or all of the property located in a designated floodplain?    Yes   (No)   Unkn   NA    (If yes, explain below.)

11. Is any or all of the property located in a designated wetland?    Yes   (No)   Unkn   NA    (If yes, explain below.)

12. Is the property located in an agricultural district?    Yes   (No)   Unkn   NA    (If yes, explain below.)

13. Was the property ever the site of a landfill?    Yes   (No)   Unkn   NA    (If yes, explain below.)

14. Are there or have there ever been fuel storage tanks above or below the ground on the property?   (Yes)   No   Unkn   NA    *Oil tank*

   If yes, are they currently in use?    Yes   No   Unkn   NA

   Location(s) _____

   Are they leaking or have they ever leaked?    Yes   (No)   Unkn   NA    (If yes, explain below.)

15. Is there asbestos in the structure?    Yes   (No)   Unkn   NA    (If yes, state location or locations below.)

16. Is lead plumbing present?    Yes   (No)   Unkn   NA    (If yes, state location or locations below.)

17. Has a radon test been done?    Yes   (No)   Unkn   NA    (If yes, attach a copy of the report.)

18. Has motor fuel, motor oil, home heating fuel, lubricating oil or any other petroleum product, methane gas, or any hazardous or toxic substance spilled, leaked or otherwise been released on the property or from the property onto any other property?    Yes   (No)   Unkn   NA    (If yes, describe below.)

Are there any known material defects in any of the following (If yes, explain below. Use additional sheets if necessary.):

32. Plumbing System?              Yes  (No)   Unkn  NA
33. Security System?              Yes   No.   (Unkn) NA
34. Carbon Monoxide Detector?     Yes  (No)   Unkn  NA
35. Smoke Detector?               Yes  (No)   Unkn  NA
36. Fire Sprinkler System?        Yes  (No)   Unkn  NA
37. Sump Pump?                   (Yes) (No)   Unkn  NA
38. Foundation/Slab?              Yes  (No)   Unkn  NA
39. Interior Walls/Ceilings?      Yes  (No)   Unkn  NA
40. Exterior Walls Or Siding?     Yes  (No)   Unkn  NA
41. Floors?                      (Yes)  No    Unkn  NA  ——— some tiles cracked
42. Chimney/Fireplace or Stove?   Yes  (No)   Unkn  NA
43. Patio/Deck?                   Yes  (No)   Unkn  NA
44. Driveway?                     Yes  (No)   Unkn  NA
45. Air Conditioner?              Yes  (No)   Unkn  NA
46. Heating System?               Yes  (No)   Unkn  NA
47. Hot Water Heater?             Yes  (No)   Unkn  NA
48. The Property is located in the following School District: Newburgh ___ Unkn
Enlarged City School

*Note:* Buyer is encouraged to check public records concerning the property (e.g. tax records and wetland and flood plain maps.)

The seller should use this area to further explain any item above. If necessary, attach additional pages and indicate here the number of additional pages attached.

_____
_____
_____
_____
_____

**Seller's Certification:** Seller certifies that the information in this property condition disclosure statement is true and complete to the seller's actual knowledge as of the date signed by the seller. If a seller of residential real property acquires knowledge which renders materially inaccurate a property condition disclosure statement provided previously, the seller shall deliver a revised property condition disclosure statement to the buyer as soon as practicable. In no event, however, shall a seller be required to provide a revised property condition disclosure statement after the transfer of title from the seller to the buyer or occupancy by the buyer, whichever is earlier.

Seller  *Ann E. Cohen*            Date  7/14/05

Seller  _____          Date  7/14/05

**Buyer's Acknowledgment:** Buyer acknowledges receipt of a copy of this statement and buyer understands that this information is a statement of certain conditions and information concerning the property known to the seller. It is not a warranty of any kind by the seller or seller's agent and is not a substitute for any home, pest, radon or other inspections or testing of the property or inspection of the public records.

Buyer  *David G. Gunn*             Date  7/15/05

Buyer  *Yolanda Gunn*              Date  7/15/05

### ADDITIONAL RIDER TO CONTRACT OF SALE
### 23 Stacy Lee Drive
### Newburgh, NY

1.The terms of this Additional Rider shall prevail over the terms of the printed form and any other Rider to the Contract to which this Additional Rider is attached.

2. Seller makes the following additional representations and covenants:

    (a) The underground oil tank has never leaked or been damaged.
    (b) All work and alterations to the Premises have been performed in accordance with applicable law,
    (c)Seller shall maintain the Premises, including landscaping in its present condition (reasonable wear and tear excepted) until closing;
    (d) Seller is not in violation of any of the Restrictive Covenants set forth in the deed in which the premises were conveyed to Seller,and
    (e)At closing, (i)the roof and basement shall be free of leaks and water seepage, and (ii) all pool equipment shall be included in this sale.

3. This Agreement may be executed in counterparts, and the delivery of facsimile copies of the fully executed agreement shall constitute a binding agreement provided that the Downpayment is delivered to Escrow Agent, and that original executed copies are delivered promptly after the delivery of a facsimile copy.

4. If due to Purchaser's inability to close, the closing does not occur by September 15, 2005 then the Seller shall have the pool closed for the season and Purchaser shall reimburse Seller the sum of $500 at closing.

5. Paragraph 20 of the Rider is modified and supplemented to provide that in the event that Purchaser is unable to close title due to the inability to close title on the sale of their present residence within 90 days following the date a fully executed copy of this Contract is delivered to Purchaser attorney, then Seller by notice to Purchaser delivered within 10 days following the expiration of such 90 day period, may elect to either (x) terminate this Contract, in which case Seller shall cause the Downpayment to be refunded to Purchaser and neither party shall have any further obligations to the other party, or (b) extend the contract under the same terms and conditions for an additional thirty (30) days. The Contract shall automatically terminate at the expiration of such additional 30 day period if the closing has not occurred and the Downpayment shall be refunded to Purchaser, If Seller delivers a notice of termination, Purchaser shall have the right by notice to Seller deliveagred within five (5) days following the receipt of the termination to elect to close notwithstanding that Purchaser has not closed on the sale of their present residence, and in which case the parties shall proceed to closing on a date no later than 15 days later then the date of Purchaser's notice to proceed.

6. Modifying Paragraph 2 of the First Rider, (a) delivery of the title report shall constitute notice of objections, and (b) notwithstanding the provisions of this paragraph, Seller shall cause any mortgages executed by Seller to be discharged prior to closing.

7. Modifying paragraphs 3 and 5 of the Rider, nothing contained therein shall diminish Seller's obligations under Paragraph 16 of the Printed Form of this Contract.

8. Paragraph 11 of the Rider is deleted. If Seller is in possession of a survey, Seller shall deliver same to Purchaser simultaneously with the delivery of fully executed copies of the Contract of Sale. Otherwise Purchaser may order a survey from any licensed surveyor and Seller agrees to attach a metes and bounds description as an exhibit to the deed unless Seller demonstrates error in such description.

9. Paragraph 28 of the Rider is deleted in its entirety.

10. Modifying Paragraph 15 of the first Rider, Purchaser within 15 days of the date its attorney receives a fully executed copy of the Contract, may cause the underground fuel tank and to be inspected for tightness. If the inspection reveals leakage or contamination, Seller shall remediate same prior to closing.

     IN WITNESS WHEREOF, the parties have executed the within instrument as of the ___ day of July, 2005

SELLERS:                                    PURCHASERS:

# Exhibit C - Part 2

## AMENDMENT TO CONTRACT OF SALE

This Amendment dated as of September 14, 2005 (this "Amendment") amending that certain Contract of Sale dated as of August 12, 2005 (the "Contract") between Ronald J. Cohen and Ann Eve Cohen ("Sellers") and Darrick Grimes and Yoland Grimes ("Purchasers")

THE PARTIES AGREE AS FOLLOWS

1. Paragraph 3 is amended to increase the Purchase Price to $450,000.00

2. At closing, Seller shall credit Purchaser the sum of $13,500, as Seller's contribution toward Purchaser's closing costs.

SELLERS:

RONALD J. COHEN

ANN EVE COHEN

PURCHASERS:

DARRICK GRIMES

YOLANDA GRIMES

# RESIDENTIAL CONTRACT OF SALE

*Jointly Prepared by the Real Property Section of the New York State Bar Association, the New York State Land Title Association, the Committee on Real Property Law of the Association of the Bar of the City of New York and the Committee on Real Property Law of the New York County Lawyers' Association. (11/00)*

## CONSULT YOUR LAWYER BEFORE SIGNING THIS CONTRACT.

**NOTE: FIRE AND CASUALTY LOSSES AND CONDEMNATION.** This contract form does not provide for what happens in the event of fire, or other casualty loss or condemnation before the title closing. Unless different provision is made in this contract, Section 5-1311 of the General Obligations Law will apply. One part of that law makes a Purchaser responsible for fire and casualty loss upon taking possession of the Premises before the title closing.

**WARNING: PLAIN LANGUAGE.** No representation is made that this form of contract for the sale and purchase of real estate complies with Section 5-702 of the General Obligations Law ("Plain Language").

**CONTRACT OF SALE** made as of                                                                                    between

   **Ronald J. Cohen and Ann Eve Cohen, husband and wife**
Address: **23 Stacy Lee Drive, Newburgh, New York 12550**

Social Security Number/Fed. I. D. No(s):                                              hereinafter called "Seller" and

   **Darrick Grimes and Yolanda Grimes, husband and wife**
Address: **188-19 104th Avenue, St. Albans, New York 11412**

Social Security Number/Fed. I. D. No(s):                                              hereinafter called "Purchaser."

The parties hereby agree as follows:

1.    **Premises.** Seller shall sell and convey and Purchaser shall purchase the property, together with all buildings and improvements thereon (collectively the "Premises"), more fully described on a separate page marked "Schedule A," annexed hereto and made a part hereof and also known as:
Street Address: **23 Stacy Lee Drive, Newburgh, New York 12550**
Tax Map Designation: **Section 106, Block 2, Lot(s) 4.2, Town of Newburgh, Orange County**
together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, ~~opened or proposed, adjoining the Premises to the center line thereof~~, including any right of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway. Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), or thereafter, on demand, any documents that Purchaser may reasonably require for the conveyance of such title and the assignment and collection of such award or damages.

2.    **Personal Property.** This sale also includes all <ins>attached</ins> fixtures and articles of personal property now attached or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at Closing they will be paid for and owned by Seller, free and clear of all liens and encumbrances, except any existing mortgage to which this sale may be subject. They include, but are not limited to, plumbing, heating, lighting and cooking fixtures, ~~chandeliers~~, bathroom and kitchen cabinets and counters, mantels, ~~door mirrors~~, switch plates and door hardware, venetian blinds, window treatments, ~~shades~~, screens, ~~awnings, storm windows, storm doors, window boxes~~, mail box, ~~TV aerials, weather vane~~, flagpole, ~~pumps, shrubbery~~, fencing, ~~outdoor statuary, tool shed~~, dishwasher, washing machine, clothes dryer, ~~garbage disposal unit~~, range, oven, ~~built-in microwave oven~~, refrigerator, ~~freezer~~, <ins>central</ins> air conditioning equipment and installations, wall to wall carpeting and built-ins not excluded below. ~~(strike out inapplicable items).~~

**central vacuum, ceiling fan, cook top, compactor, garage door opener, microwave wall oven, 2 sheds, pool heating, pool filter, pool cover.**

~~Excluded from this sale are furniture and household furnishings and~~

**\* and Stacy Lee Drive private road and interest therein**

3. **Purchase Price.** The purchase price is                                                    $      435,000.00
payable as follows:

    (a)   on the signing of this contract, by Purchaser's good check payable to the Escrowee (as hereinafter defined), subject to
collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 6 of this contract (the
"Downpayment"):                                                                                 $       20,000.00

~~(b)   by allowance for the principal amount unpaid on the existing mortgage on the date hereof, payment of which Purchaser
shall assume by joinder in the deed:~~                                                          $

~~(c)   by a purchase money note and mortgage from Purchaser to Seller:~~              $

    (d)   balance at Closing in accordance with paragraph 7:                   $      415,000.00

~~4.   **Existing Mortgage.** *(Delete if inapplicable)* If this sale is subject to an existing mortgage as indicated in paragraph 3(b) above:~~
~~(a)   The Premises shall be conveyed subject to the continuing lien of the existing mortgage, which is presently payable, with
interest at the rate of      percent per annum, in monthly installments of $      which include principal,
interest and escrow amounts, if any, and with any balance of principal being due and payable on~~
~~(b)   To the extent that any required payments are made on the existing mortgage between the date hereof and Closing which
reduce the unpaid principal amount thereof below the amount shown in paragraph 3(b), then the balance of the price payable at
Closing under paragraph 3(d) shall be increased by the amount of the payments of principal. Seller represents and warrants that the
amount shown in paragraph 3(b) is substantially correct and agrees that only payments required by the existing mortgage will be
made between the date hereof and Closing.~~
~~(c)   If there is a mortgagee escrow account, Seller shall assign it to Purchaser, if it can be assigned, and in that case Purchaser
shall pay the amount in the escrow account to Seller at Closing.~~
~~(d)   Seller shall deliver to Purchaser at Closing a certificate dated not more than 30 days before Closing signed by the holder
of the existing mortgage, in form for recording, certifying the amount of the unpaid principal, the date to which interest has been
paid and the amounts, if any, claimed to be unpaid for principal and interest, itemizing the same. Seller shall pay the fees for
recording such certificate. If the holder of the existing mortgage is a bank or other institution as defined in Section 274-a of the Real
Property Law it may, instead of the certificate, furnish a letter signed by a duly authorized officer, employee or agent, dated not more
than 30 days before Closing, containing the same information.~~
~~(e)   Seller represents and warrants that (i) Seller has delivered to Purchaser true and complete copies of the existing mortgage,
the note secured thereby and any extensions and modifications thereof, (ii) the existing mortgage is not now, and at the time of
Closing will not be, in default, and (iii) the existing mortgage does not contain any provision that permits the holder of the mortgage
require its immediate payment in full or to change any other term thereof by reason of the sale or conveyance of the Premises.~~

~~5.   **Purchase Money Mortgage.** *(Delete if inapplicable)* If there is to be a purchase money mortgage as indicated in paragraph
3(c) above:~~
~~(a)   The purchase money note and mortgage shall be drawn by the attorney for Seller in the form attached or, if not, in the
standard form adopted by the New York State Land Title Association. Purchaser shall pay at Closing the mortgage recording tax,
recording fees and the attorney's fees in the amount of $      for its preparation.~~
~~(b)   The purchase money note and mortgage shall also provide that it is subject and subordinate to the lien of the existing
mortgage and any extensions, modifications, replacements or consolidations of the existing mortgage, provided that (i) the interest
rate thereof shall not be greater than      percent per annum and the total debt service thereunder shall not be greater than
$      per annum, and (ii) if the principal amount thereof shall exceed the amount of principal owing and unpaid on the
existing mortgage at the time of placing such new mortgage or consolidated mortgage, the excess be paid to the holder of such
purchase money mortgage in reduction of the principal thereof. The purchase money mortgage shall also provide that such payment
to the holder thereof shall not alter or affect the regular installments, if any, of principal payable thereunder and that the holder
thereof will, on demand and without charge therefor, execute, acknowledge and deliver any agreement or agreements further to
effectuate such subordination.~~

6.   **Downpayment in Escrow.** (a) Seller's attorney ("Escrowee") shall hold the Downpayment in escrow in a segregated bank
account at  **The Bank of New York**
Address:  **225 Main Street, Goshen, New York 10924**
until Closing or sooner termination of this contract and shall pay over or apply the Downpayment in accordance with the terms of
this paragraph. Escrowee shall hold the Downpayment in a(n)   **non**   interest-bearing account for the benefit of the parties. If
interest is held for the benefit of the parties, it shall be paid to the party entitled to the Downpayment and the party receiving the
interest shall pay any income taxes thereon. If interest is not held for the benefit of the parties, the Downpayment shall be placed in
an IOLA account or as otherwise permitted or required by law. The Social Security or Federal Identification numbers of the parties
shall be furnished to Escrowee upon request. At Closing, the Downpayment shall be paid by Escrowee to Seller. If for any reason
Closing does not occur and either party gives Notice (as defined in paragraph 25) to Escrowee demanding payment of the
Downpayment, Escrowee shall give prompt Notice to the other party of such demand. If Escrowee does not receive Notice of

objection from such other party to the proposed payment within 10 business days after the giving of such Notice, Escrowee is hereby authorized and directed to make such payment. If Escrowee does receive such Notice of objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by Notice from the parties to this contract or a final, nonappealable judgment, order or decree of a court. However, Escrowee shall have the right at any time to deposit the Downpayment and the interest thereon with the clerk of a court in the county in which the Premises are located and shall give Notice of such deposit to Seller and Purchaser. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b)    The parties acknowledge that, Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c)    Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from acting upon the advice of such counsel.

(d)    Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this contract.

(e)    Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

(f)    The party whose attorney is Escrowee shall be liable for loss of the Downpayment.

7.    **Acceptable Funds.** All money payable under this contract, unless otherwise specified, shall be paid by:

(a)    Cash, but not over $1,000.00;

(b)    Good certified check of Purchaser drawn on or official check issued by ~~any~~ a New York bank, savings bank, trust company or savings and loan association having a banking office in the State of New York, unendorsed and payable to the order of Seller, or as Seller may otherwise direct upon reasonable prior notice (by telephone or otherwise) to Purchaser;

(c)    As to money other than the purchase price payable to Seller at Closing, uncertified check of Purchaser up to the amount of 250.00          ; and

(d)    As otherwise agreed to in writing by Seller or Seller's attorney.

8. **Mortgage Commitment Contingency.** ~~(Delete paragraph if inapplicable. For explanation, see Notes on Mortgage Commitment Contingency Clause.)~~

(a) The obligation of Purchaser to purchase under this contract is conditioned upon issuance, on or before       30      days after a fully executed copy of this contract is given to Purchaser or Purchaser's attorney in the manner set forth in paragraph 25 or subparagraph 8(j) (the "Commitment Date"), of a written commitment from an Institutional Lender   pursuant to which such Institutional Lender agrees to make a first mortgage loan, other than a VA, FHA or other governmentally insured loan, to Purchaser, at Purchaser's sole cost and expense, of $      391,500.00      for a term of at least      30      years (or such lesser sum or shorter term as Purchaser shall be willing to accept) at the prevailing fixed or adjustable rate of interest and on other customary commitment terms (the "Commitment"). To the extent a Commitment is conditioned on the sale of Purchaser's current home, payment of any outstanding debt, no material adverse change in Purchaser's financial condition or any other customary conditions, Purchaser accepts the risk that such conditions may not be met; however, a commitment conditioned on the Institutional Lender's approval of an appraisal shall not be deemed a "Commitment" hereunder until an appraisal is approved (and if that does not occur before the Commitment Date, Purchaser may cancel under subparagraph 8(e) unless the Commitment Date is extended). Purchaser's obligations hereunder are conditioned only on issuance of a Commitment. Once a Commitment is issued, Purchaser is bound under this contract even if the lender fails or refuses to fund the loan for any reason.

(b) Purchaser shall (i) make prompt application to one or, at Purchaser's election, more than one Institutional Lender for such mortgage loan, (ii) furnish accurate and complete information regarding Purchaser and members of Purchaser's family, as required, (iii) pay all fees, points and charges required in connection with such application and loan, (iv) pursue such application with diligence, and (v) cooperate in good faith with such Institutional Lender(s) to obtain a Commitment. Purchaser shall accept a Commitment meeting the terms set forth in subparagraph 8(a) and shall comply with all requirements of such Commitment (or any other commitment accepted by Purchaser). Purchaser shall furnish Seller with a copy of the Commitment promptly after receipt thereof.

(c) ~~(Delete this subparagraph if inapplicable)~~ Prompt submission by Purchaser of an application to a mortgage broker registered pursuant to Article 12-D of the New York Banking Law ("Mortgage Broker") shall constitute full compliance with the

terms and conditions set forth in subparagraph 8(b)(i), provided that such Mortgage Broker promptly submits such application to such Institutional Lender(s). Purchaser shall cooperate in good faith with such Mortgage Broker to obtain a Commitment from such Institutional Lender(s).

(d) If all Institutional Lenders to whom applications were made deny such applications in writing prior to the Commitment Date, Purchaser may cancel this contract by giving Notice thereof to Seller, with a copy of such denials, provided that Purchaser has complied with all its obligations under this paragraph 8.

(e) If no Commitment is issued by the Institutional Lender on or before the Commitment Date, then, unless Purchaser has accepted a written commitment from an Institutional Lender that does not conform to the terms set forth in subparagraph 8(a), Purchaser may cancel this contract by giving Notice to Seller within 5 business days after the Commitment Date, provided that such Notice includes the name and address of the Institutional Lender(s) to whom application was made and that Purchaser has complied with all its obligations under this paragraph 8.

(f) If this contract is canceled by Purchaser pursuant to subparagraphs 8(d) or (e), neither party shall thereafter have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser and except as set forth in paragraph 27.

(g) If Purchaser fails to give timely Notice of cancellation or if Purchaser accepts a written commitment from an Institutional Lender that does not conform to the terms set forth in subparagraph 8(a), then Purchaser shall be deemed to have waived Purchaser's right to cancel this contract and to receive a refund of the Downpayment by reason of the contingency contained in this paragraph 8.

(h) If Seller has not received a copy of a commitment from an Institutional Lender accepted by Purchaser by the Commitment Date, Seller may cancel this contract by giving Notice to Purchaser within 5 business days after the Commitment Date, which cancellation shall become effective unless Purchaser delivers a copy of such commitment to Seller within 10 business days after the Commitment Date. After such cancellation neither party shall have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser (provided Purchaser has complied with all its obligations under this paragraph 8) and except as set forth in paragraph 27.

(i) For purposes of this contract, the term "Institutional Lender" shall mean any bank, savings bank, private banker, trust company, savings and loan association, credit union or similar banking institution whether organized under the laws of this state, the United States or any other state; foreign banking corporation licensed by the Superintendent of Banks of New York or regulated by the Comptroller of the Currency to transact business in New York State; insurance company duly organized or licensed to do business in New York State; mortgage banker licensed pursuant to Article 12-D of the Banking Law; and any instrumentality created by the United States or any state with the power to make mortgage loans.

(j) For purposes of subparagraph 8(a), Purchaser shall be deemed to have been given a fully executed copy of this contract on third business day following the date of ordinary or regular mailing, postage prepaid.

9. **Permitted Exceptions.** The Premises are sold and shall be conveyed subject to:

(a) Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the property or their use;

(b) Consents for the erection of any structures on, under or above any streets on which the Premises abut;

(c) Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;

(d) Real estate taxes that are a lien, but are not yet due and payable; and

(e) The other matters, if any, including a survey exception, set forth in a Rider attached.

10. **Governmental Violations and Orders.** (a) Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as of the date hereof by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises. The Premises shall be conveyed free of them at Closing. Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters.

~~(b) (Delete if inapplicable) All obligations affecting the Premises pursuant to the Administrative Code of the City of New York incurred prior to Closing and payable in money shall be discharged by Seller at or prior to Closing.~~

11. **Seller's Representations.** (a) Seller represents and warrants to Purchaser that:

(i) The Premises abut or have a right of access to a public road;

(ii) Seller is the sole owner of the Premises and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this contract;

(iii) Seller is not a "foreign person," as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code ("IRC") Section 1445, as amended, and the regulations promulgated thereunder (collectively "FIRPTA");

(iv) The Premises are not affected by any exemptions or abatements of taxes; and

(v) Seller has been known by no other name for the past ten years, except

(b)   Seller covenants and warrants that all of the representations and warranties set forth in this contract shall be true and correct at Closing.

(c)   Except as otherwise expressly set forth in this contract, none of Seller's covenants, representations, warranties or other obligations contained in this contract shall survive Closing.

**12.   Condition of Property.** Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical condition, state of repair, use, cost of operation or any other matter related to the Premises or the other property included in the sale, given or made by Seller or its representatives, and shall accept the same "as is" in their present condition and state of repair, subject to reasonable use, wear, tear and natural deterioration between the date hereof and the date of closing ~~(except as otherwise set forth in paragraph 16(c))~~, without any reduction in the purchase price or claim of any kind for any change in such condition by reason thereof subsequent to the date of this contract. Purchaser and its authorized representatives shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the Premises before Closing.

**13.   Insurable Title.** Seller shall give and Purchaser shall accept such title as **any reputable title insurance or abstract company licensed to do business in the state of New York**
shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for in this contract.

**14.   Closing, Deed and Title.** (a) "Closing" means the settlement of the obligations of Seller and Purchaser to each other under this contract, including the payment of the purchase price to Seller, and the delivery to Purchaser of a **bargain and sale with covenant against grantor's acts**                                              deed in proper statutory short form for record, duly executed and acknowledged, so as to convey to Purchaser fee simple title to the Premises, free of all encumbrances, except as otherwise herein stated. The deed shall contain a covenant by Seller as required by subd. 5 of Section 13 of the Lien Law.

~~(b)   If Seller is a corporation, it shall deliver to Purchaser at the time of Closing (i) a resolution of its Board of Directors authorizing the sale and delivery of the deed, and (ii) a certificate by the Secretary or Assistant Secretary of the corporation certifying such resolution and setting forth facts showing that the transfer is in conformity with the requirements of Section 909 of the Business Corporation Law. The deed in such case shall contain a recital sufficient to establish compliance with that Section.~~

**15.   Closing Date and Place.** Closing shall take place at the office of **Seller's attorney**

at       **10AM**     o'clock on       **or about September 15, 2005**             or, upon reasonable notice (by telephone or otherwise) by Purchaser, at the office of **lender's attorney**

**16.   Conditions to Closing.** This contract and Purchaser's obligation to purchase the Premises are also subject to and conditioned upon the fulfillment of the following conditions precedent:

(a)   The accuracy, as of the date of Closing, of the representations and warranties of Seller made in this contract.

(b)   The delivery by Seller to Purchaser of a valid and subsisting Certificate of Occupancy or other required certificate of compliance, or evidence that none was required, covering the building(s) and all of the other improvements located on the property authorizing their use as a   **single**
family dwelling at the date of Closing.

(c)   The delivery by Seller to Purchaser of a certificate stating that Seller is not a foreign person, which certificate shall be in the form then required by FIRPTA, or a withholding certificate from the I.R.S. If Seller fails to deliver the aforesaid certificate or if Purchaser is not entitled under FIRPTA to rely on such certificate, Purchaser shall deduct and withhold from the purchase price a sum equal to 10% thereof (or any lesser amount permitted by law) and shall at Closing remit the withheld amount with the required forms to the Internal Revenue Service.

(d)   The delivery of the Premises and all buildings(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with keys to the Premises.

(e)   All plumbing (including water supply and septic systems, if any), heating and air conditioning, if any, electrical and mechanical systems, equipment and machinery in the buildings(s) located on the property and all appliances which are included in this sale being in working order as of the date of Closing.

(f)   If the Premises are a one or two family house, delivery by the parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Premises a smoke detecting alarm device or devices.

(g)   The delivery by the parties of any other affidavits required as a condition of recording the deed.

**17.   Deed Transfer and Recording Taxes.** At Closing, certified or official bank checks payable to the order of the appropriate

State, City or County officer in the amount of any applicable transfer and/or recording tax payable by reason of the delivery or recording of the deed or mortgage, if any, shall be delivered by the party required by law or by this contract to pay such transfer and/or recording tax, together with any required tax returns duly executed and sworn to, and such party shall cause any such checks and returns to be delivered to the appropriate officer promptly after Closing. The obligation to pay any additional tax or deficiency and any interest or penalties thereon shall survive Closing.

**18.  Apportionments and Other Adjustments; Water Meter and Installment Assessments.** (a) To the extent applicable, the following shall be apportioned as of midnight of the day before the day of Closing:

(i)   taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed; (ii) fuel; ~~(iii) interest on the existing mortgage; (iv) premiums on existing transferable insurance policies and renewals of those expiring prior to Closing; (v) vault charges; (vi) rents as and when collected.~~ (iii) Apple Knoll Estates $100 per quarter maintenance fee

(b)   If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to the latest assessed valuation.

~~(c)   If there is a water meter on the Premises, Seller shall furnish a reading to a date not more than 30 days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.~~

(d)   If at the date of Closing the premises are affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e)   Any errors or omissions in computing apportionments or other adjustments at Closing shall be corrected within a reasonable time following Closing. This subparagraph shall survive Closing.

**19.  Allowance for Unpaid Taxes, etc.** Seller has the option to credit Purchaser as an adjustment to the purchase price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less than five business days after Closing, provided that official bills therefor computed to said date are produced at Closing.

**20.  Use of Purchase Price to Remove Encumbrances.** If at Closing there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the cash balance of the purchase price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments. As an alternative Seller may deposit sufficient moneys with the title insurance company employed by Purchaser acceptable to and required by it to assure their discharge, but only if the title insurance company will insure Purchaser's title clear of the matters or insure against their enforcement out of the Premises and will insure Purchaser's Institutional Lender clear of such matters. Upon reasonable prior notice (by telephone or otherwise), Purchaser shall provide separate certified or official bank checks as requested to assist in clearing up these matters.

**21.  Title Examination; Seller's Inability to Convey; Limitations of Liability.** (a) Purchaser shall order an examination of title in respect of the Premises from a title company licensed or authorized to issue title insurance by the New York State Insurance Department or any agent for such title company promptly after the execution of this contract or, if this contract is subject to the mortgage contingency set forth in paragraph 8, after a mortgage commitment has been accepted by Purchaser. Purchaser shall cause a copy of the title report and of any additions thereto to be delivered to the attorney(s) for Seller promptly after receipt thereof.

(b)(i) If at the date of Closing Seller is unable to transfer title to Purchaser in accordance with this contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called "Defects"), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other than those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the purchase price, then, except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this contract; (ii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate (but not extending beyond the date upon which Purchaser's mortgage commitment, if any, shall expire), and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. If for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with such Defects at the expiration of such adjournment(s), and if Purchaser shall still be unwilling to waive the same and to close title without abatement of the purchase price, then either party may cancel this contract by Notice to the other given within 10 days after such adjourned date; (iii) notwithstanding the foregoing, the existing mortgage (unless this sale is subject to the same) and any matter created by Seller after the date hereof shall be released, discharged or otherwise cured by Seller at or prior to Closing.

(c)   If this contract is cancelled pursuant to its terms, other than as a result of Purchaser's default, this contract shall terminate and come to an end, and neither party shall have any further rights, obligations or liabilities against or to the other hereunder or otherwise, except that: (i) Seller shall promptly refund or cause the Escrowee to refund the Downpayment to Purchaser and, unless

cancelled as a result of Purchaser's default or pursuant to paragraph 8, to reimburse Purchaser ~~for the net cost of examination of title, including any appropriate additional charges related thereto, and the net cost, if actually paid or incurred by Purchaser, for updating the existing survey of the Premises or of a new survey, and (ii) the obligations under paragraph 27 shall survive the termination of contract.~~

**22. Affidavit as to Judgments, Bankruptcies, etc.** If a title examination discloses judgments, bankruptcies or other returns against persons having names the same as or similar to that of Seller, Seller shall deliver an affidavit at Closing showing that they are not against Seller.

**23. Defaults and Remedies.** (a) If Purchaser defaults hereunder, Seller's sole remedy shall be to receive and retain the Downpayment as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be impossible to ascertain and that the Downpayment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

    (b)    If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including, but not limited to, specific performance.

**24. Purchaser's Lien.** All money paid on account of this contract, and the reasonable expenses of examination of title to the Premises and of any survey and survey inspection charges, are hereby made liens on the Premises, but such liens shall not continue after default by Purchaser under this contract.

**25. Notices.** Any notice or other communication ("Notice") shall be in writing and either (a) sent by either of the parties hereto or by their respective attorneys who are hereby authorized to do so on their behalf or by the Escrowee, by registered or certified mail, postage prepaid, or

    (b)    delivered in person or by overnight courier, with receipt acknowledged, to the respective addresses given in this contract for the party and the Escrowee, to whom the Notice is to be given, or to such other address as such party or Escrowee shall hereafter designate by Notice given to the other party or parties and the Escrowee pursuant to this paragraph. Each Notice mailed shall be deemed given on the third business day following the date of mailing the same, except that any notice to Escrowee shall be deemed given only upon receipt by Escrowee and each Notice delivered in person or by overnight courier shall be deemed given when delivered, or

    (c)    with respect to ¶7(b) or ¶20, sent by fax to the party's attorney. Each Notice by fax shall be deemed given when transmission is confirmed by the sender's fax machine.  A copy of each Notice sent to a party shall also be sent to the party's attorney.  The attorneys for the parties are hereby authorized to give and receive on behalf of their clients all Notices and deliveries. This contract may be delivered as provided above or by ordinary mail.

**26. No Assignment.** This contract may not be assigned by Purchaser without the prior written consent of Seller in each instance and any purported assignment(s) made without such consent shall be void.

**27. Broker.** Seller and Purchaser each represents and warrants to the other that it has not dealt with any real estate broker in connection with this sale other than  **Easy Lifestyle Real Estate (selling broker) and Century 21 Anarumo-ZOAR Realty (listing broker)**
("Broker") and Seller shall pay Broker any commission earned pursuant to a separate agreement between Seller and Broker. Seller and Purchaser shall indemnify and defend each other against any costs, claims and expenses, including reasonable attorneys' fees, arising out of the breach on their respective parts of any representation or agreement contained in this paragraph. The provisions of this paragraph shall survive Closing or, if Closing does not occur, the termination of this contract.

**28. Miscellaneous.** (a) All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract; it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.

    (b)    Neither this contract nor any provision thereof may be waived, changed or cancelled except in writing. This contract shall also apply to and bind the heirs, distributees, legal representatives, successors and permitted assigns of the respective parties. The parties hereby authorize their respective attorneys to agree in writing to any changes in dates and time periods provided for in this contract.

    (c)    Any singular word or term herein shall also be read as in the plural and the neuter shall include the masculine and feminine gender, whenever the sense of this contract may require it.

    (d)    The captions in this contract are for convenience of reference only and in no way define, limit or describe the scope of this contract and shall not be considered in the interpretation of this contract or any provision hereof.

    (e)    This contract shall not be binding or effective until duly executed and delivered by Seller and Purchaser.

(f)  Seller and Purchaser shall comply with IRC reporting requirements, if applicable. This subparagraph shall survive Closing.

(g)  Each party shall, at any time and from time to time, execute, acknowledge where appropriate and deliver such further instruments and documents and take such other action as may be reasonably requested by the other in order to carry out the intent and purpose of this contract. This subparagraph shall survive Closing.

(h)  This contract is intended for the exclusive benefit of the parties hereto and, except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by, any other person or entity.

(i)  If applicable, the complete and fully executed disclosure of information on **lead-based paint** and/or lead-based paint hazards is attached hereto and made a part hereof.

**IN WITNESS WHEREOF**, this contract has been duly executed by the parties hereto.

| | |
|---|---|
| Ronald J. Cohen, Seller | Darrick Grimes, Purchaser |
| *Social Security No./Fed. I.D. No.* | *Social Security No./Fed. I.D. No.* |
| Ann Eve Cohen, Seller | Yolanda  Grimes, Purchaser |
| *Social Security No./Fed. I.D. No.* | *Social Security No./Fed. I.D. No.* |

Attorney for Seller:
    **Cohen, Estis & Associates, LLP**
Address: **40 Matthews Street**
    **Goshen, New York 10924**
Tel.: **(845) 291-1900**    Fax: **(845) 291-0861**

Attorney for Purchaser: **Mark Marmer, Esq.**
    **Debevoise & Plimpton LLC**
Address: **919  3rd Avenue**
    **New York, New York 10022**
Tel.: **(212) 909-7211**    Fax:  **(212) 909-6386**

Receipt of the Downpayment is acknowledged and the undersigned agrees to act in accordance with the provisions of paragraph 6.

    **Cohen, Estis & Associates, LLP**

Schedule A Description

~writer No. 8711048097
le Number 0211040653

Page    1

ALL that certain plot, piece or parcel of land situate lying and being in the Town of Newburgh, County of Orange and State of New York, being designated as Lot No. 11 on a map entitled "Subdivision Plan Lands of Parcel Development Corp.", dated May 20, 1986, filed in the Orange County Clerk's Office on June 23, 1986 as Map No. 7681, being mare particularly bounded and described as follows:

Beginning at a point in the southwesterly line of the existing Stacy Lee Drive, a 60 foot right-of-way and private road, said point being North 67 deg. 37' West 440.00 feet from the intersection of the said southwesterly line of Stacy Lee Drive with the westerly line of the existing Frozen Ridge Road, said point also being on the division line between Lot No. 12, of the above mentioned filed map, on the east and the lot No. 11 herein described on the west; thence along the last mentioned division line, South 22 deg. 23' West 238.39 feet to a point on the division line between the lands now or formerly of Frozen Ridge Acres on the south and Lot No. 11 herein described on the north; thence along the last mentioned division line, North 72 deg. 40' West 301.17 feet to a point on the division line between Lot No. 10, of the above mentioned filed map, on the west and Lot No. 11 herein described on the east; thence along the last mentioned division line, North 22 deg. 23' East 264.90 feet to a point in the aforementioned southwesterly line of Stacy Lee Drive; thence along the last mentioned line South 67 deg. 37' East 300.00 feet to the point or place of beginning.

Together with an undivided one twelfth interest in and to the private road known as Stacy Lee Drive as shown on the aforementioned Map No. 7681 as well as the right to place utilities under said private road.



*Insure*

## DISCLOSURE OF INFORMATION ON LEAD-BASED PAINT
## AND LEAD-BASED PAINT HAZARDS

**Lead Warning Statement**
Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

**Seller's Disclosure** (initial)
_____ (a)    Presence of lead-based paint and/or lead-based paint hazards (check one below):
         [ ]    Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

         _____
         _____
         [ ]    Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.
_____ (b)    Records and reports available to the seller (check one below):
         [ ]    Seller has provided the purchaser with all available records and reports pertaining to lead-based
                paint and/or lead-based paint hazards in the housing (list documents below).

         _____
         _____
         [ ]    Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the
                housing.

**Purchaser's Acknowledgment** (initial)
_____ (c)    Purchaser has received copies of all information listed above.
_____ (d)    Purchaser has received the pamphlet _Protect Your Family from Lead in Your Home._
_____ (e)    Purchaser has (check one below):
         [ ]    Received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or
                inspection for the presence of lead-based paint and/or lead-based paint hazards; or
         [ ]    Waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based
                paint and/or lead-based paint hazards.

**Agent's Acknowledgment** (initial)
_____ (f)    Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852(d) and is aware of
               his/her responsibility to ensure compliance.

**Certification of Accuracy**
The following parties have reviewed the information above and certify, to the best of their knowledge, that the information provided by the signatory is true and accurate.

_____    _____    _____    _____
Seller **Ronald J. Cohen**         Date       Seller **Ann Eve Cohen**            Date

_____    _____    _____    _____
Agent                          Date       Agent                          Date

_____    _____    _____    _____
Purchaser **Darrick Grimes**       Date       Purchaser **Yolanda  Grimes**       Date

NYSBA's Residential Real Estate Forms (9/03)                    © 2004 Matthew Bender & Co., a member of the LexisNexis Group.

EXHIBIT "A"

Tax Map #106-2-4.2

THIS INDENTURE, made the 11th day of January , Nineteen hundred and eighty eight

BETWEEN APPLE KNOLL ESTATES, a partnership with office at R. D. #2, Box 436C, Walden, New York 12586

party of the first part, and

RONALD J. COHEN & EVE EVE COHEN, husband and wife, residing at 6 Danbury Court, Apt. 12E1, Suffern, New York 10901

party of the second part,

WITNESSETH, that the party of the first part, in consideration of TEN AND NO/100---------------------------------- ($10.00)---------------------------- dollars,

lawful money of the United States, and other good and valuable consideration paid

by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the

SEE SCHEDULE "A" ANNEXED HERETO.



7. No junk yards, tents, shacks, trailers or other similar structures or parts thereof, motor vehicles without current licenses, machinery, equipment, airplanes or parts of any kind, shall be left, permitted or maintained on the premises.

8. No animals of any kind shall be kept on the premises except for household pets consisting of dogs and cats ... as specifically hereinafter set forth.

9. No animals ... the ... of the dwelling unit ... be erected around any existing ... pursuant to premises or if enclosure by fence is required ... any municipal authority having jurisdiction or ordinance ...

A wooden fence in the same may be erected around any tennis court, dwelling unit to be erected within a 75 foot radius of the ...

10. No building shall be erected on ... the premises ... the location of the building ...

MODEL ESTATES: Each dwelling house constructed on the premises shall have ... only one single family ... exclusive of ... floor space, garage and basement ...

that other material ... the ... dwelling erected on the premises except that other materials may be ... with ... first approved by the grantor. Brick, ... and slate materials are ... No building or enclosure of any building shall be constructed ... for ... of materials ... airplanes or ... No building ... the construction hole ... which the foundation hole be dug prior to the ... days ... commencement of the construction of the building upon the premises.

11. No signs shall be placed on the premises except as follows:

(1) a single sign announcing the premises for sale or for rent, not ... by two feet;

(2) a sign of no more than two feet indicating medicine, dentistry, law ... profession in the fields of medicine, dentistry, law, architecture, engineering, surveying or accounting;

(3) a sign of ... one foot by six inches indicating the name of the occupant of the premises;

(4) ... the sign of no more than one foot by six inches indicating the name of the occupant of the premises;

12. Clothes lines or "trees" shall not be hoisted in front of any ... house or ... shall be ... in front or side yards ... sculpture or yard decoration shall be placed or exhibited in front or side yards.

13. There shall be no disruption of the ... the quiet ... of the premises by any ... any method of propulsion ... upon his or her lot ... constitute a nuisance to any other lot owner.

14. The grantor subdivider of APPLE KNOLL ESTATES reserves ... the ... restrictions with respect to this lot ... said restriction ... its sole discretion it deems such change beneficial, for this lot ... provided the consent of the majority of the owners of lots sold within the ... consent ... be unreasonably withheld.

17. The easements and the covenants and restrictions herein shall be deemed to be easements and covenants respectively running with the land, and any person claiming under the ... Declarant shall violate or attempt to violate any of such easements, restrictions or covenants, it shall be lawful for the

MODEL ESTATES: (a) to prosecute proceedings at law for the recovery of damages against the person or persons attempting to violate any such covenant or restriction, or (b) to maintain a proceeding in equity for the purpose of preventing the violation or attempted violation of any such covenant or restriction, or (c) to maintain a proceeding ... for the purpose of compelling any person or persons to comply with any such easement, covenant or restriction, provided however, that the ... as herein contained shall be construed to be cumulative with all other remedies now or hereafter provided by law.

SUBJECT to that certain Private Road Maintenance Declaration dated May 22, 1997 and recorded in the Orange County Clerk's Office on June 3, 1997 in liber 2720 at Page 64.

BEING the same premises described in a deed from Apple Knoll Estates to Ronald J. Cohen and Ana Cohen, dated May 22, 1997 and recorded in the Orange County Clerk's Office on June 3, 1997 in liber 2720 at Page 61, this being a Correction Deed.

This deed is given to correct the variation in the aforesaid prior deed of the transfer from the grantor to the grantees of a 1/12 undivided interest in and to the private road known as Stacy Lee Drive.

SELLER'S RIDER TO CONTRACT

RONALD J. COHEN and ANN EVE COHEN
TO
DARRICK GRIMES and YOLANDA GRIMES

1.    **NOTICE OF OBJECTIONS**

Purchaser agrees to notify COHEN, ESTIS & ASSOCIATES, LLP, attorneys for the Seller, in writing, of any objections to title at least twenty (20) days before the date set for closing. In the event that there be any objections to title, the Seller may adjourn the closing of title to afford him reasonable opportunity to dispose of such objections. Seller, however, shall not be required to bring any action or proceeding or incur any expense to render its title marketable, except as hereinafter provided, with respect to disposition or payment of judgment, mechanic liens, mortgages federal and state tax liens and warrants.

2.    **MERGER OF CONTRACT**

It is understood and agreed by the parties that the delivery and acceptance of the deed of conveyance at the time of closing of title shall be deemed to constitute full compliance by the Seller of all of the terms, covenants and conditions of this Contract on its part to be performed. It is agreed that none of the terms hereof except those specifically made to survive title closing, shall survive such title closing.

3.    **SELLER'S LIABILITY LIMITED**

In the event Seller shall be unable to convey a marketable title to the premises hereinabove described or convey title to the premises in accordance with the terms of this Contract, Purchaser shall at Purchaser's election have the right to accept such title as the Seller is able to convey without claim on the part of the Purchaser for abatement for defects or objections, or Purchaser shall have the right to rescind this Contract, and upon such recision pursuant to this paragraph, the rights of the Purchaser shall be limited to the return of the monies paid upon the signing of this Contract shall be under no obligation or liability whatsoever to the Purchaser for any damages that Purchaser may have sustained by reason of Seller's failure to convey title hereunder. In no event shall Seller be required to incur any expenditures of any sums of money to cure or remove defects, liens or encumbrances or institute any action or proceedings to render title marketable.

4.    **DEPOSIT FOR LIENS**

If the premises be subject to any liens, including transfer, inheritance, estate, franchise, license or other similar tax, the amount of which has not been finally fixed, the same shall not be deemed an objection to title, provided that any title company in good standing to which Purchaser has applied for title insurance will, at the time of the closing of title, issue or bind itself to issue its policy which will insure Purchaser against collection of said liens and taxes from said premises, or if Seller leaves a reasonable deposit with Seller's attorney or with Purchaser's title company to

secure the payment thereof.

### 5.    PURCHASER'S RISKS

Purchaser represents that the Purchaser has inspected the premises hereinabove described and is purchasing said premises in "as is" condition as of this date, reasonable wear and tear excepted. This Contract, as written, contains all the terms of the agreement entered into between the parties, and Purchaser acknowledges that Seller has made no representations, is unwilling to make any representations, and held out no inducements to the Purchaser, other than those herein expressed, and the Seller is not liable or bound in any manner by expressed or implied warranties, guarantees, promises, statements, representations, or information pertaining to the said premises as to the physical condition, income, expense, operation, or to what use the premises can be applied, including, but not limited to any matter or thing affecting or relating to the said premises, except as herein specifically set forth. The Seller is not liable or bound in any manner by any verbal or written statements, representations, or information pertaining to the above premises furnished by any real estate broker, agent, employee, servant or other person, unless the same are specifically set forth herein.

### 6.    RIGHT OF ASSIGNMENT

The Purchaser shall not assign this agreement without the written consent of the Seller.

### 7    CONTROLLING PROVISIONS

The provisions of this rider are in addition to the main body of this Contract. In each instance in which a provision of this rider shall contradict or be inconsistent with a provision of the main body of the Contract or any subsequent rider, the provisions contained in this rider shall govern and prevail.

### 8    ACCEPTANCE OF RIDER

The execution of the printed form by the Seller and the Purchaser of the Contract annexed hereto shall constitute acceptance of the terms of this rider.

### 9.    CHANGING OR CANCELING OF CONTRACT

This Contract may not be changed or canceled except in writing. The Contract shall also apply to and bind the distributees, heirs, executors, administrators, successors and assign of the respective parties. Each of the parties hereby authorize their attorneys to agree in writing to any change in dates and time period provided for in this Contract.

The purchaser acknowledges that this agreement was prepared by the attorney for the Seller. To the extent that changes made by the Purchaser or his attorney are not initialed by the Seller, those changes shall not be binding upon the Seller and terms of this agreement as originally prepared in that respect shall be binding upon both parties hereto.

10    **CONTRACT TERMINATION**

In the event this Contract is terminated by Purchaser, notwithstanding any other provision of this agreement, or law of the State of New York, Purchaser shall deliver to Seller all maps, surveys, site plans, preliminary and final subdivision plans, engineering reports, studies and analyses at no cost to the Seller.

## 11.    METES AND BOUNDS DESCRIPTION

If Purchaser orders a survey, Purchaser shall use the firm of Vince Doce, 15 New Road, Newburgh, NY 12550.

In the event Purchaser obtains a survey of the premises and the survey is certified to the Seller, the Seller agrees to include in the deed of conveyance a metes and bounds description in accordance with the survey, with the understanding by Purchaser that Seller does not thereby warrant the accuracy of said metes and bounds description.

## 12.    PURCHASER'S DEFAULT

The parties mutually acknowledge that if the Purchasers should default in closing title or under any other term or condition of this Contract, it may be impossible to determine Seller's actual damages. Accordingly, if the Purchasers shall default, whether such default be willful or otherwise, the Sellers shall have the option to retain any and all funds previously paid by the Purchasers pursuant to this agreement as liquidated damages. In the event Seller elects to retain the down payment, both parties shall be relieved and released of and from any further liabilities hereunder, and Purchaser expressly releases any lien Purchaser may have against the property. Further, in the event of any default by Purchasers in closing title, the Seller is authorized to place the premises back on the market free and clear of any claim which the Purchaser may have against the premises.

## 13.    WATER SUPPLY

If the water supply serving the premises is derived from a well, Seller represents that the water is potable and of pure quality for domestic purposes, without the need for treatment and Purchaser is given the right to test the water to determine the above. The Purchaser shall have until ten (10) days after receipt of fully executed contracts to obtain the report and notify Seller's attorney of any defects and in the event the Purchaser does not so notify Seller's attorney by that date, performance of the condition shall be deemed waived.

## 14.    TERMITE INSPECTION

The Purchaser may have the premises inspected for termite and/or carpenter ant infestation. In the event such infestation is found, the Seller, at Seller's option, may have same repaired by a licensed exterminator of their choice, or in the alternative, may cancel this Contract and return the down payment hereunder, unless the Purchaser, at Purchaser's option, elects to accept the premises "as is". Purchaser shall have until ten (10) days after receipt of fully executed contract to obtain the report and notify Seller's attorney for any defects and in the event Purchaser does not so notify

Seller's attorney by that date, performance of the condition shall be deemed waived.

## 15. INSPECTIONS

Within ten (10) days Purchaser(s) at his/her/their own cost and expense may cause the premises to be examined by an engineer for structural items, for mold contamination and if such inspection reveals unacceptable conditions then the Purchaser(s) may, at their option, terminate this agreement and receive the return of the downpayment.

## 16.    LEAD PAINT DISCLOSURE

Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, a reduced intelligence quotient, behavior problem and impaired memory. Lead Poisoning also poses a particular risk to pregnant women. The Seller of any interest in residential property is required to provide the buyer with any information on lead based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead based paint hazards. A risk assessment or inspection for possible lead based paint hazards is recommended prior to purchase. Seller knows of no lead based paint hazards and has no reports or records pertaining to lead based paint or hazards in the house, except as may be attached to this Contract. Purchaser has ten (10) days from the signing of this Contract to conduct a risk assessment or inspection for the presence of lead based paint and/or lead based paint hazards.

## 17. SMOKE ALARM  AFFIDAVIT

The Seller(s) herein shall deliver to the Purchaser(s) at the time of transfer an affidavit, in recordable form, indicating that the dwelling in question is in compliance with the Executive Law Section 378(5), and that such dwelling has installed an operable single station smoke detecting alarm device or devices, which is in compliance with the uniform code, prior to the sale or transfer of the property.

## 18. CARBO MONOXIDE AFFIDAVIT

The Seller(s) herein shall deliver to the Purchaser(s) at the time of transfer an affidavit, in recordable form, indicating that the dwelling in question is in compliance with Executive Law Section 378(5)(a), and that such dwelling has installed an operable single station carbon monoxide detecting alarm device or devices, which is in compliance with the uniform code, prior to the sale or transfer of the property.

## 19.    LENDING INSTITUTION IN ANOTHER COUNTY

If the lending institution selected by the Purchasers requires a closing to be held in a county other than the county where the property is located, the Purchasers agree to pay to the Seller at

closing, an additional sum of $250.00 for travel to adjacent counties. If travel is to New York City or any of the boroughs of New York City, the additional sum is $400.00; if travel to Westchester County, the additional sum is $300.00.

**20.    SALE OF HOUSE CONTINGENCY**

Purchaser represents that they have a house in Queen County that must be sold prior to their ability to close on this contract. Purchaser represents that they have already or will within ten (10) days of execution of this contarct list the house with licensed real estate broker at fair market value. Seller may elect to accept another offer to purchase the premises in the event that Purchaser does not close on their Queens property within ninety(90) days of this contract. Purchaser shall receive ten (10) day written notice from Seller and has the right to close within the 100th day of this contract, otherwise Seller has the right to either (a) terminate Purchasers rights under this contract ; or (b) extend the opportunity of Purchaser to proceed to a closing upon such term and conditions as Seller shall require. The purpose of this provision is to prevent an unlimited "lock-in" of the Sales Price and terms of Seller's obligations to hold the Premises out for the benefit of the Purchaser.

**21.    POSSESSION OF PROPERTY**

The conditions of the premises on closing shall be the same as at the time of the contract, reasonable wear and tear excepted.  The Seller shall deliver the premises vacant and broom clean, free of all rubbish, garbage, debris and waste.  Seller agrees to maintain the property in its present condition, continuing to mow and otherwise care for the lawn and garden beds and to generally maintain the appearance of the premises in accord with the standard of the neighborhood.

**22.    "SUBJECT TO" CLAUSES**

In addition to any other "subject to" clauses contained in the form contract, said premises are sold subject to the following:

a.    Any state of facts an accurate survey would show provided same do not render title unmarketable;

b.    Zoning ordinances, building regulations, covenants, easements, restrictions of record affecting the same premises, provided existing structure does not violate the same;

c.    Mining and mineral rights of third parties, if any;

d.    Any variance in connection with fence, hedge, and like, surrounding the premises, provided the same does not render title unmarketable;

e.    In the event there exists any additional improvement to the premises, which violate covenants and restrictions, the existence of such violation of the covenants and restrictions shall not be deemed objection to title provided a title company can insure that said additions or improvements may remain in their present location as long as the same shall stand;

f.    Any state of facts a personal inspection of the premises would disclose.

g.    Public utility easements of record, if any.

## 23.    IRS INFORMATION RETURN DESIGNATION

Pursuant to the revised Section 6045 of the Internal Revenue Code, the attorney for the Seller, the attorney for the Purchaser or other closing agent must report the details of the closing of this transaction to the Internal Revenue Service.  To enable such party to so report this transaction, the parties hereby certify that the Federal Identification Number/ Social Security Number is as follows:

Seller: _____          Purchaser:_____

Seller:_____          Purchaser:_____

Seller and Purchaser agree to notify the party required to report this transaction to the Internal Revenue Service at the closing, and to sign and date an informational sheet in that regard.  It is further agreed that if the lender's attorney does not agree to perform such filing, said filing shall be the responsibility of the Seller's attorney.

## 24.    EXECUTION OF CONTRACT

It is expressly understood and agreed that this Contract offer made by Seller is not a binding Contract, and is subject to Sellers' acceptance and approval, and that this Contract is not an offer to sell, and shall not in any way bind Sellers until such time as the same has been approved and executed by the Sellers and delivered to the Purchaser or Purchaser's attorney.  Until this Contract is executed by the Sellers and good checks are received by the Sellers, the Purchaser has no interest in the property or remedy against the Sellers for failure to execute this Contract.

Executed contracts of sale must be returned to the Seller's attorney's office no later than **August 1, 2005**, or this Contract shall be deemed null and void and the Sellers shall have the right to place  their property back on the market.

## 24.    APPORTIONMENTS

Any errors or omissions in computing closing costs or apportionments at closing shall be corrected as soon as reasonably possible.  This provision shall survive closing of title.

## 25. .  CERTIFIED FUNDS

Notwithstanding the acceptance of any uncertified funds by the Seller in consideration for the delivery of the deed herein, said acceptance shall not constitute a waiver of any right under this Contract or shall be construed as an unconditional delivery of the deed to the Purchaser by the Seller, it being the attention of the parties hereto that the Purchaser shall personally guarantee, as part of Purchaser's consideration hereunder, said uncertified funds and further, it being the intention of the



of the parties, that the failure of said uncertified funds to be honored upon presentation to an appropriate bank shall constitute a failure of consideration under this Contract and shall require the Purchaser to tender the deed back to the Seller on ten (10) days written notice of that event. This provision shall survive closing of title.

### 26.    STACY LEE DRIVE

Seller has disclosed that Stacy Lee Drive is a private road and is governed by a recorded agreement see Exhibit "A" annexed.

The fee(s) assed by the homeowners association Apple Knoll Estates is $100.00 per quarter and this shall be apportioned at closing. There is no notice to Seller of any special Assessment. The maintenance fee covers(i) taxes on the private road - all up to date (ii) insurance and (iii) maintenance.

### 27.    PROPERTY DISCLOSURE FORM

Seller has completed and the form is annexed hereto.

### 28.    TITLE COMPANY

Purchaser shall use Feldman- Jacobson Abstract Corp. at 24 Market Street, Poughkeepsie, NY 12601, phone 845 454-1171, fax 845 454-3720 as the title company. Notwithstanding anything herein to the contrary.

_____
RONALD J. COHEN

_____
DARRICK GRIMES

_____
ANN EVE COHEN

_____
YOLANDA GRIMES

# Property Condition Disclosure Statement

**Name of Seller or Sellers:** Ronald J. Cohen and Ann Eve Cohen
**Property Address:** 23 Stacy Lee Drive, Newburgh, New York 12550

  The Property Condition Disclosure Act requires the seller of residential real property to cause this disclosure statement or a copy thereof to be delivered to a buyer or buyer's agent prior to the signing by the buyer of a binding contract of sale.

**Purpose of Statement:**
  This is a statement of certain conditions and information concerning the property known to the seller. This disclosure statement is not a warranty of any kind by the seller or by any agent representing the seller in this transaction. It is not a substitute for any inspections or tests and the buyer is encouraged to obtain his or her own independent professional inspections and environmental tests and also is encouraged to check public records pertaining to the property.
  A knowingly false or incomplete statement by the seller on this form may subject the seller to claims by the buyer prior to or after the transfer of title. In the event a seller fails to perform the duty prescribed in this article to deliver a disclosure statement prior to the signing by the buyer of a binding contract of sale, the buyer shall receive upon the transfer of title a credit of five hundred dollars ($500.00) against the agreed upon purchase price of the residential real property.
  "Residential Real Property" means real property improved by a one to four family dwelling used or occupied, or intended to be used or occupied, wholly or partly, as the home or residence of one or more persons, but shall not refer to (a) unimproved real property upon which such dwellings are to be constructed or (b) condominium units or cooperative apartments or (c) property on a homeowners' association that is not owned in fee simple by the seller.

**Instructions to the Seller:**
(a) Answer all questions based upon your actual knowledge.
(b) Attach additional pages with your signature if additional space is required.
(c) Complete this form yourself.
(d) If some items do not apply to your property, check "NA" (Non-Applicable). If you do not know the answer check "Unkn" (Unknown).

**Seller's Statement:** The seller makes the following representations to the buyer based upon the seller's actual knowledge at the time of signing this document. The seller authorizes his or her agent, if any, to provide a copy of this statement to a prospective buyer of the residential real property. The following are representations made by the seller and are not the representations of the seller's agent.

**General Information**
1. How long have you owned the property? _1987 New at the time_
2. How long have you occupied the property? _1987_
3. What is the age of the structure or structures? _1987 House_
   *Note to Buyer* - If the structure was built before 1978 you are encouraged to investigate for the presence of lead based paint.
4. Does anybody other than yourself have a lease, easement or any other right to use or occupy any part of your property other than those stated in documents available in the public record, such as rights to use a road or path or cut trees or crops?
      Yes  (No)  Unkn  NA  (If yes, explain below.)
5. Does anybody else claim to own any part of your property?
      Yes  (No)  Unkn  NA  (If yes, explain below.)

6.  Has anyone denied you access to the property or made a formal legal claim challenging your title to the property?    Yes    (No)    Unkn    NA    (If yes, explain below.)
7.  Are there any features of the property shared in common with adjoining land owners or a homeowners association, such as walls, fences or driveways?    *Stacy Lee Drive Private Road*
    (Yes)    No    Unkn    NA    (If yes, explain below.)
8.  Are there any electric or gas utility surcharges for line extensions, special assessments or homeowner or other association fees that apply to the property?
    (Yes)    No    Unkn    NA    (If yes, describe below.)    *loo per quarter*
9.  Are there certificates of occupancy related to the property?    *to Apple Knoll*
    (Yes)    No    Unkn    NA    (If no, explain below.)    *Estates.*

**Environmental**

*Note to Seller* - In this section, you will be asked questions regarding petroleum products and hazardous or toxic substances that you know to have been spilled, leaked or otherwise been released on the property or from the property onto any other property. Petroleum products may include, but are not limited to, gasoline, diesel fuel, home heating fuel, and lubricants. Hazardous or toxic substances are products that could pose short- or long-term danger to personal health or the environment if they are not properly disposed of, applied or stored. These include, but are not limited to, fertilizers, pesticides and insecticides, paint including paint thinner, varnish remover and wood preservatives, treated wood, construction materials such as asphalt and roofing materials, antifreeze and other automotive products, batteries, cleaning solvents including septic tank cleaners, household cleaners and pool chemicals and products containing mercury and lead.

*Note to Buyer* - If contamination of this property from petroleum products and/or hazardous or toxic substances is a concern to you, you are urged to consider soil and groundwater testing of this property.

10.  Is any or all of the property located in a designated floodplain?
    Yes    (No)    Unkn    NA    (If yes, explain below.)
11.  Is any or all of the property located in a designated wetland?
    Yes    (No)    Unkn    NA    (If yes, explain below.)
12.  Is the property located in an agricultural district?
    Yes    (No)    Unkn    NA    (If yes, explain below.)
13.  Was the property ever the site of a landfill?
    Yes    (No)    Unkn    NA    (If yes, explain below.)
14.  Are there or have there ever been fuel storage tanks above or below the ground on the property?
    (Yes)    No    Unkn    NA    *Oil tank*
    If yes, are they currently in use?
    Yes    No    Unkn    NA
    Location(s) _____
    Are they leaking or have they ever leaked?
    Yes    (No)    Unkn    NA    (If yes, explain below.)
15.  Is there asbestos in the structure?
    Yes    (No)    Unkn    NA    (If yes, state location or locations below.)
16.  Is lead plumbing present?
    Yes    (No)    Unkn    NA    (If yes, state location or locations below.)
17.  Has a radon test been done?
    Yes    (No)    Unkn    NA    (If yes, attach a copy of the report.)
18.  Has motor fuel, motor oil, home heating fuel, lubricating oil or any other petroleum product, methane gas, or any hazardous or toxic substance spilled, leaked or otherwise been released on the property or from the property onto any other property?
    Yes    (No)    Unkn    NA    (If yes, describe below.)

Are there any known material defects in any of the following (If yes, explain below. Use additional sheets if necessary.):

| | | | | |
|---|---|---|---|---|
| 32. Plumbing System? | Yes | No | Unkn | NA |
| 33. Security System? | Yes | No | Unkn | NA |
| 34. Carbon Monoxide Detector? | Yes | No | Unkn | NA |
| 35. Smoke Detector? | Yes | No | Unkn | NA |
| 36. Fire Sprinkler System? | Yes | No | Unkn | NA |
| 37. Sump Pump? | Yes | No | Unkn | NA |
| 38. Foundation/Slab? | Yes | No | Unkn | NA |
| 39. Interior Walls/Ceilings? | Yes | No | Unkn | NA |
| 40. Exterior Walls Or Siding? | Yes | No | Unkn | NA |
| 41. Floors? | Yes | No | Unkn | NA |  — Some tiles cracked
| 42. Chimney/Fireplace or Stove? | Yes | No | Unkn | NA |
| 43. Patio/Deck? | Yes | No | Unkn | NA |
| 44. Driveway? | Yes | No | Unkn | NA |
| 45. Air Conditioner? | Yes | No | Unkn | NA |
| 46. Heating System? | Yes | No | Unkn | NA |
| 47. Hot Water Heater? | Yes | No | Unkn | NA |

48. The Property is located in the following School District: _Newburgh Enlarged City School_ Unkn

*Note:* Buyer is encouraged to check public records concerning the property (e.g. tax records and wetland and flood plain maps.)

The seller should use this area to further explain any item above. If necessary, attach additional pages and indicate here the number of additional pages attached.

_____
_____
_____
_____
_____

**Seller's Certification:** Seller certifies that the information in this property condition disclosure statement is true and complete to the seller's actual knowledge as of the date signed by the seller. If a seller of residential real property acquires knowledge which renders materially inaccurate a property condition disclosure statement provided previously, the seller shall deliver a revised property condition disclosure statement to the buyer as soon as practicable. In no event, however, shall a seller be required to provide a revised property condition disclosure statement after the transfer of title from the seller to the buyer or occupancy by the buyer, whichever is earlier.

Seller _Ann E. Cohen_                    Date _7/14/05_

Seller _[signature]_                         Date _7/14/05_

**Buyer's Acknowledgment:** Buyer acknowledges receipt of a copy of this statement and buyer understands that this information is a statement of certain conditions and information concerning the property known to the seller. It is not a warranty of any kind by the seller or seller's agent and is not a substitute for any home, pest, radon or other inspections or testing of the property or inspection of the public records.

Buyer _____    Date _____

Buyer _____    Date _____

ADDITIONAL RIDER TO CONTRACT OF SALE
23 Stacy Lee Drive
Newburgh, NY

1.The terms of this Additional Rider shall prevail over the terms of the printed form and any other Rider to the Contract to which this Additional Rider is attached.

2. Seller makes the following additional representations and covenants:

(a)  The underground oil tank has never leaked or been damaged.
(b) All work and alterations to the Premises have been performed in accordance with applicable law,
(c)Seller shall maintain the Premises, including landscaping in its present condition (reasonable wear and tear excepted) until closing,
(d) Seller is not in violation of any of the Restrictive Covenants set forth in the deed in which the premises were conveyed to Seller,and
(e)At closing,  (i)the roof and basement shall be free of leaks and water seepage, and (ii) all pool equipment shall be included in this sale.

3. This Agreement may be executed in counterparts, and the delivery of  facsimile copies of  the fully executed agreement shall constitute a binding agreement provided that the Downpayment is delivered to Escrow Agent, and that original executed copies are delivered promptly after the delivery of a facsimile copy.

4. If due to Purchaser's inability to close, the closing does not occur by September 15, 2005 then the Seller shall have the pool closed for the season and Purchaser shall reimburse Seller the sum of $500 at closing.

5. Paragraph 20 of the Rider is modified and supplemented to provide that in the event that Purchaser is unable to close title due to the inability to close title on the sale of their present residence within 90 days following the date a fully executed copy of this Contract is delivered to Purchaser attorney, then Seller by notice to Purchaser delivered within 10 days following the expiration of such 90 day period, may elect to either (x) terminate this Contract, in which case Seller shall cause the Downpayment to be refunded to Purchaser and neither party shall have any further obligations to the other party, or (b) extend the contract under the same terms and conditions for an additional thirty (30) days. The Contract shall automatically terminate at the expiration of such additional 30 day period if the closing has not occurred and the Downpayment shall be refunded to Purchaser, If Seller delivers a notice of termination, Purchaser shall have the right by notice to Seller deliveagred within five (5) days following the receipt of the termination to elect to close notwithstanding that Purchaser has not closed on the sale of their present residence, and in which case the parties shall proceed to closing on a date no later than 15 days later then the date of Purchaser's notice to proceed.

6. Modifying Paragraph 2 of the First Rider, (a) delivery of the title report shall constitute notice of objections, and (b) notwithstanding the provisions of this paragraph, Seller shall cause any mortgages executed by Seller to be discharged prior to closing.

7. Modifying paragraphs 3 and 5 of the Rider, nothing contained therein shall diminish Seller's obligations under Paragraph 16 of the Printed Form of this Contract.

8. Paragraph 11 of the Rider is deleted. If Seller is in possession of a survey, Seller shall deliver same to Purchaser simultaneously with the delivery of fully executed copies of the Contract of Sale. Otherwise Purchaser may order a survey from any licensed surveyor and Seller agrees to attach a metes and bounds description as an exhibit to the deed unless Seller demonstrates error in such description.

9. Paragraph 28 of the Rider is deleted in its entirety.

10. Modifying Paragraph 15 of the first Rider, Purchaser within 15 days of the date its attorney receives a fully executed copy of the Contract, may cause the underground fuel tank and  to be inspected for tightness. If the inspection reveals leakage or contamination, Seller shall remediate same prior to closing.

**IN WITNESS WHEREOF,** the parties have executed the within instrument as of the ___ day of July, 2005

SELLERS:                              PURCHASERS:

_____          _____


_____          _____

# Exhibit D

# LOAN TRACKING

| CUSTOMER NAME: | DARRICK GRIMES | | CURRENT STATUS:  BOARDED |
| | YOLANDA GRIMES | | DATE OF ACTION TAKEN:  10/17/05 |
| PERTY ADDRESS: | 23 STACY LEE DR | | REASONS FOR DENIAL: |
| | NEWBURGH, NY  12550 | | |
| APPLICATION NUMBER: | 925000182284 | | 3 |
| LOAN AMOUNT: | 405,000.00 | | |

HMDA Denial Reason Code:
1. Debt to income ratio
2. Employment history
3. Credit History
4. Collateral
5. Insufficient cash
6. Unverifiable information
7. Credit application incomplete
8. Mortgage insurance denied
9. Other

TYPE OF LOAN:  **WHOLESLE**

PURPOSE OF LOAN:  Purchase

OCCUPANCY:  OWNER OCCUPIED

GROSS ANNUAL INCOME OF APPLICANT(S):  128640

**BORROWER:**

Race/National Origin:
- [ ] American Indian or Alaska Native
- [ ] Asian
- [X] Black or African American
- [ ] Native Hawaiian or Pacific Islander
- [ ] Not Provided in mail, internet, or telephone application
- [ ] White

Ethnicity:
- [ ] Hispanic or Latino
- [X] Not Hispanic or Latino
- [ ] Not provided in mail, internet, or telephone application

Sex:  [ ] Female   [X] Male

**CO-BORROWER:**

Race/National Origin:
- [ ] American Indian or Alaska Native
- [ ] Asian
- [X] Black or African American
- [ ] Native Hawaiian or Pacific Islander
- [ ] Not Provided in mail, internet, or telephone app
- [ ] White

Ethnicity:
- [ ] Hispanic or Latino
- [X] Not Hispanic or Latino
- [ ] Not provided in mail, internet, or telephone application

Sex:  [X] Female   [ ] Male

| PROCESSING | DATE | TIME |
|---|---|---|
| Application Received: | 9/16/05 | 7:48 a.m. |
| Disclosures Printed: | 9/16/05 | 8:06 a.m. |
| Credit Report Pulled: | 9/16/05 | 7:55 a.m. |
| Promote to U Stage: | 9/16/05 | 8:39 a.m. |
| PROCESSOR: | JAMIE HANCOCK | |

| UNDERWRITING | DATE | TIME |
|---|---|---|
| Loan Approved: | 9/16/05 | 9:37 a.m. |
| Loan Denied: | | |
| Counter Offered: | 9/16/05 | N/A |
| Counter Accepted: | | N/A |
| Loan Withdrawn: | | |
| Commitment Printed: | 9/29/05 | 3:25 p.m. |
| Denial Letter Printed: | | :    .m. |
| Counter-Offer Ltr Print: | 10/1/1/05 | N/A |
| Flood Zone Ltr Print: | | N/A |
| Promoted to LC Stage: | 9/19/05 | 10:44 a.m. |
| Promoted to DOCS: | 9/29/05 | 2:51 p.m. |
| UNDERWRITER: | STEVEN MOLENAAR | |

| FUNDING | DATE | TIME |
|---|---|---|
| Docs Drawn: | 10/12/05 | 12:32 p.m. |
| Docs Received: | | N/A |
| Estimated Close: | 10/12/05 | N/A |
| Promote to FUND: | | |
| Approval Review Date: | 10/17/05 | N/A |
| Date Funded: | 10/12/05 | 10:38 a.m. |
| RECORDING DATE: | | N/A |
| RECORDING #: | | |
| BOARDING DATE: | 10/17/05 | N/A |
| FUNDER: | KRISTA MCCORMICK | |

| ELAPSED TIME | DAYS | HH:MM |
|---|---|---|
| Time in Processing: | | 0:51  .m. |
| Time in Underwriting: | 2 | 0:58  .m. |
| Elapsed Days in System: | 25 | |

LNTRAC2 rev 042404 TG

FREMONT COPY

SEP 16 2005 FRI 00:14 PM  FREMONT    FAX NO. 813 901 7780    P. 01

FREMONT INVESTMENT & LOAN
CONDITIONAL COUNTER OFFER

| Date: 9/16/05 | Approval Review Date: 10/16/05 | Account Exec.: JEFF PORFIRIO |
|---|---|---|
| Print Date: 9/16/05 | | Application #: 926000182284 |
| Broker: WCS LENDING LLC | | Borrowers: DARRICK GRIMES |
| | | YOLANDA GRIMES |

Atn: JOHN
Phone: 561-864-2401  Fax: 561-864-2801

Property Address: 23 STACEY LEE DR
NEWBURGH, NY 12550

Status: Approved ☑
　　　　Modified ☑

Reason for Modification: APPROVED AS COUNTERED

CREDIT SCORE

Property Type: 1 FAMILY
Occupancy: OWNER OCCUPIED
Loan Purpose: PURCHASE 1-4 UNITS
LTV: 90.000 %

Program: A-XP 2/28 FULL DOC 30/30 1ST    578
Loan Amount: $ 405,000.00    Start Rate/Floor: 8.450 %
Index: 6 MONTH LIBOR    Margin: 5.6737 %    Ceiling: 14.4500 %
1st Rate Change/Cap: 24 months   2.0000%
Regular Rate Change/Cap: 6 months   1.5000%
Prepayment Penalty Term: 0 Years   Window? NO

Monthly P&I payment: $ 3,099.76
IMPOUNDS (Escrows) REQUIRED- NO

Rebate to Broker: 1.500 %
Points (Discount) to FIL: %

## LOAN CONDITIONS

### PRE-DOC Conditions

1. ___ AAR  REVIEW APPRAISAL, APPROVED BY LENDER, TO SUPPORT A VALUE OF $ 450,000.00

2. ___ ___ EVIDENCE OF INSURANCE (COMPANY RATED B OR BETTER IN BEST GUIDE) NAMING:
FREMONT INVESTMENT & LOAN

3. A ___ ___ 2 ORIG APPR'LS, 1003'S, & DISCLOSURES REQD

4. U ___ ___ HUD 1A FROM RECENT REFINANCE(PRIOR MTG SHOWING 2X30)GRADE SUB TOO

5. U ___ ___ SIGNED RENTAL AGREEMENT.

6. A ___ ___ VERBAL EMPLOYMENT VERIFICATION BY FIL.

7. U ___ ___ FULLY EXECUTED PURCHASE AGREEMENT, ONLY AMENDMENT EXECUTED.

8. A ___ ___ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

9. AAR ___ COPY OF ORIGINAL APPSL INVOICE SHOWING ACTUAL COST OF APPRAISAL

10. ___ ___ SEE ATTACHED APPRAISAL CONDITIONS.

11. ___ ___ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

12. ___ ___ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

(handwritten) Downgrade to A-

### CLOSING Conditions

1. ___ ___ ORIGINAL,TYPED CORRECTED 1003 APPL, SIGNED & DATED BY BORROWER & INTRVWR

2. ___ ___ VERIFICATION LENDER WILL BE IN 1ST LIEN POSITION

3. ___ ___ FIL 1ST & 2ND TO CLOSE CONCURRENTLY.

4. ___ ___ CORRECTED MARKED-UP FINAL TITLE POLICY

5. ___ ___ CERTIFIED FUNDS FROM BORROWER THAT MATCH ASSETS LISTED ON 1003.

6. ___ ___ 6% MAX SELLER PAID CONCESSIONS.

If you have any questions, or request any changes, please contact your Account Manager
SHENELLE DANIEL at 813-426-1706.  Our fax number is 813-901-7631.

Underwriter: _____    * Terms Subject to Change
Signed STEVEN MOLENAAR

DMMTA  REV, 03/02/04 TG    Page 1 of 2

FREMONT
INVESTMENT&LOAN

XSS-11/18/2005

FREMONT INVESTMENT & LOAN
CONDITIONAL COUNTER OFFER *

Date:          9/16/05                Approval Review Date: 10/16/05 *        Account Exec.: JEFF PORFIRIO
Print Date:    9/23/05                                                        Application #:  8260001322S4
Broker: WGS LENDING LLC                                                       Borrower:      DARRICK    GRIMES
                                                                                             YOLANDA    GRIMES
Attn:    JOHN
Phone:   561-854-2401    Fax: 561-854-2801                                    Property Address:  23 STACEY LEE DR
Status: Approved ☑                                                                              NEWBURGH, NY  12550
         Modified  ☑
         Reason for Modification: APPROVED AS COUNTERED                       Property Type:  1 FAMILY
                                                                             Occupancy:  OWNER OCCUPIED
Program:  A-XP 2/28 FULL DOC 30/30 1ST          578                          Loan Purpose:  PURCHASE 1-4 UNITS
Loan Amount: $ 405,000.00               Start Rate/Floor:  8.450 %           LTV:            80.000 %
Index:  6 MONTH LIBOR  Margin:  8.6737 %   Ceiling: 14.4500 %                Monthly P&I payment: $ 3,089.73
                                                                            IMPOUNDS (Escrows) REQUIRED-  NO
1st Rate Change/Cap:     24 months  2.0000%
Regular Rate Change/Cap:  6 months  1.5000%
Prepayment Penalty Term:  0  Years  Window:  NO                              Rebate to Broker:         1.500 %
                                                                            Points (Discount) to FIL:       %
LOAN CONDITIONS              PRE-DOC Conditions

1.  ___  AAR  REVIEW APPRAISAL, APPROVED BY LENDER, TO SUPPORT A VALUE OF $ 450,000.00

2.  ___  ___  EVIDENCE OF INSURANCE (COMPANY RATED B OR BETTER IN BEST GUIDE) NAMING:
         FREMONT INVESTMENT & LOAN

3.  A SXD  ___  2 DRIO APPR'LS, 1003'S, & DISCLOSURES REQD.

4.  U AAR  ___  HUD 1A FROM RECENT REFINANCE(PRIOR MTG SHOWING 2X30)GRADE SUB TOO

5.  U AAR  ___  SIGNED RENTAL AGREEMENTS.

6.  A SXD  ___  VERBAL EMPLOYMENT VERIFICATION BY FIL

7.  U AAR  ___  FULLY EXECUTED PURCHASE AGREEMENT. ONLY AMENDMENT EXECUTED.

8.  A SXD  ___  PRELIMINARY TITLE POLICY, ED, ALTA 8.1,9/SURVEY AND PEST

8.  AAR  ___  COPY OF ORIGINAL APRSL INVOICE SHOWING ACTUAL COST OF APPRAISAL

10.  ___  ___  SEE ATTACHED APPRAISAL CONDITIONS.

11.  ___  ___  TAX CERTIFICATION REQUIRED PRIOR TO DRAWING OF LOAN DOCS.

CLOSING Conditions

1.  ___  ___  ORIGINAL,TYPED CORRECTED 1003 APRL, SIGNED & DATED BY BORROWER & INTRVWR

2.  ___  ___  VERIFICATION LENDER WILL BE IN 1ST LIEN POSITION

3.  ___  ___  FIL 1ST & 2ND TO CLOSE CONCURRENTLY.

4.  ___  ___  CORRECTED MARKED-UP FINAL TITLE POLICY

5.  ___  ___  CERTIFIED FUNDS FROM BORROWER THAT MATCH ASSETS LISTED ON 1003.

6.  ___  ___  6% MAX SELLER PAID CONCESSIONS.

If you have any questions, or request any changes, please contact your Account Manager
SHENELLE DANIEL at 813-426-1708.  Our fax number is 813-901-7631.

Underwriter _____                              * Terms Subject to Change
            Signed  STEVEN MOLEHMAN

W/COMMTA  REV. 03/02/04  TG            Page 1 of 2                    FREMONT
                                                                     INVESTMENT&LOAN

QDA-11/18/2005

**FREMONT INVESTMENT & LOAN**
**CONDITIONAL LOAN APPROVAL**

Date: 9/16/05
Print Date: 9/25/05       Approval Review Date: 10/16/05
Broker: WCS LENDING LLC

Attn: JOHN
Phone: 561-864-2401   Fax: 561-864-2801
Status: Approved ☑
        Modified ☐
Reason for Modification: APPROVED AS COUNTERED

Account Exec.: JEFF PORFIRIO
Application #: 825000182344
Borrowers: DARRICK GRIMES
           YOLANDA GRIMES

Property Address: 23 STACEY LEE DR
                  NEWBURGH, NY 12550
Property Type: 1 FAMILY
Occupancy: OWNER OCCUPIED
Loan Purpose: PURCHASE 1-4 UNITS
LTV: 85.000 %

| | CREDIT SCORE |
|---|---|
| Program: A-XP FIXED FULL DOC 15/15 2ND | 578 |
| Loan Amount: $ 22,500.00 | |
| Start Rate: 12.4900 | |

Monthly P&I payment: $ 277.15
IMPOUNDS (Escrows) REQUIRED - NO

Prepayment Penalty Term: 1 Years Window? NO

Rebate to Broker:   N/A   %
Points (Discount) to FIL: N/A   %

## LOAN CONDITIONS

### PRE-DOC Conditions

1. ___  ___  AAR  REVIEW APPRAISAL, APPROVED BY LENDER, TO SUPPORT A VALUE OF $ 450,000.00

2. ___  ___  EVIDENCE OF INSURANCE (COMPANY RATED B OR BETTER IN BEST GUIDE) NAMING: FREMONT INVESTMENT & LOAN

3. AAR  ___  COPY OF ORIGINAL APRSL INVOICE SHOWING ACTUAL COST OF APPRAISAL

4. ___  ___  SEE ATTACHED APPRAISAL CONDITIONS.

5. ___  ___  TAX CERTIFICATION REQUIRED PRIOR TO DRAWING OF LOAN DOCS.

6. ___  ___  FINAL TITLE POLICY TO BE INSURED BY FIL APPROVED CO.

### CLOSING Conditions

1. ___  ___  ORIGINAL, TYPED CORRECTED 1003 APPL, SIGNED & DATED BY BORROWER & INTRVWR

2. ___  ___  VERIFICATION LENDER WILL BE IN 1ST LIEN POSITION

3. ___  ___  VERIFICATION LENDER WILL BE IN 2ND LIEN POSITION

4. ___  ___  FIL 1ST & 2ND TO CLOSE CONCURRENTLY.

If you have any questions, or request any changes, please contact your Account Manager
SHENELLE DANIEL at 813-428-1305.   Our fax number is 813-901-7631.   Terms Subject to Change
Underwriter: _____
            Signed STEVEN MOLENAAR

WCOMMFX  lg  03/02/04                    Page 1 of 2

**FREMONT**
INVESTMENT&LOAN

FREMONT INVESTMENT & LOAN

| | | | | |
|---|---|---|---|---|
| Date: | 9/16/05 | | Account Exec: | JEFF PORFIRIO |
| Print Date: | 9/16/05 | | Application #: | 9260000142284 |
| Approval Review Date: | 10/16/05 | | Borrower(s): | DARRICK GRIMES |
| | | | | YOLANDA GRIMES |

Broker: WCS LENDING LLC

| | | | | |
|---|---|---|---|---|
| In: | JOHN | | Property Address: | 23 STACEY LEE DR |
| Phone: | 561-864-2401 | | | NEWBURGH, NY 12550 |
| Fax: | 561-864-2801 | | | |

Program  A-XP 2/28 FULL DOC 30/30 1ST
Loan Amount $  405,000.00   Start Rate/Floor:   8.450 %
Index:  6 MONTH LIBOR   Margin 6.5737 %  Ceiling 14.4500 %
1st Rate Change/Cap:  24  months  2.0000 %
Regular Rate Change/Cap:  6  months  1.5000 %
Prepayment Penalty Term: 0  Term  Window? NO

Property Type: 1 FAMILY
Occupancy: OWNER OCCUPIED
Loan Purpose: PURCHASE 1-4 UNITS
LTV:  90.000 %
Rebate to broker  1.500 %
Points (discount) to FIL  %

## BROKER DEMAND

Please be advised increase in fees may result in required re-disclosure to the borrower(s) with applicable delays in document delivery.

| | PREPAID FINANCE CHARGES | | | | |
|---|---|---|---|---|---|
| | REMIT TO FIL | REMIT TO BROKER | POD | | TOTAL TO APPLICANT |
| Lender Orig. Fee | $ 0.00 + ( %) | $ | | = | $ |
| Broker FEE | $ N/A + ( 0.0000%) | $ 4,050.00 | | = | 4,050.00 |
| Loan Discount Fee ( %) | $ + ( %) | $ | | = | |
| Underwriting Fee | 894.00 + | | | = | 894.00 |
| Application Fee | 0.00 + | 295.00 | | = | 295.00 |
| Doc Prep Fee | 0.00 + | | | = | |
| Tax Service - LERETA | 60.00 + | | | = | 60.00 |
| Wire Fee | 0.00 + | | | = | |
| Flood Zone Cert. Fee - LERETA | 9.50 + | | | = | 9.50 |
| Processing Fee | 0.00 + | 945.00 | | = | 945.00 |
| Credit Reporting Fees | | | | = | |
| Other | + | | | = | |
| Other | + | | | = | |
| Other | + | | | = | |
| Other | + | | | = | |
| Rebate to Broker | ( 1.500%) | $ 6,075.00 | | | |

## BROKER MUST COMPLETE    Escrow/Closing Agent Fee $

These fees must be accurate as they will be reflected on the final HUD-1. Please stress to the escrow/closing company that their fees must be exact. Any changes in the fees may result in a redraw with applicable charges.

| | | OTHER FEES | | TOTAL |
|---|---|---|---|---|
| Appraisal Fee | $ _____ (Paid) | + $ 300.00 (Due) | = | 300.00 |
| | $ _____ (Paid) | + $ _____ (Due) | = | |
| Title Insurance | | | | 3,259.00 |
| Recording Fee | | | | 50.00 |

Does Borrower want impounds?  ____ NO  _✓_ YES. If Yes, provide insurance policy with this form

LENDER'S LOSS PAYABLE  FREMONT INVESTMENT & LOAN
ENDORSEMENT TO READ:  Its successors and/or assigns
P.O. BOX 858
AMELIA, OH 45102

Vesting to be as follows:  _Darrick Grimes + Yolanda Grimes_
_Joint Tennants_

Send Docs to:  _Majestic Settlement Services_  CONTACT: _Jessica/Krista_
Street Address:  _55 Washington Street #851_  ESCROW NO: _____
EMAIL Address:  _MajestidDocs@aol.com_  PHONE NO: _718-643-6320_
FAX NO: _718-643-6511_

☐ FEDEX AIR BILL NO. _____

I accept the terms of this loan, request
FIL to draw documents and wire funds.   _[signature]_   _9/28/05_
Broker Signature

Form of Broker Disbursement ☐ Check  ☐ Wire Funds to Closing Agent  ☐ Wire to Broker Account

If you have any questions, or request any changes, please contact your Account Manager
SHEMELLE DANIEL at 813-425-1705.  Our fax number is 813-901-7931.

* Terms Subject to Change

WCD044T8  REV. XX64  11/16/04  Page 2 of 2

## FREMONT INVESTMENT & LOAN

| | |
|---|---|
| Date: 9/16/05 | Account Exec: JEFF PORFIRIO |
| Print Date: 9/16/05 | Application #: 9250000182344 |
| Approval Review Date: 10/15/05 * | Borrower(s): DARRICK GRIMES |
| | YOLANDA GRIMES |
| Broker: WCS LENDING LLC | |
| Ln: JOHN | Property Address: 23 STACEY LEE DR |
| Phone: 561-864-2401 | NEWBURGH, NY 12550 |
| Fax: 561-864-2801 | Property Type: 1 FAMILY |
| Program: A-XP FIXED FULL DOC 15/15 2ND | Occupancy: OWNER OCCUPIED |
| Loan Amount $ 22,500.00 | Loan Purpose: PURCHASE 1-4 UNITS |
| Start Rate: 12.4900 % | LTV: 95.000 |
| Prepayment Penalty Term: 1 Years | Rebate to broker: % |
| | Points (discount) to FIL: % |

**BROKER DEMAND**   Please be advised increase in fees may result in required re-disclosure to the borrower(s) with applicable delays in document delivery.

### PREPAID FINANCE CHARGES

| | REMIT TO FIL | | REMIT TO BROKER | | POC | | TOTAL TO APPLICANT |
|---|---|---|---|---|---|---|---|
| Lender Orig. Fee | $ | ( %) | $ | | $ | = | |
| Broker FEE | $ | N/A + ( 0.000%) | $ | | | = | |
| Loan Discount Fee ( %) | $ | + ( %) | $ | | | = | |
| Underwriting Fee | | + | | | | = | |
| Application Fee | | + | | | | = | |
| Doc Prep Fee | | + | | | | = | |
| Tax Service - LERETA | | + | | | | = | |
| Wire Fee | | + | | | | = | |
| Flood Zone Cert. Fee - LERETA | | + | | | | = | |
| Processing Fee | 0.00 | + | | | | = | |
| Credit Reporting Fees | | + | | | | = | |
| Other | | + | | | | = | |
| Other | | + | | | | = | |
| Other | | + | | | | = | |
| Other | | + | | | | = | |
| Rebate to Broker | | ( %) | $ | | | | |

**BROKER MUST COMPLETE**   Escrow/Closing Agent Fee $

Those fees must be accurate as they will be reflected on the final HUD-1. Please stress to the escrow/closing company that their fees must be exact. Any changes in the fees may result in a redraw with applicable charges.

### OTHER FEES

| | | | | | | TOTAL |
|---|---|---|---|---|---|---|
| Appraisal Fee | $ _____ | (Paid) + $ _____ | (Due) = | |
| | $ _____ | (Paid) + $ _____ | (Due) = | |
| Title Insurance | | | | |
| Recording Fee | | | | 0.00 |

LENDER'S LOSS PAYABLE FREMONT INVESTMENT & LOAN
ENDORSEMENT TO READ: Its successors and/or assigns
P.O. BOX 858
AMELIA, OH 45102

Vesting to be as follows: _Darrick Grimes & Yolanda Grimes, Joint tenants_

Send Docs to: _Majestic Settlements Services_ CONTACT: _Jessica/Krista_

Street Address: _52 Washington Street #85_ ESCROW NO: __

EMAIL Address: _Majestic Docs@aol.com_ PHONE NO: _718-643-6320_

FAX NO: _718-643-6511_

I accept the terms of this loan, request FIL to draw docs and wire funds.

☐ FEDEX AIRBILL NO. _____

Broker Signature: _____  Date: _9/28/05_

Form of Broker Disbursement:  ☐ Check   ☐ Wire Funds to Closing Agent   ☐ Wire to Broker Account

If you have any questions, or request any changes, please contact your Account Manager SHENELLE DANIEL at 513-428-1708.  Our fax number is 813-901-7631.

WCOA48FB  XX6M  11/15/04   Page 2 of 2   * Terms Subject to Change   FREMONT INVESTMENT & LOAN

FREMONT INVESTMENT & LOAN

Date:               9/16/05
Print Date:         9/16/05
Approval Review Date:  10/16/05

Account Exec:  JEFF PORFIRIO
Application #:  926000182284
Borrower(s):   DARRICK   GRIMES
               YOLANDA   GRIMES

roker:  WCS LENDING LLC

Attn:   JOHN
Phone:  561-864-2401
Fax:    561-864-2801

Property Address:  23 STACEY LEE DR
                   NEWBURGH, NY  12550

Program   A-XP 2/28 FULL DOC 30/30 1ST
Loan Amount $   405,000.00  Start Rate/Floor:   8.450  %
Index:  6 MONTH LIBOR  Margin 6.6737 %  Ceiling 14.4500 %
1st Rate Change/Cap:   24    months  2.0000 %
Regular Rate Change/Cap:  6   months  1.5000 %
Prepayment Penalty Term:  0  Years  Window?  NO

Property Type:  1 FAMILY
Occupancy:   OWNER OCCUPIED
Loan Purpose:  PURCHASE 1-4 UNITS
LTV:                  90.000  %
Rebate to broker      1.500  %
Points (discount) to FIL        %

## BROKER DEMAND

Please be advised increase in fees may result in required re-disclosure to the borrower(s) with applicable delays in document delivery.

### PREPAID FINANCE CHARGES

| | REMIT TO FIL | REMIT TO BROKER | POC | TOTAL TO APPLICANT |
|---|---|---|---|---|
| Lender Orig. Fee | $ 0.00 + | ( %) $ | = $ | 0.00 |
| Broker FEE | $ N/A + | ( 0.0000%) $ | 4,050.00 | 4,050.00 |
| Loan Discount Fee ( %) | $ + | ( %) $ | = | |
| Underwriting Fee | 894.00 + | | = | 894.00 |
| Application Fee | 0.00 + | 295.00 | = | 295.00 |
| Doc Prep Fee | 0.00 + | | = | |
| Tax Service - LERETA | 60.00 + | | = | 60.00 |
| Wire Fee | 0.00 + | | = | |
| Flood Zone Cert. Fee - LERETA | 9.50 + | 945.00 | = | 9.50 |
| Processing Fee | 0.00 + | | = | 945.00 |
| Credit Reporting Fees | + | | = | |
| Other | + | | = | |
| Other | + | | = | |
| Other | + | | = | |
| Other | + | | = | |
| Rebate to Broker | ( 1.500%) | $ 6,075.00 | | |

## BROKER MUST COMPLETE    Escrow/Closing Agent Fee  $

ese fees must be accurate as they will be reflected on the final HUD-1. Please stress to the escrow/closing mpany that their fees must be exact. Any changes in the fees may result in a redraw with applicable charges.

### OTHER FEES

| | | | | | TOTAL |
|---|---|---|---|---|---|
| Appraisal Fee | $ _____ | (Paid) | + $ 300.00 | (Due) = | 300.00 |
| | $ _____ | (Paid) | + $ | (Due) = | |
| Title Insurance | | | | | 3,259.00 |
| Recording Fee | | | | | 50.00 |

Does Borrower want impounds? ___ NO  ✓ YES. If Yes, provide insurance policy with this form

LENDER'S LOSS PAYABLE  FREMONT INVESTMENT & LOAN
ENDORSEMENT TO READ:  Its successors and/or assigns
                      P.O. BOX 658
                      AMELIA, OH 45102

Vesting to be as follows:  _Darrick Grimes & Yolanda Grimes_
                           _Joint Tennants_
Send Docs to:  _Majestic Settlement Services_  CONTACT: _Jessica / Krista_
Street Address:  _55 Washington Street # 851_   ESCROW NO: _____
EMAIL Address:  _MajesticDocs@aol.com_  PHONE NO: _718-643-6320_
                                        FAX NO: _718-643-6511_

☐ FEDEX AIR BILL NO. _____

I accept the terms of this loan, request
FIL to draw documents and wire funds.   _signature_       _9/28/05_
                                        Broker Signature       Date

Form of Broker Disbursement: ☐ Check   ☐ Wire Funds to Closing Agent   ☐ Wire to Broker Account

If you have any questions, or request any changes, please contact your Account Manager
SHENELLE DANIEL at 813-426-1706.  Our fax number is 813-901-7631.

JMMTB  REV. XMM  11/16/04          Page 2 of 2                      * Terms Subject to Change

FREMONT INVESTMENT & LOAN

| | | | |
|---|---|---|---|
| Date: | 8/16/05 | Account Exec: | JEFF PORFIRIO |
| Print Date: | 8/16/05 | Application #: | 9260000162344 |
| Approval Review Date: | 10/15/05 | Borrower(s): | DARRICK GRIMES |
| | | | YOLANDA GRIMES |

Broker:   WCS LENDING LLC

| | | | |
|---|---|---|---|
| Ln: | JOHN | Property Address: | 23 STACEY LEE DR |
| Phone: | 561-864-2401 | | NEWBURGH, WY 12550 |
| Fax: | 561-864-2801 | Property Type: | 1 FAMILY |

| | | | |
|---|---|---|---|
| Program: | A-XP FIXED FULL DOC 15/15 2ND | Occupancy: | OWNER OCCUPIED |
| Loan Amount $ | 22,500.00 | Loan Purpose: | PURCHASE 1-4 UNITS |
| Start Rate: | 12.4900 % | LTV: | 95.000 |
| Prepayment Penalty Term: | 1 Years | Rebate to broker: | % |
| | | Points (discount) to FIL: | % |

## BROKER DEMAND

Please be advised increase in fees may result in required re-disclosure to the borrower(s) with applicable delays in document delivery.

PREPAID FINANCE CHARGES

| | RENT TO FIL | | RENT TO BROKER | POC | TOTAL TO APPLICANT |
|---|---|---|---|---|---|
| Lender Orig. Fee | $ | ( %) | $ | | = |
| Broker FEE | $ | N/A + ( 0.000%) | $ | | = |
| Loan Discount Fee ( %) | $ | + ( %) | $ | | = |
| Underwriting Fee | | + | | | = |
| Application Fee | | + | | | = |
| Doc Prep Fee | | + | | | = |
| Tax Service - LERETA | | + | | | = |
| Wire Fee | | + | | | = |
| Flood Zone Cert. Fee - LERETA | | + | | | = |
| Processing Fee | 0.00 | + | | | = |
| Credit Reporting Fees | | + | | | = |
| Other | | + | | | = |
| Other | | + | | | = |
| Other | | + | | | = |
| Other | | + | | | = |
| Rebate to Broker | | ( %) | $ | | |

## BROKER MUST COMPLETE

Escrow/Closing Agent Fee $

These fees must be accurate as they will be reflected on the final HUD-1. Please stress to the escrow/closing company that their fees must be exact. Any changes in the fees may result in a redraw with applicable charges.

OTHER FEES

| | | | | | TOTAL |
|---|---|---|---|---|---|
| Appraisal Fee | $ _____ | (Paid) + $ _____ | (Due) = | | |
| | $ _____ | (Paid) + $ _____ | (Due) = | | |
| Title Insurance | | | | | |
| Recording Fee | | | | | 0.00 |

LENDER'S LOSS PAYABLE FREMONT INVESTMENT & LOAN
ENDORSEMENT TO READ: Its successors and/or assigns
     P.O. BOX 658
     AMELIA, OH 45102

Vesting to be as follows: _Darrick Grimes & Yolanda Grimes, Joint Tennants_

Send Docs to: _Majestic Settlement Services_ CONTACT: _Jessica/Trista_
Street Address: _55 Washington Street #85_ ESCROW NO: _____
EMAIL Address: _majestic docs@aol.com_ PHONE NO: _718-643-6320_
     FAX NO: _718-643-6511_

I accept the terms of this loan, request    ☐ FEDEX AIRBILL NO. _____
FIL to draw documents and wire funds.    _X [signature]_    _9/28/05_
     Broker Signature      Date

Form of Broker Disbursement: ☐ Check   ☐ Wire Funds to Closing Agent   ☐ Wire to Broker Account

If you have any questions, or request any changes, please contact your Account Manager
SHENELLE DANIEL at 513-428-1708. Our fax number is 813-801-7631.

| | |
|---|---|
| Lender: | FREMONT INVESTMENT & LOAN |
| Address: | 2727 EAST IMPERIAL HIGHWAY<br>BREA, CA 92821 |
| Date: | September 16, 2005 |
| Application Number: | 926000182284 |

Applicant(s): DARRICK GRIMES<br>YOLANDA GRIMES

Property Address: 23 STACEY LEE DR<br>NEWBURGH, NY  12550

## GOOD FAITH ESTIMATE OF SETTLEMENT CHARGES

Information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates - the actual charges may be more or less. Your transaction may not involve a fee for every item listed. Interest, late charges and prepayment penalties, if any, shall be governed by Federal and California law. If your loan is prepaid within the next 3 years, it may be subject to a prepayment penalty. If your loan is prepaid, the loan fees or other similar charges will not be subject to any refund.

The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 settlement statement which you will be receiving at settlement. The HUD-1 settlement statement will show you the actual cost for items paid at settlement.

| Ref. HUD-1 Statement | | PAID | DUE |
|---|---|---|---|
| | **Amount paid on your account:** | | |
| 1000's | Hazard Insurance Premium Reserves          mo @$        $ | | |
| 1000's | Flood Insurance Premium Reserves           mo @$        $ | | |
| 1000's | Tax & Account Reserves            mo @$ 468.75 $ | | |
| | **Amount paid to others on your behalf:** | | |
| 800's | Appraisal Fees to Appraiser | | 300.00 |
| 800's | | | |
| 800's | | | |
| 900's | Hazard Insurance Premiums to Insurance Agency | | 1,350.00 |
| 900's | Flood Insurance Premiums to Insurance Agency | | |
| 1100's | | | |
| 1100's | Notary Fee to: | | |
| | Title Insurance Premiums to: Title Company | | 3,259.00 |
| 1200's | Filing Fees to Public Officials/ Recording Fees | | 50.00 |
| | Loan Proceeds to: Title Company | $ | 392,047.18 |
| | AMOUNT FINANCED | $ | 395,656.18 |
| | Prepaid Finance Charge | $ | 9,343.82 |

| Itemization of Prepaid Finance Charge: | LENDER | BROKER | POC |
|---|---|---|---|
| Lender Origination Fee (        %) | 0.00 | | |
| 800's | Broker FEE        (        %) | | 5,265.00 | |
| 800's | Loan Discount        (        %) | | | |
| 900's | Prepaid Interest (16 Days) | | | |
| 800's | @ $ 88.77   per day | 1,420.32 | | |
| 1100's | Underwriting Fee | 894.00 | | |
| 800's | Escrow/Closing Agent Fee | 1,695.00 | | |
| 800's | **Credit Reporting Fees** | | | |
| | Application Fee | 0.00 | | |
| | Doc Prep Fee | 0.00 | | |
| | Tax Service Fee -LandAmerica Tax and Flood Services | 60.00 | | |
| 800's | Wire Fee | 0.00 | | |
| 800's | Flood Cert Fee -LandAmerica Tax and Flood Services | 9.50 | | |
| 800's | Processing Fee | 0.00 | | |
| 800's | | | | |
| 800's | | | | |
| 800's | | | | |
| | Prepaid Finance Charge | 4,078.82 | 5,265.00 | |
| | **Total Prepaid Finance Charge** | 9,343.82 | | |

**LOAN AMOUNT $ 405,000.00**

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender.

[X] All Disclosures are estimates

[X] Broker Yield Spread Premium: 0=3% of Loan Amount

THIS SECTION TO BE COMPLETED BY LENDER ONLY IF PARTICULAR PROVIDER OF SERVICE IS REQUIRED. Use of the particular provider is required and the estimate is based on charges of that provider.

| ITEM | NAME & ADDRESS OF PROVIDER | TELEPHONE NO. | NATURE OF RELATIONSHIP |
|---|---|---|---|
| Tax Service Contract<br>and<br>Flood Zone Certification | LandAmerica Tax and Flood Services<br>1123 S. Parkview Dr.<br>Covina, CA 91724 | (800) 537-3821 | Lender has repeatedly used or required borrowers to use the services of this provider. |

Neither you nor the creditor previously has become obligated to make or accept this loan, nor is any such obligation made by the delivery or signing of this disclosure. The undersigned acknowledges receipt of the booklet "Settlement Costs," and if applicable the "Consumer Handbook on Adjustable Rate Mortgages", and a copy of this disclosure.

| | | | |
|---|---|---|---|
| Applic: DARRICK GRIMES | Date | Applicant YOLANDA GRIMES | Date |
| Applicant | Date | Applicant | Date |

ITGFAITH TG 05/18/04

FREMONT INVESTMENT & LOAN

Lender: FREMONT INVESTMENT & LOAN

Applicant(s): DARRICK GRIMES
YOLANDA GRIMES

Address: 2727 E IMPERIAL HIGHWAY
BREA, CA 92821

Date: October 11, 2005

Application Number: 926000182284

Property Address: 23 STACEY LEE DR
NEWBURGH, NY 12550

## GOOD FAITH ESTIMATE OF SETTLEMENT CHARGES

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates - the actual charges may be more or less. Your transaction may not involve a fee for every item listed. Interest, late charges and prepayment penalties, if any, shall be governed by Federal and California law. If your loan is prepaid within the next 3 years, it may be subject to a prepayment penalty. If your loan is prepaid, the loan fees or other similar charges will not be subject to any refund.

The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 settlement statement which you will be receiving at settlement. The HUD-1 settlement statement will show you the actual cost for items paid at settlement.

| Ref. HUD-1 Statement | | | | |
|---|---|---|---|---|
| | Amount paid on your account: | | | |
| 1000's | Hazard Insurance Premium Reserves | mo @$ | | $ |
| 1000's | Flood Insurance Premium Reserves | mo @$ | | $ |
| 1000's | Tax & Assessment Reserves | mo @$ 420.85 | | $ |
| | Amount paid to others on your behalf: | | PAID | DUE |
| 800's | Appraisal Fees to Appraiser | | | 300.00 |
| 800's | | | | |
| 800's | | | | |
| 900's | Hazard Insurance Premiums to Insurance Agency | | | 1,350.00 |
| 900's | Flood Insurance Premiums to Insurance Agency | | | |
| 1100's | | | | |
| | Notary Fee to: | | | |
| 1100's | Title Insurance Premiums to: MAJESTIC SETTLEMENT SERVIES | | | 3,259.00 |
| 1200's | Filing Fees to Public Officials/ Recording Fees | | | 50.00 |
| | Loan Proceeds to: MAJESTIC SETTLEMENT SERVIES | | $ | 391,473.54 |
| | AMOUNT FINANCED | | $ | 395,082.54 |
| | Prepaid Finance Charge | | $ | 9,917.46 |

Itemization of Prepaid Finance Charge:

| | | LENDER | BROKER | POC |
|---|---|---|---|---|
| | Lender Origination Fee ( %) | 0.00 | | |
| 800 | Broker FEE ( %) | | 4,050.00 | |
| 800's | Loan Discount ( %) | | | |
| 800's | Prepaid Interest (21 Days) | | | |
| 900's | @ $ 93.76 per day | 1,968.96 | | |
| 800's | Underwriting Fee | 894.00 | | |
| 1100's | Escrow/Closing Agent Fee | 1,695.00 | | |
| 800's | Credit Reporting Fees | | | |
| 800's | | | | |
| | Application Fee | 0.00 | 295.00 | |
| | Doc Prep Fee | 0.00 | | |
| | Tax Service Fee -LandAmerica Tax and Flood Services | 60.00 | | |
| 800's | Wire Fee | 0.00 | | |
| 800's | Flood Cert Fee -LandAmerica Tax and Flood Services | 9.50 | | |
| 800's | Processing Fee | 0.00 | 945.00 | |
| 800's | | | | |
| 800's | | | | |
| 800's | | | | |
| | Prepaid Finance Charge | 4,627.46 | 5,290.00 | |
| | Total Prepaid Finance Charge | 9,917.46 | | |

LOAN
AMOUNT $ 405,000.00

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender.

[X] All Disclosures are estimates

[X] Broker Yield Spread Premium
0-3% of Loan Amount

THIS SECTION TO BE COMPLETED BY LENDER ONLY IF PARTICULAR PROVIDER OF SERVICE IS REQUIRED. Use of the particular provider is required and the estimate is based on charges of the particular provider.

| ITEM | NAME & ADDRESS OF PROVIDER | TELEPHONE NO. | NATURE OF RELATIONSHIP |
|---|---|---|---|
| Tax Service Contract and Flood Zone Certification | LandAmerica Tax and Flood Services 1123 S. Parkview Dr. Covina, CA 91724 | (800) 537-3821 | Lender has repeatedly used or required borrowers to use the services of this provider. |

Neither you nor the creditor previously has become obligated to make or accept this loan, nor is any such obligation made by the delivery or signing of this disclosure. The undersigned acknowledges receipt of the booklet "Settlement Costs," and if applicable the "Consumer Handbook on Adjustable Rate Mortgages", and a copy of this disclosure.

| Applicant RRICK GRIMES | Date | Applicant YOLANDA GRIMES | Date |
|---|---|---|---|

| Applicant | Date | Applicant | Date |
|---|---|---|---|

GFAITH TG 05/17/04

**FREMONT** INVESTMENT & LOAN

# A. Settlement Statement

B. Type of Loan 1.☐ FHA 2.☐ FmHA 3.☐ Conv. Unins. 4.☐ VA 5.☐ Conv. Ins.

| 6. File Number | 7. Loan Number | 8. Mortgage Insurance Case No. |
|---|---|---|
| PA005-4023 | 926000182384 | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts by to and by settlement agent are shown. Items marked (P.O.C.) were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name and Address of Borrower: Durr...  s & Yolanda Grimes 188-... St. Alb... NY 11412 | E. Name and Address of Seller Ronald J Cohen & Ann Eve Cohen 23 Stacy Lee Drive Newburgh, NY 12550 | F. Name and Address of Lender: Fremont Investment & Loan 5404 Cypress Center Ste 300 Tampa, Fl, 33609 |
|---|---|---|

| G. Property Location: 23 Stacy Lee Drive Newburgh, NY 12550 | H. Settlement Agent: Majestic Settlement Services 55 Washington Street, Suite.851 Brooklyn, NY 11201 | FINAL HUD-1 ACCEPTED BY FREMONT By: _KM_ Date:_1-5-05_ | I. Settlement Date 10/12/2005 |
|---|---|---|---|

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transactions | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower** | | **400. Gross Amount Due to Seller** | |
| 101. Contract Sales Price | 450,000.00 | 401. Contract Sales Price | 450,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (line 1400) | 22,915.82 | 403. | |
| 104. Payoff to Wilshire Credit Corporation | | 404. | |
| 105. Payoff to | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes   1/1   to 12/31 | 458.03 | 406. City/town taxes   1/1   to 12/31 | 458.03 |
| 107. County Taxes   to | | 407. County Taxes   to | |
| 108. Assessments   to | | 408. Assessments   to | |
| 109. School Taxes   to | | 409. School Taxes   to | |
| 110. Fuel Oil | 1367.50 | 410. Fuel Oil | 1367.50 |
| 111. Propane | 604.20 | 411. Propane | 604.20 |
| 112. Pool Closing | 500.00 | 412. Pool Closing | 500.00 |
| **120. Gross Amount Due From Borrower** | 476,045.55 | **420. Gross Amount Due to Seller** | 453,129.73 |
| **200. A...ts Paid By Or In Behalf Of Borrower** | | **500. Reductions In Amounts Due To Seller** | |
| 201. ...  or earnest money | 20,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 405,000.00 | 502. Settlement charges to seller (line 1400) | 27,850.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Borrowers Credit | | 504. Payoff ABN AMRO | 250,000.00 |
| 205. 2n Loan Proceeds | 21,366.88 | 505. Payoff Chase Bank One | 164,951.16 |
| 206. Early Closing | -3,000.00 | 506. Deposit | 20,000.00 |
| 207. Seller's Concession | 13,500.00 | 507. Early Closing | 3,000.00 |
| 208. | | 508. Seller's Concession | -13,500.00 |
| 209. | | 509. | |
| Adjustments for items unpaid by sellers | | Adjustments for items unpaid by sellers | |
| 210. City/town taxes   to | | 510. City/town taxes   to | |
| 211. County Taxes   to | | 511. County Taxes   to | |
| 212. Assessments   to | | 512. Assessments   to | |
| 213. School Taxes   7/1   to 6/30 | 1501.97 | 513. School Taxes   7/1   to 6/30 | 1501.97 |
| 214. Maintenance | 11.96 | 514. Maintenance Fee | 11.96 |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| **220. Total Paid By/For Borrower** | 464,580.81 | **520. Total Reduction Amount Due Seller** | 480,315.09 |
| **300. Cash At Settlement From/To Borrower** | | **600. Cash At Settlement To/From Seller** | |
| 301. C...ount due from borrower (line 120) | 476,045.55 | 601. Gross Amount due to seller (line 420) | 453,129.73 |
| 302. Less amounts paid by/for borrower (line 220) | 464,580.81 | 602. Less reductions in amt. due to seller (line 520) | 480,315.09 |
| 303. Cash ☒From ☐To   Borrower | 11,464.74 | 303. Cash ☒To ☐From   Seller | 27,185.36 |

ight: Borrower_____ Borrower_____                    Seller_____ Seller_____

## SETTLEMENT CHARGES

| | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| 700. | TOTAL SALES BROKER'S COMMISSION  Based on Price $  @  % | | |
| 701. $ | 10,800.00  to Easy Lifestyle | | |
| 702. $ | 15,120.00  to Century 21 Anaromo | | |
| 703. | Commission paid at settlement | | 25,920.00 |
| 800. | PAYABLE IN CONNECTION WITH LOAN: | | |
| 801. | Underwriting Fee to Fremont Investment & Loan | 894.00 | |
| 802. | Mortgage Broker Fee to  WCS Lending | 4,050.00 | |
| 803. | Application fee to WCS Lending | 295.00 | |
| 804. | Appraisal Fee to  POC ($300.00) | | |
| 805. | Flood Certification Fee paid to  Land America Tax and Flood Services | 9.50 | |
| 806. | Tax Service Fee to Land America Tax and Flood Services | 60.00 | |
| 807. | YSP to WCS Lending from Fremont Investment & Loan  POC ($6,075.00) | | |
| 808. | Processing fee to  WCS Lending | 945.00 | |
| 900. | ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE: | | |
| 901. | Interest from 10-12-05  to  11-01-05  @$93.76  day | 1,875.20 | |
| 902. | Hazard insurance premium for  months, To Allstate  POC 1,383.00 | | |
| 903. | Flood insurance premium for  yrs. To | | |
| 904. | Aggregate Adjustment | | |
| 1000. | RESERVES DEPOSITED WITH LENDER: | | |
| 1001. | Hazard insurance  4  months @ $115.25  per month | 461.00 | |
| 1002. | Mortgage insurance  months @ $  per month | | |
| 1003. | City property tax  12  months @ $172.00  per month | 2,064.00 | |
| 1004. | Town-Village property tax  months @ $  per month | | |
| 1005. | Flood insurance  months @ $  per month | | |
| 1006. | School tax  6  months @ $  420.85  per month | 2,525.10 | |
| 1007. | School Tax  months @ $  per month | | |
| 1008. | Adjustment | (2,718.94) | |
| 1100. | CHARGES: | | |
| 1101. | Courier Fee Wire to Majestic Settlement Services | 125.00 | |
| 1102. | Attorney Fee to Majestic Settlement Services Inc | 850.00 | |
| 1103. | Escrow Service Fee  to | | |
| 1104. | New Survey Inspection | 815.00 | |
| 1105. | Owner's Coverage to  Perfect Abstract | 524.88 | |
| 1106. | 2,300.00 | 1,234.00 | |
| 1107. | Fed Ex and Courier Fee to | | |
| 1108. | Endorsements to Perfect Abstract | 100.00 | |
| 1109. | Municipal Searches to Perfect Abstract | 540.00 | |
| 1110. | Confirmation Charge and Clearance fee to | | |
| 1200. | GOVERNMENT RECORDING AND TRANSFER CHARGES: | | |
| 1201. | Recording fees:  Deed $  150.00  Mortgage $  175  Releases $ 130 | 325.00 | 130.00 |
| 1202. | City/ county tax/stamps:  Deed $  Mortgage $ | | |
| 1203. | State tax stamps:  Deed $  Mortgage $  (1-4 pt lender POC $1012.50  ) | 3,210.00 | 1,800.00 |
| 1204. | RP 5217 | | |
| 1300. | ADDITIONAL SETTLEMENT CHARGES: | | |
| 1301. | Travel Fee to Majestic Settlement Services | 100.00 | |
| 1302. | Taxes to Perfect Abstract | 3,566.08 | |
| 1303. | | | |
| 1304. | | | |
| 1305. | | | |
| 1306. | | | |
| 1307. | | | |
| 1400. | TOTAL SETTLEMENT CHARGES | 22,915.82 | 27,850.00 |

# Exhibit E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE
--------------------------------------------------------------X  Index No.: 2006-10714

US BANK NATIONAL ASSOCIATION, AS TRUSTEE
FOR MASTER ASSET BACKED SECURITIES TRUST
2006-FRE1,

Plaintiff,

AMENDED
ANSWER

-against-

DARRICK GRIMES, YOLANDA GRIMES,
BENEFICIAL HOMEOWNER SERVICE
CORPORATION; "JOHN DOES" and "JANE DOES",
said names being fictitious, parties intended being
possible tenants or occupants of premises, and corporations,
other entities or persons who claim, or may claim, a lien
against the premises,

Defendants.
-------------------------------------------------------------X

Defendants, DARRICK GRIMES and YOLANDA GRIMES, as and for their

Verified Answer, by their attorneys, BONACIC, KRAHULIK & ASSOCIATES, LLP,

respectfully allege upon information and belief, as follows:

1.    Denies knowledge and information sufficient to form a belief as to each

allegation contained in paragraph "1" of the verified complaint.

2.    Admits the allegations contained in paragraph "2" of the verified

complaint.

3.    Admits the allegations contained in paragraph "3" of the verified

complaint to the extent that it is alleged that the Defendants signed a promissory note, but

denies knowledge and information sufficient to form a belief as to the remaining

allegations therein.

4.    Admits the allegation contained in paragraph "4" of the verified complaint to the extent that it is alleged that the Defendants signed a mortgage, but denies knowledge or information sufficient to form a belief as to the remaining allegations therein.

5.    Denies the allegations contained in paragraph "5" of the verified complaint.

6.    Denies each and every allegation contained in paragraphs "7", "8", "9", "10", "11" and "12" of the verified complaint.

7.    Denies knowledge and information sufficient to form a belief as to each allegation contained in paragraphs "14", "15" and "16" of the verified complaint.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

8.    Defendants, Darrick and Yolanda Grimes, suffered damages due to the fraud and misrepresentation in the inducement of a mortgage given by Plaintiff, or its agents.

WHEREFORE, Defendants demand judgment against Plaintiff:

(a)    dismissing the complaint;

(b)    awarding Defendants attorneys' fees, costs and disbursements of this action; and

(c)    awarding Defendants such other and further relief that this Court may deem just and proper.

Dated: Middletown, New York
July 9, 2007

ARIANA J. ANTONELLI, ESQ.
BONACIC, KRAHULIK & ASSOCIATES, LLP
90 Crystal Run Road, Suite 104

Middletown, New York 10941
(845) 703-3101

TO:    ROSICKI, ROSICKI & ASSOCIATES, P.C.
Attorneys for Plaintiff
51 E. Bethpage Road
Plainview, New York 11803
(516) 741-2585

CC:    McCABE, WEISBERG & CONWAY, P.C.
Attorneys for Co-Defendant BENEFICIAL
    HOMEOWNER SERVICE CORP.
53 West 36th Street, Suite 205
New York, New York  10018
(917) 351-1188

# Exhibit F

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE

---------------------------------------------------------------X

US BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR
MASTR ASSET BACKED SECURITIES TRUST 2006-
FRE1,

Index No.: 06 - 10714

D/O/F: 12/26/06

                                        Plaintiff,

VERIFIED COMPLAINT

-against-

DARRICK GRIMES; YOLANDA GRIMES; BENEFICIAL
HOMEOWNER SERVICE CORPORATION;
"JOHN DOES" and "JANE DOES", said names being
fictitious, parties intended being possible tenants or occupants
of premises, and corporations, other entities or persons who
claim, or may claim, a lien against the premises,

                                        Defendants.

---------------------------------------------------------------X

Plaintiff, by its attorney, ROSICKI, ROSICKI & ASSOCIATES, P.C., complaining of
the Defendant(s) alleges, upon information and belief as follows:

1.    At all times hereinafter mentioned, plaintiff US BANK NATIONAL
ASSOCIATION, AS TRUSTEE FOR MASTR ASSET BACKED SECURITIES TRUST 2006-
FRE1 was and still is duly organized and existing under the laws of the State of South Carolina.

2.    At all times hereinafter mentioned, the defendants were, and still are, residents,
corporations and/or bodies politics, duly authorized to reside and/or exist in and under the laws
of New York State.

3.    On or about October 12, 2005, DARRICK GRIMES; YOLANDA GRIMES
executed and delivered to Fremont Investment & Loan, a certain note bearing date that day,
whereby DARRICK GRIMES; YOLANDA GRIMES covenanted and agreed to pay the sum of
$405,000.00, which sum, with interest on the unpaid balance thereof, to be computed from the
date of said note, at a rate variable in accordance with the aforesaid instrument, with the initial
rate being 8.450 percent per annum, or such other adjusted rate as provided for in said
agreement, by payments of $3,099.76 on December 1, 2005 and thereafter in payments of
$3,099.76 on the like date of each subsequent month subject to change in accordance with
changes in interest rate, until said note is fully paid, except that the final payment of principal
and interest remaining due, if not sooner paid, shall become due and payable on November 1,
2035.

4.    As collateral security for the payment of said indebtedness, the aforesaid
defendant(s) DARRICK GRIMES; YOLANDA GRIMES, also executed, acknowledged and
delivered to Fremont Investment & Loan, a mortgage dated October 12, 2005 and recorded in the

County of Orange on December 6, 2005 in Liber/Reel 12012 of Mortgages, at page 378. The mortgage tax was duly paid. The aforesaid instruments were assigned to Plaintiff by assignments(s). Plaintiff is still the owner and holder of the aforementioned instrument(s).

Said mortgaged premises being known as and by street address:

23 Stacy Lee Drive, Newburgh, NY 12550, bearing tax map designation:

Section:  106 Block:  2 Lot(s): 4.2

which premises are more fully described in Schedule "A," annexed hereto and made a part hereof.

5.    . Said premises are subject to covenants, restrictions, easements of record, prior mortgages and liens, and amendments thereto, if any; to any state of facts an accurate survey may show; railroad consents and sewer agreements, and to utility agreements, municipal and governmental zoning, rules, regulations and ordinances, if any.

6.    That the total monthly payment due as of default date to plaintiff is $3,807.87.

7.    That the Mortgagors, their successors, assigns and/or transferees, have failed to comply with the terms and conditions of said above named instrument[s] by failing or omitting to pay the installment which became due and payable as of August 1, 2006 and also by failing or omitting to pay the installment which became due and payable each and every month thereafter, to the date hereof, although duly demanded.

8.    That the terms of the above described instruments provide: (1) that the whole of said principal sum and interest shall become due at the option of the Mortgagee after default in the payment of any installment of principal or of interest; (2) that upon any default the Mortgagor will pay to the Mortgagee any sums paid for taxes, charges, assessments, and insurance premiums upon said mortgaged premises; (3) that in case of sale under foreclosure, the premises may be sold in one parcel.

9.    Pursuant to the terms of said instrument[s] notice of default has been duly given to the defendants if required, and the period to cure, if any, has elapsed and by reason thereof, Plaintiff has elected and hereby elects to declare immediately due and payable the entire unpaid balance of principal.

10.    That the balance of principal due upon said note and mortgage as of the date of said default and as of the time of this Complaint is $402,967.36 plus interest from July 1, 2006.

11.    That in order to protect its security, plaintiff may be compelled during the pendency of this action to make repairs to, board, secure, protect and maintain the premises, to pay taxes, assessments, water rates, sewer rentals, insurance premiums, mortgage insurance premiums, if there be any, and other charges affecting the premises, and the plaintiff requests that any sum so paid be added to the sum otherwise due, with interest as provided in the

aforesaid instruments, and be deemed secured by said instrument[s] and adjudged a valid lien on the premises hereinabove described.

12.    That the plaintiff requests that in the event this action proceeds to Judgment of Foreclosure and Sale, said premises be sold subject to covenants, restrictions and easements, prior mortgages and liens, and amendments, if any, of record; any state of facts an accurate survey may show; restrictions, regulations, ordinances and zoning ordinances of any municipal or governmental authority having jurisdiction thereof; and municipal, departmental and other governmental violations, if any, affecting the premises; and real estate taxes, sewer rents, water charges, if any, open of record.

13.    That no other action has been commenced at law or otherwise for the recovery of the sum or any part thereof secured by the said instrument[s].

14.    That the defendants all have or claim to have some interest in or lien[s] upon the said mortgaged premises, or some part thereof, which interest or lien[s], if any, has [have] accrued subsequently to the lien[s] of the said mortgage[s] or was in express terms or by law made subject thereto, or has [have] been duly subordinated thereunto.

15.    That the defendants "JOHN DOES" and "JANE DOES" may be tenants or may be in possession of the aforementioned premises, or may be corporations, other entities or persons who claim, or may claim, a lien against the premises.

16.    That the basis for naming any political subdivision, governmental agency or similar body, or the holder of a security interest in personal property, if any, is set forth as Exhibit "B".

WHEREFORE, plaintiff demands judgment that the defendants and all persons claiming under them subsequent to the filing of the Notice of Pendency of this action in the County of Orange may be forever barred and foreclosed from all right, title, claim, lien and equity of redemption in said mortgaged premises, and each and every part thereof, except the right of the United States of America and its political subdivision, if it or they be a party to this action, to redeem as provided for in the applicable laws; that the said premises may be decreed to be sold according to law; that the amount of principal due the plaintiff on said note and mortgage may be adjudged in the sum of $402,967.36 plus interest from July 1, 2006, and that from the money arising from the sale, plaintiff be paid the amount of $402,967.36 principal due it on said note and mortgage with interest and late charges that may be due and owing to the time of such payment plus the expenses of sale and the costs and expenses of this action, together with any sum which may be paid by the plaintiff for repairs to, boarding, securing, protecting and maintaining the premises, taxes, charges, assessments and insurance premiums upon said mortgaged premises, with appropriate interest thereon so far as such moneys properly applicable

JUN-06-2007  16:16        BONACIC KRAHULIK                    845 703 3110      P.18
Jan. 12. 2007  3:44PM                                        No. 6079   P. 7

thereto will pay the same; that the defendants DARRICK GRIMES; YOLANDA GRIMES be adjudged to pay any deficiency which may remain; that a Receiver, upon plaintiff's application therefore, be forthwith appointed for said mortgaged premises for the benefit of the plaintiff, with all powers of receivers in such actions, and that the plaintiff have such other and further relief as may be just and proper in the premises, together with attorney's fees, costs and disbursements of this action.

Dated: December 21, 2006
     Fishkill, New York

Daniel Wade, Esq.
**ROSICKI, ROSICKI & ASSOCIATES, P.C.**
Attorneys for Plaintiff
2 Summit Court, Suite 301
Fishkill, NY 12524
(845) 897-1600

JUN-06-2007  16:16          BONACIC KRAHULIK                          845 703 3110      P.19
Jan. 12. 2007  3:44PM                                                No. 6079   P. 8

## Schedule A

Title Number: 06-052358

ALL THAT PIECE, OR PARCEL OF LAND, situate, lying and being in the Town of Newburgh, County of Orange, State of New York, being designated as Lot Number 11 on a map entitled, Subdivision Plan Lands of Parcel Development Corp. dated May 20, 1986, filed in the Orange County Clerk's Office on June 23, 1986 as Map Number 7681, being more particularly bounded and described as follows:

BEGINNING at a point in the southwesterly line of the existing Stacy Lee Drive, a 60 foot right-of-way and private road, said point being North 67 degrees 37 minutes West, 440.00 feet from the intersection of the said southwesterly line of Stacy Lee Drive with the westerly line of the existing Frozen Ridge Road, said point also being on the division line between Lot Number 12, of the above mentioned filed map, on the east and the Lot Number 11, herein described on the west;

THENCE along the last mentioned division line, South 22 degrees 23 minutes West, 238.39 feet to a point on the division line between the lands now or formerly of Frozen Ridge Acres on the south and Lot Number 11 herein described on the north;

THENCE along the last mentioned line, North 72 degrees 40 minutes West, 301.17 feet to a point on the division line between Lot Number 10, of the above mentioned filed map, on the west and Lot Number 11 herein described on the east;

THENCE along the last mentioned division line, North 22 degrees 23 minutes East, 264.90 feet to a point in the aforementioned southwesterly line of Stacy Lee Drive;

THENCE along the last mentioned division line, South 67 degrees 37 minutes East, 300.00 feet to the point or place of BEGINNING.

TOGETHER WITH, along with others, the right of ingress and egress, as well as the right to place utilities over a 60 foot right-of-way, known as Stacy Lee Drive, a private road as shown on the aforementioned filed Map Number 7681.

Section:    106      Block:    2      Lot:    4.2

## ATTORNEY'S VERIFICATION

STATE OF NEW YORK    )
                        ) ss:

COUNTY OF DUTCHESS  )

      Daniel Wade, Esq., the undersigned, an attorney duly admitted to practice law before the Courts of the State of New York, affirms under the penalty of perjury:

      That (s)he is an associate of ROSICKI, ROSICKI & ASSOCIATES, P.C., attorney of record for plaintiff in the above entitled action; that (s)he has read the foregoing Summons and Complaint and knows the contents thereof; that the same is true to affiant's knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters (s)he believes it to be true.

      The reason that this verification is made by the undersigned and not by plaintiff is because plaintiff maintains its principal place of business outside Dutchess County; that being the County in which your affiant maintains an office for the practice of law.

      The grounds of deponent's belief as to all matters not stated upon deponent's knowledge are based upon the records of plaintiff in deponent's possession.

Dated: December 21, 2006
Fishkill, New York

                                     Daniel Wade, Esq.

JUN-06-2007  16:16        BONACIC KRAHULIK                845 703 3110      P.21
Jan. 12. 2007  3:44PM                                    No. 6079  P. 10

Index No.:

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF ORANGE

----------------------------------------------------------------

US BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR
MASTR ASSET BACKED SECURITIES TRUST 2006-FRE1,

Plaintiff,

-against-

DARRICK GRIMES; YOLANDA GRIMES, et al.,

Defendants.

----------------------------------------------------------------

## SUMMONS AND VERIFIED COMPLAINT

**ROSICKI, ROSICKI & ASSOCIATES, P.C.**
Attorneys for Plaintiff
2 Summit Court, Suite 301
Fishkill, NY 12524
(845) 897-1600
(845) 897-2648
RR&A #: 06-052332

**EXHIBIT B**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE
------------------------------------------------------X   Index No.: 2006-10714

US BANK NATIONAL ASSOCIATION,
 AS TRUSTEE FOR MASTER ASSET BACKED
SECURITES TRUST 2006-FRE1,

                                                    VERIFIED ANSWER
                    Plaintiff,

        -against-

DARRICK GRIMES, YOLANDA GRIMES,
BENECIRICAL HOMEWONER SERVICE CORPORATION,
                    Defendants.
------------------------------------------------------X

        Defendants, DARRICK GRIMES and YOLANDA GRIMES , as and for its

Verified Answer, by its attorneys, BONACIC, LoBIONDO & KRAHULIK, LLP,

respectfully alleges upon information and belief, as follows:

        1.      Denies knowledge or information sufficient to form a belief as to each

allegation contained in paragraphs "1" of the Verified Complaint.

        2.      Admits the allegations contained in paragraph "2" of the Verified

Complaint.

        3.      Admits the allegation contained in paragraph "3" of the Verified

        Complaint to the extent that it is alleged that the Defendants signed a

        promissory note, but denies knowledge or information sufficient to form a

        belief as to the remaining allegations therein.

        4.      Admits the allegation contained in paragraph "4" of the Verified

        Complaint to the extent that it is alleged that the Defendants signed a

        mortgage, but denies knowledge or information sufficient to form a belief

        as to the remaining allegations therein.

        5.      Denies the allegation contained in paragraph "5" of the Verified

        Complaint.

JUN-06-2007  16:16        BONACIC KRAHULIK                         845 703 3110      P.24

6.    Denies each and every allegation contained in paragraphs "7", "8",

"9", "10", "11", "12", of the Verified Complaint.

7.    Denies  knowledge or information sufficient to form a belief as to each

allegation contained in paragraphs "14", "15 and "16" of the Verified

Complaint.

WHEREFORE, Defendant demands judgment against Plaintiff:

(a)    dismissing the Complaint;

(b)    awarding Defendant the attorneys' fees, costs and disbursements of this

action; and

(c)    awarding Defendant such other and further relief that this Court may deem

just and proper.

Dated:  Warwick, New York
        January 16,  2007

ROBERT E. KRAHULIK, ESQ.
BONACIC, LoBIONDO & KRAHULIK, LLP
Attorneys for Defendant
90 Crystal Run Road, Suite 104
Middletown, New York  10941
(845) 703-3100

TO:    Daniel Wade, Esq.
       Rosicki, Rosicki & Associates, P.C.
       Attorneys for Plaintiff
       2 Summit Court, Suite 301
       Fishkill, New York  12524

STATE OF NEW YORK)

                                        SS:

COUNTY OF ORANGE)

    Darrick Grimes, being duly sworn, says:

    I am the defendant in the action herein; I have read the annexed Verified Answer, know the contents thereof, and the same are true to my knowledge, except those matters therein which are stated to be alleged on information and belief and as to those matters, I believe them to be true.

                                  Darrick Grimes

Sworn to before me on
January 16, 2007.

Notary Public

**Victor Guzman, Esq.**
**02GU6011244**
**Orange County**
**Notary Public**
**Expires August, 2010**

certify that the annexed

has been compared by me with _____ original and found to be a true and complete copy _____ :of.

say that: I am the attorney of record, or of counsel with the attorney(s) of record, for

_____ . I have read the annexed

know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged on informatio and belief, and as to those matters I believe them to be true. My belief, as to those matters therein not stated upo knowledge. is based upon the following.

The reason I make this affirmation instead of _____ is

I affirm that the foregoing statements are true under penalties of perjury.
Dated:

.....................................................
*(Print signer's name below signature)*

**STATE OF NEW YORK, COUNTY OF** _____    ss:

being sworn says: I am

in the action herein; I have read the annexed

know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged or information and belief. and as to those matters I believe them to be true.

the _____ of

a corporation, one of the parties to the action; I have read the annexed

know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged on information and belief, and as to those matters I believe them to be true.

My belief, as to those matters therein not stated upon knowledge, is based upon the following:

Sworn to before me on _____ , 20

.....................................................
*(Print signer's name below signature)*

**STATE OF NEW YORK, COUNTY OF   ORANGE**    ss:

Carol Ann Sciarra

being sworn says: I am not a party to the action. am over 18 years of age and reside at 10 S. Lynn Street, Warwick, NY 10990

On January 16 _____ , 20 07 I served a true copy of the annexed   **Verified Answer** in the following manner:

by mailing the same in a sealed envelope. with postage prepaid thereon, in a post-office or official depository of the U.S. Postal Service within the State of New York, addressed to the last-known address of the addressee(s) as indicated below:

by delivering the same personally to the persons at the address indicated below:

by transmitting the same to the attorney by electronic means to the telephone number or other station or other limitation designated by the attorney for that purpose. In doing so I received a signal from the equipment of the attorney indicating that the transmission was received, and mailed a copy of same to that attorney, in a sealed envelope, with postage prepaid thereon, in a post office or official depository of the U.S. Postal Service within the State of New York, addressed to the last-known address of the addressee(s) as indicated below:

by depositing the same with an overnight delivery service in a wrapper properly addressed. Said delivery was made prior to the latest time designated by the overnight delivery service for overnight delivery. The address and delivery service are indicated below:

Daniel Wade, Esq.
Rosicki, Rosicki & Associates, P.C.
2 Summit Court, Suite 301
Fishkill, NY 12524

Sworn to before me on January 16 _____ , 20 07

.....................................................

.....................................................
Carol Ann Sciarra *(Print signer's name below signatur)*

US BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR MASTER ASSET BACKED SECURITIES
TRUST 2006-FRE1,                              Plaintiff

        -against-

DARRICK GRIMES, YOLANDA GRIMES, BENECIRICAL HOMEOWNER SERVICE CORPORATION,

                              Defendants

VERIFIED ANSWER

### BONACIC, LoBIONDO & KRAHULIK, LLP

*Attorney(s) for* Defendants, Darrick Grimes and Yolanda Grimes

90 CRYSTAL RUN ROAD, SUITE 106
MIDDLETOWN, NEW YORK 10941
(845) 703-3100

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.*

Dated: 1/16/07

Signature................................................

Print Signer's Name........ Robert E. Krahulik .............

*is hereby admitted.*

*Service of a copy of the within*

*Dated:*

*Attorney(s) for*

*PLEASE TAKE NOTICE*                                                    20

☐  NOTICE OF ENTRY
   *that the within is a (certified) true copy of a
   entered in the office of the clerk of the within named Court on*

☐  NOTICE OF SETTLEMENT
   *that an Order of which the within is a true copy will be presented for settlement to the
   one of the judges of the within named Court,*
   Hon.
   at
   on                        20          , at                    M.

*Dated:*

### BONACIC, LoBIONDO & KRAHULIK, LLP

*Attorney(s) for* Defendants, Darrick Grimes and Yolanda

90 CRYSTAL RUN ROAD, SUITE 106
MIDDLETOWN, NEW YORK 10941
(845) 703-3100

To:

*Attorney(s) for*

JUN-06-2007  16:17    BONACIC KRAHULIK    845 703 3110    P.28

**EXHIBIT C**

JUN-06-2007  16:17          BONACIC KRAHULIK                  845 703 3110      P.29

23 Stacy Lee Drive
Newburgh, NY 12550
February 26, 2007

**VIA REGULAR MAIL AND FACSIMILE**

Mr. Lee R. Mitau (612) -303-0799
Executive Vice President, Secretary and General Counsel
U.S. Bancorp
800 Nicollet Mall
Minneapolis, Minnesota 55402

Fremont Investment & Loan (714) 961-5293
2727 E. Imperial Highway
Brea, California 92821
Attn: Ms. Maureen Barlow

State of New York (718) 8103
Banking Department
One State Street Plaza
New York, New York 10004-1417

Re: Loan No.: 1146013644 and Fremont Loan Nos. 6000182284 & 6000182284
        Property Address: 23 Stacy Lee Drive, Newburgh, New York 12550

New York File No.: 07 M 6

Dear Mr. Mitau:

    I am writing this letter to your attention for assistance in resolving a predatory lending issue and to bring to alert you that a fraudulent loan transaction took place on or before October 12, 2005 involving Fremont Investment and Loan and WCS Lending LLC. Wells Fargo & Co. and/or America's Servicing Company sold, assigned or transfer the mortgage loan to your institution in February 2006.

    This letter shall serve as our revised terms for a Loan Modification to the Mortgage and Note held by and assigned, sold or transfer to US Bank National Association, as Trustee for Master Asset Backed Securities Trust 2006-FRE1 ("US Bancorp"). As previously communicated with your department, we believe a fraudulent transaction took place prior to closing on the above-referenced loan. Fremont Investment & Loan ("Fremont") is clearly taking the position if any fraudulent transaction was committed by WCS Lending LLC, the independent mortgage broker and they have no responsibility for such actions. We are pursuing our position that a fraudulent act was committed by WCS Lending LLC and Fremont and that the contractual obligations should be null and voided or the mortgage loan should be modify to reflect fraud. In any event, we are stating that we are victims of predatory lending and mortgage discrimination and would like our mortgage to reflect such fraudulent actions.

    At the loan approval stage, Fremont has complete and total decision making authority for deciding whether to make a loan. They set the terms of the loan, including the interest rate, loan fees, maturity date, loan-to-value ratio, and loan type (conventional, adjustable rate, FHA, and so on). This is a critical factor and important issue, because predatory lending and mortgage discrimination often involves unfair terms and conditions for loans, and there is no reason to

believe that a lending institution may have established policies and procedures of shifting "credit rationing" -- where customers perceived to be high risk are denied loans or are shifted toward "risk-based pricing" -- where these same customers are simply charged a higher price for their loans. We are requesting an intensive review by state and federal regulators regarding Fremont's underwriting policies and procedures to reveal empirical evidence of mortgage discrimination against minority customers. It is clear that WCS Lending chose Fremont based upon certain underwriting guidelines. Fremont's underwriting loan guidelines should be carefully examined for discrimination in overages, defined as the excess of the final contractual interest rate over the lender's official rate when it first commits to a loan.

We are also requesting state and federal regulators to review America's Servicing Company's policies and procedures regarding taking a harsher stance in foreclosure decisions against minority customers. We will be seeking anecdotal evidence from Wells Fargo & Co. and America's Servicing Company for imposing differential treatment in pursuing foreclosure actions based upon race or ethnicity. Our chief complaint involves the imposing of differential treatment or disparate impact on certain minority customers when decisions are determined based upon race or ethnicity. It is clear that unfair terms and conditions are imposed on minority customers when mortgage loans are structured and interest rates are determined. Fremont may be more likely to charge higher interest rates and/or fees for minority customers they perceived to be risky, rather then denying them financing altogether. Likewise, America's Servicing Company may be more likely to make the decision to foreclosure on minority customers' home because they perceive them to be more risky and unlikely to find a solution for a loan work-out.

Currently, we are requesting assistance from various state and federal governmental agencies to act as a mediator in this matter to avoid costly legal expenses. We have discussed our situation with legal counsel and await a response from US Bancorp and America's Servicing Company. This proposal reflects all the damages suffered under the current mortgage held by US Bancorp. In the interest of resolving this matter in a timely manner, we are willing to negotiate an amicable settlement.

While it is our desire to resolve this matter in an amicable fashion, we are willing to enter into a loan modification agreement only if we can mitigate all of the damages we have suffered under the mortgage currently held by US Bancorp. The table on page 3 reflects in detail our proposed terms for a loan modification we would be willing to agree upon. The fact that America's Servicing Company and or US Bancorp has not responded in a timely fashion to prior written communications and is not willing to discuss any proposed work-out arrangement to date or waive late charges, certain interest payments or reduce the interest rate (to reflect the 5.00%) does not make us whole or mitigate the damages we have incurred.

The unpaid principal balance is being re-adjusted to reflect the fraudulent mortgage loan transactions originated by Fremont and WCS Lending LLC. It does not address the unfair acts and deceptive business practice of the lender and/or mortgage broker in this matter.

A final condition for entering into the loan modification agreement would be that our credit reports be updated to reflect that there was a dispute with respect to the mortgage since October 12, 2005 and July 1, 2006. This is a final condition for entering into any form of loan modification agreement that would be mandatory. Any corrections and/or amendments to our credit reports would be required to be reported upon execution of the loan agreement promptly and the major credit report agencies should be instructed in writing to amended and or delete all negative or derogatory data from our credit histories and updated to reflect that there was a dispute with respect to the mortgage and all payments have been timely made.

Our current credit reports have been severely damaged while we have been trying to re-negotiate the terms of this mortgage. Had we been properly informed, we would have never entered into such a transaction because it was not beneficial to us since the interest rate of 8.45% was substantially higher than the 7.00% interest rate we were anticipating receiving.

We propose that the terms of the mortgage be revised to reflect the following:

Re-Adjusted Unpaid Principal Balance: $339, 660.58 *(a)*
Reduction of Interest Rate:                           5.00%
Waive Interest Due:                      $30,198.40
Waive Late Fees:                         $1,583.64
Waive Recoverable Corporate Advance      $1,522.87
Maturity Date                            November 30, 2035 (Fixed **30 years**)

Please review our proposed terms with US Bancorp and senior management of America's Servicing Company and advise us in writing on or before March 31, 2007, whether these terms are acceptable.

If these terms are acceptable would you kindly calculate the new monthly payment under the proposed terms? Our first payment under the modified loan would be due on June 1, 2007.

We look forward to an amicable resolution in this matter.

Very truly yours,

Darrick Grimes

Yolanda Grimes

cc: U.S. Department Housing and Urban Development
    U.S. Comptroller of Currency, Customer Service Group

(a) This amount reflects a deduction of $67,264.28 from the fraudulent transaction, detailed are as follows:
$11,365 in broker's fees and miscellaneous fees and $40,505.43 mortgage interest paid year to date from
Closing.

23 Stacy Lee Drive
Newburgh, NY 12550
March 7, 2007

**VIA REGULAR MAIL AND FACSIMILE**

Mr. Lee R. Mitau (612) -303-0799
Executive Vice President, Secretary and General Counsel
U.S. Bancorp
800 Nicollet Mall
Minneapolis, Minnesota 55402

Fremont Investment & Loan (714) 961-5293
2727 E. Imperial Highway
Brea, California 92821
Attn: Ms. Maureen Barlow

State of New York (718) 8103
Banking Department
One State Street Plaza
New York, New York 10004-1417
Attn: Carmen Gomez

Re: Loan No.: 1146013644 and Fremont Loan Nos. 6000182284 & 6000182284
        Property Address: 23 Stacy Lee Drive, Newburgh, New York 12550

New York File No.: 07 M 6

Dear Mr. Mitau:

        This letter shall serve the purpose to follow-up on my previous complaint and letter of
February 26, 2007 and provide further supporting documentation that a predatory loan was
originated by Fremont Investment and Loan in September/October 2005. WCS Lending LLC has
responded to our complaint made to the New York State Banking Department and provided us
with a copy of their New York Pre-Application Disclosure and Broker Fee Agreement and Good
Faith Estimate, **both dated September 13, 2005** and both were *fraudulently signed* by someone
at WCS Lending LLC other than Darrick and Yolanda Grimes.  As previously stated in prior
communications and supported by e-mail communications and various closing documents
provided by Fremont Investment and Loan the signatures do not match and were fraudulently
signed by WCS Lending LLC or Fremont Investment and Loan.  We signed the loan application
provided by WCS Lending LLC on September 20, 2005 and again at closing on October 12,
2005, which was the first time we were able to examine the disclosure documents at Closing by
Fremont Investment and Loan and WCS Lending LLC.  We did not sign any pre-disclosure
documentation or Good Faith Estimate with an interest rate of **8.0%**.  As a matter of fact the only
pre-disclosure documentation we signed had an indicated interest rate of 7.0%interest rate and not
**8.0%.  Mortgage fraud and mortgage discrimination was committed by WCS Lending LLC
and Fremont Investment and Loan for failure to properly disclosed the true terms of the
transaction, submitting falsified documentation** to obtain a higher loan commitment,
fraudulently signing borrowers name and signature to disclosure documents and increasing the
disclosure interest rate from **7.0%** to **8.45%. at closing sandbagging borrowers in front of
Sellers without recourse and jeopardizing the borrowers good faith down-payment deposit.**

Please review the prior communications and note that our signatures do not match or compare to any other the closing documents signed on October 12, 2005. Furthermore please review our signatures in comparison to the pre-disclosure documents that were provided by WCS Lending LLC to the final closing documents from Fremont Investment and Loan's response letter to the New York State Banking Department.

This is a classic case of _**Bait and Switch**_ and WCS Lending LLC committed mortgage fraud and Fremont Investment and Loan directly or indirectly assisted this mortgage broker with such act or activities. Mortgage Fraud is a criminal act and I am immediately alerting you that a fraudulent loan transaction took place on or before October 12, 2005 involving Fremont Investment and Loan and WCS Lending LLC. As previously stated by us WCS Lending submitted a fraudulent loan application to Fremont Investment and Loan and immediately sold, assigned or transfer the first mortgage to Wells Fargo & Co. and/or America's Servicing Company for mortgage servicing and sold, assigned or transfer the mortgage loan to your institution in February 2006.

This letter shall serve as our revised terms for a Loan Modification to the Mortgage and Note held by and assigned, sold or transfer to US Bank National Association, as Trustee for Master Asset Backed Securities Trust 2006-FRE1 ("US Bancorp"). As previously communicated with your department, we believe a fraudulent transaction took place prior to closing on the above-referenced loan on or about September 13, 2005 prior to the mortgage loan application being signed on September 20, 2005. Fremont Investment & Loan ("Fremont") is clearly taking the position if any fraudulent transaction was committed by WCS Lending LLC, the independent mortgage broker and they have no responsibility for such actions. As previously stated by Fremont Investment and Loan in their response letter the loans were approved on September 16, 2005 before we signed the loan application.

We will be pursuing our position that a fraudulent act(s) were committed by WCS Lending LLC and Fremont Investment and Loan and that the contractual obligations should be null and voided or the mortgage loan should be modify to reflect mortgage fraud. **In any event, we are stating that we are victims of predatory lending and mortgage discrimination and would like our mortgage to reflect such fraudulent actions immediately.**

At the loan approval stage, Fremont has complete and total decision making authority for deciding whether to make a loan. They set the terms of the loan, including the interest rate, loan fees, maturity date, loan-to-value ratio, and loan type (conventional, adjustable rate, FHA, and so on). This is a critical factor and important issue, because predatory lending and mortgage discrimination often involves unfair terms and conditions for loans, and there is no reason to believe that a lending institution may have established policies and procedures of shifting "credit rationing" – where customers perceived to be high risk are denied loans or are shifted toward "risk-based pricing" – where these same customers are simply charged a higher price for their loans. We are requesting an intensive review by state and federal regulators regarding Fremont's underwriting policies and procedures to reveal empirical evidence of mortgage discrimination against minority customers. It is clear that WCS Lending chose Fremont based upon certain underwriting guidelines. Fremont's underwriting loan guidelines should be carefully examined for discrimination in overages, defined as the excess of the final contractual interest rate over the lender's official rate when it first commits to a loan.

We will be requesting state and federal regulators to review WCS Lending LLC and Fremont Investment and Loan for their unfair business practices and policies for criminal

behavior and activities in the mortgage markets. We are also going to request that America's Servicing Company's policies and procedures regarding taking a harsher stance in foreclosure decisions against minority customers be re-evaluate in light of this new evidence. We will be seeking anecdotal evidence from Wells Fargo & Co. and America's Servicing Company for imposing differential treatment in pursuing foreclosure actions based upon race or ethnicity. Our chief complaint involves the imposing of differential treatment or disparate impact on certain minority customers when decisions are determined based upon race or ethnicity. It is clear that unfair terms and conditions are imposed on minority customers when mortgage loans are structured and interest rates are determined. Fremont may be more likely to charge higher interest rates and/or fees for minority customers they perceived to be risky, rather then denying them financing altogether. Likewise, America's Servicing Company may be more likely to make the decision to foreclosure on minority customers' home because they perceive them to be more risky and unlikely to find a solution for a loan work-out.

Currently, we are requesting assistance from various state and federal governmental agencies to act as a mediator in this matter to avoid costly legal expenses. We have discussed our situation with legal counsel and await a response from US Bancorp and America's Servicing Company. This proposal reflects all the damages suffered under the current mortgage held by US Bancorp. In the interest of resolving this matter in a timely manner, we are willing to negotiate an amicable settlement.

While it is our desire to resolve this matter in an amicable fashion, we are willing to enter into a loan modification agreement only if we can mitigate all of the damages we have suffered under the mortgage currently held by US Bancorp. The table on page 3 reflects in detail our proposed terms for a loan modification we would be willing to agree upon. The fact that America's Servicing Company and or US Bancorp has not responded in a timely fashion to prior written communications and is not willing to discuss any proposed work-out arrangement to date or waive late charges, certain interest payments or reduce the interest rate (to reflect the 5.00%) does not make us whole or mitigate the damages we have incurred.

The unpaid principal balance is being re-adjusted to reflect the fraudulent mortgage loan transactions originated by Fremont and WCS Lending LLC. It does not address the unfair acts and deceptive business practice of the lender and/or mortgage broker in this matter.

A final condition for entering into the loan modification agreement would be that our credit reports be updated to reflect that there was a dispute with respect to the mortgage since October 12, 2005 and July 1, 2006. This is a final condition for entering into any form of loan modification agreement that would be mandatory. Any corrections and/or amendments to our credit reports would be required to be reported upon execution of the loan agreement promptly and the major credit report agencies should be instructed in writing to amended and or delete all negative or derogatory data from our credit histories and updated to reflect that there was a dispute with respect to the mortgage and all payments have been timely made.

Our current credit reports have been severely damaged while we have been trying to re-negotiate the terms of this mortgage. Had we been properly informed, we would have never entered into such a transaction because it was not beneficial to us since the interest rate of 8.45% was substantially higher than the 7.00% interest rate we were anticipating receiving.

We propose that the terms of the mortgage be revised to reflect the following:

Re-Adjusted Unpaid Principal Balance: $339, 660.58 *(a)*

| | |
|---|---|
| Reduction of Interest Rate: | 5.00% |
| Waive Interest Due: | $30,198.40 |
| Waive Late Fees: | $1,583.64 |
| Waive Recoverable Corporate Advance | $1,522.87 |
| Maturity Date | November 30, 2035 (Fixed 30 years) |

Please review our proposed terms and advise us in writing on or before March 31, 2007, whether these terms are acceptable.

If these terms are acceptable would you kindly calculate the new monthly payment under the proposed terms?  Our first payment under the modified loan would be due on June 1, 2007.

We look forward to an amicable resolution in this matter.

Very truly yours,

/s/ Darrick Grimes

Darrick Grimes

Yolanda Grimes

cc: U.S. Department Housing and Urban Development
    U.S. Comptroller of Currency, Customer Service Group

(a) This amount reflects a deduction of $67,264.28 from the fraudulent transaction, detailed are as follows: $11,365 in broker's fees and miscellaneous fees and $40,505.43 mortgage interest paid year to date from Closing.

**Exhibit D**

23 Stacy Lee Drive
Newburgh, New York 12550
March 5, 2007

Consumer Complaints (Fax) 415-393-1962
Division of Banking Supervision and Regulation
Federal Reserve Bank of San Francisco
101 Market Street, Mail-Sop 945
San Francisco, California 94105

Federal Deposit Insurance Corporation (Fax) 703-812-1020
Consumer Response Center
2345 Grand Boulevard, Suite 100
Kansas City, MO 64108-2638

California Department of Financial Institutions
7575 Metropolitan Drive, Suite 108
San Diego, California 92108
Attn: Mr. Albert Marquez

Florida, Office of Financial Regulation
200 E. Gaines Street
Tallahassee, Florida 32399
Attn: Enforcement Division

Re: Fremont Investment and Loan; America's Servicing Company, WCS Lending LLC
and U.S. Bank,    National Association, as Trustee for Master Asset Backed Securities
Trust 2006-FRE-1 as assignee and successor

Dear Consumer Complaint Units:

This letter shall serve the purpose to file a formal complaint
against Fremont Investment and Loan, Fremont General Corporation and WCS Lending
LLC for unfair acts and deceptive lending in the sub-prime loan market. This Complaint
outlines the deceptive and unfair business acts of predatory lending and fraudulent loans
conducted by Fremont.

"Why do you believe you are discriminated against":

1. Defendant, Fremont Investment and Loan ("Fremont"), is a wholly
   owned subsidiary of defendant, Fremont General Corporation, a
   banking holding company and financial holding company, a publicly

held company traded on the New York Stock Exchange (except where otherwise noted, both defendants are collectively referred to as "Fremont or "Fremont General").

2. From at least 2000 until present, Fremont's business has included regularly engaging in residential real estate-related transactions and regularly extended credit to persons. Fremont's home mortgage loans are residential real estate-related transactions within the meaning of the Fair Housing Act, 42 U.S.C. $ 3605, Fremont is a creditor as that term is defined by section 702 (e) of the Equal Credit Opportunity Act, 15 U.S.C. $ 1692a(e), and therefore, subject to the requirements of the Equal Credit Opportunity Act and its implementing Regulation B, as amended, 12 C.F.R. Part 202, in effect on or after March 23, 1977.

3. Fremont's brokers ("*WCS Lending LLC*") are entities that bring borrowers and Fremont together for the borrower to obtain mortgage loans, Fremont solicits and receives applications for credit, primarily through mortgage brokers who submit home mortgage loan applications from potential borrowers. Such broker submissions are referrals under the Real Estate Settlement Procedures Act and its implementing regulations, 24 C.F.R. 3500.14(f).

4. The persons on whose behalf such credit applications are submitted are applicants as that term is defined by Section 702(b) of the Equal Credit Opportunity Act, 15 U.S.C. $169](b).

5. Fremont underwrites each loan submitted to it by its brokers, if it approves the application; the loan is funded in Fremont's name. The actions by Fremont and its brokers in the origination and making of the mortgage loan constitutes a settlement service as defined by the Real Estate Settlement Procedures Act, 12 U.S.C. $ 2602(3).

6. Fremont brokers' fees are paid in three different ways, with all costs ultimately borne by the borrower: (a) through "up-front" charges, fees, or points, with points being a percentage of the loan amount paid to the broker (usually at closing from the proceeds of the loan); (b) through "back-end" fees (also called "yield spread premiums"), whereby the borrower accepts an interest rate that is higher than Fremont's par interest rate and Fremont makes a direct payment to the broker for securing the higher-than-par loan; and (c) through "miscellaneous" fees, which are usually paid out of loan proceeds.

7. Fremont is responsible for the fees charged to borrowers for its loan. It individually underwrote and funded each loan, it approved each loan fee paid to a broker, and it aided its brokers in obtaining unearned fees described herein. With respect to a substantial portion of the loans, Fremont was aware that little or no services were being performed in exchange for the broker charges. Further, Fremont review and knew that the total of the broker compensation did not bear a reasonable relation to the level of the goods and services that the brokers provided or performed. In fact, Fremont aided its brokers in obtaining the unearned fees described herein by approving mortgage loan applications and performing many of the services for the brokers.

8. Fremont also frequently gave its broker a portion of the broker fees in connection with a mortgage loan in the form of a yield spread premium, when no nominal

services were actually performed. In addition, such payment constituted the giving of a thing of value in exchange for the referral of loan business.

9. Fremont's brokers typically charged fees ranging from 1 to 5 percent or more of the total amount borrowed. Fremont's borrowers, particularly those who were charged high fee amounts, seldom had the cash on hand with which to pay all of the brokers' fees. Therefore, the borrowers' loan amounts were increased to cover the high fees. The increased loan proceeds provide Fremont with additional profit and with a mechanism through which to pay its brokers. In doing so, Fremont directly or indirectly gave a portion of the loan proceeds to its mortgage brokers to pay charges for which nominal services were rendered.

10. Fremont has subjected its African American female borrowers to terms and conditions for home mortgage loan that resulted in those borrowers paying more for their loans than similarly situated white male borrowers.

11. Fremont's brokers received their fees without regard to risk that the borrower would default on the loan, and no part of the broker fees referred to herein related to the credit risk presented by the borrower.

12. Fremont has often approved loans without regard to a borrower's ability to repay when prudent underwriting criteria, such as debt-to-income ratios, residual income, and repayment history, would have indicated that the borrower would likely have difficulty repaying the loan, Fremont has approved loans where the borrower's debt payments would consume more than half of the borrower's total pretax income, and in many instances would leave the borrower with less than adequate income for living expenses. Fremont has approved mortgage loans that cause the borrower's monthly debt payments to increase, despite Fremont's knowledge of the borrower's past inability to meet the lower prior monthly payments. In many cases, there were was no changes in the borrower's circumstances or other evidence to suggest that the borrower would be able to meet the newer and more onerous requirements. Fremont's practice of approving loans without regard to borrower's ability to repay has exposed borrowers to unwarranted risk of default and foreclosure.

13. Fremont's policies and practices, as alleged herein constitute:

14. Discrimination on the basis of race and sex in making available residential real estate-related transactions in violation of Section 805 of the Fair Housing Act, 42 U.S.C. $ 3605(a); and

15. Discrimination against applicants with respect to credit transactions, on the basis of race and sex in violation of the Equal Credit Opportunity Act, 15 U.S.C. $ 1691 (a)(1).

16. The defendants' policies and practices constitute:

17. A pattern or practice of resistance to the thrill enjoyment of rights secured by the Fair Housing Act, as amended, 42 U.S.C. $$ 169 1-1691f; and

18. A denial of rights granted by the Fair Housing Act, as amended, to a group of persons that raises an issue of general public importance.

19. Persons who have been victims of Fremont's discriminatory policies and practices are aggrieved persons as defined in the Fair Housing Act and Equal Credit Opportunity Act, and have suffered damages as a result of the Fremont's conduct as described herein.

20. Fremont's discriminatory policies and practices were intentional and willful, and

were implemented with deliberate disregard for the rights of African American women.

21. Fremont's policies and practices, as alleged herein constitute:

22. The giving of a kickback or thing of value for the referral of settlement service business involving a federally related mortgage loan in violation of Section 8(a) of the Real Estate Settlement Procedures Act, 12 U.S.C. $ 2607(a); and

23. The giving of a portion or percentage of a settlement service charge involving a federally related mortgage loan other than for services actually performed in violation of Section (8)(b) of the Real Estate Settlement Procedures Act, 12 U.S.C. $2607(b).

24. In conducting its home mortgage lending operations, Fremont has chosen to serve the "subprime" or "B/C" mortgage loan market. As a subprime lender, Fremont hold itself out as willing to approve and fund loans to borrowers who have flawed credit histories and/or debt-to-income ratios that are higher than those deemed acceptable in the "A" or "conforming"

25. Fremont's violation of the Fair Housing Act, Equal Credit Opportunity Act, HOEPA and TILA have injured its borrowers and, absent injunctive and other relief entered by this court, are likely to continue to injure borrowers and harm the public interest.

Please review the following summary of events:

1. This complaint only address the factual circumstances that affect the borrowers Darrick and Yolanda Grimes  and the property address at 23 Stacy Lee Drive, New burgh, New York 12550.

2. Fremont Investment and Loan was the originator of the loan which mortgage application was prepared and submitted by WCS Lending LLC ("WCS Lending" or "mortgage broker") on or about *September 12, 2005*. The closing date for the purchase of the property located at 23 Stacy Lee Drive, Newburgh, New York was on *October 12, 2005*. The first time we saw the final mortgage commitment letter issued by Fremont Investment and Loan was on *October 12, 2005* the day of the closing.  The Mortgage Servicing Transfer of the first mortgage was transfer to America's Servicing Company in the month of *February 2006* without proper notice under the Real Estate Settlement Procedure Act a clear violation and, U.S. Bank, National Association, as Trustee for Master Asset Backed Securities Trust 2006-FRE-1 as assignee and successor became the first mortgage holder. While Fremont Investment and Loan retained the second mortgage.

3. Fremont Investment and Loan and WCS Lending LLC, the mortgage broker engaged in deceptive and unfair acts under the Section 5(a) of the Federal Trade Commission Act with misrepresentation and conducting mortgage fraud with the mortgage application and inflating incomes to seek approval on a higher mortgage and by purposely discriminating against minorities and women by imposing different loan terms to the borrowers without proper disclosure. Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq., and Federal Reserve Board Regulation B, 12 C.F.R. part 202. and based upon race and sex a clear violation of the Fair Housing Act, 42 U.S.C. $$ 3605 and Equal Credit Opportunity Act 15 U.S.C $$1692a(e). Fremont Investment and Loan and WCS Lending provided false and misleading information on the mortgage application to obtain a higher mortgage

loan approval based upon the borrower's equity in the home and not based upon the borrowers' ability to repay the loan based upon documented income engaged in deceptive and unfair acts by not properly disclosing the true terms of the loan until the closing a violation of Truth in Lending Act. When brokers deliver a loan with an inflated interest rate (i.e., higher than the rate acceptable to the lender), the lender often pays a "yield spread premium" -- a kickback for making the loan more costly to the borrower. Section 8 of RESPA, 12 U.S.C. § 2607, and Regulation X, 24 C.F.R. §3500.14, prohibit referral fees and kickbacks. The Truth In Lending Act requires disclosure of all essential terms, including finance charges, the finance charge express as an annual percent rate, and the total of all loan payments be provide prior to closing a transaction to allow the potential borrower the opportunity to review such terms. In the case of Fremont Investment and Loan and WCS Lending they intentionally failed to provide a proper disclosure of the true terms until the Closing date and misrepresented terms of the mortgage loan by relying upon the preliminary disclosure interest rate. Failure by a lender to provide the essential terms of a loan transaction is a direction violation of the Truth in Lending Act. A lender shall not make a high risk home loan if the lender does not believe at the time the loan is consummated that the borrower or borrowers will be able to make the scheduled payments to repay the obligation based upon a consideration of their current and expected income, current obligations, employment status and other financial resources (other than the borrower's equity in the dwelling that secures repayment of the loan). A borrower shall be presumed to be able to repay the loan if, at the time the loan is consummated, or at the time of the first rate adjustment in the case of a lower introductory interest rate, the borrower's scheduled monthly payments on the loan (including principal, interest, taxes, insurance and assessments), combined with the scheduled payments for all other disclosed debts, do not exceed 50% of the borrower's monthly gross income." The lender is required to verify the borrower's ability to repay the loan. Minimum verification requirements include:

4. America's Servicing Company violated the Real Estate Settlement Act by failing to timely pay the property taxes from the escrow account and by failure to respond and acknowledge the borrowers qualified written request for information about servicing of the loan and escrow account and property taxes for nine months in 2006.

5. U.S. Bank, National Association, as Trustee for Master Asset Backed Securities Trust 2006-FRE-1 as assignee and successor is in the practice of acquiring sub-prime loans from sub-prime lenders who actively engage in deceptive and unfair acts or practices of predatory lending and therefore indirectly benefits from the violations of the originator of these types of loans and attempts to enforce the terms of a loan that have been misrepresented to the borrowers in the beginning a clear violation of the Federal Trade Commission Act, the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq., and Federal Reserve Board Regulation B, 12 C.F.R. part 202 based upon mortgage discrimination based upon race and sex a clear violation of the Fair Housing Act, 42 U.S.C. $$ 3605.

Fremont Investment and Loan and WCS Lending intentionally misrepresented the true term of the mortgage until the day of the closing to conduct mortgage fraud. From September 13, 2005 until October 12, 2005 the interest rate and monthly mortgage payments were with held from the borrowers intentionally to avoid last minute cancellation of the Closing and to sandbag the borrowers at the Closing with the Sellers. The initial interest rate disclosure of 7.0% to the final set interest rate of 8.45% should have been properly disclosed in the mortgage commitment letter of Fremont Investment & Loan prior to October 12, 2005.

Under normal circumstance borrowers would have been able to shop for a competitive interest rate if the commitment letter was provided by the lender in a timely manner.

WCS Lending LLC and Fremont Investment and Loan purposely withheld essential information regarding the terms of the loan and inflated and or falsified the mortgage application solely for their own financial purpose and to defrauded and to equity strip valuable home equity in the borrowers home.

If you have any questions, please do not hesitate to contact me at 845-562-0450 or via e-mail at darrickgrimes@aol.com.

Very truly yours,

/s/ Darrick Grimes

Darrick and Yolanda Grimes

VIA FACSIMILE (714) 961-5293

March 21, 2007

Fremont Investment & Loan
2727 E. Imperial Highway
Brea, California 92821
Attn: Ms. Maureen Barlow

State of New York
Banking Department
One State Street Plaza
New York, New York 10004-1417

Re: New York File No.: 07 M 6
    Fremont Loan Nos. 6000182284 & 6000182284

Dear Ms. Barlow:

    I have reviewed your responses to our complaint to the New York State, Banking Department and the New York State, Executive Department Division of Human Right.

Please be advised and note that WCS Lending LLC "(WCS Lending") has responded to our complaint and produced supporting documentation for their response. A carefully examination of WCS Lending supporting documentation provides evidence of our complaint that mortgage fraud was committed and that the mortgage application and pre-disclosure documents were forged signatures. Mortgage Fraud was committed in obtaining the mortgage loan from Fremont Investment and Loan and this matter will be referred to the criminal divisions of the state and federal governmental regulatory agencies.

In addition to forging our signatures on the documents, the Sellers signatures were forged on the Contract of Sale to give the appearance of earlier negotiations with the lender in this case, Fremont. One of the Sellers just happens to be a tax attorney licensed in the State of New York and he will provide supporting evidence that the signature on the Residential Contract of Sale and Amendment to Contract of Sale are not their signatures and will take legal action on all parties that forged his signature along with his wife. It appears that the classic *Bait and Switch* act was performed either by WCS Lending or Fremont prior to the Closing Date of October 12, 2005.

It appears that WCS Lending has back-dated certain documents to provided supporting evidence of their obtaining approval from Fremont before September 20, 2005 the date the mortgage application was signed.   WCS Lending prepared two sets of mortgage applications and submitted the application directly to Fremont.

The total broker fees paid to WCS Lending were $10,125.00.

    The total fees paid to WCS Lending LLC were as follows:

- Mortgage broker fee        $4,050

- Yield spread premium       $6,076

JUN-06-2007 16:22          BONACIC KRAHULIK            845 703 3110        P.44

This "mortgage broker fee" presumably was for acting as the representative (hence the term "broker") of the borrowers and was payable by the borrowers. The "yield spread premium" is a euphemism for a kickback paid by a lender to a mortgage broker for bringing to it a loan for which it can charge a high interest rate, high closing fees, or both. These two separate fees paid to WCS Lending LLC were unearned, excessive, and the product of illegal conduct. They show that it was being paid by both lender and borrowers, that it was attempting to act as the representative of both parties, and thus it was acting unfaithfully to the borrowers.

It should be noted that Fremont only disclosure prior to the Closing Date of October 12, 2005 was a small notation of **Broker Yield Spread Premium: 0-3% of Loan Amount.**

- **Mortgage Broker's Fees and Kickbacks.**  Predatory mortgage lenders also originate loans through local mortgage brokers who act as "bird dogs", or finders for the lenders.  These brokers represent to the homeowners that they are working for them to help them obtain the best available loan, and the homeowners usually pay a broker's fee.  In fact, the brokers are working for predatory lenders, who pay brokers kickbacks to refer borrowers for loans at higher interest rates than those for which the borrower would otherwise qualify.  On loan closing documents, the industry uses euphemisms to describe these referral fees:  yield spread premiums and service release fees.  Also, unbeknownst to the borrower, their interest rate is increased to cover the fee.  The industry calls this bonus up selling or par-plus premium pricing; we call it paying unlawful kickbacks.

I have attached for your review a copy of the loan application signed on *September 20, 2005* by the borrowers and deliver to WCS Lending for submission to the Fremont.  Please note that the application was signed on *September 20, 2005 along with the NYS Pre-Disclosure Documents and Good Faith Estimate* as provided by WCS Lending with a **stated interest rate of 7.0**% and not **8.0**% as provided by WCS Lending to the NYS Department of Banking with a *forged signatures* of Darrick Grimes and Yolanda Grimes, dated *September 13, 2005.*

Your letter also indicates that a second set of disclosures were mailed to the borrowers on *October 11, 2005 the day before Closing.*  Because of federal statutes, the pre-disclosures are to be mailed to the consumers within three days.  If pre-disclosures were mailed in a timely manner to the consumers prior to the Closing Date of *October 12, 2005*, than the consumers would have ample opportunity to review the second set of disclosures prior to the Closing Date.  Perhaps Fremont can offer an explanation on why the set second of pre-disclosures were mailed to the borrowers the day prior to the Closing Date of *October 12, 2005*, if indeed both loans were approved on or about *September 16, 2005.*  Please provide me with documentation on approval of the loans in September 2005 and all communications with WCS Lending and a time-line on when Fremont provided a mortgage commitment letter to WCS Lending approving above-referenced loans.  A review of your Loan Tracking Status indicates that the loan was denied.  Date of Action Taken: 10/17/05 five days after closing of the loan.  Reason for Denial: Number 3 – Credit History.

Which indicates that a fraudulent mortgage application was submitted to Fremont by WCS Lending?  The pre-disclosures sent by Fremont were not made timely to the borrowers and application that we signed on September 20, 2005 is certainly not the same application signed during closing on October 12, 2005. As a matter of fact the HUD-1 Settlement Statement faxed on October 11, 2005 was illegible and not reviewed by the borrowers until October 12, 2005, at which time the disclosure of the yield premium spread of $6,075 was noticed.  This conflict of interest was created by Fremont and supported by WCS Lending to establish the very foundation of predatory lending.

Predatory lending in the sub prime mortgage market covers a wide range of practices. While the practices are quite varied, there are common traits. They generally aim either to extract excessive fees and costs from the borrower or to obtain outright the equity in the borrower's home. This is often accomplished through a combination of aggressive marketing practices, high-pressure sales tactics, and loan terms, such as prepayment penalties, that inhibit a borrower's ability to go elsewhere for credit.

Fremont's responses indicated that all disclosures were made in a timely manner and that the bulk of the complaint appears to involve representations made by the broker, WCS Lending.  Fremont has a legal responsibility to provide consumers and borrowers with accurate Truth in Lending Disclosures and Good Faith Estimates that will ensure that borrowers know exactly the terms of a loan prior to closing.

The original Truth in Lending Disclosure Statement reveals an annual percentage rate of 5.167%, with the amount of payments beginning at $2,694.48 for the first 24 payments. **(Dated 9/13/2005)**

The actual Truth in Lending Disclosure Statement shows an annual percentage rate of 10.711%, with the amounts of payments beginning at $3,099.76 for the first 24 payments.
**(Dated 10/12/2005)**

What information the application does contain about the income of the borrowers is mistaken. It shows monthly net rental income in the amount of $1,076. This entry is false because no monthly rental income was being collected in the primary residences of the borrowers.  The relevant income of the borrowers is based on net or disposable income, not a fictitious rental income supplied by WCS Lending. As a matter of fact, the borrowers had their primary residence in Contract with a potential buyer at the same time the purchase transaction was going on.  A review of Fremont underwriting guidelines clearly should be reviewed going forward with state and federal regulatory.   Based upon monthly payments beginning on December 1, 2007, borrowers would have to make payments in the amount of $3,669.91 excluding real estate property and school taxes based upon the income supplied on the application.

- **Making Unaffordable Loans.**  Some predatory mortgage lenders purposely structure loans with monthly payments that they know the borrower cannot afford so that when the homeowner is led inexorably to the point of default, she will return to the lender to refinance the loan, and the lender can impose

additional points and fees.  Other predatory mortgage lenders, called hard lenders, intentionally structure the loans with payments the homeowner cannot afford in order to lead to foreclosure so that they may acquire the house and the valuable equity in the house at a foreclosure sale.

- Lending more than the borrower can afford. HUD guidelines say that shelter costs, including utilities, should not exceed 40% of a borrower's income. Most borrowers would not take on more debt than they could possible handle, but sub-prime lenders often stretch borrowers far beyond that.  In our case the mortgage payments would exceed more than 40% of net income and thus leave borrowers with just barely enough funds to manage utilities, in a drafty houses and out-of-sight heating bills.
- Lending more than the value of the property. It is clear that WCS Lending was able to obtain an artificially high appraisal on the home because two months later, the house appraised at $10,000 to $20,000 than the purchase priced. Often this is done by bringing in an artificially high appraisal on the house, done by an appraiser "in cahoots" with the lender or mortgage broker, sometimes comparing it to other recent sales of properties that are larger, in better condition, or in more upscale neighborhoods. The buyer is then really stuck, because they can't re-sell the house for anywhere near that amount if they run into trouble.
- Inflated closing costs. Borrowers have been charged much more than the going rate for closing cost items such as title search, appraisal, termite inspection, lawyers' fees and credit check. These services may even be provided by people working for the lender.

Among the most harmful of these predatory lending practices is "equity-stripping. This often begins with a loan that is based on equity in a property rather than on a borrower's ability to repay the loan -- a practice known as "asset-based lending." As a general rule, loans made to individuals who do not have the income to repay such loans usually are designed to fail; they frequently result in the lender acquiring the borrower's home equity. The borrower is likely to default, and then ultimately lose her home through foreclosure or by signing over the deed to the lender in lieu of foreclosure. Such a scheme is particularly damaging because these vulnerable borrowers often have no significant assets except the equity in their homes.

JUN-06-2007 16:23    BONACIC KRAHULIK                    845 703 3110    P.47

We will send you a copy of WCS Lending response under separate cover, along with copies of the actual signed documents by both Buyers/Borrowers and Sellers.

Very truly yours,

Darrick Grimes

Yolanda Grimes

23 Stacy Lee Drive
Newburgh, NY 12550
March 29, 2007

**VIA REGULAR MAIL AND FACSIMILE (718) 741-8166**

Ms. Natasha Saxon
Ms. Iris Carrasquillo
State of New York
Executive Department
Division of Human Rights
One Fordham Plaza, 4th Floor
Bronx, New York 10458

State of New York
Banking Department
One State Street Plaza
New York, New York 10004-1417
Attn: Carmen Gomez

Re: Case No.:10115874

Dear Ms. Saxton:

       This letter shall serve as our formal written response (rebuttal) against the Respondent in the above-referenced case. WCS Lending LLC ("WCS Lending") and Fremont Investment and Loan ("Fremont") have respectively submitted their response to our complaint made to the New York State, Executive Department, Division of Human Rights and provided you with copies of the Uniform Residential Loan Application (*8.0% interest rate*), New York Pre-Application Disclosure and Broker Fee Agreement and Good Faith Estimate, all dated September 13, 2005 for reference.

       First, as a matter of establishing the truth in this case and elaborating on the factual basis for mortgage fraud and mortgage discrimination, we stated categorically that the documents produced by WCS Lending, dated September 13, 2005 are forged documents *("Forged Documents")*. The Good Faith Estimate, the New York Pre-Application Disclosure and Broker Fee Agreement and the Uniform Residential Loan Application were *fraudulently signed* by someone at WCS Lending or Fremont on September 13, 2005. As previously stated in prior communications and supported by the various closing documents provided by Fremont the signatures do not match any of the closing documents signed on October 12, 2005 as submitted by Fremont. The *Forged Documents* that WCS Lending produced to support their written response, also are the same forged documents that, Fremont is relying upon to approve the two loans without our the borrowers prior knowledge. We have carefully examined the *Forged Documents* and the Cohen's signatures (the "Sellers") have also been fraudulently signed to an undated Residential Contract of Sale and the Amendment to Contract. (See **Annex I** -*Forged Documents*). The Residential Contract of Sale is dated August 12, 2005 and the Amendment to the Contract is dated September 14, 2005 for the record.

       Second, as a matter of factual statement, we attaching the first and only Initial Disclosures received from WSC Lending a Pre-Qualification Letter, dated September 12, 2005,

which was addressed to Yolanda Grimes, outlining the pre-qualifying financing and indicating that her excellent credit, income and assets would qualify for a loan up to amount of $440,000:

On September 13, 2005, Yolanda Grimes received the loan application package from WCS Lending on their letterhead, dated September 13, 2005, requesting for various documents to support the loan application. Included in the loan application package was the following: a prepared Uniform Residential Loan Application (*7.0% interest rate*), Good Faith Estimate (7.0%), the Truth in Lending Disclosure Statement, New York Pre-Disclosure and Broker Fee Agreement and other disclosure documents. Now, between September 12, 2005 and September 20, 2005, WCS Lending made a request to Yolanda Grimes that her husband, Darrick Grimes should become a co-signer to the loan application to strengthen the approval process of loan.

We signed the first loan application, which was prepared and provided by WCS Lending LLC on **September 20, 2005** and submitted back to the mortgage broker on the same day. We signed a second loan application as part of the Closing transaction on **October 12, 2005**, which was the first disclosure we noticed that we had a higher interest rate of 8.45%. We strongly disagree with all statements made by Fremont regarding receiving a disclosure notice prior to October 12, 2005. The interest rate was revised upward to a higher level and no written notice or communication was given by WCS Lending or Fremont until at Closing. Fremont alleges to have mailed a letter dated October 11, 2005 via regular mail stating that the rate would change but does not state whether the letter was prior to the Closing Date of October 12, 2005. Fremont intentionally mailed notification late to avoid the borrowers trying to negotiate a better rate or better yet canceling the transaction. The Grimes strongly denies receiving any notification letter from Fremont and if so the letter was received more than five (5) days after closing. (See **Annex II**).

The Grimes denies and disagrees with Fremont regarding the mailing of two sets of Initial Disclosure documents, particularly since according to Fremont the two loans were approved on September 16, 2005 prior to their knowledge of the terms of the loans. Furthermore, neither Fremont nor WCS Lending has produced any written correspondence addressed to the Grimes indicating that a mortgage loan was approved on a certain date or approval was obtained on a certain date or a signed mortgage commitment letter was issued to the Grimes outlining the terms of the two mortgage loans and the condition when the mortgage commitments will expire.

Fremont and WCS Lending written responses rely solely upon *Forged Documents* submitted by WCS Lending on September 13, 2005. The Grimes denies and disputes all statement made by Fremont and WCS Lending regarding signing a loan application on September 13, 2005. We restate again, that any loan application, pre-disclosure documentation or Good Faith Estimate with an indicated interest rate of **8.0%** is fraudulent signed by either WCS Lending or Fremont. As a matter of fact the only pre-disclosure documentation we signed had an indicated interest rate of 7.0% interest rate and not **8.0%.**

In responding to WCS Lending's written response we simply referred to the documents submitted by WCS Lending see **Annex I** – "Mortgage Fraud" and "Bait and Switch" Scheme.

The Grimes disagrees with the statement made by Fremont regarding the approval of the loan based upon on false documentation. First, the loan application submitted by WCS Lending was a *Forged Document* see **Annex I**. Secondly, the loan application lists our primary residence or home under Section VI. Assets and Liabilities as "Type of Property –Multi" and "Rental Property" with Gross Rental Income as $4,400.00 and Net Rental Income as $1,076.00, which is a false statement. Under Section V. Monthly Income and Combined Housing expenses Information – Net Rental Income is listed as $1,076.00, which is a false statement. Our primary

house was listed on market in July 2005 with Langer Realty Group for sale at the purchase price of $440,000. **See documents attached to Annex III.**

In reference to statements made by Fremont and WCS Lending , we are providing copies of the actual signed documents for verification of the signatures of the Sellers and the Buyers/Borrowers (Grimes): (a) Residential Contract of Sale, dated August 12, 2005, (b) Durable Power of Attorney for the Sale of the House- 188-19 104th Avenue, St. Albans, New York, (c) Washington Mutual Bank – Pre-Approval Letter, dated July 13, 2005, (d) Easy Lifestyle Real Estate Agency Binder Letter, dated July 11, 2005, outlining the Purchase price and Terms of the Transaction, (e) Affidavit of Seller (Ronald J. Cohen, Esq.) as evidence of forged signature of Seller. With respect to the Forged Documents, please note that certain dates were inserted into various documents as a deceptive practice and false pretense of timing of the transactions.

We are also attaching for you review the Initial Loan Disclosures delivered by WCS Lending via Fremont: (a) WCS Lending Pre-Qualification Letter, dated September 12, 2005 addressed to Yolanda Grimes, as a creditworthy borrower. As indicated in the letter, "pre-qualifying financing – Specifically, your credit and assets are excellent and your income conforms to our investor guidelines", (b) Uniform Residential Loan Application-Principal Amount $405,000; Interest Rate – 7.0%; No, of Months – 360/360; Arm 2/28. **See documents attached to Annex II.**

**Mortgage fraud and mortgage discrimination was committed by WCS Lending and Fremont** for failure to properly disclose the true terms of the transaction in writing prior to closing and submitting **Forged Documents** to obtain a loan commitment without the borrower's prior knowledge. They fraudulently signing borrowers name and the Sellers signature to Residential Contract of Sale, and other related contractual documents to give appearance of a mutually agreed upon transaction and to established a false time frame.

The Grimes disagrees and categorically denies the statements made by Fremont that two sets of disclosure documents were mailed to the Grimes, which increased the initial interest rate from **8.0%** to **8.45% prior to closing on October 12, 2005. See Annex II for a copy of the letter Fremont allegedly mailed on October 11, 2005.**

The Grimes denies all statement made by Fremont and WCS Lending regarding providing proper written disclosure and timely notification in writing from Fremont and WCS Lending. **Fremont and WCS Lending intentionally sandbagged the borrowers at closing in front of Sellers** without prior notification or recourse to negotiate the terms of the loans or seek another lender. Furthermore Fremont and WCS Lending placed the borrowers in an uncompromising position with the Sellers that could have jeopardized the borrowers' good faith deposit of $20,000.00. Neither, WCS Lending or Fremont has explained the fact that a loan application and Good Faith Estimate was prepared with a stated interest rate of 7.0% with the exact same information as the forged document of September 13, 2005. The respondent has also not produced any written documentation stating that the interest rate has increased from 7.0% to 8.0% or that the interest rate increased from 8.0% to 8.45%.

**"Bait and switch".** You know the term. It is most commonly used when a retailer advertises a great sale on a large screen television or new car. When the buyers flock to his store, that item is sold out or the ad was a mistake. However, the retailer has something? Almost as good? That he will let go at a steal to make up for the confusion. Well this practice is rampant in mortgage lending as well.

Here is the scenario in our case of bait and switch.

The Grimes commits to a mortgage under a set of terms: a certain interest rate (**7.0%**), a fixed or adjustable mortgage with a specified frequency and method of adjustment; length of loan; and so forth. Then, at the closing table, the borrower realizes that the loan documents specify a higher interest rate (**8.45%**), a two year adjustment, with a larger monthly mortgage payment or other terms to which the borrower would not certainly had agreed upon.

The loan originator does not answer his cell phone, the moving van is loaded, and the sellers are beginning to look real unhappy. Under such pressure, the borrower signs the documents while swearing to get the mess straightened out. But with a signed note and mortgage, it is now a legal issue that will take time and money and perhaps the courts to sort out. This is the classic case of ***Bait and Switch*** and WCS Lending committed mortgage fraud and Fremont assisted this mortgage broker with such act(s). Mortgage Fraud is a criminal act and we are immediately alerting you that a fraudulent loan transaction took place on October 12, 2005 involving Fremont and WCS Lending.

The Grimes disagrees and categorically denies all statements made by Fremont regarding the submitting of a signed loan application for the purchase of a home via their broker based upon the fraudulent documents attached to **Annex I**.

The Grimes disagrees and categorically denies all statements made by Fremont regarding prior inquiring about the terms of the loan. As previously stated, WCS Lending submitted a fraudulent loan application to Fremont without our prior knowledge. Than Fremont immediately sold, assigned or transfers the first mortgage to Wells Fargo & Co. or America's Servicing Company for mortgage servicing within 90 days before we could detect the fraudulent activities. Several telephone calls were to Fremont regarding the first and second mortgages in January and February 2006. As a matter of fact, after being sandbagged at the Closing on October 12, 2005, WCS Lending gave verbal assurance that the two mortgages could be refinance in January 2006. Between December 2005 and January 2006, Fremont and WCS Lending gave us nothing but lip service about the loan terms and refinancing terms. Attached please find a Fremont letter dated March 6, 2006, acknowledging our request for closing and loan documentation for the transaction that closed on October 12, 2005.

The Grimes disagrees and categorically denies all statements made by Fremont regarding approval of the loan was based solely upon the origination of the mortgage without regard to the borrower's ability to repay the loan and thus strip valuable equity from their home  We are attaching a copy of an **Order to Cease and Desist** (Docket No. FDIC-07-035b) issued by the Federal Deposit Insurance Corporation on March 7, 2007 and a recent article from The New York Daily News, dated March 21, 2007, that supports our complaint regarding Fremont's mortgage underwriting loan criteria. If forged documents were submitted to gain loan approval, the whole process was tainted and borrowers never had a true opportunity to seek better loan terms from another lender. Thus the true essence of mortgage discrimination against minority customers denies certain group of customers from seeking and obtaining the best loan terms that they qualified. Deceptive acts and unfair practices forms the underlying principals of predatory lending and mortgage discrimination and denies minority customers with equal and fair lending avenues based upon the same criteria of other applicants.

Fremont structured two mortgage loans based upon the lower credit score of the one borrower that would eventually and substantially increase the likelihood of loan default. Based

upon the documented income of the Grimes' paychecks statements stubs provided to WCS Lending and Fremont: **Gross Income was $8,471.64** and **Net Income was $5,395.64** at the time of the loan underwriting and approval of the two mortgages.   This would leave a shortfall of **$2,249.00** based upon **Gross Income** and **$5,325.00** based upon **Net Income** if Fremont just made some basic math calculations based upon verified income documentation (excluding the phantom monthly rental income of $1,076.00).   Certainly, WCS Lending did the income calculations to derive a monthly income of $10,720.00 because they prepared the loan application.   The loan application was prepared by WCS Lending with the inflated income amounts of $10,720.00 (borrower and co-borrower) including the phantom monthly rental income, to make sure the debt to income ratio would fall under the Fremont's underwriting criteria of 46.278% and the property's loan to value ratio of 95% (90% LTV on the First Mortgage and 5% LTV on the Second Mortgage).   We are attaching a copy of the Residential Contract of Sale to support our complaint that our primary house was on the market to be sold in conjunction with the purchase of the home in Newburgh, New York and was not used as **Rental Property**.  (See **Annex III**).   As stated by Fremont in their written responses, they had direct communications with the mortgage broker, WCS Lending and should have requested documentation of the income of the borrowers.  Please note that at the time of the loan application the co-borrower had been working part-time for the prior 18 months and WCS Lending was fully advised prior to borrowers signing the loan application on September 20, 2005.

At the underwriting stage, Fremont has complete and total decision making authority for deciding whether to approve or decline a loan.  They set the terms of the loan, including the interest rate, loan fees, maturity date, loan-to-value ratio, and loan type (conventional, adjustable rate, FHA, and so on).  This is a critical factor and important issue, because predatory lending and mortgage discrimination often involves unfair terms and conditions for loans, and there is no reason to believe that a lending institution may have established policies and procedures of shifting "credit rationing" – where customers perceived to be high risk are denied loans or are shifted toward "risk-based pricing" – where these same customers are simply charged a higher price for their loans.   We are requesting an intensive review by state and federal regulators regarding Fremont's underwriting policies and procedures to reveal empirical evidence of mortgage discrimination against minority customers.  It is clear that WCS Lending chose Fremont based upon certain underwriting guidelines.  Fremont's underwriting loan guidelines should be carefully examined for discrimination in overages, defined as the excess of the final contractual interest rate over the lender's official rate when it first commits to a loan.

We will be requesting state and federal regulators to review WCS Lending and Fremont for their unfair business practices and policies for criminal behavior and activities in the mortgage markets.   We are also going to request that America's Servicing Company's policies and procedures regarding taking a harsher stance in foreclosure decisions against minority customers be re-evaluate in light of this new evidence.  We will be seeking anecdotal evidence from Wells Fargo & Co. and America's Servicing Company for imposing differential treatment in pursuing foreclosure actions based upon race or ethnicity.  Our chief complaint involves the imposing of differential treatment or disparate impact on certain minority customers when decisions are determined based upon race or ethnicity.  It is clear that unfair terms and conditions are imposed on minority customers when mortgage loans are structured and interest rates are determined. Fremont may be more likely to charge higher interest rates and/or fees for minority customers they perceived to be risky, rather then denying them financing altogether.  Likewise, America's Servicing Company may be more likely to make the decision to foreclosure on minority customers' home because they perceive them to be more risky and unlikely to find a solution for a loan work-out.

JUN-06-2007  16:26          BONACIC KRAHULIK                    845 703 3110      P.53

We strongly believe that fraudulent act(s) were committed by WCS Lending and Fremont and that the contractual obligations should be null and voided and any liens established by these predatory and mortgage discrimination loans should be modify to reflect mortgage fraud. **In any event, we are stating that we are victims of predatory lending and mortgage discrimination and would like our mortgage to reflect such fraudulent actions immediately.**

With respect to America's Servicing Company and U.S. Bancorp's written response, we acknowledge that they individually and collectively they did not participate nor have any part in the origination of our loans or were involved in the mortgage discrimination in the origination loan process. However, we strongly stated again that several mortgage fraudulent act(s) or activities did take place in the origination process of our loan and, each party now either directly or indirectly is a mortgage loan servicing company, in the case of America's Servicing Company or in the case of US Bancorp (U.S. Bank National Association in its capacity as a Trustee for a master Asset backed Securities Trust 2006-FRE-1 is holding the fraudulent loan as collateral or for better illustration in the possession of stolen goods or ill gotten gains (stolen property) and thus should not be able to hold such property legal.

We respectfully request that a full judgment in the entire amount of the two mortgages originated by Fremont and brokered by WCS Lending be awarded to the borrowers in this matter.

Very truly your,

Yolanda Grimes

Darrick Grimes

## Grimes, Darrick

**From:** Grimes, Darrick
**Sent:** Friday, April 27, 2007 11:50 AM
**To:** 'financialjustice1@acorn.org'
**Subject:** Wells Fargo & Co. and America's Servicing Company

——Original Message——
**From:** Grimes, Darrick
**Sent:** Thursday, April 12, 2007 4:49 PM
**To:** 'OFR'
**Subject:** RE: Complaint Letter re WCS Lending LLC

Finance Enforcement Department

I have forward our complaint letters regarding a mortgage fraud committed by WCS Lending LLC (forged signatures) and Fremont Investment and Loan and our attempt to resolve or modify a fraudulent loan transfer to a Wells Fargo's subsidiary within 90 days of closing the transaction. In this particular matter our mortgage broker (WCS Lending LLC) and lender (Fremont Investment and Loan) have performed a classic "Bait and Switch" scheme where our signatures were forged on one set of disclosure documents including the loan application and we signed a different set of disclosure documents and loan application with different terms (interest rates) for the loan only to find out at closing we were signing for a mortgage with higher interest rates. The loan application contained phantom rental income on the house we were selling in Queens, New York and inflated incomes to qualify for the loan approval submitted by the mortgage broker. I faxed copies of the forged documents to the Office of the Attorney General of the State of Florida for review since not only were the borrowers' signatures forged but also the Sellers' signatures.

I sent to you under separate cover our rebuttal response to the complaints we filed with the New York State Division of Human Rights and New York State Banking Department- Mortgage Division regarding the deceptive and fraudulent loans that we were misled into signing at the closing. The true terms of the loan transactions were not disclosed until closing and as a matter of fact the loan was approved on forged signatures submitted by our mortgage.
broker. There were two sets of disclosure documents and lender (Fremont) never properly disclosed the true terms of the transact

I have been working with NYS Banking Department and NYS Division of Human Rights on this issue and the lender in this case Fremont Investment and Loan is asserting that disclosure was given to the mortgage broker directly and mailed to the borrowers on September 16, 2005 the same date the loan was approved. The odd thing about this case is that the loan application submitted on September 13, 2005 by our mortgage broker, WCS Lending has forged signature of the borrowers as well as the Sellers. Fremont's response is that disclosures were mailed to the borrowers on the September 16, 2005 and a counter-off on September 29, 2005 but borrowers do not have a copy of the letter, despite the fact that the borrowers signed different disclosure documents on September 20, 2005. NYS Department of Banking believes that this might be a criminal matter and that the police or district attorney should be contacted. America's Servicing Company, who is the loan servicer and a Wells Fargo & Company subsidiary has refused to offer any time of loan modification or repayment options on the mortgage and the investor in this case (U.S. Bancorp, serving as Trustee for the Securitization Master Trust) has no real input in the matter.

We would appreciate any assistance in this matter.

Darrick and Yolanda Grimes
23 Stacy Lee Drive
Newburgh, New York 12550

4/27/2007

JUN-06-2007  16:26        BONACIC KRAHULIK                    845 703 3110    P.55

**EXHIBIT E**

JUN-06-2007 16:26     BONACIC KRAHULIK     845 703 3110     P.56



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

ANDREW M. CUOMO                    212-416-8294                    DIVISION OF PUBLIC ADVOCACY
ATTORNEY GENERAL                                                   BUREAU OF CONSUMER FRAUDS AND PROTECTION

April 13, 2007

Darrick & Yolanda Grimes
23 Stacy Lee Drive
Newburgh, NY 12550

Re: Our File No: 2007-600048
Company: America's Servicing Company

Dear Darrick & Yolanda Grimes:

On behalf of Attorney General Andrew M. Cuomo, I am writing to notify you that we have received your correspondence. We appreciate your alerting us to this matter.

We note that you have already contacted the agency shown below. It appears that your complaint properly falls within that organization's purview and our office must respectfully defer to their expertise in this matter. By a copy of this letter, however, I am requesting that they review your complaint to determine if they can offer further assistance or suggestions.

Thank you for writing to our office. We will keep your correspondence on file for future reference.

Very truly yours,

Philip Gemma
Bureau of Consumer Frauds
and Protection

cc: NYS Department of Banking
    Mortgage Division
    One State Street
    New York, NY 10004-1417

120 Broadway, New York, NY 10271 ● (212) 416-8300 ● Fax (212) 416-6003 ● http://www.oag.state.ny.us

**Grimes, Darrick**

| | |
|---|---|
| **From:** | ServicePoint@fldfs.com |
| **Sent:** | Friday, April 20, 2007 10:40 AM |
| **To:** | Grimes, Darrick |
| **Subject:** | [File Number: SI20070400283] WCS Lending |

Dear Darrick and Yolanda Grimes:

Chief Financial Officer (CFO) Alex Sink shared your e-mail with me and asked that I respond on her behalf. We appreciate the opportunity to serve you.

Florida laws dealing with the mortgage and banking industry only apply if the mortgaged property is within the State of Florida. The companies may be located all over the United States but if they are writing mortgages on Florida property they fall under our jurisdiction. The exception to that are the Federal banks and their wholly owned subsidiaries which fall under federal laws. You may wish to contact the New York State Banking Department at the address below:

Consumer Help Unit
New York State Banking Department
One State Street
New York, NY 10004-1417
(212) 709-5470

If you have additional questions or concerns, you may call our Consumer Helpline at 1-800-342-2762 within Florida or (850) 413-3132 from outside Florida. A Specialist will be happy to assist your. Also, current information in banking, insurance and financial issues is available through our free Consumer eViews Newsletter. If you are interested, you may subscribe by visiting our website at www.fldfs.com or calling our Consumer Helpline.

Sincerely

Mary A. Westbrook
Insurance Specialist II

# Exhibit G

| Applicants: | Darrick Grimes / Yolanda Grimes |
|---|---|
| Property Addr: | 23 Stark Drive, Washingtonville, NY 10992 |
| Prepared By: | WCS Financial Services   Ph. 866-927-6363 |
| | 6501 Congress Avenue, 3rd Floor, Boca Raton, FL  33487 |

Application No: Grimes,Yolanda/T586580
Date Prepared: 09/13/2008
Loan Program: 2/28 ARM

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates - actual charges may be more or less. Your transaction may not involve a fee for every item listed. The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 settlement statement which you will be receiving at settlement. The HUD-1 settlement statement will show you the actual cost for item paid at settlement.

Loan Amount $    405,000     Interest Rate:  8.000  %     Term:  360 / 360  mths

| | ITEMS PAYABLE IN CONNECTION WITH LOAN | | $ |
|---|---|---|---|
| 801 | Loan Origination Fee | | |
| 802 | Loan Discount | | |
| 803 | Appraisal Fee | (PAID) | 300.00 |
| 804 | Credit Report | | |
| 805 | Lender's Inspection Fee | | |
| 808 | Mortgage Broker Fee | 1.000% | 4,050.00 |
| 809 | Tax Related Service Fee | | 60.00 |
| 810 | Processing Fee | | 650.00 |
| 811 | Underwriting Fee | | 405.00 |
| 812 | Wire Transfer Fee | | |
| | Application Fee | | 295.00 |
| | Flood Certification | | 9.50 |

| | TITLE CHARGES | | $ |
|---|---|---|---|
| 1101 | Closing or Escrow Fee | | |
| 1105 | Document Preparation Fee | | 195.00 |
| 1106 | Notary Fees | | |
| 1107 | Attorney Fees | | |
| 1108 | Title Insurance:   NY (Orange) Purchase Owners | | 500.00 |
| | Title Search | | 2,104.00 |
| | Title Exam | | 195.00 |
| | Miscellaneous Title | | 150.00 |
| | | | 300.00 |

| | GOVERNMENT RECORDING & TRANSFER CHARGES | | |
|---|---|---|---|
| 1201 | Recording Fees: | | $ |
| 1202 | City/County Tax/Stamps:   City/County Tax Stamps | | 150.00 |
| 1203 | State Tax/Stamps | | 810.00 |

| | ADDITIONAL SETTLEMENT CHARGES | | |
|---|---|---|---|
| 1302 | Pest Inspection | | $ |

| | | Estimated Closing Costs | 10,173.50 |
|---|---|---|---|

| | ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE | | |
|---|---|---|---|
| 901 | Interest for   15   days @ $   90.0000   per day | $ | 1,350.00 |
| 902 | Mortgage Insurance Premium | | |
| 903 | Hazard Insurance Premium | | 900.00 |
| 904 | | | |
| 905 | VA Funding Fee | | |

| | RESERVES DEPOSITED WITH LENDER | | | |
|---|---|---|---|---|
| 1001 | Hazard Insurance Premiums | 5 months @ $  75.00  per month | $ | 375.00 |
| 1002 | Mortgage Ins. Premium Reserves | months @ $   per month | | |
| 1003 | School Tax | months @ $   per month | | |
| 1004 | Taxes and Assessment Reserves | 2 months @ $  585.00  per month | | 1,170.00 |
| 1005 | Flood Insurance Reserves | months @ $   per month | | |
| | | months @ $   per month | | |
| | | months @ $   per month | | |

| | | Estimated Prepaid Items/Reserves | 3,795.00 |
|---|---|---|---|
| TOTAL ESTIMATED SETTLEMENT CHARGES | | | 13,968.50 |

| TOTAL ESTIMATED FUNDS NEEDED TO CLOSE | | | | TOTAL ESTIMATED MONTHLY PAYMENT | |
|---|---|---|---|---|---|
| Purchase Price/Payoff (+) | 450,000.00 | New First Mortgage(-) | | Principal & Interest | 2,971.75 |
| Loan Amount (-) | 405,000.00 | Sub Financing(-) | | Other Financing (P & I) | 270.00 |
| Est. Closing Costs (+) | 10,173.50 | New 2nd Mtg Closing Costs(+) | | Hazard Insurance | 75.00 |
| Est. Prepaid Items/Reserves (+) | 3,795.00 | | | Real Estate Taxes | 585.00 |
| Amount Paid by Seller (-) | | | | Mortgage Insurance | |
| Cash Deposit | (10,000.00) | | | Homeowner Assn. Dues | |
| | | | | Other | |
| Total Est. Funds needed to close | | | 48,968.50 | Total Monthly Payment | 3,901.75 |

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the lender will take a first lien on the property.   The undersigned acknowledges receipt of the booklet "Settlement Costs," and if applicable the Consumer Handbook on ARM Mortgages.

Applicant   Darrick Grimes          Date  9/13/05          Applicant  Yolanda Grimes          Date  9-13-05

Calyx Form gfe2.frm 11/01

Applicants: Darrick Grimes / Yolanda Grimes
Property Address: [illegible] NY 1258
Prepared By: WCS Financial Services  Ph. 866-927-5363
6501 Congress Avenue, 3rd Floor, Boca Raton, FL 33487

Application No: GrimesYolandaNT80659
Date: 9/20/2005
Loan Program: 2/28 ARM

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates-actual charges may be more or less. Your transaction may not involve a fee for every item listed. The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 settlement statement which you will be receiving at settlement. The HUD-1 settlement statement will show you the actual cost for items paid at settlement.

Total Loan Amount $ 405,000    Interest Rate: 7.000 %    Term: 360 / 360 mths

| 800 | ITEMS PAYABLE IN CONNECTION WITH LOAN | | | |
|---|---|---|---|---|
| 801 | Loan Origination Fee | | $ | |
| 802 | Loan Discount | | | |
| 803 | Appraisal Fee | | (PAID) | 300.00 |
| 804 | Credit Report | | | |
| 805 | Lender's Inspection Fee | | | |
| 808 | Mortgage Broker Fee | 1.000% | | 4,050.00 |
| 809 | Tax Related Service Fee | | | |
| 810 | Processing Fee | | | 60.00 |
| 811 | Underwriting Fee | | | 575.00 |
| 812 | Wire Transfer Fee | | | 405.00 |
| | Application Fee | | | 225.00 |
| | Flood Certification | | | 9.50 |

| 1100 | TITLE CHARGES | | | |
|---|---|---|---|---|
| 1101 | Closing or Escrow Fee | | $ | |
| 1105 | Document Preparation Fee | | | 195.00 |
| 1106 | Notary Fees | | | |
| 1107 | Attorney Fees | | | 500.00 |
| 1108 | Title Insurance | NY (Orange) Purchase Owners | | 2,104.00 |
| | Title Search | | | 195.00 |
| | Title Exam | | | 150.00 |
| | Miscellaneous Title | | | 300.00 |

| 1200 | GOVERNMENT RECORDING & TRANSFER CHARGES | | | |
|---|---|---|---|---|
| 1201 | Recording Fees | | $ | 150.00 |
| 1202 | City/County Tax/Stamps | | | |
| 1203 | State Tax/Stamps | | | |

| 1300 | ADDITIONAL SETTLEMENT CHARGES | | | |
|---|---|---|---|---|
| 1302 | Pest Inspection | | $ | |

| | | Estimated Closing Costs | | 9,218.50 |
|---|---|---|---|---|
| 900 | ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE | | | |
| 901 | Interest for 15 days @ $ 78.7500 per day | | $ | 1,181.25 |
| 902 | Mortgage Insurance Premium | | | |
| 903 | Hazard Insurance Premium | | | 900.00 |
| 904 | | | | |
| 905 | VA Funding Fee | | | |

| 1000 | RESERVES DEPOSITED WITH LENDER | | | |
|---|---|---|---|---|
| 1001 | Hazard Insurance Premiums | 5 months @ $ 75.00 per month | | 375.00 |
| 1002 | Mortgage Ins. Premium Reserves | months @ $ per month | | |
| 1003 | School Tax | months @ $ per month | | |
| 1004 | Taxes and Assessment Reserves | 2 months @ $ 585.00 per month | | 1,170.00 |
| 1005 | Flood Insurance Reserves | months @ $ per month | | |
| | | months @ $ per month | | |
| | | months @ $ per month | | |

| | | Estimated Prepaid Items/Reserves | | 3,626.25 |
|---|---|---|---|---|
| | TOTAL ESTIMATED SETTLEMENT CHARGES | | | 12,844.75 |
| | COMPENSATION TO BROKER (Not Paid Out of Loan Proceeds) | | $ | |
| | Lender Paid Comp 0-4% | | | |

| | TOTAL ESTIMATED FUNDS NEEDED TO CLOSE | | | TOTAL ESTIMATED MONTHLY PAYMENT | |
|---|---|---|---|---|---|
| Purchase Price/Payoff (+) | 450,000.00 | New First Mortgage (-) | | Principal & Interest | 2,694.48 |
| Loan Amount (-) | 405,000.00 | Sub Financing (-) | | Other Financing (P & I) | 270.00 |
| Est. Closing Cost (+) | 9,218.50 | New 2nd Mtg Closing Costs (+) | | Hazard Insurance | 75.00 |
| Est. Prepaid Items/Reserves (+) | 3,626.25 | | | Real Estate Taxes | 585.00 |
| Amount Paid by Seller (-) | | | | Mortgage Insurance | |
| | | | | Homeowner Assn. Dues | |
| | | | | Other | |
| Total Est. Funds needed to close | | | 57,844.75 | Total Monthly Payment | 3,624.48 |

☐ This Good Faith Estimate is being provided by _____, a mortgage broker, and no lender has been obtained. These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the lender will take a first lien on the property. The undersigned acknowledges receipt of the booklet "Settlement Costs" and if applicable the Consumer Handbook on ARM Mortgages.

_Darrick Grimes_ 9/20/05  _Yolanda Grimes_ 9/20/05
Applicant  Darrick Grimes  Date    Applicant  Yolanda Grimes  Date

Calyx Form gfe.frm 11/01

*(handwritten, right margin:)* Settlement 19,268 Charges

Type of Loan 1.☐ FHA 2.☐ ... U.S. Department of Housing and Urban Development HUD-1

6. File Number: PA00S-4023   7. Loan Number: 926000182284

Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by settlement agent are shown. Items marked P.O.C. were paid outside closing; they are shown here for informational purposes and are not included in the totals.

| D. Name and Address of Borrower: ...ick Grimes & Yolanda Grimes ...th Ave ...11412 | E. Name and Address of Seller: Ronald J Cohen & Ann Eva Cohen 23 Stacy Lee Drive Newburgh, NY 12550 | F. Name and Address of Lender: Fremont Investment & Loan 5404 Cypress Center Ste 300 Tampa, FL 33609 |
| --- | --- | --- |
| Property Location: ...tacy Lee Drive ...burgh, NY 12550 | H. Settlement Agent: Majestic Settlement Services 55 Washington Street, Suite 851 Brooklyn, NY 11201 | I. Settlement Date 10/12/2005 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
| --- | --- | --- | --- |
| 100. Gross Amount Due From Borrower | | 400. Gross Amount Due to Seller | |
| Contract Sales Price | 450,000.00 | 401. Contract Sales Price | 450,000.00 |
| Personal Property | | 402. Personal Property | |
| Settlement Charges to Borrower (line 1400) | 22,915.82 | 403. | |
| Payoff to Wilshire Credit Corporation | | 404. | |
| Payoff to | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| City/town taxes 1/1 to 12/31 | 458.03 | 406. City/town taxes 1/1 to 12/31 | 458.03 |
| County Taxes to | | 407. County Taxes to | |
| Assessments to | | 408. Assessments to | |
| School Taxes to | | 409. School Taxes to | |
| Fuel Oil | 1567.50 | 410. Fuel Oil | 1567.50 |
| Propane | 604.20 | 411. Propane | 604.20 |
| Pool Closing | 500.00 | 412. Pool Closing | 500.00 |
| Gross Amount Due From Borrower | 476,045.55 | 420. Gross Amount Due to Seller | 453,129.73 |
| 200. Amount Paid By Or In Behalf Of Borrower | | 500. Reductions In Amount Due To Seller | |
| Deposit or earnest money | 20,000.00 | 501. Excess deposit (see instructions) | |
| ...amount of new loan(s) | 405,000.00 | 502. Settlement charges to seller (line 1400) | 27,850.00 |
| Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| Borrowers Credit | | 504. Payoff ABN AMRO | 250,000.00 |
| ...an Loan Proceeds | 21,566.88 | 505. Payoff Chase Bank One | 164,451.16 |
| ...arly Closing | 3,000.00 | 506. Deposit | 20,000.00 |
| ...ller's Concession | 15,500.00 | 507. Early Closing | 3,000.00 |
| | | 508. Seller's Concession | 15,500.00 |
| | | 509. | |
| Adjustments for items unpaid by sellers | | Adjustments for items unpaid by sellers | |
| City/town taxes to | | 510. City/town taxes to | |
| County Taxes to | | 511. County Taxes to | |
| Assessments to | | 512. Assessments to | |
| School Taxes 7/1 to 6/30 | 1501.97 | 513. School Taxes 7/1 to 6/30 | 1501.97 |
| Maintenance | 11.96 | 514. Maintenance Fee | 11.96 |
| | | 515. | |
| | | 516. | |
| | | 517. | |
| | | 518. | |
| Total Paid By/For Borrower | 464,580.81 | 520. Total Reduction Amount Due Seller | 480,315.09 |
| 300. Cash At Settlement From/To Borrower | | 600. Cash At Settlement To/From Seller | |
| ...unt due from borrower (line 120) | 476,045.55 | 601. Gross Amount due to seller (line 420) | 453,129.73 |
| ...ss ...paid by/for borrower (line 220) | 464,580.81 | 602. Less reductions in amt. due to seller (line 520) | 480,315.09 |
| ...ash ☒From To Borrower | 11,464.74 | 303. Cash ☒To ☐From Seller | 27,185.36 |

Borrower _____ Borrower _____  Seller _____ Seller _____

SETTLEMENT CHARGES

| | BORROWER'S FUNDS AT SETTLEMENT | SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|
| AL SALES/BROKER'S COMMISSION based on price $ | | |
| 10,800.00 | to Easy Lifestyle | | |
| 15,120.00 | to Century 21 Anzruno | | |
| | | 25,920.00 |
| ission paid at settlement | | |
| ...BLE IN CONNECTION WITH LOAN: | | |
| ...ce...Fee to Fremont Investment & Loan | 894.00 | |
| ...gage Broker Fee to WCS Lending | -4,650.00 | |
| ...lication fee to WCS Lending | 595.00 | |
| ...raisal Fee to    POC ($350.00) | | |
| ...d Certification Fee paid to Land America Tax and Flood Services | 9.50 | |
| ...Service Fee to Land America Tax and Flood Services | 60.00 | |
| P to WCS Lending from Fremont Investment & Loan  POC ($6,075.00) | | |
| ...cessing fee to WCS Lending | 945.00 | |
| ...MS REQUIRED BY LENDER TO BE PAID IN ADVANCE: | | |
| ...rest from 10/12/05    to    11/01/05    @$93.76 /day | 1,875.20 | |
| ...ard Insurance premium for    months. To Allstate  POC 1,083.00 | | |
| ...ed insurance premium for    yrs. To | | |
| ...regate Adjustment | | |
| ...ESERVES DEPOSITED WITH LENDER: | | |
| ...ard Insurance    4    months @ $115.25    per month | 461.00 | |
| ...tgatge Insurance    months @ $    per month | | |
| ...ty property tax    12    months @ $172.00    per month | 2,064.00 | |
| ...own/Village property tax    months @ $    per month | | |
| ...lood Insurance    months @ $    per month | | |
| ...chool tax    6    months @ $    420.35    per month | | 2,525.10 |
| ...School Tax    months @ $    per month | | |
| ...djustment | (2,718.94) | |
| ...TLE...HARGES: | | |
| ...Courier Fee/Wire to Majestic Settlement Services | 125.00 | |
| ...Attorney Fee to Majestic Settlement Services Inc. | 850.00 | |
| ...Escrow Service Fee  to | | |
| ...New Survey Inspection | 815.00 | |
| ...Owner's Coverage to Perfect Abstract | 524.25 | |
| ...00 | 2,254.00 | |
| ...Fed Ex and Courier Fee to | | |
| ...Endorsements to Perfect Abstract | 160.00 | |
| ...Municipal Searches to Perfect Abstract | 540.00 | |
| ...Combination Charge and Clearance fee to | | |
| GOVERNMENT RECORDING AND TRANSFER CHARGES: | | |
| | | 325.00    130.00 |
| Recording fees:    Deed $    150.00    Mortgage $    175    Releases $ 130 | | |
| City/ county tax/stamps:    Deed $    Mortgage $ | | |
| State tax/stamps:    Deed $    Mortgage $    (1/4 pt lender POC $1012.50 ) | 3,218.00 | 1,900.00 |
| RP 5217 | | |
| ADDITIONAL SETTLEMENT CHARGES: | | |
| | | 700.00 |
| Travel Fee to Majestic Settlement Services | | |
| Taxes to Perfect Abstract | 3,566.05 | |
| | | |
| | | |
| TOTAL SETTLEMENT CHARGES | 22,915.82 | 27,550.04 |

sing Date:

n Number:

ddress:

**rowers(s) and Seller(s) Certification**

e have carefully reviewed the attached HUD-1 Settlement Statement and to the best of my knowledge and belief it
true and accurate statement of all receipts and disbursements made on account or by me in this transaction.  All the
rmation on the attached HUD-1 is as it appeared at the time of execution.  No changes or additions have been made
he document since the time of closing.  I further certify that I have received a copy of the HUD 1 Settlement
tement.



**sing Agent**

e HUD-1 Settlement Statement that I have prepared is a true and accurate account of this transaction.  I have caused
will cause the funds to be disbursed in accordance with this statement.

\RNING:  Section 1010, Title 18, U.S.C., "Department of Housing and Urban Development and Federal Housing
ministration Transactions," provides: :"Whoever for the purpose of . . . influencing in any way the action of such
ministration . . . makes, passes, utters or publishes any statement, knowing the same to be false . . . shall be fined not
re than $5,000.00 or imprisoned not more than two years, or both."

# Exhibit H

<u>**VIA FACSIMILE AND**</u>
<u>**CERTIFIED MAIL**</u>
<u>**RETURN RECEIPT REQUESTED**</u>

December 28, 2006

America's Servicing Company
3476 Stateview Blvd., MAC X7801-03K
Fort Mill, South Carolina 29715
Attn: Loss Mitigation Department

Re:  Loan Number:  1146013644

Ladies and Gentlemen:

    This letter will serve as formal notice to exercise our Right of Rescission and cancel the above referenced loan transaction under the Truth in Lending Act and Home Ownership and Equity Protection Act of 1994.

We hereby cancel the above- referenced loan transaction pursuant to violation of the Truth in Lending Act, and this Notice of Right of Rescission will become effective immediately as of December 28, 2006.

Very truly yours,

Darrick Grimes

Yolanda Grimes

23 Stacy Lee Drive
Newburgh, New York 12550
September 28, 2007

**VIA FACSIMILE AND CERTIFIED MAIL**

America's Servicing Company
7495 New Horizon Way
Frederick, Maryland 21703
Attn: Attn: Loss Mitigation Department

Re: Loan No. 1146013644
    Property Address: 23 Stacy Lee Drive, Newburgh, New York 12550

Ladies and Gentlemen:

This letter shall serve as notice that America's Servicing Company has improperly failed to take the required steps to return the borrowers' money and void the security interest in the above-referenced property pursuant to their Right of Rescission provided on December 28, 2006. We properly exercise our Right of Rescission and cancel the mortgage transaction and provided prompt and timely notice to you on December 28, 2006 pursuant to the Truth in Lending Act, 15, U.S.C. Section 1635 and Regulation Z, [15 C.F.R.] Section 226.23.

You are required under the Regulation Z, upon twenty days after receipt of the Notice of Rescission to return all monies paid and to take action necessary and appropriate to terminate the security interest in the borrower's property.  The legal requirement that a lender returns borrower's monies and take action to terminate their security interest in the property within twenty days of receiving a rightful notice of rescission is a regulatory requirement under Regulation Z and the Truth in Lending Act.  We asserted our rights to rescind the mortgage transaction pursuant to Regulation Z and Section 1635 of the Truth in Lending Act.

America's Servicing Company has failed to properly addressed the Notice of Rescission and take the necessary actions and steps to return all monies or property to the borrowers and take the required action to terminate the security interest created by the fraudulent mortgage loan transaction.  This is a clear violation of the requirements of Section 1635 of the Truth in Lending Act and the legal remedy for such actions can result in liability for America's Servicing Company in terms of monetary damages to the borrowers for willful intention not to return all monies and termination of security interest in the property.

I am again writing this letter to your attention for assistance in resolving a fraudulent and predatory lending issue on the above-referenced account and to alert you that a fraudulent loan transaction took place on or before October 12, 2005 involving Fremont Investment and Loan and WCS Lending LLC. Wells Fargo & Co. and/or America's Servicing Company sold, assigned or transfer the mortgage loan to your institution in February 2006. As a threshold in attempting to resolve this matter America's Servicing Company has not address any issues relating to fraudulent acts by Fremont Investment and Loan which has been issued an Order to Cease and Desist from the Federal Deposit Insurance Corporation, dated March 7, 2007. Furthermore all responses relating to America's Servicing Company's position regarding the collection of a fraudulent loan have not been addressed (Forbearance Agreement and/or Loan Modification).

This letter shall serve as our revised terms for a Loan Modification to the Mortgage and Note held by and assigned, sold or transfer to US Bank National Association, as Trustee for Master Asset Backed Securities Trust 2006-FRE1 ("US Bancorp"). As previously communicated with your department, we believe a fraudulent transaction took place prior to closing on the above-referenced loan. Fremont Investment & Loan ("Fremont") is clearly taking the position if any fraudulent transaction was committed by WCS Lending LLC, the independent mortgage broker and they have no responsibility for such actions. We are pursuing our position that a fraudulent act was committed by WCS Lending LLC and Fremont and that the contractual obligations should be null and voided or the mortgage loan should be modify to reflect fraud. In any event, we are stating that we are victims of predatory lending and mortgage discrimination and would like our mortgage to reflect such fraudulent actions.

At the loan approval stage, Fremont has complete and total decision making authority for deciding whether to make a loan. They set the terms of the loan, including the interest rate, loan fees, maturity date, loan-to-value ratio, and loan type (conventional, adjustable rate, FHA, and so on). This is a critical factor and important issue, because predatory lending and mortgage discrimination often involves unfair terms and conditions for loans, and there is no reason to believe that a lending institution may have established policies and procedures of shifting "credit rationing" – where customers perceived to be high risk are denied loans or are shifted toward "risk-based pricing" – where these same customers are simply charged a higher price for their loans. We are requesting an intensive review by state and federal regulators regarding Fremont's underwriting policies and procedures to reveal empirical evidence of mortgage discrimination against minority customers. It is clear that WCS Lending chose Fremont based upon certain underwriting guidelines. Fremont's underwriting loan guidelines should be carefully examined for discrimination in overages, defined as the excess of the final contractual interest rate over the lender's official rate when it first commits to a loan.

We are also requesting state and federal regulators to review America's Servicing Company's policies and procedures regarding taking a harsher stance in foreclosure decisions against minority customers. We will be seeking anecdotal evidence from Wells Fargo & Co. and America's Servicing Company for imposing differential treatment in pursuing foreclosure actions based upon race or ethnicity. Our chief complaint involves the imposing of differential treatment or disparate impact on certain minority customers when decisions are determined based upon race or ethnicity. It is clear that unfair terms and conditions are imposed on minority customers when mortgage loans are structured and interest rates are determined. Fremont may be more likely to charge higher interest rates and/or fees for minority customers they perceived to be risky, rather then denying them financing altogether. Likewise, America's Servicing Company may be more likely to make the decision to foreclosure on minority customers' home because they perceive them to be more risky and unlikely to find a solution for a loan work-out.

Currently, we are requesting assistance from various state and federal governmental agencies to act as a mediator in this matter to avoid costly legal expenses. We had several discussions with senior counsel of US Bancorp and the Federal Deposit Insurance Corporation and Federal Reserve Bank of San Francisco regarding this matter. This proposal reflects all the damages suffered under the current mortgage held by US Bancorp. In the interest of resolving this matter in a timely manner, we are willing to negotiate an amicable settlement. We will be vigorously pursuing our fraud claims under New York law based upon the fact that "a representation of material fact was made," "the falsity of the representation, knowledge by the party making the representation that it was false when made to borrowers and the lender justifiable reliance on the mortgage broker resulting in injury to borrowers".

The element of our fraud claim and fraudulent concealment will be based upon the falsified and forged mortgage application and related documentation and the Contract of Sale between purchasers and sellers signed by employed personnel of WCS Lending and/or Fremont. The fraudulent concealment element of the fraud was to prevent borrowers from discovering the true terms and conditions of the loan until Closing. This deceptive act is a violation of New York General Business Law, Section 349, which deceptive acts were directed at consumers in the State of New York, with the intentionally deceptive act of misleading in a material way and causing financial injury to the borrowers. We will produce strong supporting documentation including an **Affidavit from the Seller (NYS Bar Licensed Attorney)** that there signature was forged on the Contract of Sale and Addendum submitted to the underwriters at Fremont by WCS Lending, which will provide strong credibility to our fraud claim in NYS courts.

Whether WCS Lending or Fremont had malice intent to harm borrowers will be fact findings of the courts. The mere fact of concealment by WCS Lending and Fremont not to disclose and state the true terms and conditions of the loans prior to the Closing date in a reasonable time frame and the discovery of fraudulent signatures of the mortgage application and related disclosure documents provides strong evidence in a fraud claim regarding misrepresentation of material facts, active concealment of material facts and conspiracy to defraud borrowers that WCS Lending and Fremont.

While it is our desire to resolve this matter in an amicable fashion, we are willing to enter into a loan modification agreement only if we can mitigate all of the damages we have suffered under the mortgage currently held by US Bancorp. The table on page 3 reflects in detail our proposed terms for a loan modification we would be willing to agree upon. The fact that America's Servicing Company and/or US Bancorp has not responded in a timely fashion to prior written communications and is not willing to discuss any proposed work-out arrangement to date or waive late charges, certain interest payments or reduce the interest rate (to reflect the 5.00%) does not make us whole or mitigate the damages we have incurred.

The unpaid principal balance is being re-adjusted to reflect the fraudulent mortgage loan transactions originated by Fremont and WCS Lending LLC. It does not address the unfair acts and deceptive business practice of the lender and/or mortgage broker in this matter. As an initial matter of facts, WCS Lending and Fremont have violated the Fair Housing Act. Section 360(b) of the Fair Housing Act prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provisions of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or conditions of such transaction, because of race, color, religion, sex, handicap, familial status, or national origin."

A final condition for entering into the loan modification agreement would be that our credit reports be updated to reflect that there was a dispute with respect to the mortgage since October 12, 2005 through October 31, 2007. This is a final condition for entering into any form of loan modification agreement that would be mandatory. Any corrections and/or amendments to our credit reports would be required to be reported upon execution of the loan agreement promptly and the major credit report agencies should be instructed in writing to amended and or delete all negative or derogatory data from our credit histories and updated to reflect that there was a dispute with respect to the mortgage and all payments have been timely made.

Our current credit reports have been severely damaged while we have been trying to re-negotiate the terms of this mortgage. Had we been properly informed, we would have never entered into such a transaction because it was not beneficial to us since the interest rate of 8.45% was substantially higher than the 7.00% interest rate we were anticipating receiving.

We propose that the terms of the mortgage be revised to reflect the following:

Re-Adjusted Unpaid Principal Balance:  $304, 625.58 *(a)*
Reduction of Interest Rate:                          5.00%
Waive Interest Due:                       $89,010.00
Waive Late Fees:                          $1,583.64
Waive Recoverable Corporate Advance       $1,522.87
Maturity Date                             November 30, 2035 (Fixed 30 years)

Please review our proposed terms with US Bancorp and senior management of America's Servicing Company and advise us in writing on or before October 31, 2007, whether these terms are acceptable.

If these terms are acceptable would you kindly calculate the new monthly payment under the proposed terms?  Our first payment under the modified loan would be due on January 1, 2008.

We look forward to an amicable resolution in this matter.

Very truly yours,

Darrick Grimes

Yolanda Grimes

cc: U.S. Department Housing and Urban Development
    U.S. Comptroller of Currency, Customer Service Group

(a) This amount reflects a deduction of $100,375.00 from the fraudulent transaction, detailed are as follows: $11,365 in broker's fees and miscellaneous fees and $89,010.00 mortgage interest paid year to date from Closing.

October 15, 2007

**VIA FACSIMILE** (866) 453-6315

Ms .Linda Parker
America's Servicing Company.
P.O. Box 10328
Des Moines, Iowa 50306-0328

Re: Loan Number 106-1146013644

Dear Ms. Parker:

This letter shall serve to respond to your previous correspondences in particular to your letter dated October 10, 2007. We are advising you again, that we are exercising our extended rights to rescind the above-referenced loan transaction, and hereby exercise that right pursuant to 15 U.S.C. $$ 1635 et seq. and 1639(j). We retain the right to rescind because of multiple violations of the Truth in Lending Act, 15 U.S.C $$ 1601 et seq. and the Home Ownership and Equity Protection Act, 15 U.S.C $$ 1639 et. seq.

The security interest held by U.S. Bank, National Association, as Trustee for Master Asset Backed Securities Trust 2006-FRE-1 as assignee and successor, the trustee for the securitization pool of mortgages and successor in interest as a result of this transaction is void upon receipt of this recession pursuant to 15 U. S. C. $$ 1635 and 1639(j) and 12 C.F.R. $$ 226.23. Federal regulations require that within twenty days after receipt of this notice of recession you return all monies paid and take any action necessary and appropriate to reflect termination of the security interest.

The Truth in Lending Act gives you the right to cancel any real estate loan transaction within three business days without penalty, **provided**, **however**, that the lender has not violate any provisions of the TLIA. Any violation of the TLIA gives a borrower the legal extended right to rescind the loan against any lender pursuant to 15 U.S.C. $41635 and 12 C.F.R $$ 226.23 for material misrepresentations of loan terms and failure to deliver all material disclosures as required by the Act and Regulation Z$$ 226.17(a).

A borrower is also entitled to an extended right of recession against any assignees of the loan pursuant to 15 U.S.C. $$1641(c) pursuant to the multiple violations under the Truth in Lending Act. A lender and/or a mortgage broker that has intentionally and willfully committed any fraudulently act (s) or intentionally and knowingly induced a borrower to enter into a mortgage related loan transaction by fraud or misrepresenting material terms of a loan or by failing to provide material disclosure requirements regarding a loan has willfully and maliciously deceived and misled a customer in violation of the Deceptive Practices Act, General Business Law $$ 349 under the laws of the State of New York. The misrepresentation to a borrower that the annual interest rate on the subject mortgage or failure to provide true and accurate loan disclosure prior to scheduled Closing is a violation of the Deceptive Practices Act.

You have previously stated in numerous correspondences that America's Servicing Company obtained the servicing of our loan on February 1, 2006. That would be one hundred eight (108) days after the closing date of the fraudulently induced Note and Mortgage originated by Fremont Investment & Loan dated on October 12, 2005. You also stated that the normal recession period would have ended on October 15, 2005. You correctly state what would have been a normal recession period if fraud and misrepresentation of material terms were not involved in the transaction. However, you do not state any of the facts of forged signatures of the Seller and the Purchaser/Borrower on a Contract of Sale or the forged signatures on the fraudulently submitted mortgage application and related documents of the borrowers.

Please advise me if you have contacted (U.S. Bank, N.A.) the investor regarding the serious fraud claims that the borrowers have discovered on this loan that you are currently servicing. It appears that America's Servicing Company has taken the position that servicing of **fraudulently induced** Notes and Mortgages or **criminal activity** by any lender s not a major concern for the investors in the U.S. Bank, National Association, as Trustee for Master Asset Backed Securities Trust 2006-FRE-1 as assignee and successor.

The extended recession period would be trigged upon any willful and intentionally committed fraudulently act by a lender and/or mortgage broker when such acts result in the willful failure to properly make required disclosure clearly in writing in violation of 15 U.S.C. $1632(a) and Federal Reserve Board Regulation Z, 12 C.F. $$226. Therefore the extended recession period would start upon the borrower first discovery and disclosure of fraud by Fremont Investment and Loan and WCS Lending LLC for intentionally failure to deliver all material disclosures as required by the Act and Regulation Z.

While America's Servicing Company's position is that all legal action should be directed to Fremont Investment and Loan and WCS Lending LLC, the Note and security interest in the property were secured by fraud and forge signatures and as such America's Servicing Company is attempting to collect monies on a fraudulent transaction with a Note and security interest that should be nulled and void based upon the facts in this matter.

As previous stated before America's Servicing Company is servicing a loan that was fraudulently induced and a mortgage application and related disclosure documents that were submitted upon false pretense for the very purpose of committing fraud on the borrowers and obtaining a mortgage approval with forged signatures with lender.

Upon completion of these responsibilities, we will perform all necessary actions required by 15 U.S.C $$ 1635 and 12 C.F.R $$ 226.35.

Very truly yours,

Darrick Grimes

# Exhibit I

Letter to Ms. Sachie Tanaka
Federal Deposit Insurance Corporation
Re: Complaint of Darrick and Yolanda Grimes
    Your File No.:  SCC2007W-002073-0
March 28, 2007


# GOODBYE LETTER

01/12/06

12  100-000054  0001

DARRICK GRIMES
23 STACY LEE DR
NEWBURGH NY  12550-8750

Property Address:  23 STACY LEE DR, NEWBURGH, NY 12550
Fremont Investment & Loan Number:  6000182284

## NOTICE OF ASSIGNMENT, SALE, OR TRANSFER OF SERVICING RIGHTS

You are hereby notified that the servicing of your first mortgage loan, that is, the right to collect payments from you, has been assigned, sold, or transferred from Fremont Investment & Loan to AMERICA'S SERVICING COMPANY effective 02/01/2006.

The assignment, sale or transfer of the servicing of your first mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you this notice no later than 15 days before the effective date of transfer or at closing.  Your new servicer must also send you this notice no later than 15 days after this effective date or at closing.

Your present servicer is Fremont Investment & Loan.  If you have any questions relating to the transfer of servicing from your present servicer, call the Customer Service Center between 5:00 a.m. and 6:00 p.m., PST, Monday through Friday.  The number is (800) 776-7511.  This is a toll free number.

Your new servicer is AMERICA'S SERVICING COMPANY.  The business address for your new servicer is P.O. BOX 10328, DES MOINES, IA 50306-0328. The payment address for your new servicer is P.O. BOX 37297, BALTIMORE, MD 21297-3297. If you have any questions relating to the transfer of servicing to your new servicer, call the Customer Service Department at 866-222-5557, MONDAY THROUGH FRIDAY 8:00 AM TO 6:00 PM EST.

The date that your present servicer will stop accepting payments from you is 01/31/2006.  The date your new servicer will start accepting payments from you is 02/01/2006.  Send all payments due on or after that date to your new servicer.  Please note that any automatic drafting/ACH service will also be cancelled as of 01/31/2006.  If you are interested in re-establishing this automatic draft/ACH method with your new servicer, please contact their Customer Service Department after the transfer date.

The transfer of servicing rights may affect the terms of, or the continued availability of, any optional insurance coverage or other membership products.  If you have been paying fees for optional insurance or membership products in addition to your mortgage payment, these services will not be continued.  You should contact the provider of the optional insurance or membership product directly regarding any continued availability.

At year-end, Fremont Investment & Loan will send you a statement reflecting your account activity for the portion of the year we serviced your loan.  Your new servicer will send a statement for the portion of the year they serviced your loan.  You will need to consolidate both statements to obtain the totals you paid for principal and interest.                    (Over)

(continued)

You should be aware of the following information, which is set out in more detail in Section 6 of RESPA (12 U.S.C. 2605):

During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed upon you.

The transfer of servicing rights may affect the terms of, or the continued availability of, any optional insurance coverage or other membership products. If you have been paying fees for optional insurance or membership products in addition to your mortgage payment, those services will not be continued. You should contact the provider of the optional insurance or membership product directly regarding any continued availability.

At year-end, Fremont Investment & Loan will send you a statement reflecting your account activity for the portion of the year we serviced your loan. Your new servicer will send a statement for the portion of the year they serviced your loan. You will need to consolidate both statements to obtain the totals you paid for principal and interest.

You should be aware of the following information, which is set out in more detail in section s of RESPA (12 U.S.C. 2605)

During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. 2605) gives certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgement within 20 business days of receipt of your request.

A "qualified written request" is a written correspondence other than notice on a payment statement or other payment medium supplied by the servicer that includes your name and account number, and your reasons for the request.

Not later than 60 Business Days after receiving your request, your Servicer must make appropriate corrections to your account, and must provide you with a written clarification regarding any dispute. During this 60 Business Day period, your Servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the Servicer from initiating foreclosure if proper grounds exist under the mortgage documents.

A Business Day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

Section 6 of RESPA also provides for damages and costs for individuals Or classes of individuals in circumstances where servicers are shown to have violated the requirements of the Section. You should seek legal advice if you believe your rights have been violated.

Sincerely,
Fremont Investment & Loan

Fremont Investment & Loan is attempting to collect a debt and any information obtained will be used for that purpose.

**ASC**
AMERICA'S SERVICING COMPANY

February 9, 2006

RE:    New Loan Number:  1146013644
       Old Loan Number:  6000182284

005230

Darrick Grimes
Yolanda Grimes
23 Stacy Lee Dr.
Newburgh NY 12550-8750

Dear Valued Customer:

This letter is being sent to inform you that the servicing of your loan has transferred to America's Servicing Company effective February 1, 2006. The transfer of mortgage servicing is a common practice in today's market and does not affect any terms or conditions of your mortgage, other than those provisions related to the servicing of your mortgage. Please refer to the Notice of Assignment for the Real Estate Settlement Procedures Act (RESPA) printed on the reverse side of this letter for more information. America's Servicing Company is committed to providing the quality service you are accustomed to and to ensuring a smooth transition.

Beginning February 1, 2006, please direct payments to America's Servicing Company. America's Servicing Company will send you a billing statement each month after your payment is received. If you wish to make a payment greater than the amount due, please indicate how you wish to have the additional funds applied.

All payments and correspondence regarding your loan should be addressed as indicated below:

| PAYMENT: | CORRESPONDENCE: |
|---|---|
| America's Servicing Company | America's Servicing Company |
| PO Box 37297 | P.O. Box 10328 |
| Baltimore MD 21297-3297 | Des Moines, IA 50306-0328 |

include your old loan number, or America's Servicing Company loan number on all inquiries to assure prompt response to your needs during period. When you send in a check to make your payment, America's Servicing Company may clear the check electronically. Receipt of your check at the address listed on your payment coupon will authorize us to process your payment as an electronic debit to the checking account on which the check was written. If your mortgage check does not clear and is returned, we may withdraw funds from your account electronically. Normally, if this occurs your check will not be returned to you with your bank statement but you can obtain a copy by other means.

If your mortgage payments were drafted from an account this service was discontinued. This may be a good time to consider the convenience of our Automatic Mortgage Payment (AMP106) program and begin deducting your mortgage payment from your checking or savings account. If interested, please call America's Servicing Company Customer Service at 866-222-6557 and reference AMP106 to enroll over the phone. You may also return the enclosed application to the correspondence address referenced above.

If you currently have credit life or other optional insurance, it will not transfer to America's Servicing Company.

No later than January 31st of next year, America's Servicing Company will provide you with a statement reflecting the amount of mortgage interest paid by you to America's Servicing Company.

The goal of America's Servicing Company is to continue to meet your expectations of service. If you have any questions regarding this transfer please call America's Servicing Company Customer Service at 866-222-6557, Monday through Friday 8:00 a.m. to 6:00 p.m. Eastern Standard Time. If you have any questions relating to your loan activity prior to the transfer of servicing, please call your previous servicer below:

Previous Servicer:  Fremont Investment and Loan
Toll Free Phone Number:  1-800-776-7511
Hours of Operation: 6:00 a.m. to 6:00 p.m. PST, Monday through Friday

Sincerely,

*Leesa Whitt-Potter*

Leesa Whitt-Potter
Vice President
Customer Operations

WF66294/DD

877-537-3666 telephone
www.gofremont.com



03/14/06

14  100-001979  0603

DARRICK GRIMES
23 STACY LEE DR
NEWBURGH NY  12550-8750


Property Address:  **23 STACY LEE DR, NEWBURGH, NY 12550**
Fremont Investment & Loan Number:  **6000182344**

## NOTICE OF ASSIGNMENT, SALE, OR TRANSFER OF SERVICING RIGHTS

You are hereby notified that the servicing of your <u>second</u> mortgage loan, that is, the right to collect payments from you, has been assigned, sold, or transferred from **Fremont Investment & Loan** to <u>OCWEN LOAN SERVICING LLC</u> effective <u>04/03/2006.</u>

The assignment, sale or transfer of the servicing of your <u>second</u> mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you this notice no later than 15 days before the effective date of transfer or at closing.  Your new servicer must also send you this notice no later than 15 days after this effective date or at closing.

**Your present servicer is Fremont Investment & Loan.**  If you have any questions relating to the transfer of servicing from your present servicer, call the Customer Service Center between 6:00 a.m. and 6:00 p.m., PST, Monday through Friday.  The number is (800) 776-7511.  This is a toll free number.

**Your new servicer is OCWEN LOAN SERVICING LLC.**  The business address for your new servicer is <u>P.O. BOX 785055, ORLANDO, FL 32878-5055. The payment address for your new servicer is P.O. BOX 6440, CAROL STREAM, IL 60197-6440.</u> If you have any questions relating to the transfer of servicing to your new servicer, call the Customer Service Department at <u>800-74-OCWEN, MONDAY THROUGH THURSDAY, 9:00 AM-9:00 PM EST, FRIDAY 9:00 AM-6:30 PM EST</u>.

The date that your present servicer will stop accepting payments from you is <u>04/02/2006.</u>  The date your new servicer will start accepting payments from you is <u>04/03/2006.</u>  Send all payments due on or after that date to your new servicer.  <u>Please note that any automatic drafting/ACH service will also be cancelled as of 04/02/2006.</u>  If you are interested in re-establishing this automatic draft/ACH method with your new servicer, please contact their Customer Service Department after the transfer date.

The transfer of servicing rights may affect the terms of, or the continued availability of, any optional insurance coverage or other membership products.  If you have been paying fees for optional insurance or membership products in addition to your mortgage payment, these services will not be continued.  You should contact the provider of the optional insurance or membership product directly regarding any continued availability.

At year-end, Fremont Investment & Loan will send you a statement reflecting your account activity for the portion of the year we serviced your loan.  Your new servicer will send a statement for the portion of the year they serviced your loan.  You will need to consolidate both statements to obtain the totals you paid for principal and interest.                                        (Over)

---

**RESIDENTIAL LOAN SERVICE CENTER** | P.O. BOX 19030 | SAN BERNARDINO, CA 92423-9030

*Member FDIC | Serving our customers since 1937*